JUDGE SCHEINDLIN

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK



|   |   |
|---|---|
| VLADIMIR GUSINSKY, TRUSTEE, FOR THE VLADIMIR GUSINSKY LIVING TRUST, Individually And On Behalf Of All Others Similarly Situated, | |
| Plaintiff, | CLASS ACTION COMPLAINT |
| v. | JURY TRIAL DEMANDED |
| BARCLAYS PLC, BARCLAYS BANK PLC, BARCLAYS CAPITAL INC., ROBERT DIAMOND, and MARCUS A P AGIUS | |
| Defendants. | |

1.      Plaintiff Vladimir Gusinsky, Trustee, for the Vladimir Gusinsky Living Trust ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Class Action Complaint (the "Complaint") the following upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Barclays PLC, Barclays Bank PLC, Barclays Capital Inc. (collectively, "Barclays" or the "Company" or "Defendants") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of relevant filings made by Barclays with The Commodity Futures Trading Commission ("CFTC"); (c)  review and analysis of Defendants' other public documents, conference calls and press releases; (d) review and analysis of securities analysts' reports and advisories concerning the Company; (e) information readily obtainable on the Internet; and (f) information obtained from the statement of facts annexed to the Department of Justice's June 26, 2012 deferred prosecution agreement, findings of fact issued by the CFTC, and

similar findings issued by the Financial Services Authority of the United Kingdom (sometimes "UK") dated June 27, 2012.

2.      Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.  Most of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control.

## NATURE OF THE ACTION

3.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants, who purchased Barclays sponsored American Depository Receipts on an American securities exchange between July 10, 2007 and June 27, 2012, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

## BACKGROUND AND MARKET INFORMATION

### *What is Libor?*

4.      Each morning, bankers huddle together and consider how much money they need to borrow from other banks to shore up their own bank's balance sheet and generally to engage in day-to-day banking activities.  In other meetings, bankers who are holding excess cash decide at what rate they are willing to lend money to their peers.

5.      In order to place uniformity and predictability into the system, Libor – the London Inter-Bank Offered Rate – was created to formally measure the cost of this inter-bank lending, setting out the average rate banks pay to borrow from one another on any given day.

6.      There are 150 different Libor rates calculated on a daily basis by *Thomson Reuters* for 15 borrowing periods ranging from overnight to 12 months, spanning 10 different currencies.

7.      These rates are calculated based on data submitted by a panel of major banks – the number of banks on the panel varies according to the currency. The UK's sterling rate, for example, is based on submissions from 16 banks, while the US dollar rate on the other hand is calculated using a panel of 18 banks.

8.      Each bank is asked the same question: "At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11am London time?"

9.      Essentially, the question is if a bank had to borrow money from a fellow bank, how much would the latter charge the first bank for the loan?

10.     Once the rates are submitted, the four highest and four lowest rates are tossed out, and those left are used to calculate the Libor rate which, along with the individual rates submitted by each bank, are then published before midday UK time every weekday.

11.     This process was first introduced by the British Banker's Association ("BBA") in 1986, and is overseen by the Foreign Exchange and Money Markets Committee.

12.     Libor is a tool to measure risk within the banking system as a whole and it may be more surgically applied to test a particular bank's creditworthiness.  When a bank lends to a customer, it fixes the interest rate and other terms premised on an assessment of the borrower's ability to repay the loan.  The greater the risk, the higher the rate the bank will charge to assume the risk.  The opposite is true: the lower the credit risk, the lower the rate the bank will charge to take on the risk.

13.     It is by no means an oversimplification to say that one bank's assessment of another bank's ability to repay a loan is similar to the assessment made when weighing whether to loan money to a customer.

14.     When viewed as a measure of the health of the banking sector, Libor reflects the strength of the banking sector as a whole and as the BBA states it "acts as a barometer of how global markets are reacting to the prevailing conditions".

15.     A good example of this is that during the credit crisis, Lehman meltdown, Bear Stearns debacle, and the other financial train wrecks that occurred during the last five years, Libor rates spiked – reflecting overall uncertainty (and in some cases outright panic) in the market over whether certain banks were solvent and/or could continue to finance their heavily leveraged balance sheets.

16.     Libor is not only important to traders on Wall Street and the City of London ("City"); its calculated value on a day-by-day basis is equally important to Main Street – many mortgages, student loans, and consumer loans are linked to, and rise and fall with, movements in Libor.

17.     Given that Libor is not an esoteric economic measurement valuing an obscure metric only material to economists, it is critical that those banks that participate in the Libor fixing process act fairly, transparently, and try in good faith to fix these important rates at levels that accurately reflect the inherent and actual risk in the market place.

18.     Barclays and its officers and directors failed to do this – Defendants did not act fairly, transparently, and try in good faith to fix these important rates at levels that accurately reflect the inherent and actual risk in the market place.  Defendants, instead, admittedly participated in an illegal scheme to manipulate the Libor interest rates for the benefit of Barclays' traders and to make Barclays appear financially healthier than it was during the relevant time period.

19.     Moreover, apart from participating in an illegal scheme to manipulate rates in a way that would allow Defendants and other bankers to exploit the market, the Defendants lied to the Company's shareholders about the Company's purported compliance with their principles and operational risk management processes and repeatedly told shareholders that Barclays was a model corporate citizen even though at all relevant times it was flouting the law.

20.     As will be detailed below, Barclays violated the law because it fixed unfair Libor rates that exploited borrowers and other market participants and caused its stockholders to incur substantial economic loss.

21.     On June 27, 2012, Barclays was found by US and UK regulators to have manipulated or "fixed" its rate submissions.  Barclays' top management essentially admitted to the Bank's malfeasance.  In an open letter to the chairman of the Treasury Select Committee, Bob Diamond, chief executive of Barclays, disclosed their illegal conduct.

22.     First, a number of individual traders manipulated the bank's interest rate submissions in order to boost their own trading desk's profits. Operating purely for their own benefit, Diamond said this conduct was wholly inappropriate.

23.     Second, that during the credit crisis Barclays reduced its Libor submissions to protect the reputation of the bank from negative speculation, which arose as a result of Barclays' higher rate submissions in comparison to other banks – i.e. the bank wanted to make itself look stronger relative to other banks in order to keep its borrowing costs down and market reputation up.

24.     These admissions caused the Company's ADRs initially to fall by 12%, from $12.33 per share to $10.84 per share on over 22 million shares traded.  On the following trading

date, the Company's stock price fell an additional 5%, to $10.30 per share, on over 14 million shares traded.

**PARTIES**

25.     Plaintiff, Vladimir Gusinsky, Trustee, for the Vladimir Gusinsky Living Trust, purchased Barclays ADRs on the New York Stock Exchange during the Class Period as set forth in the attached Certification.

26.     Defendant Barclays is located at 1 Churchill Place, London, E14 5HP, United Kingdom.   Founded in 1896, Barclays provides various financial products and services worldwide. It offers retail and commercial banking, credit cards, investment banking, wealth management, and investment management services.  Barclays securities trade on the New York Stock Exchange as American Depositary Receipts ("ADR").  An ADR is a negotiable security that represents securities of a non-US company that trades in the US financial markets. Securities of a foreign company that are represented by an ADR are called American depositary shares (ADSs).  Barclays Capital Inc. has offices within this District including at 200 Park Avenue and 745 Seventh Avenue, New York, NY.  Barclays Bank PLC has an office within this District at 745 Seventh Avenue, New York, NY.  Upon information and belief, Barclays PLC also has an office within this District at 745 Seventh Avenue, New York, NY.

27.     Barclays trades as a sponsored Level III ADR.  A Level 3 American Depositary Receipt program is the highest level a foreign company can sponsor. Because of this distinction, the company is required to adhere to stricter rules that are similar to those followed by U.S. companies.  Setting up a Level 3 program means that the foreign company is not only taking steps to permit shares from its home market to be deposited into an ADR program and traded in the U.S.; it is actually issuing shares to raise capital. In accordance with this offering, the company is required to file a Form F-1, which is the format for an Offering Prospectus for the

shares. It also must file a Form 20-F annually and must adhere to U.S. GAAP standards or IFRS as published by the IASB. In addition, any material information given to shareholders in the home market must be filed with the SEC through Form 6K.

28.     Foreign companies with Level 3 programs will often publish materials that are more informative and more accommodating to their U.S. shareholders because they rely on them for capital. Overall, foreign companies with an established Level 3 program are the easiest on which to find information.

29.     Defendant Marcus Agius was the Company's Chairman until his recent resignation though it is reported that he will remain at the bank until a successor management group is appointed: Agius joined the Barclays Board in September 2006 as a non-Executive Director and was appointed Chairman on January 1, 2007. Agius has extensive City and commercial experience, having spent over 40 years in the banking sector, holding senior positions such as Chairman of Lazard in London and Deputy Chairman of Lazard LLC. Agius also has non-executive experience that includes a number of non-executive directorships and the chairmanship of BAA plc from 2001 until 2006.  He is also intimately familiar with Libor having served as Chairman of the British Bankers' Association since 2010; Senior Independent Director of the BBC since 2006; Member of the Executive Committee of the IIEB; Business Ambassador for UK Trade and Investment; Member of the Advisory Council of TheCityUK; Member of the Takeover Panel; Chairman of the Trustees of the Royal Botanic Gardens, Kew; Chairman of The Foundation and Friends of the Royal Botanic Gardens, Kew.

30.     His Barclays committee memberships include Chairman of the Board, Corporate Governance and Nominations Committee since January 2007; Member of the Board

Remuneration Committee since January 2007; and Chairman of the Board, Citizenship Committee since August 2011.

31.     Defendant Robert "Bob" Diamond, was the Chief Executive, and an Executive Director, of the Company until his recent resignation in the wake of the Libor scandal.  He became Chief Executive on January 1, 2011, having previously held the position of President of Barclays PLC and Chief Executive of Corporate & Investment Banking and Wealth Management, comprising Barclays Capital, Barclays Corporate and Barclays Wealth.  He became an Executive Director in June 2005 and has been a member of the Barclays Executive Committee since September 1997.

32.     Diamond's other principal external appointments include non-Executive Director of BlackRock, Inc.; Chairman, Board of Trustees of Colby College, Waterville, Maine; Chairman, Old Vic Productions, Plc; Trustee, The Mayor's Fund for London; Member of the Advisory Board, Judge Business School at Cambridge University; Member of International Advisory Board, British-American Business Council; Life Member of The Council on Foreign Relations; Member of The International Advisory Board, The Atlantic Council; and Director, Imperial War Museum Foundation.

33.     Agius & Diamond are together referred to hereinafter as the "Individual Defendants."

34.     Each of the Individual Defendants:

(a)     was directly involved in the day-to-day operations of the Company at the highest levels;

(b)     was privy to confidential proprietary information concerning the Company and its business and operations;

(c)     was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(d)     knew, or recklessly disregarded the fact, that the false and misleading statements were being published concerning the Company; and

(e)     approved or ratified these statements in violation of the federal securities laws.

35.     As officers, directors and controlling persons of a publicly-held company whose common stock is and was registered with the SEC pursuant to the Exchange Act, and was traded on the NYSE as an ADR and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate accurate and truthful information promptly with respect to the Company's financial condition and to correct any previously-published statements that were or had become materially misleading or untrue to allow the market price of the Company's publicly-traded stock to reflect truthful and accurate information.

36.     Barclay's is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

37.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Barclays under *respondeat superior* and agency principles.

## **JURISDICTION**

38.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

39.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

40.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as a substantial part of the conduct complained of herein occurred in this District.

41.    In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## SUBSTANTIVE FACTUAL ALLEGATIONS OF FRAUD

42.    Throughout the Class Period, in its SEC filings and to the market in general, Barclays falsely and misleadingly represented that it was compliant with all applicable securities laws and regulations, was adhering to the highest standards of good corporate governance, and had taken and was taking actions to improve its operational risk controls.

43.    On March 26, 2007, the Company filed its 2006 annual report on Form 20-F with the SEC (hereinafter "2006 annual report" or "2006 Form 20-F").

44.    The 2006 annual report was effective during part of the Class Period.

45.    In the *Corporate Responsibility* section on page 139 of the 2006 annual report, the Company stated in pertinent part:

> Corporate Responsibility
> Responsible Banking
>
> For Barclays, corporate responsibility is embodied in the concept of 'responsible banking' – reflecting its place at the heart of our strategy as an integral part of the way in which we do business. Firmly based on the clear values enshrined in our Guiding Principles, responsible banking means making informed, reasoned and ethical decisions in our business dealings with customers, clients, employees and our other stakeholders.

> Our Guiding Principles of Winning Together, Customer Focus, The Best People, Pioneering and Trusted describe how we expect our employees to behave with external stakeholders and each other. Responsible banking is the approach by which we aim to progress towards sustainability – recognising that we will succeed in our strategic and financial goals only if we have a strong commitment and focus on achieving sustainable outcomes for all stakeholders. . . .
>
> Ethical indices
>
> Barclays is a long-standing member of the Dow Jones Sustainability and FTSE4Good ethical indices. Our ranking in the Business in the Community Corporate Responsibility Index rose to 3rd position out of 131 companies.

46.     The 2006 annual report contains many statements that the Company manages its operational risk and is "implementing improved management and measurement approaches for operational risk to strength control, improve customer service and minimize operating losses."

47.     The 2006 annual report states at page 114 that the Board is:

> . . . responsible for ensuring that management maintain a system of internal control that provides assurance of effective and efficient operations, internal financial controls and compliance with law and regulation.

48.     The Individual Defendants were each members of the Board.

49.     The 2006 annual report states at page 86 concerning "Operational risk and business risk management":

> Operational risk and business risk management
>
> Operational and business risks are inherent in Barclays operations and are typical of any large enterprise.
>
> **Operational risk** is the risk of direct or indirect losses resulting from inadequate or failed internal processes or systems, human factors, or from external events. Major sources of operational risk include: operational process reliability, IT security, outsourcing of operations, dependence on key suppliers, implementation of strategic change, integration of acquisitions, fraud, error, customer service quality, regulatory compliance,

recruitment, training and retention of staff, and social and environmental impacts. . . . [business risk description omitted]

Barclays is committed to the advanced management of operational and business risks. In particular, ***we are implementing improved management and measurement approaches for operational risk to strengthen control, improve customer service and minimise operating losses.*** In addition, this investment is being made to improve risk sensitivity, to enhance the Operational Risk Capital model and to obtain approval to apply the Advanced Measurement Approach under the Basel II Accord when that option first becomes available in 2008. ***Barclays works closely with peer banks to benchmark our internal Operational Risk practices and to drive the development of advanced Operational Risk techniques across the industry.*** . . .

Responsibility for and control of operational risk

Barclays has a Group Operational Risk Framework, which is consistent with and part of the Group Internal Control and Assurance Framework. Minimum control requirements have been established for all key areas of identified risk. The risk categories relevant to operational and business risks are: Financial Crime, Financial Reporting, Taxation, Legal, Operations, People, Regulatory Compliance, Technology, Brand Management, Change, Corporate Responsibility and Strategic. (emph. added).

50.     Subsequent Barclays annual reports contain essentially identical statements that Barclays knew its legal and regulatory requirements and was in compliance with them, and that Barclays was implementing and had implemented improved operational controls.

51.     On March 26, 2008, the Company filed its 2007 annual report on Form 20-F with the SEC (hereinafter "2007 annual report" or "2007 Form 20-F").

52.     The 2007 annual report was in effect during part of the Class Period.

53.     In the *Corporate Sustainability* section on page 58 of the 2007 Form 20-F, the Company stated in pertinent part:

For Barclays, there are two separate but mutually dependent aspects to sustainability. One is our duty as a bank to provide sound and enduring returns for our shareholders, and the best possible services for our customers. The other is our responsibility to conduct our global business

ethically, and with full regard to wider social and environmental considerations. Our ambition is to develop both of these complementary strands as we move forward.

In all of this, the customer is absolutely central. If we are to make sustainable banking successful, and successful banking sustainable, we must put our customers at the heart of everything we do, and build our services around them. We must earn – and keep – their trust by ensuring that the products we sell are understandable and appropriate.

54.     The *Risk Factors* section contains a subsection on page 64 of the 2007 annual report concerning the Company's *Legal Risk*, which stated in pertinent part:

The Group is subject to a comprehensive range of legal obligations in all countries in which it operates. As a result, the Group is exposed to many forms of legal risk, which may arise in a number of ways. Primarily: the Group's business **may not** be conducted in accordance with applicable laws around the world; (emph. added.)

55.     The *Corporate Governance* section on page 117 of the 2007 Form 20-F, includes a statement signed by defendant Agius, concerning Barclays purported compliance with law and regulations, which stated in pertinent part:

We report below on how we have complied in 2007 with the UK Combined Code on Corporate Governance (the Code). We are committed to promoting good corporate governance. We seek to be at the forefront of global best practice and to respond, in a timely fashion, to corporate governance developments. To gain a greater understanding of the corporate governance framework within Barclays I encourage you to read 'Corporate Governance in Barclays', which is available from our website. . . .

Barclays has American Depositary Receipts listed on the New York Stock Exchange (NYSE) and is therefore subject to the NYSE's Corporate Governance rules (NYSE Rules). As a non-US company listed on the NYSE, we are exempt from most of the NYSE Rules, which domestic US companies must follow. We are required to provide an Annual Written Affirmation to the NYSE of our compliance with the applicable NYSE Rules and also to disclose any significant ways in which our corporate governance practices differ from those followed by domestic US companies listed on the NYSE. As our main listing is on the London Stock Exchange, we follow the UK's Combined Code. Key differences between the NYSE Rules and the Code are set out later in this report.

56.    The Company made substantially similar statements of compliance on subsequent Form 20-Fs that were in effect throughout the Class Period.

57.    The *Corporate Governance* section also contains a subsection on page 119 of the 2007 annual report concerning the *Role of the Board*, which stated in pertinent part:

> The role and responsibilities of the Barclays Board, which encompass the duties of Directors described above, are set out in Corporate Governance in Barclays. The Board is responsible to shareholders for creating and delivering sustainable shareholder value through the management of the Group's businesses. It therefore determines the goals and policies of the Group to deliver such long-term value, providing overall strategic direction within a framework of rewards, incentives and **controls**.
>
> The Board is also responsible for ensuring that **management maintains a system of internal control that provides assurance of effective and efficient operations, internal financial controls** and compliance with law and regulation. (emph. added).

58.    The *Corporate Governance* section on page 144 of the Form 2007 20-F, includes another statement signed on behalf of the Board by Agius, which stated :

> The Group Chief Executive, John Varley, and the Group Finance Director, Chris Lucas, conducted with Group Management an evaluation of the effectiveness of the design and operation of the Group's disclosure controls and procedures as at 31st December 2007, which are defined as those controls and procedures designed to ensure that information required to be disclosed in reports filed or submitted under the US Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the US Securities and Exchange Commission's rules and forms. As of the date of the evaluation, the Group Chief Executive and Group Finance Director concluded that the design and operation of these disclosure controls and procedures were effective. The Group Chief Executive and Group Finance Director also concluded that no significant changes were made in our internal controls or in other factors that could significantly affect these controls subsequent to their evaluation.

59.    The Company made substantially similar statements, signed by Agius, on subsequent Form 20-Fs which were in effect throughout the Class Period.

60.     The 2007 annual report contains statements at page 93 virtually identical to the statements in the 2006 annual report concerning Barclays' operations risk and its actions to strengthen controls.

> Risk management
> Operational risk management
>
> Operational risk management
>
> Operational risk is the risk of direct or indirect losses resulting from human factors, external events, and inadequate or failed internal processes and systems.
>
> Operational risks are inherent in Barclays operations and are typical of any large enterprise. Major sources of operational risk include: operational process reliability, IT security, outsourcing of operations, dependence on key suppliers, implementation of strategic change, integration of acquisitions, fraud, human error, customer service quality, regulatory compliance, recruitment, training and retention of staff, and social and environmental impacts.
>
> Barclays is committed to the advanced management of operational risks. In particular, ***it has implemented improved management and measurement approaches for operational risk to strengthen control, improve customer service and minimise operating losses.*** Barclays was granted a Waiver to operate an Advanced Measurement Approach (AMA) under Basel II, which commenced in January 2008.
>
> The Group's operational risk management framework aims to:
> –  Understand and report the operational risks being taken by the Group.
> –  Capture and report operational errors made.
> –   Understand and minimise the frequency and impact, on a cost benefit basis, of operational risk events.
>
> Barclays works closely with peer banks to benchmark our internal Operational Risk practices and to drive the development of advanced Operational Risk techniques across the industry. It is not cost effective to attempt to eliminate all operational risks and in any event it would not be possible to do so. Events of small significance are expected to occur and are accepted as inevitable; events of material significance are rare and the Group seeks to reduce the risk from these in a framework consistent with its agreed Risk Appetite.
>
> Organisation and structure

Barclays has a Group Operational Risk Framework, which is consistent with and part of the Group Internal Control and Assurance Framework. Minimum control requirements have been established for all key areas of identified risk by 'Principal Risk' owners (see page 85). The risk categories relevant to operational risks are Financial Crime, Financial Reporting, Taxation, Legal, Operations, People, Regulatory, Technology and Change. In addition the following risk categories are used for business risk: Brand Management, Corporate Responsibility and Strategic. (emph. added).

61.     The 2007 annual report went beyond the 2006 annual report in that the 2007 annual report stated that Barclays "**has implemented** improved management and measurement approaches for operational risk to strengthen control," while the 2006 annual report stated that Barclays was in the process of "implementing" such controls.

62.     Concerning Libor, the 2007 annual report stated at page 66:

Liquidity risk

Bank funding markets and general liquidity in credit markets came under pressure in 2007. In the second half, some money market participants faced difficulties in obtaining funding beyond one week, and term LIBOR premiums rose despite the helpful provision of liquidity by central banks. The cost of longer-term bank funding and capital also increased, and funding channels such as securitisation and covered bond issuance became significantly constrained. Despite these developments, the Group's liquidity position remained strong due to its deep retail funding base, its diversity of institutional funding sources across tenors, counterparties and geographies and its limited reliance on securitisation as a funding source.

63.     On March 24, 2009, the Company filed its annual report for 2008 on Form 20-F with the SEC ("2008 annual report" or "2008 Form 20-F").

64.     The 2008 annual report was in effect during part or all of the Class Period.

65.     In the *Corporate Sustainability* section on page 54 of the 2008 Form 20-F, the Company stated in pertinent part:

We acknowledge and accept that we have an obligation to be a responsible global citizen, and our sustainability efforts help us to achieve this. This

means managing our business and supply chain to improve our social, economic and environmental impact, and **doing business ethically**. (emph. added)

66.     The *Risk Factors* section of the 2008 annual report contains a subsection on page 60 concerning the Company's *Legal Risk*, which stated in pertinent part:

> The Group is subject to a comprehensive range of legal obligations in all countries in which it operates. As a result, the Group is exposed to many forms of legal risk, which may arise in a number of ways. Primarily: the Group's business **may not** be conducted in accordance with applicable laws around the world (emph. added).

67.     The *Financial Crime Risk Management* section on page 120 of the 2008 annual report stated in pertinent part:

> Barclays adopts an integrated approach to financial crime risk management. In line with the five-step risk management model, Group Financial Crime Management (GFCM) has the responsibility to direct, assess, control, report and manage/challenge financial crime risks, which are structured into three strands: anti-money laundering (AML) and sanctions; fraud; and security.

> Each business unit within Barclays develops its own capability to tackle financial crime, providing regular reporting on performance, incidents and the latest trends impacting business. This integrated model allows us to:

> --Develop a clear profile of financial crime risk across the Group

> --Share intelligence, adopt common standards and respond promptly to emerging issues

> --Drive forward law enforcement and other government initiatives

> --Benchmark ourselves against other financial institutions facing similar challenges

68.     The Company's statements concerning financial crime risk management in its 2008 annual report continued on page 121 to address *Fraud Risk*:

> The Group establishes and operates a fraud risk framework which measures overall fraud risk exposure and controls. Together with the Group-wide policies and reporting, this structure directs how fraud is managed.

GFCM is responsible for delivering the overall Group Fraud Strategy by providing oversight to Group and business units in the management of fraud risk.

The Group Fraud Strategy is designed to:

--Contain existing risks through effective measurement, monitoring and robust anti-fraud systems, in line with the expansion of the bank

--Identify emerging threats in order that effective fraud controls are embedded across the Group along with increased capability to manage risk

--Identify and manage fraud incidents, ensuring regulatory and legal conformance, appropriate escalation and resolution of control issues to prevent further loss

--Share fraud trends, intelligence and knowledge across the Group and between government bodies, law enforcement agencies, financial institutions and other key stakeholders

GFCM assesses fraud risk across existing and emerging products, channels, and jurisdictions. It has embedded a robust fraud reporting framework which tracks current exposure to identify risk and ensure adequate risk management capability and controls.

69.     The *Corporate Governance* section of the 2008 annual report also contains a subsection on page 145 concerning the *Role of the Board*, which stated in pertinent part:

The Board is responsible to shareholders for creating and delivering sustainable shareholder value. In order to achieve this it must establish the objectives and policies of the Group that will deliver long-term value. The Board sets the overall strategic direction and ensures it is delivered within an appropriate framework of reward, incentive and **control**.

Another key responsibility of the Board is **to ensure that management maintains a system of internal control that provides assurance of effective and efficient operations, internal financial controls** and compliance with law and regulation. **The Board considers the Group's business and reputation and ensures that the controls in place are appropriate to the materiality of financial and other risks** and the relative costs and benefits of implementing specific controls. (emph. added).

70.     The *Corporate Governance* section of the 2008 annual report also contains a subsection on page 155 entitled *Code of Ethics*, which stated in pertinent part:

The NYSE Rules require that domestic US companies adopt and disclose a code of business conduct and ethics for Directors, officers and employees. Rather than a single consolidated code as envisaged in the NYSE Rules, we have a number of 'values based' business conduct and ethics policies which apply to all employees. In addition, we have adopted a Code of Ethics for the Group Chief Executive and senior financial officers as required by the US Securities and Exchange Commission.

71.    Concerning operational risk management, the Barclays 2008 annual report contains statements essentially identical to prior annual reports.

Risk management
Operational risk management
Organisation and structure

Operational risk is the risk of direct or indirect losses resulting from human factors, external events, and inadequate or failed internal processes and systems. Operational risks are inherent in the Group's operations and are typical of any large enterprise. Major sources of operational risk include: operational process reliability, IT security, outsourcing of operations, dependence on key suppliers, implementation of strategic change, integration of acquisitions, fraud, human error, customer service quality, regulatory compliance, recruitment, training and retention of staff, and social and environmental impacts. Barclays is committed to the advanced measurement and management of operational risks**. *In particular, it has implemented improved management and measurement approaches for operational risk to strengthen control, improve customer service and minimise operating losses.* **Barclays was granted a Waiver to operate an Advanced Measurement Approach (AMA) under Basel II, which commenced in January 2008.

The Group's operational risk management framework aims to:

– Understand and report the operational risks being taken by the Group.

– Capture and report operational errors made.

– Understand and minimise the frequency and impact, on a cost benefit basis, of operational risk events.

**Barclays works closely with peer banks to benchmark our internal operational risk practices and to drive the development of advanced operational risk techniques across the industry.** It is not cost effective to attempt to eliminate all operational risks and in any event it would not be possible to do so. Events of small significance are expected to occur and are accepted as inevitable; events of material significance are rare and

the Group seeks to reduce the risk from these in a framework consistent with its agreed Risk Appetite.  (emph. added).

72.     Concerning Libor, the 2008 annual report states at page 275 under "Notes to the Accounts:"

> [note] 50 Fair value of financial instruments. . . .
>
> Valuations based on unobservable inputs. . . .
>
> *(b) Exotic products*. . . .
>
> *(iv) Spreads to discount rates*
> For certain product types, particularly credit related such as asset backed financial instruments, the discount rate is set at a spread to the standard discount (LIBOR) rates. In these cases, in addition to standard discount rates, the spread is a significant input to the valuation. For some assets this spread data can be unobservable.

73.     On March 22, 2010, the Company filed its 2009 annual report on Form 20-F with the SEC ("2009 annual report" or "2009 Form 20-F").

74.     The 2009 annual report was in effect during part or all of the Class Period.

75.     In the *Corporate Sustainability* section of the 2009 annual report on page 53, the Company stated in pertinent part:

> We have remained 'open for business' throughout the downturn, and at the same time have reinforced our commitment to be a responsible lender, providing access to credit and support while maintaining prudent lending standards. We are focused on offering a strong safe and responsible service that contributes to the economic progress of society as a whole.
>
> As well as supporting our customers and clients, and the communities in which we operate, we have:  . . . aimed to operate as a responsible global citizen.

76.     The *Risk Factors* section of the 2009 annual report contains a subsection on page 58 concerning the Company's *Legal Risk*, which stated in pertinent:

> The Group is subject to a comprehensive range of legal obligations in all countries in which it operates. As a result, the Group is exposed to many forms of legal risk, which may arise in a number of ways. Primarily: the

Group's business **may not** be conducted in accordance with applicable laws around the world. (emph. added).

77.    The *Operational Risk Management* section on page 106 of the 2009 annual report stated in pertinent part:

>    Operational risk is the risk of direct or indirect losses resulting from human factors, external events, and inadequate or failed internal processes and systems. Operational risks … include:… fraud, … regulatory compliance, and social and environmental impacts. Barclays is committed to the advanced measurement and management of operational risks. In particular, **it has implemented improved management and measurement approaches for operational risk to strengthen control, improve customer service and minimise operating losses …** The Group's operational risk management framework aims to: Understand and report the operational risks being taken by the Group.  (emph. added).

78.    The *Risk Management Supervision and Regulation* section of the 2009 annual report on page 118 touted how well regulated Barclays was and stated in pertinent part:

>    The Group's operations, including its overseas offices, subsidiaries and associates, are subject to a significant body of rules and regulations that are a condition for authorization to conduct banking and financial services business, constrain business operations and affect financial returns. These include reserve and reporting requirements and conduct of business regulations. These requirements are imposed by the relevant central banks and regulatory authorities that supervise the Group in the jurisdictions in which it operates. The requirements reflect global standards developed by, among others, the Basel Committee on Banking Supervision and the International Organisation of Securities Commissions. They also reflect requirements derived from EU directives.

79.    The 2009 annual report continues to state that in the "United States, Barclays PLC, Barclays Bank PLC and Barclays US banking subsidiaries are subject to a comprehensive regulatory structure involving numerous statutes, rules and regulations."

80.    The Company continued to tout how well regulated it was on page 119 of the *Risk Management Supervision and Regulation* where it stated that, "Barclays Capital Inc. and the other subsidiaries that conduct these operations are regulated by a number of different

government agencies and self-regulatory organizations, including the SEC and the Financial Industry Regulatory Authority (FINRA)."

81.     The *Corporate Governance* section on page 127 of the Form 20-F, includes a statement signed by Group Chairman Marcus Agius which stated in pertinent part:

> The report that follows sets out how we have complied with the UK Combined Code on Corporate Governance (the Code) and also gives further details of any enhancements made during the year and in particular, in response to the recommendations of the Walker Review.

82.     The theme of Barclays' legal and regulatory compliance continued on page 129 of the *Corporate Governance* section of the 2009 annual report, where the Company stated that the "role of the Group Chairman is to lead and manage the Board to ensure it discharges its legal and regulatory responsibilities fully and effectively."

83.     Once again, the *Corporate Governance* section of the 2009 annual report included a subsection on page 145 entitled *Code of Ethics*, which stated in pertinent part:

> The NYSE Rules require that domestic US companies adopt and disclose a code of business conduct and ethics for Directors, officers and employees. Rather than a single consolidated code as envisaged in the NYSE Rules, we have a number of 'values based' business conduct and ethics policies which apply to all employees. In addition, we have adopted a Code of Ethics for the Group Chief Executive and senior financial officers as required by the US Securities and Exchange Commission.

84.     The *Corporate Governance* section of the 2009 annual report also contained a statement, on page 148, that the Company wanted to encourage:

> "behaviour consistent with the principles that guide Barclays business," including, "acting with the highest levels of integrity to retain the trust of customers, shareholders, other external stakeholders and colleagues," and "taking full responsibility for decisions and actions Reflecting the operation of independent, robust and evidence based governance and control and complying with relevant legal and regulatory requirements."

85.     On March 21, 2011, the Company filed its 2010 annual report on Form 20-F with the SEC ("2010 annual report" or "2010 Form 20-F").

86.     The 2010 annual report was in effect during part or all of the Class Period.

87.     The *Citizenship* section on page 40 of the 2010 Form 20-F features the following

quote from Chief Executive Bob Diamond:

> "Our role is to help improve the lives of our customers. We must provide
> mortgages, allow businesses to invest and create jobs, protect savings, pay
> tax, be a good neighbour in the community while also generating positive
> economic returns for our investors"

88.     The *Risk Management* section of the 2010 annual report on page 54 made the

following statement concerning *Legal Risk*:

> The General Counsel for each business unit is responsible for management
> and reporting of Legal Risk. The adequacy and effectiveness of the
> controls operated in the business units is overseen by the Group Legal
> Executive Committee.
>
> Specific risks relating to Legal Risk are reported on a quarterly basis to the
> Executive Committee and the Board

89.     The *Directors' Report* on page 129 of the 2010 Form 20-F addressed the

directors' role in maintaining *internal control* at the Company, stating in pertinent part:

> The Directors have responsibility for ensuring that management maintain
> an effective system of internal control and for reviewing its
> effectiveness… Throughout the year ended 31st December 2010, and to
> date, the Group has operated a system of internal control which provides
> reasonable assurance of effective and efficient operations covering all
> controls, including financial and **operational controls and compliance
> with laws and regulations.** (emph. added).

90.     The *Corporate Governance* section on page 134 of the 2010 Form 20-F, includes

a statement signed by Group Chairman Marcus Agius, which addressed his role at the Company,

stating, "[m]y role as Group Chairman is to provide leadership to the Board, ensuring that it

satisfies its legal and regulatory responsibilities."

91.     Concerning operational risk management, the 2010 annual report states at page

114 in relevant part:

Risk management
Operational risk management

**Operational Risk is defined as the risk of direct or indirect impacts resulting from human factors, inadequate or failed internal processes and systems** or external events. Operational risks are inherent in the Group's business activities and are typical of any large enterprise. It is not cost effective to attempt to eliminate all operational risks and in any event it would not be possible to do so. Losses from operational risks of small significance are expected to occur and are accepted as part of the normal course of business. Those of material significance are rare and the Group seeks to reduce the likelihood of these in accordance with its Risk Appetite.

**Overview**
**The management of Operational Risk has two key objectives:**
**– To minimise the impact of losses suffered in the normal course of business (expected losses) and to avoid or reduce the likelihood of suffering a large extreme (or unexpected) loss.**
**– To improve the effective management of the Barclays Group and strengthen its brand and external reputation.**

Barclays is committed to the management and measurement of operational risk and was granted a waiver to operate an Advanced Measurement Approach (AMA) for Operational Risk under Basel II, which commenced in January 2008. The majority of the Group calculates regulatory capital using AMA, however in specific areas we apply the Standardised approach or Basic Indicator approach. In certain joint ventures and associates, Barclays may not be able to apply the AMA.

Areas where the roll-out of AMA is still continuing and the Standardised approach is currently applied are Barclays Bank Mozambique, National Bank of Commerce (Tanzania), and the portfolio of assets purchased from Woolworths Financial Services in South Africa, Citi Cards and Standard Life Bank, while these are integrated into our infrastructure.

Areas where the Group is working towards the rollout of AMA and the Basic Indicator approach is applied are Barclays Bank PLC Pakistan, Barclays Bank LLC Russia, Barclays Investment and Loans India Limited, the ABSA Africa businesses and the 'new-to-bank' business activities acquired from Lehman Brothers.

**Barclays works to benchmark its internal operational risk practices with peer banks** and to drive the development of advanced operational risk techniques across the industry. . . .

- 24 -

**Barclays operates within a robust system of internal control that enables business to be transacted and risk taken without exposure to unacceptable potential losses or reputational damage.** To this end, Barclays has implemented the Group Internal Control and Assurance Framework (GICAF) which is aligned with the internationally recognised Committee of Sponsoring Organisations of the Treadway Commission Framework (COSO).  (emph. added).

92.     On March 30, 2012, the Company filed its 2011 annual report on Form 20-F with the SEC ("2011 annual report" or "2011 Form 20-F").

93.     The 2011 annual report was in effect during part or all of the Class Period.

94.     The *Corporate Governance* section on page 4 of the 2011 Form 20-F, includes a statement addressed to shareholders, signed by Group Chairman Marcus Agius, which stated in pertinent part:

> The fundamental purpose of any company is the creation and delivery of long-term sustainable shareholder value in a manner consistent with its obligations as a responsible corporate citizen. …. We continue therefore to review our corporate governance processes and practices carefully to ensure they are fit for purpose and have again conducted a rigorous, externally facilitated Board Effectiveness Review during 2011. . . .
>
> Our remit is to have oversight of our conduct with regard to our corporate and societal obligations and our reputation as a responsible corporate citizen. We will oversee matters such as our progress against our Treating Customers Fairly objectives and our conduct on matters relating to our shareholders, clients, customers, employees, suppliers and the communities in which we operate. More information on this Committee can be found in its Terms of Reference on our website.

95.     The *Citizenship* section on page 25 of the 2011 Form 20-F features the following quote from Chief Executive Bob Diamond: "Banks need to become better citizens. This is not about philanthropy – it's about delivering real commercial benefits in a way that also creates value for society."

> Continuing on this theme, page 26 of the *Our Citizenship strategy* section of the Form 20-F states that, "[w]e seek to reinforce our integrity every day in the way that we manage our business and treat our customers."

96.     Concerning operational risk, the 2011 annual report states at pages 125-26 in relevant part:

> Risk management
> Operational risk management
>
> **Operational Risk is defined as the risk of direct or indirect impacts resulting from human factors, inadequate or failed internal processes and systems** or external events. Operational risks are inherent in the Group's business activities and are typical of any large enterprise. It is not cost effective to attempt to eliminate all operational risks and in any event it would not be possible to do so. Losses from operational risks of small significance are expected to occur and are accepted as part of the normal course of business. Those of material significance are rare and the Group seeks to reduce the likelihood of these in accordance with its Risk Appetite.
>
> **Overview**
> **The management of Operational Risk has two key objectives:**
> **– To minimise the impact of losses suffered in the normal course of business (expected losses) and to avoid or reduce the likelihood of suffering a large extreme (or unexpected) loss.**
> **– To improve the effective management of the Barclays Group and strengthen its brand and external reputation.**
>
> Barclays is committed to the management and measurement of operational risk and was granted a waiver to operate an Advanced Measurement Approach (AMA) for Operational Risk under Basel 2, which commenced in January 2008. The majority of the Group calculates regulatory capital using AMA, however in specific areas we apply the Standardised approach or Basic Indicator Approach. In certain joint ventures and associates, Barclays may not be able to apply the AMA.
>
> Areas where the Group is working towards the rollout of AMA and the Basic Indicator Approach is applied are: the Africa RBB businesses, including Barclays Bank Mozambique and National Bank of Commerce (Tanzania); Barclays Bank PLC Pakistan; Barclays Investment and Loans India Limited; the business activities acquired from Lehman Brothers; and the portfolios of assets purchased from Woolworths Financial Services in South Africa, Citi Cards Portugal and Italy, Standard Life Bank, MBNA Corporate Cards, Upromise and Egg Cards.
>
> **Barclays works to benchmark its internal operational risk practices with peer banks** and to drive the development of advanced operational risk techniques across the industry. . . .

- 26 -

**Barclays operates within a robust system of internal control that enables business to be transacted and risk taken without exposure to unacceptable potential losses or reputational damage.** To this end, Barclays has implemented the Group Internal Control and Assurance Framework (GICAF) which is aligned with the internationally recognised Committee of Sponsoring Organisations of the Treadway Commission Framework (COSO).  (emph. added).

97.     The *Risk Factors* section in the 2011 annual report contains a subsection on page

269 concerning the Company's *Legal and Litigation Risk*, which stated in pertinent part:

The Group is subject to a comprehensive range of legal obligations in all countries in which it operates. As a result, the Group is exposed to many forms of legal risk, which may arise in a number of ways: business **may not** be conducted in accordance with applicable laws around the world. . . .  Adverse regulatory action or adverse judgments in legal proceedings could result in significant financial penalties and losses, restrictions or limitations on the Group's operations or have a significant adverse effect on the Group's reputation or results of operations, financial condition or prospects or result in a loss of value in securities issued by the Group. (emph. added).

98.     In its *Notes to the Financial Statements* on page 223 of the 2011 annual report, the

Company made the following disclosure concerning investigations into its role in fixing Libor

rates :

The FSA, the US Commodity Futures Trading Commission, the SEC, the US Department of Justice Fraud Section of the Criminal Division and Antitrust Division and the European Commission are amongst various authorities conducting investigations into submissions made by Barclays and other panel members to the bodies that set various interbank offered rates. Barclays is co-operating in the relevant investigations and is keeping regulators informed. In addition, Barclays has been named as a defendant in a number of class action lawsuits filed in US federal courts involving claims by purported classes of purchasers and sellers of LIBOR-based derivative products or Eurodollar futures or options contracts between 2006 and 2009. The complaints are substantially similar and allege, amongst other things, that Barclays and other banks individually and collectively violated US antitrust and commodities laws and state common law by suppressing LIBOR rates during the relevant period. Barclays has been informed by certain of the authorities investigating these matters that proceedings against Barclays may be recommended with respect to some aspects of the matters under investigation, and Barclays is engaged in

discussions with those authorities about potential resolution of those aspects. It is not currently possible to predict the ultimate resolution of the issues covered by the various investigations and lawsuits, including the timing and the scale of the potential impact on the Group of any resolution.

99. Finally, the 20-Fs throughout the Class Period incorporated by reference Codes of Ethics (Exhibit 11.1) which all contained statements that were substantially similar to the following:

Under the Sarbanes Oxley Act 2002 section 406 and the relevant Securities and Exchange Commission (SEC) rules (17 CFR Parts 228 & 229) Barclays Group (Barclays PLC, Barclays Bank PLC and their subsidiaries) is required to adopt and disclose a Code of Ethics for Senior Financial Officers.

This Code of Ethics ('the Code') embodies the commitment of Barclays PLC, Barclays Bank PLC and their subsidiaries to promote:

- Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- Full, fair, accurate, timely, and understandable disclosure in reports and documents that a registrant files with, or submits to, the Commission and in other public communications made by the registrant;

- Compliance with applicable governmental laws, rules and regulations;

- The prompt internal reporting to an appropriate person or persons identified in the code of violations of the code; and

- Accountability for adherence to the code.

100. Each 20-F filed with the SEC, which was in effect during at least part of the Class Period, identifies another report issued, at least annually, by Barclays entitled "Corporate Governance in Barclays" ("CGB"). During their respective, operative time periods, the CGB was available on, *inter alia*, Barclays' website.

101.    For example, the CGB Report issued in February 2012 states in part, in the

sections entitled "Role and Responsibilities of the Board" (page 4) and again in "Role Profile –

Directors" (page 12 of Board Governance, Role Profiles and Charter of Expectations):

> The Board is responsible to shareholders for creating and delivering
> sustainable shareholder value through the management of the Group's
> businesses. It should therefore determine the objectives and policies of the
> Group to deliver such long-term value, providing overall strategic
> direction within a framework of rewards, incentives and controls. The
> Board must ensure that management strikes an appropriate balance
> between promoting long-term growth and delivering short-term objectives.
> Directors must act in a way they consider, in good faith, would promote
> the success of the company for the benefit of the shareholders as a whole .
> . . .   The Board is also responsible for ensuring that **management
> maintain a system of internal control which provides assurance of
> effective and efficient operations, internal financial controls** and
> compliance with law and regulation. In addition, the Board is responsible
> for ensuring that management maintain an effective risk management and
> oversight process at the highest level across the Group. in carrying out
> these responsibilities, the board must have regard to what is appropriate
> for the Group's business and reputation, the materiality of the financial
> and other risks inherent in the business and the relative costs and benefits
> of implementing specific controls.  (emph. added).

102.    The February 2012 CGB report also states at page 10:

> The Board has delegated the responsibility for the day-to-day management
> of the Group to the Chief Executive, who is responsible for leading the
> Executive Directors and for making and implementing operational
> decisions. The Chief Executive is supported by the Group Executive
> Committee, which he chairs.

103.    Upon information and belief, each of the prior CGB reports that were either

identified in an annual 20-F filing that was in effect during at least part of the Class Period or

which were otherwise published by Barclays (including but not limited to its website) contained

essentially the same material language.

104.    The forgoing statements were false and misleading for the following reason.

105.   First, defendants knew that their statements touting strict compliance with applicable laws and adherence to principles that supported its public statements that it was an exemplary corporate citizen were false because from approximately 2005 through 2009, Barclays swap traders requested that certain Barclays Libor submitters submit Libor contribution data that would benefit the swap traders' position rather than accurately reflect rates that complied with the definition of Libor.  In other words, Barclays submitted Libor bids that reflected the needs of swap traders to profit on positions, not figures representing the Company's true cost of capital and fundamental financial stability.

106.   Second, from August 2005 through May 2008, Barclays swap traders communicated with swap traders from other Libor contributing banks and other financial institutions about requesting Libor contributions that would be favorable to Barclays's trading positions and or its counterparties at other financial institutions.

107.   Third, from approximately August 2007 through at least January 2009, Barclays, at the direction of senior management, submitted inaccurate Libor information that under-reported its actual knowledge of the bank's borrowing costs and overall financial stability.  Barclays's submitters, at the direction of management, submitted rates they believed would be consistent or more competitive than the bids of other banks in an effort to secure a competitive and reputational advantage.  Indeed, managers directed the submitters not to be "outliers" relative to other banks despite the bank's true financial condition.

108.   Fourth, Defendants falsely stated specific internal controls were in place designed to prevent the conduct that actually occurred.  Instead, the Company lacked internal controls and procedures designed to oversee the bank's submission process for Libor and to supervise the bank's trading desks.

109.     Fifth, even if Defendants had sufficient internal controls in place, Defendants falsely stated that the internal controls were being utilized when, in fact, they were being knowingly or recklessly ignored with respect to, among other things, Libor transactions and rate setting.

110.     Sixth, Defendants' conduct knowingly violated Sections 6(c), 6(d) and 9(a)(2) of the Commodity Exchange Act, 7 U.S.C. Sec. 9, 13(b) and 13(a)(2) (2006), which prohibits the use if interstate commerce to manipulate the price of a commodity through the use of false or misleading statements.   Further, defendants knowingly violated numerous principles of the Financial Services Authority of the United Kingdom.

111.     The volume of Barclays' continually repeated materially false and misleading statements as compared to the realities of its overall financial results and business operations and operational risk management controls (with the operational risk management controls either non-existence or not being implemented), combined with Barclays intentional scheme of conspiring to manipulate Libor, demonstrates a cogent and compelling inference of scienter.

## THE TRUTH EMERGES

112.     On June 27, 2012, it was announced that Barclays had agreed to settle claims by both US and UK authorities that Barclays illegally set Libor rates that affected how consumers and companies borrowed money around the world.   Specifically, Barclays agreed to pay $453 million to resolve accusations that it had tried to manipulate, and had manipulated, rates to benefit the bank's own bottom line.

113.     Regulators stated that at the height of the financial crisis, Barclays reported bogus figures that in some cases had influenced a benchmark for student loans, credit cards and mortgages.

114.   Regulators stated they uncovered 'pervasive' wrongdoing that spanned a four-year period and touched top rungs of the firm, including members of senior management and traders stationed in London, New York and Tokyo.   Barclays was also accused of aiding attempts by other banks to manipulate Euribor.

115.   Traders seeking favorable rates received a welcome reception from bank employees who set the benchmark. 'Always happy to help,' one employee said in an e-mail.

116.   The settlement further explained how the bank submitted artificially low figures to depress Libor and deflect scrutiny about its health. At the time, the bank faced concerns that its high borrowing rates pointed to a weak financial position.

117.   The Barclays settlement represented a record settlement for the C.F.T.C., Wall Street's "smallest watchdog."   The trading commission levied a $200 million penalty, the largest in its history.

118.   The Financial Services Authority in London imposed a record $92.8 million fine, while the Justice Department imposed a $160 million penalty and agreed not to prosecute Barclays.

119.   Diamond said that he and three other top executives had voluntarily agreed to give up their bonuses this year and that most of the traders involved in the case have left the bank.

120.   Barclays internal conduct had become open and brazen.   There was a complete breakdown in the information wall designed to separate cash decisions made by the Barclays corporate treasury department from being influenced by traders' desires to capitalize on rate movements.

121.   At the time of the settlement, more than a dozen financial firms, including JPMorgan, Bank of America and HSBC, provide information to set the daily American dollar Libor rate.

122.   The Barclays case reveals that the bank shared information between its treasury department, which helped to set Libor, and its trading units, which buy and sell financial products on a daily basis. Financial institutions are expected to maintain so-called Chinese Walls between divisions, to avoid sharing confidential information in pursuit of a profit.

123.   But when a Barclays trader sought an advantageous yet bogus rate, an employee responded. "For you, anything," one employee who submitted false rates said. Or, as another employee put it, "Done ... for you big boy."

124.   The rosy feelings appeared to be mutual. One trader, after receiving a favorable rate from a bank employee, declared: "I love you." Another trader called a colleague a "superstar" for playing ball.

125.   Traders even sent themselves electronic calendar notifications to remind themselves about what rates to seek from Barclays employees who submitted the figures, according to regulators.

126.   Some of the most troubling actions, regulators say, occurred between 2007 and 2009. As bank financing costs rose to new highs after the collapse of Lehman Brothers, Barclays' senior management asked employees to lower the rates submitted to the Libor committee, according to the regulatory filings. Management wanted the bank's rates in line with rivals. Senior Barclays executives instructed employees not to put your "head above the parapet."

127.   Some employees resisted, but eventually followed orders from top executives, according to regulatory documents. One concerned employee called the rates "patently false."

- 33 -

128.   "I will reluctantly, gradually and artificially get my libors in line," another person said."

129.   News of the massive fines, non-prosecution agreement, and sever reputational damage, swiftly punished the Company's stock.  On June 28, 2012, Barclays' stock declined 12% (from $12.33 per share to $10.84 per share) on volume of over 22 million shares, causing Class members to suffer substantial financial loss.  On June 29, 2012, Barclays's stock declined an additional 5% on over 14.152 million shares traded, from $10.84 per share to $10.30 per share.

130.   This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchase of securities giving rise to the cause of action.

131.   Plaintiff did not know, and Plaintiff and the members of the Class could not have known, of Defendants' material misstatements and omissions because their falsity was undisclosed until late June 2012.

## AFTERMATH

132.   In the wake of the settlement, three of Barclays' most powerful leaders tendered their resignations in shame.  First, defendant Marcus Agius resigned.  Then Jerry del Missier, the COO, and defendant Diamond jointly bowed to massive pressure and resigned.

133.   On July 4, 2012, Diamond appeared before the British Parliament and in a pure show of arrogance rarely witnessed, he tried to cast blame on British banking officials stating that they had pressured him to keep Barclays's Libor submissions low in order to create the illusion that the bank was stronger than its mostly American peers.  Diamond, however, was unable to spin a story explaining why his traders and treasury executives, along with traders at competitor firms, had colluded to submit artificial Libor submissions in order to profit on

derivative contracts and other products that ultimately proved to be the predicate for the world wide recession.

## NO SAFE HARBOR

134.    The statutory safe harbor provided for certain forward-looking statements does not apply to any of the false statements alleged in this Complaint.  None of the statements alleged herein are "forward-looking" statements and no such statement was identified as a "forward-looking statement" when made.  Rather, the statements alleged herein to be false and misleading all relate to facts and conditions existing at the time the statements were made. Moreover, cautionary statements, if any, did not identify important factors that could cause actual results to differ materially from those in any forward-looking statements.

135.    In the alternative, to the extent that the statutory safe harbor does apply to any statement pleaded herein which is deemed to be forward-looking, the Defendants are liable for such false forward-looking statements because at the time each such statement was made, the speaker actually knew and/or recklessly disregarded the fact that such forward-looking statements were materially false or misleading and/or omitted facts necessary to make statements previously made not materially false and misleading, and/or that each such statement was authorized and/or approved by a director and/or executive officer of Barclays who actually knew or recklessly disregarded the fact that each such statement was false and/or misleading when made. None of the historic or present tense statements made by the Individual Defendants was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such an assumption underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Individual Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## LOSS CAUSATION/ECONOMIC LOSS

136.   During the Class Period, the Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Barclays's stock price and operated as a fraud or deceit on purchasers of Barclays common stock by misrepresenting the Company's financial condition and accounting, operational and risk practices.   Once the Defendants' misrepresentations and fraudulent conduct were disclosed to the market, Barclays's stock price reacted negatively as the artificial inflation was removed from it.  As a result of his purchases of Barclays stock during the Class Period, Plaintiff and other members of the Class suffered economic loss.

137.   The Defendants' false and misleading statements had the intended effect and caused Barclays stock to trade at artificially inflated levels throughout the Class Period.

138.   As investors and the market became aware of Barclays's prior misstatements and omissions and that its financial statements could not be relied upon, Barclays's stock price reacted negatively, damaging the members of the Class.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

139.   At all relevant times, the market for Barclays's common stock was an efficient market for the following reasons, among others:

(a)   Barclays's stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient market;

(b)   During the class period, Barclays stock was actively traded, demonstrating a very strong presumption of an efficient market;

(c)   As a regulated issuer, Barclays filed with the SEC periodic public reports during the Class Period;

(d)     Barclays regularly communicated with public investors via established market communication mechanisms;

(e)     Barclays was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period.  Each of these reports was publicly available and entered the public marketplace; and

(f)     Unexpected material news about Barclays was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

140.    As a result of the foregoing, the market for Barclays's common stock promptly digested current information regarding Barclays from all publicly available sources and reflected such information in Barclays's stock price.   Under these circumstances, all purchasers of Barclays's common stock during the Class Period suffered similar injury through their purchase of Barclays's common stock at artificially inflated prices, and a presumption of reliance applies.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

141.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased common stock of Barclays during the Class Period and who were damaged thereby.   Excluded from the Class are Defendants, the current and former officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

142.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Barclays's securities were actively traded on the New York Stock Exchange.  According to *Bloomberg*, as of July 6, 2012, the Company had approximately three billion ADSs outstanding.  While the exact number of Class members is

unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds of members in the proposed Class.   Members of the Class may be identified from records maintained by Barclays or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

143.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

144.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

145.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether the misstatements alleged herein were made with scienter;

(c)    whether statements made by the Defendants to the investing public during the Class Period misrepresented material facts about the business, prospects, sales, operations and risk controls of Barclays; and

(d)    to what extent the members of the Class have sustained damages and the proper measure of damages.

146.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.   Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

147.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

148.   During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase and/or sell Barclays's securities at artificially inflated and distorted prices.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, individually and as a group, took the actions set forth herein.

149.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations, internal controls, and future prospects of Barclays as specified herein.

150.   These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Barclays's value and performance and continued substantial growth, and the existence and efficacy of its operational controls, which included the making of, or the participation in the making of, untrue statements

of material facts and omitting to state material facts necessary in order to make the statements made about Barclays and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Barclays's securities during the Class Period.

151.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) the Individual Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's finances, operations, and sales at all relevant times; (4) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public that they knew or recklessly disregarded was materially false and misleading; and (5) each of the Individual Defendants culpably participated in the wrongful conduct alleged herein.

152.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Barclays's financial condition, customer

relationships, and future business prospects from the investing public and supporting the artificially inflated or distorted price of its securities.  As demonstrated by Defendants' overstatements and misstatements of the Company's financial condition and business prospects, and its accounting, operational and risk procedures, throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

153.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price for Barclays's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Barclays's publicly-traded securities were artificially inflated or distorted, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the Company's securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired and/or sold Barclays securities during the Class Period at artificially high prices and were damaged thereby.

154.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Barclays's financial results, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired Barclays securities, or, if they had acquired such

securities during the Class Period, they would not have done so at the artificially inflated prices or distorted prices at which they did.

156. By virtue of the foregoing, the Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

156. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### SECOND CLAIM

**Violation Of Section 20(a) of**
**The Exchange Act Against the Individual Defendants**

157. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

158. This Second Claim is asserted against each of the Individual Defendants.

159. The Individual Defendants acted as controlling persons of Barclays within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, agency, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of aspects of the Company's revenues, earnings and operational systems and controls, and dissemination of information to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

160. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company; formulated and carried out or were provided with and

had unlimited access to information about, among other things, Barclays internal controls; and, therefore, is presumed to have had, and did have, the power to control or influence the particular conduct giving rise to the securities violations as alleged herein, and exercised the same.

161.    The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

162.    As set forth above, Barclays and the certain Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

163.    By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act as they culpably participated in the fraud alleged herein.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

164.    This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchases of securities giving rise to the cause of action.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: July 10, 2012

                              WOLF HALDENSTEIN ADLER
                              FREEMAN & HERZ LLP


                              Daniel W. Krasner (DK 6381)
                              Gregory Mark Nespole (GN 6820)
                              Robert B. Weintraub (RW 2897)
                              Martin E. Restituyo (MR 0856)
                              270 Madison Avenue
                              New York, New York 10016
                              Telephone: (212) 545-4600

                              Ryan & Maniskas, LLP
                              Richard A. Maniskas
                              Katharine M. Ryan
                              995 Old Eagle School Rd., Ste. 311
                              Wayne, PA 19087
                              Telephone: (484) 588-5516

                              *Counsel for Plaintiff*

692223v6

## CERTIFICATION

I, The Vladimir Gusinsky Living Trust, ("Plaintiff") declare, as to the claims asserted under the federal securities laws that

1.        Plaintiff has reviewed the complaint and authorizes its filing.

2.        Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3.        Plaintiff is willing to serve as a representative party on behalf of the class, either individually or as part of a group, including providing testimony at deposition or trial, if necessary.  I understand that is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

4.        Plaintiff's purchase and sale transaction(s) in the **Barclays PLC (NYSE: BCS)** security that is the subject of this action during the Class Period is/are as follows:

| Type of Security (common stock, preferred, option, or bond) | Number of Shares | Bought | Sold | Date | Price per share |
|---|---|---|---|---|---|
| ADR | 33 | B | | 12/12/2007 | $44.83 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**(Please list additional purchase and sale information on a separate sheet of paper, if necessary)**

5.        Plaintiff has complete authority to bring a suit to recover for investment losses on behalf of purchasers of the subject securities described herein (including Plaintiff, any co-owners, any corporations or other entities, and/or any beneficial owners).

6.        During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws, except as described below_____.

7.        Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___6___ day of __July__, 2012.

_V. Gusinsky_
Vladimir Gusinsky, Trustee for
The Vladimir Gusinsky Living Trust