UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x
:
VLADIMIR GUSINSKY, TRUSTEE FOR       :       Civil Action No. 1:12-cv-05329-SAS
THE VLADIMIR GUSINSKY LIVING         :
TRUST, Individually and on Behalf of All     :       CLASS ACTION
Others Similarly Situated,           :
:       SECOND AMENDED COMPLAINT
               Plaintiff,            :
:       FOR VIOLATIONS OF THE FEDERAL
     vs.                            :       SECURITIES LAWS
:
BARCLAYS PLC, et al.,                :
:
               Defendants.           :
:
———————————————————— x

Lead Plaintiffs Carpenters Pension Trust Fund of St. Louis and St. Clair Shores Police & Fire Retirement System ("Lead Plaintiffs"), together with Plaintiff Pompano Beach Police & Firefighters' Retirement System (collectively with Lead Plaintiffs, "Plaintiffs"), allege the following based upon the investigation of Plaintiffs' counsel, which included a review of, among other things: (i) Barclays PLC's (referred to with its wholly-owned subsidiaries as "Barclays" or the "Company") filings with the United States Securities and Exchange Commission ("SEC"); (ii) Barclays's filings with other regulatory bodies; (iii) Barclays's press releases and other public statements; (iv) conference calls on which the Individual Defendants (defined below) participated; (v) securities analysts' reports and advisories about the Company; (vi) media reports about the Company; (vii) the statement of facts annexed to the June 26, 2012 non-prosecution agreement between Barclays and the United States Department of Justice ("DOJ")[1]; (viii)  the June 27, 2012 Order of the U.S. Commodity Futures Trading Commission ("CFTC"); and (ix) the June 27, 2012 Final Notice issued by the United Kingdom's Financial Services Authority ("FSA").  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action against Barclays and certain of its officers and directors for violations of the federal securities laws.  Plaintiffs bring this action on behalf of all persons or entities that purchased the American Depositary Shares ("ADSs" or "shares") of Barclays

---

[1]      According to the non-prosecution agreement, Barclays has "admit[ted], accept[ed], and acknowledge[d] responsibility for the conduct set forth in [the Statement of Facts] and [has] agree[d] not to make any public statement contradicting [the Statement of Facts]."

PLC between July 10, 2007 and June 27, 2012, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.       As detailed herein, Barclays participated in a variety of schemes to manipulate Libor rates, the benchmark interest rates used in global financial markets, and to understate its Libor Submission Rates (defined below).  These schemes not only affected banks, but also countless small businesses and individuals worldwide.  In an effort to enhance the market's perception of its financial health, Barclays, from its highest executive levels, provided false Libor submission data that was then used to calculate Libor rates.  Incredibly, at the same time that Barclays was participating in a scheme to deceive the market, it regularly touted to investors its dedication to being a responsible global citizen and to conducting its business ethically.  Barclays also described its rigorous internal controls and compliance with these controls.  Over and over again, Barclays represented to investors that it had a comprehensive risk management structure implemented throughout the organization.  Yet at the same time it was making such statements, Barclays was involved in a Libor scandal that would eventually tarnish the Company's international reputation, subject the Company to a massive *$453 million settlement* with authorities, and cause the downfall of its leadership, including its chairman, chief executive officer ("CEO"), and chief operating officer ("COO").

3.       The compliance, control, and ethical failures that led to the Libor scandal appear to be systemic within Barclays and not a one-time event.  Indeed, it has recently been announced that Barclays is the subject of at least two additional regulatory investigations: (i) the U.S. Federal Energy Regulatory Commission ("FERC") recently concluded that Barclays Bank PLC, Barclays PLC's wholly owned banking subsidiary, had manipulated the electricity market in the U.S. for financial gain; and (ii) the DOJ and SEC are now investigating Barclays for possible violations of

- 2 -

the Foreign Corrupt Practices Act ("FCPA").  Simply put, the Libor scheme, and the alleged

electricity-market manipulations and violations of federal anti-corruption laws make it clear that, at

all relevant times, the Company was lacking the internal controls, compliance structure, and ethical

culture described in its filings with the SEC.

## JURISDICTION AND VENUE

4.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the

Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC

[17 C.F.R. §240.10b-5].

5.      This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. §1331 and Section 27 of the Exchange Act.

6.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and

28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination

of materially false and misleading information, occurred in substantial part in this District.

7.      In connection with the acts alleged in this Complaint, Defendants, directly or

indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to,

the mails, interstate telephone communications and the facilities of the New York Stock Exchange

("NYSE"), a national securities market located in this district.

## PARTIES

8.      Lead Plaintiffs Carpenters Pension Trust Fund of St. Louis and St. Clair Shores

Police & Fire Retirement System, as set forth in their certifications previously filed in this action and

incorporated by reference herein, purchased the ADSs of Barclays during the Class Period and have

been damaged thereby.

9.      Plaintiff Pompano Beach Police & Firefighters' Retirement System, as set forth in its certification previously filed in this action and incorporated by reference herein, purchased the ADSs of Barclays during the Class Period and has been damaged thereby.

10.      Defendant Barclays PLC describes itself as a major global financial-services provider engaged in personal banking, credit cards, corporate and investment banking and wealth and investment management with an extensive international presence in Europe, the Americas, Africa and Asia.

11.      Defendant Barclays Bank PLC, a wholly owned subsidiary of Barclays PLC, provides various retail and commercial banking services primarily in the United Kingdom, continental Europe, the Americas, Africa, the Middle East, and Asia.  It offers current account and savings products, mortgages, unsecured loans, and general insurance, credit cards, and business lending products, as well as banking and money transmission services to small and medium sized businesses. It has offices in New York, New York.

12.      Defendant Barclays Capital Inc., a wholly owned subsidiary of Barclays PLC, provides securities brokerage and financial advisory services.  It has been registered with the CFTC since 1990, and maintains a business address and an active trading office in New York, New York.

13.      Defendant John Varley ("Varley") was appointed Group Chief Executive of Barclays on September 1, 2004.  He joined Barclays in 1982 and has held various positions across the Group. He joined the Company's Executive Committee in September 1996 and was appointed to the Company's Board of Directors (the "Board") in June 1998.  He resigned his position as CEO as of January 1, 2011 when Robert E. Diamond took over.

14.      Defendant Robert E. Diamond, Jr. ("Diamond") served as Barclays's CEO from January 1, 2011 until his resignation on July 3, 2012.  On July 3, 2012, Diamond was forced to

resign his position as CEO following public outrage over the Libor -rigging scandal.  Prior to serving as CEO, Diamond served as President of Barclays since June 2005 and had been a member of the Company's Executive Committee since September 1999.

15.     Defendant Christopher Lucas ("Lucas") is, and was at all times during the Class Period, Barclays's Chief Financial Officer, Group Finance Director, Executive Director, Chairman of Disclosure Committee and Group Finance Director - Barclays Bank PLC.

16.     Defendant Marcus Agius ("Agius") joined the Board in September 2006 as a non-executive Director and was appointed Chairman on January 1, 2007.  He resigned following public outrage over the Libor rate-rigging scandal.

17.     Defendants Varley, Diamond, Lucas, and Agius are collectively referred to herein as the "Individual Defendants."

18.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Barclays, were privy to confidential and proprietary information concerning Barclays, its operations, finances, financial condition and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Barclays, as discussed in detail below.  Because of their positions with Barclays, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

- 5 -

19.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Barclays's business.

20.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

21.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose ADSs were, and are, registered with the SEC pursuant to the Exchange Act, and were, and are, traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate, full and truthful information with respect to Barclays's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Barclays ADSs would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

22.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Barclays ADSs by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Barclays's business, operations and management and the intrinsic value of Barclays ADSs; and (ii) caused Plaintiffs and members of the Class to purchase Barclays ADSs at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

23.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the ADSs of Barclays between July 10, 2007, and June 27, 2012, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

24.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Barclays ADSs were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Barclays or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

25.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

26.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

27.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Barclays;

(c)     whether the price of Barclays ADSs was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

28.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### The London Interbank Offered Rate - Libor

29.     In the early 1980s, it became apparent that an increasing number of banks were actively trading in new instruments that utilize a reference rate, such as interest-rate swaps, forward-

rate agreements, and foreign-currency options. Banks asked the British Bankers' Association ("BBA")[2] to devise a benchmark reference rate, in order to bring a measure of uniformity to the market for these new instruments. In response, the London Interbank Offered Rate (more commonly known by the acronym Libor) was devised.

30.      Today, Libor rates serve as benchmarks for financial transactions all over the world. Libor rates serve as reference rates underlying futures contracts, options, swaps, and other derivative financial instruments traded in the over-the-counter ("OTC") market and on exchanges throughout the world. Libor rates also serve as references rates underlying loan agreements throughout world, including mortgage loans, credit cards, and student loans.

31.      The value of the financial instruments and agreements based on Libor rates is significant. For example, the ISDA[3] has estimated that, as of June 2011, the notional value of OTC interest-rate derivatives was $553 trillion.

32.      Libor rates are produced for ten currencies: US Dollar, Sterling, Euro, Japanese Yen, Swiss Franc, Canadian Dollar, Australian Dollar, New Zealand Dollar, Danish Krone and Swedish Krona. And, for each currency, Libor rates are produced for 15 maturities, *i.e.*, different borrowing periods: overnight, 1 week, 2 weeks, and from one month through twelve months. Accordingly, there are 150 Libor rates submitted each business day.

33.      For each of the ten currencies, there is a bank panel ("Bank Panel"), and each Bank Panel is comprised of between six and eighteen contributor banks ("Contributor Banks"). The BBA

---

[2]      The BBA describes itself as "the leading UK trade association for the UK banking and financial services sector, speaking for 223 banking members from 60 countries on the full range of UK or international banking issues and engaging with 37 associated professional firms."

[3]      ISDA is the acronym for the International Swaps and Derivatives Association, Inc.

explains that "[t]he aim is to produce a reference panel of banks which reflects the balance of the market."

34.     The resulting Libor rates for each currency are based on the submissions of these Contributor Banks ("Submission Rates"). Each Contributor Bank is asked to base their Submission Rates on the following question:

> At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11 am?

35.     Contributor Banks are instructed to "input their rate without reference to rates contributed by other contributor banks." The Submission Rates thus should be the rate at which a Contributor Bank perceives it could go into the London interbank money market and borrow money in reasonable market size, for a given maturity and currency.

36.     Accordingly, a Contributor Bank's Submission Rates may be perceived by the market as an indicator of a bank's financial health. For example, if *Bank A* submits a Libor Submission Rate that is high relative to the other Contributor Banks, that rate suggests that *Bank A* is paying a relatively high amount to borrow funds. *Bank A* thus could be perceived by the market to be experiencing financial difficulties because lenders are charging it relatively high rates. Additionally, higher Libor Submission Rates could indicate that a bank is willing to pay higher rates because the bank is experiencing liquidity problems.

37.     Additionally, "[t]he rates must be submitted by members of staff at a bank with primary responsibility for management of a bank's cash, rather than a bank's derivative book."

38.     Each day, the cash desk at each Contributor Bank submits the Submission Rates to Thomson Reuters, the designated calculation agent for Libor. Specifically, each business day between 11:00 am and 11:10 am, named individuals responsible for cash management at each Contributor Bank formulate their own rates for the day and submit them to Thomson Reuters.

39.     Thomson Reuters then calculates the 150 Libor rates and distributes them to the market by 11:30 am.  To calculate each Libor rate, Thomson Reuters discards the highest and lowest 25% of Submission Rates and averages the remaining submissions.  For example, the Bank Panel covering the Sterling, which comprises 16 Contributor Banks, submits 16 Submission Rates to Thomson Reuters, which then discards the four highest and four lowest Submission Rates and then averages the remaining eight rates.  This calculation is repeated for every maturity of every currency, thereby producing 150 Libor rates.

40.     The resulting 150 Libor rates are then distributed live to the market by data vendors such as Thomson Reuters, Bloomberg, Quick, Infotec, Class Editori, IDC, Proquote, and Telkurs.  Many financial website media outlets also display Libor data after 5pm (London time), and additionally, the financial press, including *The Wall Street Journal* and the *Financial Times*, publish Libor data from the previous day.

41.     Importantly, in addition to the Libor rates, Thomson Reuters also distributes to the market the Submission Rates and the names of Contributor Banks responsible for the respective Submission rates.

### Barclays's Role in Setting Libor Rates

42.     From at least 2005 through the present, Barclays has been a member of all ten Libor Bank Panels.  Thus, every business day, Barclays submits 150 Submission Rates to Thomson Reuters for disclosure to the market.  Additionally, from at least 2005 through the present, Barclays has also been a member of a panel of banks whose submissions are used to calculate the Euro Interbank Offered Rate ("Euribor"), which is a reference rate overseen by the European Banking Federation.

43.     Barclays made its daily submissions through Barclays' London Non-Sterling Liquidity Management Desk (the "London Money Market Desk"). The London Money Market Desk was, at the time, part of Barclays Capital Inc.

44.     As a panel member, Barclays was obligated to submit rates that complied with the definitions of Libor and Euribor. Further, because Barclays knew its Submission Rates would be disseminated to the market, Barclays had a duty to submit rates at which it legitimately believed it could borrow money.

45.     But from at least 2005 through May 2009, Barclays participated in two different schemes to manipulate its Libor Submission Rates. In the first scheme, Barclays traders attempted to influence Libor for financial gain by directing Libor submitters to submit specific and inaccurate Libor Submission Rates for Barclays. In the second scheme, in an effort to enhance the market's perception of Barclays's financial health, Barclays directed its Libor submitters to submit rates that were lower than the rates at which it believed it could borrow funds.

**First Scheme: Barclays Traders Manipulate Libor Using Inaccurate Submission Rates**

46.     From 2005 through May 2009, Barclays traders attempted to influence Barclays's Submission Rates in order to benefit the trading positions of their own desks. For example, swap traders employed by Barclays would contact the persons responsible for submitting Barclays's Submission Rates to request that the submitter submit a specific Submission Rate or to request that a particular Submission Rate be higher, lower, or the same. Instead of submitting the true Submission Rate for Barclays, the persons responsible for submitting Submission Rates accommodated the traders' requests and submitted a falsified rate provided to them by the Barclays traders.

47.     From June 2005 through approximately May 2009, Barclays Dollar swap traders in New York and London knowingly made unjustified requests for favorable Dollar Libor Submission Rates to the submitters on the London money markets desk. The requests were made frequently

- 12 -

from June 2005 through September 2007 and occasionally from September 2007 through May 2009. The submitters wrongfully accommodated these requests on numerous occasions.

48.     Additionally, from as early as May 2005 through approximately May 2009, Barclays Euro swap traders in London knowingly made improper requests for favorable Euribor Submission Rates to the submitters in London.  The requests were made on an ongoing basis from May 2005 through September 2007 and occasionally from September 2007 through May 2009.  The submitters wrongfully accommodated these requests on numerous occasions.

49.     And, from as early as August 2006 through January 2007, and on another occasion in June 2009, Barclays Yen swap traders in London knowingly made improper requests for favorable Yen Libor Submission Rates to the submitters in London.  The submitters wrongfully accommodated these requests on some occasions.

50.     In addition to making requests to Barclays submitters, from at least approximately August 2005 through at least approximately May 2008, Barclays swap traders also improperly communicated with submitters from other Contributor Banks to request Libor and Euribor Submission Rates that would benefit the Barclays swap traders and/or their counterparts at other financial institutions.  The motive for this scheme was to manipulate the Submission Rates in order to influence the resulting Libor and Euribor rates, which would allow these traders to then profit or minimize losses.

51.     Such trader-induced manipulations of the Submission Rates continued until at least May 2009. Specifically: (i) between January 2005 and May 2009, at least 173 improper requests for US Dollar Libor submissions were made to Barclays's submitters (including 11 requests based on communications from traders at other banks); (ii) between September 2005 and May 2009, at least 58 improper requests for Euribor submissions were made to Barclays's submitters (including 20

requests based on communications from traders at other banks); and (iii) between August 2006 and June 2009, at least 26 improper requests for yen Libor submissions were made to Barclays's submitters. These improper requests were made by traders in New York and London, via electronic messages, telephone conversations and in-person conversations. In addition, between August 2005 and May 2008, certain Barclays traders communicated with traders at other panel banks to coordinate the submission of Libor and Euribor rates from which they would all benefit.

**Second Scheme: Barclays Manipulates Submission Rates to Alter Market Perception**

52.    During the global financial crisis, from approximately August 2007 through at least approximately January 2009, Barclays improperly directed its Libor submitters to submit rates lower than the rates at which it legitimately believed it could borrow funds in order to preserve and/or enhance Barclays's reputation from what it believed were negative and unfair media and market perceptions,[4] *i.e.*, that Barclays had a liquidity problem based, in part, on its prior, relatively high, Libor submissions.[5]  In other words, the rates submitted were not the rates at which Barclays believed it could borrow funds by asking for and accepting inter-bank offers in a reasonable market size just prior to 11 am.

53.    As set forth in the DOJ Statement of Facts, ***which Barclays has admitted is true***, "Certain members of management of Barclays, including senior managers in the treasury department

---

[4]    On September 3, 2007, in an article entitled "Barclays Takes a Money-Market Beating," *Bloomberg* questioned Barclays's liquidity, in part, because it submitted a Libor rate for borrowing British pounds for three months at 6.8 percent, more than any other bank on the panel, and a full 11 basis points above the official Libor rate.

[5]    If a bank's Libor submission is relatively high, that rate suggests that the bank is paying a relatively high amount to borrow funds.  Thus, a bank could be perceived to be experiencing financial difficulties if lenders were charging higher rates to that bank.  In addition, higher Libor contributions could signal that a bank is willing to pay higher rates for funds, indicating potential liquidity problems.  *See* DOJ ¶35.

and managers of the money markets desk, directed that the Barclays Dollar LIBOR submitters contribute rates that were nearer to the expected rates of other Contributor Panel banks rather than submitting the proper, higher LIBORs." DOJ ¶36.

54.     In response to these directions from management, the Barclays Dollar Libor submitters "submitted rates that they believed would be consistent with the submissions of other Dollar Libor Contributor [Banks], or at least, that would not be too far above the expected rates of other members of the [Dollar Libor Bank] Panel." DOJ ¶36.

55.     For certain periods, Barclays management would instruct the Barclays Dollar Libor submitters "not to be an 'outlier' compared to other Contributor [Banks], even if Barclays contributed the highest rate." DOJ ¶37 (quoting internal Barclays communications).  For other periods, though, Barclays "management did not want Barclays to submit a rate higher than other Contributor [Banks], and instructed the Dollar Libor submitters to stay 'within the pack' of other members of the Dollar Libor [Bank] Panel, and to submit rates 'in line' with the other [Contributor Banks]." DOJ ¶37 (quoting internal Barclays communications).

56.     These management-orchestrated manipulations began in approximately late August 2007. That month, Barclays was forced to draw £1.6 billion (approximately $3.2 billion) from the Bank of England's emergency facility, which was followed by news articles questioning Barclays's liquidity.  At that time, Barclays was also setting its Libor Submission Rates higher relative to submissions by other Contributor Banks.

57.     In early September 2007, Barclays began receiving negative press coverage, including a *Bloomberg* article entitled "Barclays Takes a Money-Market Beating."  That article described how Barclays's Submission Rates were the highest on the Bank Panel and asked: "[W]hat

- 15 -

the hell is happening at Barclays and its Barclays Capital securities unit that is prompting its peers to

charge it premium interest rates in the money market?"

58.     As set forth in the DOJ Statement of Facts:

Senior managers within Barclays expressed concern about the negative publicity.
The managers on the money markets desk and in the treasury department who gave
the instruction to submit lower [Libor Submission Rates], sought to avoid inaccurate,
negative attention about Barclays's financial health as a result of its high Libor
submissions relative to other banks.  Those managers wanted to prevent any adverse
conclusions about Barclays's borrowing costs, and more generally, its financial
condition, because they believed that those conclusions would be mistaken and that
other Contributor Panel banks were submitting unrealistically low Dollar Libor
[Submission Rates].

DOJ ¶40.

59.     As early as September 4, 2007, a Barclays Dollar Libor submitter indicated on an

internal call that there was "internal pressure" on him to keep Submission Rates lower than they

ought to have been. FSA ¶113.

60.     On September 25, 2007, a submitter stated in an email that Barclays would "try to get

our [Yen] Libor [Submission Rates] a little more in line with the rest of the contributors, or else the

rumours will start flying about Barclays needing money because its [Submission Rates] are so high."

FSA ¶114.

61.     On November 16, 2007, a submitter indicated in an email that Barclays was "going

4.98 for libor only because of the reputational risk . . . Basically the[re] is no money out there."

Another submitter responded that Libor was being set "unrealistically low." FSA ¶116.

62.     On November 19, 2007, a submitter stated in an email that he had been asked by a

manager "to keep the libors within the group (pressure from above)." FSA ¶116.

63.     On November 28, 2007, Barclays's senior Dollar Libor submitter emailed a large

group of Barclays's employees, including senior Barclays Treasury managers, and stated, "Libors

are not reflecting the true cost of money.  I am going to set . . . , probably at the top of the range of

rates set by libor contributors . . . [T]he true cost of money is anything from 5-15 basis points higher." In response to this email, a senior Barclays Treasury manager replied, "Fine on Libor settings – thanks for remaining pragmatic but at the upper end." CFTC at 20-21.

64. On November 29, 2007, a submitter was going to submit a Dollar Libor Submission Rate of 5.50 based on seeing an offer in the market of 5.60, but the submitter was overruled on a conference call. The supervisor said on that call that "it's going to cause a sh[*]t storm" and asked that the issue be taken "upstairs" to be discussed among more senior levels of Barclays's management. The most senior Barclays's Treasury manager agreed that he would do so. Barclays ended up submitting a Dollar Libor Submission Rate of 5.30, which was in line with the other Contributor Banks' submissions. FSA ¶118; CFTC at 21.

65. The next day, on November 30, 2007, a senior Barclays Treasury manager had a conversation with the senior Dollar Libor submitter, who was again seeking guidance on his submissions. The manager stated his understanding that senior management had discussed the issue and directed them to continue to "stick within the bounds[,] so no head above [the] parapet." CFTC at 21.

66. Again, in early December 2007, the senior Barclays Dollar Libor submitter expressed concern to a supervisor. The submitter told the supervisor that he had submitted Barclays's one-month Libor Submission Rate at 5.3%, which was below the 5.4% that Barclays was paying to borrow funds in the market. The submitter noted that if "given a free hand [he] would have set around 5.45%." CFTC at 22; DOJ ¶45.

67. In early March 2008, the senior Barclays Dollar Libor submitter told a colleague that he had submitted a rate for 12-month Libor that was several points lower than the rate at which he was willing to pay to borrow funds in the market because he had been advised by senior

- 17 -

management that he should not make his submissions any higher.  During this conversation, the submitter also noted that the senior Barclays Treasury manager told him that he should "not be quite as aggressive" with his Submission Rates, which meant his submissions were too high. CFTC at 22.

68.     During a March 19, 2008 telephone conversation, a submitter instructed another to reduce Barclays's Submission Rates, stating, "just set it where everyone else sets it, we do not want to be standing out."  FSA ¶123.

69.     On April 16, 2008, in an article entitled "Bankers Cast Doubt On Key Rate Amid Crisis," *The Wall Street Journal* reported that some banks were wary of reporting the high Libor rates they were paying for short-term loans because the banks did not want to show the market that they were desperate for cash.

70.     In response to *The Wall Street Journal* article, the senior Barclays Dollar Libor submitter expressed concern to a senior Barclays Treasury manager.  The submitter stated that his prior Libor Submission Rates were lower than where he actually believed Barclays could obtain funds: "I would be paying . . . [2.98] today and I'm going to be setting my Libor at [2.74] and I'm as guilty as hell. . . .  I will go [2.74] unless I'm given permission to go otherwise, but I would be prepared to pay [2.98]."  To this, the senior Treasury manager responded, "I'm happy for you to be at and around the top of the pack but can we please not sort of be ten basis points above the next. . . ?"  The submitter told the manager that he believed there were compliance issues yet no internal action was taken to address his concerns.  CTFC at 23.

71.     Also in response to *The Wall Street Journal* article, in June 2008, the BBA conducted a review of the Libor submission process.  Barclays and other panel bank members participated in this review.

72.     On June 1, 2008, the then president of the Federal Reserve Bank of New York, Timothy Geithner, emailed the governor of the Bank of England, Mervyn King, to express his concern about the integrity of Libor. In his email, Geithner attached a list of recommendations, one of which was to eliminate the incentive to misreport. Mr. Geithner recommended changing the Libor calculation process so that the banks whose submission rates were not included in the calculation would not be publicly identified.

73.     In August 2008, the BBA published its findings from the review and concluded that Barclays and the other submitting banks were submitting accurate Libor rates. However, despite its participation in this review, Barclays failed to admit that it had been and continued to submit false, lower Libor Submission Rates for its benefit.

74.     Then, in October 2008, one of Barclays's most senior executives, Jerry del Missier ("del Missier") – who at one point was Barclays's chief operating officer – passed down orders to, Mark Dearlove ("Dearlove"), the Managing Director of Barclays Capital Inc. and head of the money market desk, to understate the Company's Libor Submission Rates. On July 16, 2012, Del Missier testified before the House of Commons Treasury Committee during which he stated that he was directed to do so by defendant Diamond, who was then President of Barclays and Chief Executive of Corporate & Investment Banking and Wealth Management. According to del Missier, Diamond told him to get Barclays's LIBOR rates down and not be an outlier, and del Missier passed down the instruction as he had received it on to Dearlove.

75.     In late October 2008, the senior Barclays Dollar Libor submitter told his supervisor: "following on from my conversation with you I will reluctantly, gradually and artificially get my libors in line with the rest of the contributors as requested. I disagree with this approach as you are

- 19 -

well aware. I will be contributing rates which are nowhere near the clearing rates for unsecured cash and therefore will not be posting honest prices." CFTC at 24.

76.     Such management-orchestrated manipulations of the Submission Rates continued through at least January 2009.

## Barclays's Inadequate Systems and Controls

77.     Although trillions of dollars worth of financial instruments and loan agreements depend on the honest reporting of Libor rates, ***Barclays had no specific systems or controls for its Libor or Euribor submissions process until December 2009.*** FSA ¶147(i). For example, Barclays "did not . . . put in place policies giving clear guidance about the importance of the integrity of the process for determining Libor and Euribor submission." Barclays also "did not . . . provide training to its Submitters about the submissions process and the appropriateness of requests for favourable submissions." FSA ¶147(ii).

78.     Moreover, Barclays "did not . . . carry out formal monitoring of the submissions it made. There was no formal monitoring of anomalous submissions until April 2010 and no spot checks on the level of Barclays's actual transaction in the interbank market as against the submissions made until May 2010." FSA ¶147 (iii). And Barclays "did not . . . conduct a review of the integrity of the processes for submitting Libor and Euribor rates until 2010 at the earliest." FSA ¶147(iv).

79.     Additionally, from at least as early as January 2005 until June 2010, "there were no clear lines of responsibility for systems and controls on Barclays's Money Market Desk." FSA ¶149. According to the FSA, it "interviewed three different managers with some responsibility for the Money Markets Desk. Each gave a different answer when questioned as to who was responsible for ensuring that there were adequate systems and controls on the Money Markets Desk. None of these managers accepted that they had responsibility." *Id.*

80.     On November 2, 2009, the BBA's Foreign Exchange and Money Markets Committee circulated new guidelines intended to ensure that, when calculating their Libor Submission Rates, all Contributing Banks applied the factors which influenced their rates in the same manner. FSA ¶152. Yet, Barclays made no changes to its systems or controls to account for, or to incorporate, these new guidelines. *Id.*

81.     Thus "Barclays had no (or inadequate) systems and controls that related specifically to its Libor or Euribor setting processes during [January 2005 until June 2010]. ***There were several relevant opportunities for Barclays to review its systems and controls however Barclays did not carry out any review on these occasions***." FSA ¶161 (emphasis added).

### Failure of Barclays's Compliance

82.     In September 2007, a senior manager flagged the potential conflict of interest between Barclays's submitters and derivative traders.  This manager made it clear to another manager that submitters should not be privy to the traders' positions in order to avoid a conflict of interest between the submitters and the traders. FSA¶163.

83.     This and other concerns were then brought to the attention of Barclays's compliance department ("Compliance"). FSA ¶182. Compliance, however, neither discussed these issues with submitters nor took the opportunity to draft policies or procedures to address such a conflict of interest.  *Id.*  As a direct result of this failure, internal and improper requests by derivative traders continued to be made to the Barclays's submitters.  *Id.*

84.     Additionally, in October 2008, Compliance became aware that senior managers were improperly instructing submitters to reduce Submission Rates but did not take appropriate remedial action.  FSA ¶¶176-179.  At that time, based on a misunderstanding or miscommunication, submitters mistakenly believed that they were operating under an instruction from the Bank of England (as conveyed by senior management) to reduce Barclays's Libor Submission Rates. FSA

¶176. On October 29, 2008, a submitter emailed a manager, copying Compliance, in which he recorded his intention to comply but stating that such compliance would be "breaking the BBA rules." FSA ¶177. Although Compliance did not consider it proper for submitters to comply with the instruction, Compliance neither spoke to the submitters nor ensured that submitters did not follow the instruction. FSA ¶¶178-179.

85.      The lack of controls and failures of compliance within Barclays can best be summed up by the following conclusion of the House of Commons Treasury Committee, in its report of its Libor-inquiry findings, printed August 9, 2012:

> The attempted manipulation of Barclays' LIBOR submissions with the intention of personal gain continued for four years. It is shocking that it flourished for so long. *Any system may fail for a short period, but compliance at Barclays was persistently ineffective. Even when Barclays' compliance had indications that something was awry, it failed to take the opportunity to strengthen the bank's controls.* Nor was there any pressure from senior executives within Barclays to ensure that effective LIBOR controls were in place, as it was considered low-risk, in particular where LIBOR setters sat, with no presence of the compliance function. These are serious failures of governance within Barclays, for which the board is responsible. The compliance function within a bank is very important. If it is weak or ignored in the practices of the bank that is reflective of a poor culture which does not take seriously enough abiding by the rules essential to proper functioning of the bank and the wider financial system. *The serious failings of the compliance function during the period under examination suggest there was this kind of culture at Barclays.* (Emphasis added.)

86.      Barclays's manipulation of its Libor and Euribor rate submissions, as well as its lack of controls, were unknown to Barclays's investors prior to and throughout the Class Period. In fact, investors were led to believe the opposite since Defendants repeatedly made materially false and misleading statements during the Class Period regarding Barclays's strength in terms of its liquidity, its internal controls and its responsibility as a good corporate citizen.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

### Pre-Class Period Materially False and Misleading Statements

### The 2006 Form 20-F and Annual Report

87.     Prior to the Class Period, Barclays and the Individual Defendants made materially false and misleading statements concerning the Company's internal controls, corporate governance, risk management and contingent liabilities, and submitted materially false Submission Rates. For example, on March 26, 2007, the Company filed its 2006 Form 20-F with the SEC ("2006 20-F"), which was signed by defendant Varley. In the *Corporate Responsibility* section of the 2006 20-F, the Company stated in pertinent part:

> *Corporate Responsibility*
> *Responsible Banking*
>
> ***For Barclays, corporate responsibility is embodied in the concept of 'responsible banking'*** – reflecting its place at the heart of our strategy as an integral part of the way in which we do business. Firmly based on the clear values enshrined in our Guiding Principles, ***responsible banking means making informed, reasoned and ethical decisions*** in our business dealings with customers, clients, employees and our other stakeholders.
>
> Our Guiding Principles of Winning Together, Customer Focus, The Best People, Pioneering and Trusted describe how we expect our employees to behave with external stakeholders and each other. Responsible banking is the approach by which we aim to progress towards sustainability – recognising that we will succeed in our strategic and financial goals only if we have a strong commitment and focus on achieving sustainable outcomes for all stakeholders. . . .
>
> *Ethical indices*
>
> Barclays is a long-standing member of the Dow Jones Sustainability and FTSE4Good ethical indices.  Our ranking in the Business in the Community Corporate Responsibility Index rose to 3rd position out of 131 companies. (Emphasis added.)

88.     The 2006 20-F also contains many statements describing how the Company manages its operational risk and is "***implementing improved management and measurement approaches for operational risk to strengthen control, improve customer service and minimize operating losses***."

(Emphasis added.)   For example, the 2006 20-F stated that the Board on which the Individual Defendants served is:

> . . . *responsible for ensuring that management maintain a system of internal control that provides assurance of effective and efficient operations, internal financial controls and compliance with law and regulation*. (Emphasis added.)

89.     The 2006 20-F describes the Company's "Operational risk and business risk management" as follows:

*Operational risk and business risk management*

Operational and business risks are inherent in Barclays operations and are typical of any large enterprise.

*Operational risk is the risk of direct or indirect losses resulting from inadequate or failed internal processes or systems, human factors, or from external events. Major sources of operational risk include*: operational process reliability, IT security, outsourcing of operations, dependence on key suppliers, implementation of strategic change, integration of acquisitions, *fraud*, error, customer service quality, *regulatory compliance*, recruitment, training and retention of staff, and social and environmental impacts. . . . [business risk description omitted]

*Barclays is committed to the advanced management of operational and business risks. In particular, we are implementing improved management and measurement approaches for operational risk to strengthen control, improve customer service and minimise operating losses*. In addition, this investment is being made to improve risk sensitivity, to enhance the Operational Risk Capital model and to obtain approval to apply the Advanced Measurement Approach under the Basel II Accord when that option first becomes available in 2008. *Barclays works closely with peer banks to benchmark our internal Operational Risk practices and to drive the development of advanced Operational Risk techniques across the industry*. . . .

*Responsibility for and control of operational risk*

Barclays has a Group Operational Risk Framework, which is consistent with and part of the Group Internal Control and Assurance Framework.   Minimum control requirements have been established for all key areas of identified risk.   The risk categories relevant to operational and business risks are: Financial Crime, Financial Reporting, Taxation, Legal, Operations, People, Regulatory Compliance, Technology, Brand Management, Change, Corporate Responsibility and Strategic. (Emphasis added.)

90.     The statements referenced above in ¶¶87-89 regarding strict compliance with applicable laws; adherence to responsible banking principles; specific internal controls that were in place designed to prevent misconduct; among other statements, were materially false and misleading because Defendants knew but failed to disclose:

(a)     that from approximately 2005 through May 2009, Barclays swap traders had improperly requested that certain Barclays Libor submitters submit false Libor contribution data that would benefit the swap traders' position instead of submitting the true rate that Barclays would have to pay to borrow funds.  In other words, Barclays repeatedly submitted false Libor Submission Rates that reflected the needs of swap traders to profit on positions, not figures representing the Company's true cost of obtaining capital;

(b)     that from August 2005 through May 2008, Barclays swap traders had communicated with swap traders from other Libor contributing banks and other financial institutions requesting Libor contributions that would be favorable to Barclays's trading positions and/or the trading positions of its counterparties at other financial institutions;

(c)     that from approximately August 2007 through at least January 2009, Barclays, at the direction of senior management, submitted false and inaccurate Libor information that under-reported its actual knowledge of Barclays's borrowing costs and overall financial stability.  In other words, Barclays's submitters, at the direction of management, submitted rates they believed would be consistent with or lower than the submissions of other banks in an effort to secure a competitive and reputational advantage.  Indeed, managers directed the submitters not to be "outliers" relative to other banks, despite Barclays's true financial condition;

(d)     that Defendants falsely stated that specific internal controls were in place which were designed to prevent the conduct that actually occurred.  In truth, the Company lacked

any internal controls and procedures designed to oversee its submission process for Libor and to supervise its trading desks;

      (e)     that even if Defendants had sufficient internal controls in place, Defendants falsely stated that the internal controls were being utilized when, in fact, they were being knowingly or recklessly ignored with respect to, among other things, Libor transactions and rate setting; and

      (f)     that Defendants' conduct knowingly violated: (i) Sections 6(c), 6(d) and 9(a)(2) of the Commodity Exchange Act, 7 U.S.C. Sec. 9, 13(b) and 13(a)(2) (2006), which prohibit the use of interstate commerce to manipulate the price of a commodity through the use of false or misleading statements; and (ii) numerous principles of the Financial Services Authority of the United Kingdom.

      91.     On March 27, 2007, Barclays also filed its annual report to shareholders on a Form 6-K ("2006 Annual Report"). In addition to repeating many of the representations that were made in the 2006 Form 20-F, the 2006 Annual Report also included a section entitled *Group Chairman's Statement*, which was signed by defendant Agius. In that section, defendant Agius, commenting on Barclays's corporate governance and how Barclays purportedly practices "Responsible Banking," stated, in pertinent part:

> *Corporate Governance*
>
> As Chairman, it is my responsibility to ensure that the highest standards of corporate governance are in place and I am committed to maintaining Barclays' strong reputation in this area.

*    *    *

> *Responsible Banking*
>
> A key objective of the Board is to be a leader in the area of corporate responsibility.

      92.     The statements referenced above in ¶91 regarding defendant Agius's commitment to maintaining Barclays's strong reputation in the area of corporate governance and regarding the

Board's purported objective to be a leader in the area of corporate responsibility were materially false and misleading for the reasons set forth above in ¶90.

### Materially False and Misleading Statements Made During the Class Period

93.     The Class Period begins on July 10, 2007, five years before the filing of the initial Complaint in this action. On that day, and throughout the Class Period, copies of the 2006 20-F and 2006 Annual Report were available to investors and the public on the Shareholders section of Barclays's website and were still in effect.

### The 2007 Form 20-F and Annual Report

94.     On March 26, 2008, the Company filed its 2007 Form 20-F with the SEC ("2007 Form 20-F"), which was signed by defendants Varley and Lucas. In the *Corporate Sustainability* section on page 58 of the 2007 Form 20-F, the Company stated in pertinent part:

> For Barclays, there are two separate but mutually dependent aspects to sustainability. One is our duty as a bank to provide sound and enduring returns for our shareholders, and the best possible services for our customers. ***The other is our responsibility to conduct our global business ethically, and with full regard to wider social and environmental considerations.*** Our ambition is to develop both of these complementary strands as we move forward. (Emphasis added.)

95.     The 2007 Form 20-F contains a section entitled *Risk Management* in which the Company categorizes the risks it faces and describes how the Company tries to manage these risks. One such category of the risks facing the Company is Legal Risks. In discussing Legal Risk, the Form 20-F stated, in pertinent part:

> *Legal Risk*
>
> The Group is subject to a comprehensive range of legal obligations in all countries in which it operates. As a result, the Group is exposed to many forms of legal risk, which may arise in a number of ways. Primarily:
>
> ***– the Group's business may not be conducted in accordance with applicable laws around the world;***

- 27 -

– contractual obligations may either not be enforceable as intended or may be enforced against the Group in an adverse way;

– the intellectual property of the Group (such as its trade names) may not be adequately protected; and

*– the Group may be liable for damages to third parties harmed by the conduct of its business*.

The Group faces risk where legal proceedings are brought against it.  Regardless of whether such claims have merit, the outcome of legal proceedings is inherently uncertain and could result in financial loss.  Defending legal proceedings can be expensive and time-consuming and there is no guarantee that all costs incurred will be recovered even if the Group is successful.  *Although the Group has processes and controls to manage legal risks, failure to manage these risks could impact the Group adversely, both financially and by reputation*.  (Emphasis added.)

96.     Another category of risks facing the Company is Regulatory Compliance Risk.  The

Form 20-F describes Regulatory Compliance Risk as follows:

*Regulatory compliance risk arises from a failure or inability to comply fully with the laws, regulations or codes applicable specifically to the financial services industry.  Non-compliance could lead to fines, public reprimands, damage to reputation, enforced suspension of operations or, in extreme cases, withdrawal of authorisations to operate*.  (Emphasis added.)

97.     The 2007 Form 20-F also discusses the Company's control framework for responding

to material risks, stating, in pertinent part:

*Material risks and control framework*

As well as overall responsibility for the Group's risk exposure versus appetite, the Board is also responsible for the Group Internal Control and Assurance Framework ('GICAF').  As part of the GICAF, it approves the Principal Risks Policy, which sets out responsibilities for the management of the Group's most significant risk exposures.  *The Board oversees the operating effectiveness of the Principal Risks Policy through the regular review of reports on the Group's material risk exposures and controls*.

The Group's risk categorisation comprises 17 risk categories ('Level 1'), thirteen of which are known as Principal Risks.  Each Principal Risk is owned by a senior individual at the Group level, who liaises with Principal Risk owners within Business and Central Support Units.  The 17 risk categories are shown in the panel below. [That panel lists "Operations," "Regulatory," and "Legal" as Principal Risk categories].

Each Group Principal Risk Owner ('GPRO') is responsible for setting minimum control requirements for their risk and for overseeing the risk and control performance across the Group. Group control requirements (*e.g.* Group Policies/Processes/Committee oversight) for each of these risks are defined, in consultation with Business Units, and communicated and maintained by the GPRO.

Implementation of the control requirements for each Principal Risk provides each Business or Central Support Unit with the foundation of its system of internal control for that particular risk. This will usually be built upon in more detail, according to the circumstances of each Business Unit, to provide a complete and appropriate system of internal control.

The specific controls for individual Principal Risks are supplemented by generic risk management requirements. These requirements are articulated as the Group's Operational Risk Management Framework (see page 109) and include policies on:

– Internal Risk Event Identification and Reporting – Detailed Risk and Control Assessment

– Key Indicators

– Key Risk Scenarios

Business Unit and Central Support Unit Heads are responsible for maintaining ongoing assurance that the controls they have put in place to manage the risks to their business objectives are operating effectively. They are required to undertake a formal six-monthly review of assurance information. These reviews support the regulatory requirement for the Group to make a statement about its system of internal control (the 'Turnbull' statement), in the annual report and accounts. (Emphasis added.)

98.    In discussing Operational Risk Management, the 2007 Form 20-F stated, in pertinent part:

*Operational risk management*

Operational risk is the risk of direct or indirect losses resulting from human factors, external events, and inadequate or failed internal processes and systems. Operational risks are inherent in Barclays operations and are typical of any large enterprise. Major sources of operational risk include: operational process reliability, IT security, outsourcing of operations, dependence on key suppliers, implementation of strategic change, integration of acquisitions, fraud, human error, customer service quality, regulatory compliance, recruitment, training and retention of staff, and social and environmental impacts.

***Barclays is committed to the advanced management of operational risks. In particular, it has implemented improved management and measurement***

- 29 -

*approaches for operational risk to strengthen control, improve customer service and minimise operating losses*.   Barclays was granted a Waiver to operate an Advanced Measurement Approach (AMA) under Basel II, which commenced in January 2008.

The Group's operational risk management framework aims to:

> — Understand and report the operational risks being taken by the Group.

> — Capture and report operational errors made.

> — Understand and minimise the frequency and impact, on a cost benefit basis, of operational risk events.

*Barclays works closely with peer banks to benchmark our internal Operational Risk practices and to drive the development of advanced Operational Risk techniques across the industry*.   It is not cost effective to attempt to eliminate all operational risks and in any event it would not be possible to do so.   Events of small significance are expected to occur and are accepted as inevitable; *events of material significance are rare and the Group seeks to reduce the risk from these in a framework consistent with its agreed Risk Appetite*.   (Emphasis added.)

99.      In discussing the how the Company is organized and structured to combat risk, the

2007 Form 20-F stated, in pertinent part:

*Organisation and structure*

Barclays has a Group Operational Risk Framework, which is consistent with and part of the Group Internal Control and Assurance Framework.   Minimum control requirements have been established for all key areas of identified risk by 'Principal Risk' owners (see page 85).   The risk categories relevant to operational risks are Financial Crime, Financial Reporting, Taxation, Legal, Operations, People, Regulatory, Technology and Change.   In addition the following risk categories are used for business risk: Brand Management, Corporate Responsibility and Strategic.

*Responsibility for implementing and overseeing these policies is positioned throughout the organisation*.   The prime responsibility for the management of operational risk and the compliance with control requirements rests with the business and functional units where the risk arises.   Frontline risk managers are widely distributed throughout the Group in business units.   They service and support these areas, assisting line managers in managing these risks.

Business Risk Directors in each business are responsible for overseeing the implementation of and compliance with Group policies.   Governance and Control Committees in each business monitor control effectiveness.   The Group Governance and Control Committee receives reports from the committees in the businesses and considers Group-wide control issues and their remediation.

In the corporate centre, each Principal Risk is owned by a senior individual who liaises with Principal Risk owners within the businesses. In addition, the Operational Risk Director oversees the range of operational risks across the Group in accordance with the Group Operational Risk Framework.

Business units are required to report on both a regular and an event-driven basis. The reports include a profile of the key risks to their business objectives, control issues of Group-level significance, and operational risk events. Specific reports are prepared on a regular basis for the Group Risk Oversight Committee, the Board Risk Committee and the Board Audit Committee. In particular, the Group Operational Risk Profile and Group Operating Committee Report is provided quarterly to the Group Risk Oversight Committee. The Internal Audit function provides further assurance for operational risk control across the organisation and reports to the Board and senior management. (Emphasis added.)

In the *Chairman's Introduction to the Corporate Governance Report* within the 2007 Form 20-F, defendant Agius commented on the Company's purported compliance with applicable laws. That section, which was signed by defendant Agius, stated, in pertinent part:

We report below on how we have complied in 2007 with the UK Combined Code on Corporate Governance (the Code). ***We are committed to promoting good corporate governance. We seek to be at the forefront of global best practice and to respond, in a timely fashion, to corporate governance developments***. To gain a greater understanding of the corporate governance framework within Barclays I encourage you to read 'Corporate Governance in Barclays', which is available from our website. . . .

Barclays has American Depositary Receipts listed on the New York Stock Exchange (NYSE) and is therefore subject to the NYSE's Corporate Governance rules (NYSE Rules). As a non-US company listed on the NYSE, we are exempt from most of the NYSE Rules, which domestic US companies must follow. We are required to provide an Annual Written Affirmation to the NYSE of our compliance with the applicable NYSE Rules and also to disclose any significant ways in which our corporate governance practices differ from those followed by domestic US companies listed on the NYSE. As our main listing is on the London Stock Exchange, we follow the UK's Combined Code. Key differences between the NYSE Rules and the Code are set out later in this report. (Emphasis added.)

100.    In the *Chairman's Introduction to the Corporate Governance Report* within the 2007

Form 20-F, defendant Agius commented on the Company's purported compliance with applicable

laws. That section, which was signed by defendant Agius, stated, in pertinent part:

We report below on how we have complied in 2007 with the UK Combined Code on Corporate Governance (the Code). ***We are committed to promoting good corporate***

*governance. We seek to be at the forefront of global best practice and to respond, in a timely fashion, to corporate governance developments.* To gain a greater understanding of the corporate governance framework within Barclays I encourage you to read 'Corporate Governance in Barclays', which is available from our website. . . .

Barclays has American Depositary Receipts listed on the New York Stock Exchange (NYSE) and is therefore subject to the NYSE's Corporate Governance rules (NYSE Rules). As a non-US company listed on the NYSE, we are exempt from most of the NYSE Rules, which domestic US companies must follow. We are required to provide an Annual Written Affirmation to the NYSE of our compliance with the applicable NYSE Rules and also to disclose any significant ways in which our corporate governance practices differ from those followed by domestic US companies listed on the NYSE. As our main listing is on the London Stock Exchange, we follow the UK's Combined Code. Key differences between the NYSE Rules and the Code are set out later in this report. (Emphasis added.)

101.    In the Corporate Governance section, the 2007 Form 20-F discusses the Company's

internal controls. That section, which defendant Agius signed on behalf of the Board, stated, in

pertinent part:

*Internal control*

The Directors have responsibility for ensuring that management maintain an effective system of internal control and for reviewing its effectiveness. Such a system is designed to manage rather than eliminate the risk of failure to achieve business objectives, and can only provide reasonable and not absolute assurance against material misstatement or loss. ***Throughout the year ended 31st December 2007, and to date, the Group has operated a system of internal control which provides reasonable assurance of effective and efficient operations covering all controls, including financial and operational controls and compliance with laws and regulations. Processes are in place for identifying, evaluating and managing the significant risks facing the Group in accordance with the guidance 'Internal Control: Guidance for Directors on the Combined Code' published by the Financial Reporting Council.*** The Board regularly reviews these processes through the Board Committees.

The Directors review the effectiveness of the system of internal control semi-annually. An internal control compliance certification process is conducted throughout the Group in support of this review. The effectiveness of controls is periodically reviewed within the business areas. Regular reports are made to the Board Audit Committee by management, Internal Audit and the compliance and legal functions covering particularly financial controls, compliance and operational controls. The Board Audit Committee monitors resolution of any identified control issues of Group level significance through to a satisfactory conclusion.

- 32 -

The Group Internal Control and Assurance Framework (GICAF) describes the Group's approach to internal control and details Group policies and processes. The GICAF is reviewed and approved on behalf of the Group Chief Executive by the Group Governance and Control Committee.

Quarterly risk reports are made to the Board covering risks of Group significance including credit risk, market risk and operational risk, including legal and compliance risk. Reports covering risk measurement standards and risk appetite are made to the Board Risk Committee. Further details of risk management procedures are given in the Risk management section on pages 80 to 112. (Emphasis added.)

102.    The *Corporate Governance* section of the 2007 Form 20-F also contains a subsection

concerning the *Role of the Board*, which stated in pertinent part:

The role and responsibilities of the Barclays Board, which encompass the duties of Directors described above, are set out in Corporate Governance in Barclays. The Board is responsible to shareholders for creating and delivering sustainable shareholder value through the management of the Group's businesses. It therefore determines the goals and policies of the Group to deliver such long-term value, providing overall strategic direction within a framework of rewards, incentives and controls.

***The Board is also responsible for ensuring that management maintains a system of internal control that provides assurance of effective and efficient operations, internal financial controls and compliance with law and regulation.*** (Emphasis added.)

103.    The *Corporate Governance* section of the Form 2007 20-F, includes another

statement signed on behalf of the Board by defendant Agius, which stated:

The Group Chief Executive, John Varley, and the Group Finance Director, Chris Lucas, conducted with Group Management an evaluation of the effectiveness of the design and operation of the Group's disclosure controls and procedures as at 31st December 2007, which are defined as those controls and procedures designed to ensure that information required to be disclosed in reports filed or submitted under the US Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the US Securities and Exchange Commission's rules and forms. ***As of the date of the evaluation, the Group Chief Executive and Group Finance Director concluded that the design and operation of these disclosure controls and procedures were effective.*** The Group Chief Executive and Group Finance Director also concluded that no significant changes were made in our internal controls or in other factors that could significantly affect these controls subsequent to their evaluation. (Emphasis added.)

104.    Concerning Libor, the 2007 Form 20-F stated at page 66:

*Liquidity risk*

Bank funding markets and general liquidity in credit markets came under pressure in 2007. In the second half, some money market participants faced difficulties in obtaining funding beyond one week, and *term LIBOR premiums rose despite the helpful provision of liquidity by central banks*. The cost of longer-term bank funding and capital also increased, and funding channels such as securitisation and covered bond issuance became significantly constrained. *Despite these developments, the Group's liquidity position remained strong due to its deep retail funding base, its diversity of institutional funding sources across tenors, counterparties and geographies and its limited reliance on securitisation as a funding source*. (Emphasis added.)

105.    The statements referenced above in ¶¶94-104 regarding adherence to responsible practices; the *possibility* of liability to third parties for its harmful conduct; the Company's commitment to the management of operational risk; the rarity of significant operational risk; the various risks associated with the Company; the Company's commitment to promoting good corporate governance; the Company's ambition to be at the forefront of global best practice and to respond, in a timely manner, to corporate governance developments; the Company's operation of a system of internal controls which provides reasonable assurance of effective and efficient operations covering all controls, including financial and operational controls and compliance with laws and regulations; the processes that the Company had in place to identify, evaluate and manage the significant risks facing the Company; the responsibility of the Board for ensuring that management maintains a system of controls that provides assurance of effective and efficient operations, internal financial controls and compliance with law and regulation; the conclusion of the CEO and Group Finance Director that the design and operation of the Company's disclosure controls and procedures were effective; statements concerning Libor and the Company's liquidity; among other statements, were materially false and misleading for the reasons set forth above in ¶90.

106.    On March 26, 2008, Barclays also filed its annual report to shareholders on a Form 6-K ("2007 Annual Report"). In addition to repeating many of the representations that were made in

the 2007 Form 20-F, the 2007 Annual Report also included a section entitled Group Chairman's

Statement, which was signed by defendant Agius.  In that section, Agius commented on how

Barclays purportedly practices "Responsible Banking":

> *Responsible Banking*
>
> During the year we redefined our corporate responsibility strategy in support of
> corporate sustainability.  The sustainability strategy we are developing encompasses
> several themes: customer centricity; inclusiveness; respect for diversity;
> environmental sustainability and ***responsible global citizenship***.  (Emphasis added.)

107.    The statement referenced above in ¶106 regarding the development of the Company's

sustainability strategy to be a responsible global citizen was materially false and misleading for the

reasons set forth above in ¶90.

108.    On October 31, 2008, Barclays held a conference call to announce a capital raise.

During the question-and-answer part of the call, the following exchange took place:

> ANALYST [Ian Smillie]: Thank you.  And the third point is, could you comment on
> your deposit flow performance, both in GRCB and in Barclays Capital, because *we
> noticed that you are consistently paying slightly higher than most of the other UK
> banks in the LIBOR rate*, and I'm keen to tie that together with how your deposit
> flows are coming through.
>
> VARLEY: Ian, on the flow, I'll ask Chris to comment, and then on the rate I'm just
> going to ask Bob to comment.
>
> *          *          *
>
> DIAMOND: Yes.  I don't know what you would be looking at to come to that
> conclusion, but *we're categorically not paying higher rates in any currency*.  We're
> seeing increased flows of deposits and *we benefit in times of turmoil, so we post
> where we're transacting, and it's clearly not at high levels*.
>
> ANALYST: Thanks.  Just to answer that question, we're looking at the sterling three
> month LIBOR rates which are about 30 bps higher than, let's say, HSBC at the other
> end of the spectrum.  But I understand that that's not the only rate that's out there.
> That's the one that we were looking at.  That's great.  Thanks, gents. (Emphasis
> added.)

109.    The statements referenced above in ¶108 that Barclays was not paying higher rates in any currency; that the Company benefits in times of turmoil; that its posting is clearly not at high levels; and other statements regarding Libor were materially false and misleading for the reasons set forth above in ¶90.

### The 2008 Form 20-F and Annual Report

110.    On March 24, 2009, the Company filed its 2008 Form 20-F with the SEC ("2008 Form 20-F"), which was signed by defendants Varley and Lucas. In the *Corporate Sustainability* section of the 2008 Form 20-F, the Company commented on how it "ensur[es] that it behaves at all times as a responsible global citizen" stating, in pertinent part:

> At Barclays, we recognise that our sustainability values have an increased importance in the current financial climate. ***We are focused on***: supporting our existing customers; being a bank that welcomes all potential customers; being an equal opportunity employer; our commitment to climate change; and ***ensuring we behave at all times as a responsible global citizen***. (Emphasis added.)

111.    In the same section, the Company also stated:

> ***We acknowledge and accept that we have an obligation to be a responsible global citizen, and our sustainability efforts help us to achieve this***. This means managing our business and supply chain to improve our social, economic and environmental impact, and ***doing business ethically***. (Emphasis added.)

112.    The 2008 Form 20-F contained a section entitled *Risk Management* in which the Company categorized the risks it faces and describes how the Company tries to manage these risks. One such category of the risks facing the Company is Legal Risks. In discussing Legal Risk, the 2008 Form 20-F stated, in pertinent part, as follows:

> *Legal Risk*
>
> The Group is subject to a comprehensive range of legal obligations in all countries in which it operates. As a result, the Group is exposed to many forms of legal risk, which may arise in a number of ways. Primarily:
>
> – ***the Group's business may not be conducted in accordance with applicable laws around the world***;

– contractual obligations may either not be enforceable as intended or may be enforced against the Group in an adverse way;

– the intellectual property of the Group (such as its trade names) may not be adequately protected; and

– the Group may be liable for damages to third parties harmed by the conduct of its business.

The Group faces risk where legal proceedings are brought against it. Regardless of whether such claims have merit, the outcome of legal proceedings is inherently uncertain and could result in financial loss.

Defending legal proceedings can be expensive and time-consuming and there is no guarantee that all costs incurred will be recovered even if the Group is successful. *Although the Group has processes and controls to manage legal risks, failure to manage these risks could impact the Group adversely, both financially and by reputation*.

Further details of the Group's legal proceedings are included in the 'Legal proceedings' note to the financial statements on page 245. (Emphasis added.)

113.    The 2008 Form 20-F also discussed the Company's control framework for responding

to material risks, stating, in pertinent part, as follows:

The Board is responsible for the Group Internal Control and Assurance Framework ('GICAF'). As part of the GICAF, it approves the Principal Risks Policy, which sets out responsibilities for the management of the Group's most significant risk exposures. The Board oversees the operating effectiveness of the Principal Risks Policy through the regular review of reports on the Group's material risk exposures and controls.

The Group's risk categorisation comprises 17 risk categories ('Level 1'), 13 of which are known as Principal Risks. Each Principal Risk is owned by a senior individual at the Group level, who liaises with Principal Risk owners within Business Units and Group Centre Functions. The 17 risk categories are shown in the panel below.

Each Group Principal Risk Owner ('GPRO') is responsible for setting minimum control requirements for their risk and for overseeing the risk and control performance across the Group. Group control requirements (*e.g.* Group Policies/Processes/Committee oversight) for each of these risks are defined, in consultation with Business Units, and communicated and maintained by the GPRO.

Implementation of the control requirements for each Principal Risk provides each Business Unit or Group Centre Function with the foundation of its system of internal control for that particular risk. This will usually be built upon in more detail,

according to the circumstances of each Business Unit, to provide a complete and appropriate system of internal control.

***The specific controls for individual Principal Risks are supplemented by generic risk management requirements***. These requirements are articulated as the Group's Operational Risk Management Framework (see page 130) and include policies on:

– Internal Risk Event Identification and Reporting – Risk and Control Assessment

– Key Indicators

– *Key Risk Scenarios*

Business Unit and Group Centre Function Heads are responsible for maintaining ongoing assurance that the controls they have put in place to manage the risks to their business objectives are operating effectively. They are required to undertake a formal six-monthly review of assurance information. These reviews support the regulatory requirement for the Group to make a statement about its system of internal control (the 'Turnbull' statement), in the Annual Report and Accounts. (Emphasis added.)

114. In discussing Operational Risk Management, the 2008 Form 20-F stated, in pertinent part, as follows:

Operational risk is the risk of direct or indirect losses resulting from human factors, external events, and inadequate or failed internal processes and systems. ***Operational risks are inherent in the Group's operations and are typical of any large enterprise***. Major sources of operational risk include: operational process reliability, IT security, outsourcing of operations, dependence on key suppliers, implementation of strategic change, integration of acquisitions, fraud, human error, customer service quality, regulatory compliance, recruitment, training and retention of staff, and social and environmental impacts. ***Barclays is committed to the advanced measurement and management of operational risks. In particular, it has implemented improved management and measurement approaches for operational risk to strengthen control, improve customer service and minimise operating losses***. Barclays was granted a Waiver to operate an Advanced Measurement Approach (AMA) under Basel II, which commenced in January 2008.

The Group's operational risk management framework aims to:

– Understand and report the operational risks being taken by the Group.

– Capture and report operational errors made.

– Understand and minimise the frequency and impact, on a cost benefit basis, of operational risk events.

> *Barclays works closely with peer banks to benchmark our internal operational risk practices and to drive the development of advanced operational risk techniques across the industry.* It is not cost effective to attempt to eliminate all operational risks and in any event it would not be possible to do so. Events of small significance are expected to occur and are accepted as inevitable; *events of material significance are rare and the Group seeks to reduce the risk from these in a framework consistent with its agreed Risk Appetite.* (Emphasis added.)

115.    In discussing how the Company is organized and structured to combat risk, the 2008 Form 20-F stated, in pertinent part, as follows:

> Barclays has a Group Operational Risk Framework, which is consistent with and part of the Group Internal Control and Assurance Framework. *Minimum control requirements have been established for all key areas of identified risk by 'Principal Risk' owners (see page 78).* The risk categories relevant to operational risks are Financial Crime, Financial Reporting, Taxation, Legal, Operations, People, Regulatory and Technology. In addition the following risk categories are used for business risk: Brand Management, Corporate Responsibility, Strategic and Change. Responsibility for implementing and overseeing these policies is positioned with Group Principal Risk Owners. The prime responsibility for the management of operational risk and the compliance with control requirements rests with the business and functional units where the risk arises. Front line risk managers are widely distributed throughout the Group in business units. They service and support these areas, assisting line managers in managing these risks.
>
> Business Risk Directors in each business are responsible for overseeing the implementation of and compliance with Group policies. Governance and Control Committees in each business monitor control effectiveness. The Group Governance and Control Committee receives reports from the committees in the businesses and considers Group- significant control issues and their remediation. In the Group Centre, each Principal Risk is owned by a senior individual who liaises with Principal Risk owners within the businesses. In addition, the Operational Risk Director oversees the range of operational risks across the Group in accordance with the Group Operational Risk Framework. Business units are required to report on both a regular and an event-driven basis. The reports include a profile of the material risks to their business objectives, control issues of Group-level significance, and operational risk events. Specific reports are prepared on a regular basis for the Risk Oversight Committee, the Board Risk Committee and the Board Audit Committee. *The Internal Audit function provides further assurance for operational risk control across the organisation and reports to the Board and senior management.* (Emphasis added.)

116.    In the *Group Chairman's introduction* to the *Corporate Governance report* in the 2008 Form 20-F, defendant Agius commented on the Company's purported compliance with

applicable laws.  That section, which was signed by defendant Agius, stated, in pertinent part, as

follows:

> I am pleased to report to you on the activities of the Board and its Committees during
> 2008.  Our report sets out how *we have complied with the UK Combined Code on*
> *Corporate Governance* (the Code) and also gives further details of the matters that
> the Board and its principal Committees have considered over the year.  (Emphasis
> added.)

117.    The *Corporate Governance* section of the 2008 Form 20-F also contained a

subsection on page 145 concerning the *Role of the Board*, which stated in pertinent part:

> The Board is responsible to shareholders for creating and delivering sustainable
> shareholder value.  In order to achieve this it must establish the objectives and
> policies of the Group that will deliver long-term value.  The Board sets the overall
> strategic direction and ensures it is delivered within an appropriate framework of
> reward, incentive and control.
>
> *Another key responsibility of the Board is to ensure that management maintains a*
> *system of internal control that provides assurance of effective and efficient*
> *operations, internal financial controls and compliance with law and regulation.*
> *The Board considers the Group's business and reputation and ensures that the*
> *controls in place are appropriate to the materiality of financial and other risks and*
> *the relative costs and benefits of implementing specific controls.* (Emphasis added.)

118.    The  statements  referenced  above  in  ¶¶110-117  regarding  the  Company's

acknowledgement of its obligation to be a responsible global citizen and its sustainability efforts to

achieve that, which includes doing business ethically; the risk that the Company's business *may* not

be conducted in accordance with applicable laws around the world; the *possibility* that the failure to

manage risks could impact the Company adversely; the Company's commitment to the advanced

measurement and management of operational risks; the Company's implementation of improved

management and measurement approaches for operational risk to strengthen control and minimize

operating losses; the Company's working relationship with peer banks to benchmark its best

practices; the rarity of significant operational risk; the establishment of minimum control

requirements across all key areas of identified risk; the assurance provided by the Internal Audit

function for operational risk control across the organization which includes reports to the board and senior management; the Company's compliance with the UK Combined Code on Corporate Governance; the Board's responsibility to ensure that management maintains a system of internal control that provides assurance of effective and efficient operations, internal financial controls and compliance with law and regulations; among other statements, were materially false and misleading for the reasons set forth above in ¶90.

119.    On March 24, 2009, Barclays also filed its annual report to shareholders on a Form 6-K ("2008 Annual Report"). In addition to repeating many of the representations that were made in the 2008 Form 20-F, the 2008 Annual Report also included a section entitled *Group Chairman's Statement*, which was signed by defendant Agius. In that section, defendant Agius commented on how Barclays was committed to sustainability, stating, in pertinent part:

> At no other time in our history have the values of sustainability mattered more to our company and to our stakeholders.
>
> ***We focus our commitment in this important area*** on our ability to support our customers well in good times and bad; on our role as an equal opportunity company employing all races, creed, colour and orientation; on our commitment to play our part in managing the impact of climate change; and ***on our role as a responsible global citizen***. (Emphasis added.)

120.    The statement referenced above in ¶119 regarding the Company's commitment to its role as a responsible global citizen was materially false and misleading for the reasons set forth above in ¶90.

121.    In the section entitled *Group Chief Executive's Statement* in the 2008 Annual Report, which was signed by defendant Varley, defendant Varley commented on Barclays's 2009 strategic framework stating, in pertinent part:

> ***Responsible corporate citizenship***. Governments in the UK and elsewhere have taken significant steps to address the impacts of the financial crisis and recession, and ***we must work with the authorities and, of course, with our customers, to deal with***

*the crisis in a way which is consistent with our obligations to shareholders.*
(Emphasis added.)

122.    The statement referenced above in ¶121 regarding the Company's responsibility as a

corporate citizen was materially false and misleading for the reasons set forth in ¶90.

### 2009 Form 20-F and Annual Report

123.    On March 22, 2010, the Company filed its 2009 Form 20-F with the SEC ("2009

Form 20-F"), which was signed by defendants Varley and Lucas.  In the *Corporate Sustainability*

section of the 2009 Form 20-F, the Company stated in pertinent part:

> We have remained 'open for business' throughout the downturn, and at the same
> time have reinforced our commitment to be a responsible lender, providing access to
> credit and support while maintaining prudent lending standards.  We are focused on
> offering a strong safe and responsible service that contributes to the economic
> progress of society as a whole.
>
> *As well as supporting our customers and clients, and the communities in which we
> operate, we have: . . . aimed to operate as a responsible global citizen.*  (Emphasis
> added.)

124.    The 2009 Form 20-F contained a section entitled *Risk Management* in which the

Company categorized the risks it faced and described how the Company tried to manage these risks,

including Regulatory Risk, for which it stated, in pertinent part:

> *Regulatory risk*
>
> *Regulatory risk arises from a failure or inability to comply fully with the laws,
> regulations or codes applicable specifically to the financial services industry. Non-
> compliance could lead to fines, public reprimands, damage to reputation, increased
> prudential requirements, enforced suspension of operations or, in extreme cases,
> withdrawal of authorisations to operate.*
>
> In addition, the Group's businesses and earnings can be affected by the fiscal or other
> policies and other actions of various governmental and regulatory authorities in the
> United Kingdom, the European Union ('EU'), the United States, South Africa and
> elsewhere.  All these are subject to change, particularly in an environment where
> recent developments in the global markets have led to an increase in the involvement
> of various governmental and regulatory authorities in the financial sector and in the
> operations of financial institutions.  In particular, governmental and regulatory
> authorities in the United Kingdom, the United States and elsewhere are implementing

measures to increase regulatory control in their respective banking sectors, including by imposing enhanced capital and liquidity requirements. Any future regulatory changes may potentially restrict the Group's operations, mandate certain lending activity and impose other compliance costs.

Areas where changes could have an impact include:

– the monetary, interest rate and other policies of central banks and regulatory authorities;

– general changes in government or regulatory policy that may significantly influence investor decisions, in particular markets in which the Group operates;

– general changes in regulatory requirements, for example, prudential rules relating to the capital adequacy framework and rules designed to promote financial stability and increase depositor protection;

– changes in competition and pricing environments;

– further developments in the financial reporting environment;

– differentiation amongst financial institutions by governments with respect to the extension of guarantees to customer deposits and the terms attaching to those guarantees; and

– implementation of, or costs related to, local customer or depositor compensation or reimbursement schemes.

Further details of specific matters that impact the Group are included in the Supervision and Regulation section on page 145 and Note 36 to the financial statements on page 248. (Emphasis added.)

125.    In discussing Legal Risk, the 2009 Form 20-F stated, in pertinent part:

*Legal risk*

The Group is subject to a comprehensive range of legal obligations in all countries in which it operates. As a result, the Group is exposed to many forms of legal risk, which may arise in a number of ways. Primarily:

– ***the Group's business may not be conducted in accordance with applicable laws around the world***;

– contractual obligations may either not be enforceable as intended or may be enforced against the Group in an adverse way;

– the intellectual property of the Group (such as its trade names) may not be adequately protected; and

- 43 -

*— the Group may be liable for damages to third parties harmed by the conduct of its business.*

The Group faces risk where legal proceedings are brought against it. Regardless of whether such claims have merit, the outcome of legal proceedings is inherently uncertain and could result in financial loss.

Defending legal proceedings can be expensive and time-consuming and there is no guarantee that all costs incurred will be recovered even if the Group is successful. *Although the Group has processes and controls to manage legal risks, failure to manage these risks could impact the Group adversely, both financially and by reputation.*

Further details of the Group's legal proceedings are included in Note 35 to the financial statements on page 247. (Emphasis added.)

126.    The 2009 Form 20-F discussed the Company's internal controls stating, in pertinent part:

*Internal control*

The Directors have responsibility for ensuring that management maintain an effective system of internal control and for reviewing its effectiveness. Such a system is designed to manage rather than eliminate the risk of failure to achieve business objectives and can only provide reasonable and not absolute assurance against material misstatement or loss. *Throughout the year ended 31st December 2009, and to date, the Group has operated a system of internal control which provides reasonable assurance of effective and efficient operations covering all controls, including financial and operational controls and compliance with laws and regulations. Processes are in place for identifying, evaluating and managing the significant risks facing the Group in accordance with the guidance 'Internal Control: Revised Guidance for Directors on the Combined Code' published by the Financial Reporting Council.* The Board regularly reviews these processes through its principal Board Committees.

The Directors review the effectiveness of the system of internal control semi-annually.  An internal control compliance certification process is conducted throughout the Group in support of this review.  The effectiveness of controls is periodically reviewed within the business areas.  Regular reports are made to the Board Audit Committee by management, Internal Audit and the finance, compliance and legal functions covering particularly financial controls, compliance and operational controls.  The Board Audit Committee monitors resolution of any identified control issues of Group level significance through to a satisfactory conclusion.

The Group Internal Control and Assurance Framework (GICAF) describes the Group's approach to internal control and details Group policies and processes. The GICAF is reviewed and approved on behalf of the Group Chief Executive by the Group Governance and Control Committee.

Regular risk reports are made to the Board covering risks of Group significance including credit risk, market risk, operational risk and legal risk. Reports covering credit, market and operational risk, key risks, risk measurement methodologies and risk appetite are made to the Board Risk Committee. Further details of risk management procedures are given in the Risk management section on pages 87 to 93. (Emphasis added.)

127.    The 2009 Form 20-F also has a section in which the Company's operational risk

management is described. The introduction to that section stated the following:

Operational risk is the risk of direct or indirect losses resulting from human factors, external events, and inadequate or failed internal processes and systems. Operational risks are inherent in the Group's operations and are typical of any large enterprise. ***Major sources of operational risk include:*** operational process reliability, IT security, outsourcing of operations, dependence on key suppliers, implementation of strategic change, integration of acquisitions, fraud, human error, customer service quality, regulatory compliance, recruitment, training and retention of staff, and social and environmental impacts. ***Barclays is committed to the advanced measurement and management of operational risks. In particular, it has implemented improved management and measurement approaches for operational risk to strengthen control, improve customer service and minimise operating losses***. Barclays was granted a Waiver to operate an Advanced Measurement Approach (AMA) under Basel II, which commenced in January 2008.

The Group's operational risk management framework aims to:

– Understand and report the operational risks being taken by the Group.

– Capture and report operational errors made.

– Understand and minimise the frequency and impact, on a cost benefit basis, of operational risk events.

– Manage residual exposures using insurance. (Emphasis added.)

128.    In discussing the how the Company is organized and structured to combat risk, the

2009 Form 20-F stated, in pertinent part:

- 45 -

*Organisation and structure*

**Barclays works to benchmark our internal operation risk practices with peer banks and to drive the development of advanced operational risk techniques across the industry.** It is not cost effective to attempt to eliminate all operational risks and in any event it would not be possible to do so.  Events of small significance are expected to occur and are accepted as part of the normal course of business; events of material significance are rare and the Group seeks to reduce the risk from these in accordance with its agreed Risk Appetite.

Barclays has a Group Operational Risk Framework, which is consistent with and part of the Group Internal Control and Assurance Framework.  **Minimum control requirements have been established for all key areas of identified risk by 'Principal Risk' owners** (see page 82).  The risk categories relevant to operational risks are Financial Crime, Financial Reporting, Taxation, Legal, Operations, People, Regulatory and Technology.  In addition, the following risk categories are used for business risk: Brand Management, Corporate Responsibility, Strategic and Major Change.  Responsibility for implementing and overseeing these policies is positioned with Group Principal Risk Owners.  The prime responsibility for the management of operational risk and the compliance with control requirements rests with the business and functional units where the risk arises.  Front line risk managers are widely distributed throughout the Group in business units.  They service and support these areas, assisting line managers in managing these risks.

Business Risk Directors in each business are responsible for overseeing the implementation of and compliance with Group policies.  Governance and Control Committees in each business monitor control effectiveness.  The Group Governance and Control Committee receives reports from the committees in the businesses and considers  Group-significant control issues and their remediation.  In the Group Centre, each Principal Risk is owned by a senior individual who liaises with Principal Risk owners within the businesses.  In addition, the Operational Risk Director oversees the range of operational risks across the Group in accordance with the Group Operational Risk Framework.  Business units are required to report on both a regular and an event-driven basis.  The reports include a profile of the material risks to their business objectives, control issues of Group-level significance, and operational risk events.  Specific reports are prepared on a regular basis for the Group Risk Oversight Committee, the Board Risk Committee and the Board Audit Committee.  **The Internal Audit function provides further assurance for operational risk control across the organisation and reports to the Board and senior management**.  (Emphasis added.)

129.    The *Risk Management: Supervision and Regulation* section of the 2009 Form 20-F on page 118 touted how well regulated Barclays was and stated in pertinent part:

**The Group's operations, including its overseas offices, subsidiaries and associates, are subject to a significant body of rules and regulations that are a condition for**

- 46 -

*authorization to conduct banking and financial services business, constrain business operations and affect financial returns*. These include reserve and reporting requirements and conduct of business regulations. These requirements are imposed by the relevant central banks and regulatory authorities that supervise the Group in the jurisdictions in which it operates. The requirements reflect global standards developed by, among others, the Basel Committee on Banking Supervision and the International Organisation of Securities Commissions. They also reflect requirements derived from EU directives. (Emphasis added.)

130.    In the *Group Chairman's Introduction* to the *Corporate Governance Report* within the 2009 Form 20-F, defendant Agius commented on the Company's purported compliance with applicable laws. That section, which was signed by defendant Agius, stated, in pertinent part:

The report that follows *sets out how we have complied with the UK Combined Code on Corporate Governance* (the Code) and also gives further details of any enhancements made during the year and in particular, in response to the recommendations of the Walker Review. (Emphasis added.)

131.    The *Corporate Governance* section of the 2009 Form 20-F also contains a subsection concerning the *Effective Internal Control*, which stated in pertinent part:

*One of the Board's key responsibilities is to ensure that management maintains a system of internal control that provides assurance of effective and efficient operations, internal financial controls and compliance with law and regulation*. The Board considers the materiality of financial and other risks to the Group's business and reputation, ensures that appropriate controls are in place and considers the relative costs and benefits of implementing specific controls.

The powers of the Board are set out in a formal schedule of matters reserved for the Board's decision. These matters are significant to the Group as a whole because of their strategic, financial or reputational implications.

The Schedule of Matters Reserved to the Board is reviewed and updated regularly to ensure it remains appropriate and a summary of these matters is set out on page 154. (Emphasis added.)

132.    The *Corporate Governance* section of the 2009 Form 20-F also contained a statement, on page 148, that the Company wanted to encourage:

"*behaviour consistent with the principles that guide Barclays business," including, "acting with the highest levels of integrity* to retain the trust of customers, shareholders, other external stakeholders and colleagues," and "taking full responsibility for decisions and actions Reflecting the operation of independent,

robust and evidence based governance and control and complying with relevant legal and regulatory requirements." (Emphasis added.)

133.    The statements referenced above in ¶¶123-132 regarding the Company's aim to operate as a responsible global citizen; the *possibility* that the failure to manage risks or the Company's non-compliance with laws, regulations or codes *could* impact the Company adversely; the Company's operation of a system of internal controls which provides reasonable assurance of effective and efficient operations covering all controls; that processes are in place for identifying, evaluating and managing the significant risks facing the Company; the risk that the Company's business *may* not be conducted in accordance with applicable laws around the world; the *possibility* of liability to third parties for its harmful conduct; the major sources of operational risk; the Company's commitment to the advanced measurement and management of operational risks; the Company's implementation of improved management and measurement approaches for operational risk to strengthen control and minimize operating losses; the assurance provided by the Internal Audit function for operational risk control across the organization which includes reports to the board and senior management; details of the Company's risk management; the Company's compliance with the UK Combined Code on Corporate Governance; and the Board's responsibility and efforts to ensure that management maintains a system of internal control that provides assurance of effective and efficient operations, internal financial controls and compliance with law and regulations; that the Company wanted to encourage behavior that includes acting with the highest levels of integrity; among other statements, were materially false and misleading for the reasons set forth in ¶90.

134.    On March 22, 2010, Barclays also filed its annual report to shareholders on a Form 6-K ("2009 Annual Report"). In addition to repeating many of the representations that were made in the 2009 Form 20-F, the 2009 Annual Report included a section entitled *Group Chairman's*

*Statement*, which began with the following quote by defendant Agius, which was in extra-large

typeface and under a photograph of defendant Agius:

> Barclays recognises the vital economic and social purpose that banks play, ***and we are committed to meeting our responsibilities to stakeholders and society in general***. (Emphasis added.)

135.    The statement referenced above in ¶134 regarding the Company's commitment to

meeting its responsibilities to stakeholders and society in general was materially false and

misleading for the reasons set forth in ¶90.

136.    Defendant Agius, in discussing how he regrets the problems caused by banks, noted

in the *Group Chairman's Statement*, in pertinent part:

> 2009 has been another difficult year for a number of the major economies in the world and this has continued to impact not just the banking industry, but also our customers and our clients. Despite the exceptional efforts of governments, central bankers and regulators to stabilise matters in the second half of 2008 – particularly in the UK – confidence generally continued to decline to dangerously low levels in early 2009. And while conditions improved as the year progressed – such that essential stability in the financial system has now been restored – the resulting impact in terms of higher global economic growth has still to be felt. Good progress has been made within the G20 forum as to the nature and extent of future regulations for the banking industry and there is a reasonable measure of international consensus as to the future measures which will need to be implemented. Regulation remains the focus of intense international debate, however, and much work remains to be done in order to deliver an effective solution on a co-ordinated basis.

> At Barclays we believe it is important that the banking industry itself learns the lessons from the crisis given the economic and financial costs that have arisen. I said in my report to shareholders last year – and I repeat it now – that ***we very much regret the problems that banks have caused. We also acknowledge and are grateful for the help and assistance given to the banking sector by governments across the world. We are determined that there must be no repeat of the turmoil that has affected the industry and wider economy, and fully recognise that changes have to be made. Banks must earn once more the confidence and trust of key stakeholders such as customers and clients, employees, shareholders, regulators, politicians and society in general***. While much remains to be done in this respect, we should not lose sight of what has already been achieved, particularly in the UK, in terms of strengthening capital ratios and improving liquidity across the sector, whilst also reducing leverage.

The regulatory reform agenda is a vital component of rebuilding confidence and trust and providing a healthy, stable and sound financial system, but it is essential that this agenda produces a level playing field internationally. Both financial and human capital are mobile and in the absence of internationally agreed standards, such capital will migrate to take advantage of differences in regulation. We therefore welcome the efforts by bodies such as the Financial Stability Board and the Basel Committee to produce internationally agreed standards and we will continue to co-operate with these international agencies as they work towards determining these standards.

It is also important that we do not seek to regulate too hastily or, in the understandable desire to avoid a repetition of recent events, go too far in terms of the reform agenda. Regulation needs to be strengthened but it must not result in a financial system that cannot serve the needs of the global economy. As recent events have shown, the financial sector has become increasingly interconnected in recent years in support of the trends in globalisation which have occurred. It follows that new solutions must be carefully balanced and fully thought through and agreed before implementation. We must take the time properly to understand the consequences and in particular the cumulative impact of the regulatory reforms being contemplated. We must ensure that the end result achieves three objectives:

– First, a safer and more secure financial system;

– Second, a banking industry that is well equipped to support the needs of the global economy; and

– Third, the ability of the suppliers of capital to earn an economic return on their capital.

All parties need to have confidence that any new regulation will be effective, but it must not be so heavy-handed as to restrict the banking industry's ability to support economic growth or to limit its ability to attract new capital in the future.

Barclays own focus in 2009 was to maintain strategic momentum despite the difficult environment. In particular, we have:

– Significantly strengthened our capital and liquidity positions and reduced our leverage;

– Focused on our customers and clients;

– ***Managed the business through the economic downturn, by a combination of income growth, strong cost control and careful risk management***; and

– Contributed to the evolving debate on the future of the industry. (Emphasis added.)

137. Defendant Agius explained how Barclays was committed to meeting its responsibilities, stating, in pertinent part:

At Barclays, we are committed to meeting our responsibilities to stakeholders. These include customers and clients, shareholders, employees, government and regulators and society in general. *We recognise in particular that we have a responsibility to*:

– Support appropriate risk-taking by customers; – Treat our customers fairly;

– Invest for the future;

– *Act as a responsible global citizen*;

– Pay responsibly;

– *Manage our affairs prudently and in a way that creates confidence*;

– Produce good returns for our shareholders; and

– Pay our fair share of taxes to the revenue authorities.

*These have been and will be our guiding lights as we seek to regain the trust and confidence of stakeholders*. And we are under no illusion that this will take time and that we will be judged by our actions. (Emphasis added.)

138.    In the section entitled *Group Chief Executive's Review* in the 2009 Annual Report, which was signed by defendant Varley, defendant Varley laid out the strategic framework for 2010 as follows:

The economic outlook remains uncertain. The worst of the financial crisis is behind us, but the environment remains unpredictable, and for that reason, *we have to be very clear about the strategic framework in which we will be doing business in 2010 and beyond*. The principal components are as follows . . . . (Emphasis added.)

139.    Defendant Varley then laid out five principal components of the 2010 strategic framework. The very first principal component was the following:

1.    *We will continue to act as responsible corporate citizens.* We will ensure that our wider responsibilities to society are reflected in how we act. To the extent consistent with what is required of us by our regulators and with our obligations to shareholders, we will continue to play our part as a source, via service to customers and clients, of economic growth and job creation in the geographies in which we operate. We must behave constructively to help our customers and clients as they cope with the economic downturn and to support governments and supervisors as they deal with the effects of the financial crisis. (Emphasis added.)

140.    The statements referenced above in ¶¶136-139 regarding the Company's determination to not repeat the turmoil that has affected the banking industry and wider economy; the Company's recognition that changes have to be made and that banks must earn once more the confidence and trust of key stakeholders; the Company's management of its business through the economic downturn by a combination of income growth, strong cost control and careful risk management; the Company's responsibility to act as a responsible global citizen, manage its affairs prudently and in a way that creates confidence; among other statements, were materially false and misleading for the reasons set forth in ¶90.

141.    On September 7, 2010, the Company issued a press release announcing that defendant Varley would step down as CEO, as well as from the Barclays's Boards and the Group Executive Committee and would be succeeded by defendant Diamond.

142.    On September 15, 2010, the chief of the FSA, Hector Sants, met with then Chairman Agius.  At that meeting, Sants told Agius that the FSA's investigation could have an effect on Barclays's decision to appoint Diamond as CEO.  Diamond, however, had already been named CEO and his tenure officially began on January 1, 2011.

### The 2010 Form 20-F and Annual Report

143.    On March 21, 2011, the Company filed its 2010 Form 20-F with the SEC ("2010 Form 20-F"), which was signed by defendants Diamond and Lucas.  The *Citizenship* section of the 2010 Form 20-F features the following quote from defendant Diamond:

> Our role is to help improve the lives of our customers. *We must* provide mortgages, allow businesses to invest and create jobs, protect savings, pay tax, *be a good neighbour in the community* while also generating positive economic returns for our investors. (Emphasis added.)

144.    The 2010 Form 20-F contains a section entitled *Risk Management* in which the Company described its risk management strategy, in pertinent part:

- 52 -

*Barclays has clear risk management objectives and a well-established strategy to deliver them, through core risk management processes.*

At a strategic level, *our risk management objectives are*:

– *To identify the Group's significant risks.*

– *To formulate the Group's Risk Appetite and ensure that business profile and plans are consistent with it.*

– *To optimize risk/return decisions by taking them as closely as possible to the business, while establishing strong and independent review and challenge structures.*

– *To ensure that business growth plans are properly supported by effective risk infrastructure.*

– *To manage risk profile to ensure that specific financial deliverables remain possible under a range of adverse business conditions.*

– To help executives improve the control and co-ordination of risk taking across the business.

The Group's approach is to provide direction on: understanding the principal risks to achieving Group strategy; establishing Risk Appetite;

and establishing and communicating the risk management framework. The process is then broken down into five steps: identify, assess, control, report, and manage/challenge. Each of these steps is broken down further, to establish end to end activities within the risk management process and the infrastructure needed to support it (see panel below). The Group's risk management strategy is broadly unchanged from 2009. (Emphasis added.)

145.    The 2010 Form 20-F further discussed the risk factors faced by the Company,

including Regulatory Risk, for which it stated, in pertinent part:

Regulatory Risk arises from a failure or inability to comply fully with the laws, regulations or codes applicable specifically to the financial services industry. *Non-compliance could lead to fines, public reprimands, damage to reputation, increased prudential requirements, enforced suspension of operations or, in extreme cases, withdrawal of authorisations to operate.* (Emphasis added.)

146.    In discussing Legal Risk, the 2010 Form 20-F stated, in pertinent part:

*Legal risk*

The Group is subject to a comprehensive range of legal obligations in all countries in which it operates.  As a result, the Group is exposed to many forms of legal risk, which may arise in a number of ways:

– ***Business may not be conducted in accordance with applicable laws around the world.***

– Contractual obligations may either not be enforceable as intended or may be enforced in an adverse way.

– Intellectual property may not be adequately protected.

– Liability for damages may be incurred to third parties harmed by the conduct of its business.  (Emphasis added.)

147.    In discussing how the Company is organized and structured to combat risk, the 2010

Form 20-F stated, in pertinent part:

*Structure and Governance*

The Operational Risk framework comprises a number of elements which allow Barclays to manage and measure its Operational Risk profile and to calculate the amount of Operational Risk capital that Barclays needs to hold to absorb potential losses.  The minimum, mandatory requirements for each of these elements are set out in the Group Operational Risk policies.  This framework is implemented: vertically, through the organisational structure with all Business Units required to implement and operate an operational risk framework that meets, as a minimum, the requirements detailed in these operational risk policies; and laterally, with Group Principal Risk Owners required to ensure that the Group Operational Risk policies are reflected in the Control Framework for their Principal Risk.

***Barclays operates within a robust system of internal control that enables business to be transacted and risk taken without exposure to unacceptable potential losses or reputational damage.   To this end, Barclays has implemented the Group Internal Control and Assurance Framework (GICAF) which is aligned with the internationally recognised Committee of Sponsoring Organisations of the Treadway Commission Framework (COSO).***

The prime responsibility for the management of operational risk and the compliance with control requirements rests with the business and functional units where the risk arises.  Front line risk managers are widely distributed throughout the Group.  They service and support these areas, assisting line managers in managing their risks.

- 54 -

The Operational Risk Director (or equivalent) for each Business Unit is responsible for ensuring the implementation of and compliance with Group Operational Risk policies.

The Group Operational Risk Director is responsible for establishing, owning and maintaining an appropriate Group wide Operational Risk Framework and for overseeing the portfolio of Operational Risk across the Group.

The Group Operational Risk Executive Committee (GOREC) assists with the oversight of Operational Risk. GOREC is a sub-committee of the Group Risk Oversight Committee (GROC), which presents to the Board Risk Committee (BRC).

In addition, Governance and Control Committees (G&CCs) in each business monitor control effectiveness. The Group G&CC receives reports from these committees and considers Group-significant control issues and their remediation. The Group G&CC presents to the Board Audit Committee (BAC).

Business units are required to report their Operational Risks on both a regular and an event-driven basis.  The reports include a profile of the material risks to their business objectives and the effectiveness of key controls, control issues of Group-level significance, operational risk events and a review of scenarios and capital. Specific reports are prepared on a regular basis for GOREC, GROC, BRC and BAC.

*The Internal Audit function provides further independent review and challenge of the Group's operational risk management controls, processes and systems and reports to the Board and senior management*.  (Emphasis added.)

148.   The 2010 Form 20-F described how the Company identifies risks, stating, in pertinent

part:

*Risk Assessments*

*Barclays identifies and assesses all material risks within each business unit and evaluates the key controls in place to mitigate those risks*.

Managers in the business units use self-assessment techniques to identify risks, evaluate the effectiveness of controls in place and assess whether the risks are effectively managed to within business risk appetite. The businesses are then able to make decisions on what, if any, action is required to reduce the level of risk to Barclays. *These risk assessments are monitored on a regular basis to ensure that each business continually understands the risks it faces*.  (Emphasis added.)

149.   The *Directors' Report* on page 129 of the 2010 Form 20-F addressed the directors'

role in maintaining internal control at the Company, stating in pertinent part:

*Internal control*

- 55 -

*The Directors have responsibility for ensuring that management maintain an effective system of internal control and for reviewing its effectiveness. Such a system is designed to manage rather than eliminate the risk of failure to achieve business objectives and can only provide reasonable and not absolute assurance against material misstatement or loss. Throughout the year ended 31st December 2010, and to date, the Group has operated a system of internal control which provides reasonable assurance of effective and efficient operations covering all controls, including financial and operational controls and compliance with laws and regulations. Processes are in place for identifying, evaluating and managing the significant risks facing the Group in accordance with the guidance 'Internal Control: Revised Guidance for Directors on the Combined Code' published by the Financial Reporting Council.* The Board regularly reviews these processes through its principal Board Committees.

*The Directors review the effectiveness of the system of internal control semi-annually.* An internal control compliance certification process is conducted throughout the Group in support of this review. The effectiveness of controls is periodically reviewed within the business areas. Regular reports are made to the Board Audit Committee by management, Internal Audit and the finance, compliance and legal functions covering particularly financial controls, compliance and operational controls.

*The Board Audit Committee monitors resolution of any identified control issues of Group level significance through to a satisfactory conclusion.*

The Group Internal Control and Assurance Framework (GICAF) describes the Group's approach to internal control and details Group policies and processes. The GICAF is reviewed and approved on behalf of the Chief Executive by the Group Governance and Control Committee.

Regular risk reports are made to the Board covering risks of Group significance including credit risk, market risk, operational risk and legal risk. Reports covering credit, market and operational risk, key risks, risk measurement methodologies and risk appetite are made to the Board Risk Committee. Further details of risk management procedures are given in the Risk management section on pages 66 to 142. (Emphasis added.)

150.   The *Corporate Governance* section of the 2010 Form 20-F, includes a statement signed by defendant Agius, which addressed his role at the Company, stating, "[m]y role as Group Chairman is to provide leadership to the Board, *ensuring that it satisfies its legal and regulatory responsibilities.*" (Emphasis added.)

- 56 -

151.    Concerning operational risk management, the 2010 Form 20-F stated at page 114 in

relevant part:

> *Risk management*
> *Operational risk management*
>
> Operational Risk is defined as the risk of direct or indirect impacts resulting from human factors, inadequate or failed internal processes and systems or external events. Operational risks are inherent in the Group's business activities and are typical of any large enterprise.  It is not cost effective to attempt to eliminate all operational risks and in any event it would not be possible to do so.  Losses from operational risks of small significance are expected to occur and are accepted as part of the normal course of business. ***Those of material significance are rare and the Group seeks to reduce the likelihood of these in accordance with its Risk Appetite.***
>
> Overview
>
> The management of Operational Risk has two key objectives:
>
> − To minimise the impact of losses suffered in the normal course of business (expected losses) and to avoid or reduce the likelihood of suffering a large extreme (or unexpected) loss.
>
> − To improve the effective management of the Barclays Group and strengthen its brand and external reputation.
>
> ***Barclays is committed to the management and measurement of operational risk*** and was granted a waiver to operate an Advanced Measurement Approach (AMA) for Operational Risk under Basel II, which commenced in January 2008.  The majority of the Group calculates regulatory capital using AMA, however in specific areas we apply the Standardised approach or Basic Indicator approach.  In certain joint ventures and associates, Barclays may not be able to apply the AMA.
>
> Areas where the roll-out of AMA is still continuing and the Standardised approach is currently applied are Barclays Bank Mozambique, National Bank of Commerce (Tanzania), and the portfolio of assets purchased from Woolworths Financial Services in South Africa, Citi Cards and Standard Life Bank, while these are integrated into our infrastructure.
>
> Areas where the Group is working towards the rollout of AMA and the Basic Indicator approach is applied are Barclays Bank PLC Pakistan, Barclays Bank LLC Russia, Barclays Investment and Loans India Limited, the ABSA Africa businesses and the 'new-to-bank' business activities acquired from Lehman Brothers.
>
> ***Barclays works to benchmark its internal operational risk practices with peer banks and to drive the development of advanced operational risk techniques across the industry.*** . . . (Emphasis added.)

- 57 -

152.   The statements referenced above in ¶¶143-151 regarding being a good neighbour in the community; having clear risk management objectives and a well-established strategy to deliver them; describing the Company's risk management objectives; the *possibility* that the failure to manage risks or the Company's non-compliance with laws, regulations or codes could impact the Company adversely; the risk that the Company's business *may* not be conducted in accordance with applicable laws around the world; the rarity of significant operational risk; the operation of the Company within a robust system of internal control that enables the Company to conduct business and take risk without exposure to unacceptable potential losses or reputational damage; the implementation of the Company's Group Internal Control and Assurance Framework to minimize risk; the assurance provided by the Internal Audit function for independent review and challenge of the operational risk controls across the organization which includes reports to the board and senior management; the Company's identification and assessment of all material risks within each business unit and evaluation of key controls in place to mitigate risks; the monitoring on a regular basis of risk assessments to ensure that each business continually understands the risks it faces; the responsibility of the Board for ensuring that management maintains an effective system of internal control and for reviewing its effectiveness; the Company's representation that, throughout the year ended December 31, 2010, it operated a system of internal control which provides reasonable assurance of effective and efficient operations covering all controls, including financial and operational controls and compliance with laws and regulations; the processes that were in place to identify, evaluate and manage the significant risks facing the Company; the review by the Board of the Company's system of controls; the monitoring by the Board Audit Committee of resolution of any identified control issues; the commitment of the Company to the management and measurement of operational risk; the Company's working relationship with peer banks to benchmark its best

practices; among other statements, were materially false and misleading for the reasons set forth above in ¶90.

153.   On April 27, 2011, Barclays issued its interim management statement for the first quarter of 2011, the period ended March 31, 2011. For the first time, the Company disclosed that it was being investigated by the FSA, the CFTC, the SEC and the DOJ. In that regard, Defendants stated, in pertinent part:

> The UK Financial Services Authority, the US Commodity Futures Trading Commission, the US Securities and Exchange Commission and the US Department of Justice are conducting investigations relating to certain past submissions made by Barclays to the British Bankers' Association, which sets Libor rates. We are cooperating with the investigations being conducted by these authorities and are keeping relevant regulators informed. It is currently not possible to predict the ultimate resolution of the issues covered by the various investigations, including the timing and the scale of the potential impact on the Group of any resolution.

### The 2011 Form 20-F

154.   On March 30, 2012, the Company filed its 2011 Form 20-F with the SEC ("2011 Form 20-F"), which was signed by defendants Diamond and Lucas. The *Corporate Governance* section on page 4 of the 2011 Form 20-F, includes a statement addressed to shareholders, signed by defendant Agius, which stated in pertinent part:

> *We must also demonstrate our wider value to society*. To support the delivery of this objective, in August 2011 we created a Board Citizenship Committee, which I chair. I am joined on the Committee by Sir John Sunderland and Dambisa Moyo, and we held its first meeting in late 2011. *Our remit is to have oversight of our conduct with regard to our corporate and societal obligations and our reputation as a responsible corporate citizen. We will oversee matters such as* our progress against our Treating Customers Fairly objectives and *our conduct on matters relating to our shareholders, clients, customers, employees, suppliers and the communities in which we operate*. More information on this Committee can be found in its Terms of Reference on our website. (Emphasis added.)

155.   The *Corporate Governance* section in the 2011 Form 20-F also contained a section summarizing the Company's risk management and controls in which it stated, in pertinent part:

> *Risk management and internal control*

- 59 -

The Directors have responsibility for ensuring that management maintain an effective system of risk management and internal control and for reviewing its effectiveness. Such a system is designed to manage rather than eliminate the risk of failure to achieve business objectives and can only provide reasonable and not absolute assurance against material misstatement or loss.

**Barclays is committed to operating within a strong system of internal control that enables business to be transacted and risk taken without exposing itself to unacceptable potential losses or reputational damage.** The Group Internal Control and Assurance Framework (GICAF) is the overarching framework that sets out Barclays approach to internal governance. It establishes the mechanisms and processes by which the Board directs the organisation, through setting the tone and expectations from the top, delegating its authority and monitoring compliance.

The purpose of the GICAF is to identify and set minimum requirements in respect of the main risks to achieving the Group's strategic objectives and to provide reasonable assurance that internal controls are effective. The key elements of the Group's system of internal control, which is aligned to the recommendations of The Committee of Sponsoring Organizations of the Treadway Commission (COSO), are set out in the risk control frameworks relating to each of the Group's Key Risks and in the Group operational risk framework. As well as incorporating our internal requirements, these reflect material Group-wide legal and regulatory requirements relating to internal control and assurance. The GICAF is reviewed and approved on behalf of the Chief Executive by the Group Governance and Control Committee at least annually. The Board Risk Committee also reviews the GICAF annually. (Emphasis added.)

156.    That section also described the Company's risk-control framework as follows:

*Risk control framework*

**Processes are in place for identifying, evaluating and managing the significant risks facing the Group in accordance with the guidance 'Internal Control: Revised Guidance for Directors on the Combined Code' published by the Financial Reporting Council (the Turnbull Guidance). The Board regularly reviews these processes through its principal Board Committees.** During 2011, the Principal Risks Policy, a material component of the GICAF, was updated to ensure that governance of non-financial risks was expanded and aligned to the structures already in place for financial risks. Regular risk reports are made to the Board covering risks of Group significance including credit risk, market risk, funding risk, operational risk and legal risk. The Board Risk Committee receives reports covering the Principal Risks as well as reports on risk measurement methodologies and risk appetite. Further details of risk management procedures are given in the Risk Management section on pages 67 to 158. (Emphasis added.)

157.    The Citizenship section of the 2011 Form 20-F features the following quote from defendant Diamond: "***Banks need to become better citizens***.  This is not about philanthropy – it's about delivering real commercial benefits in a way that also creates value for society." (Emphasis added.)

158.    Continuing on this theme, the Our Citizenship strategy section of the Form 20-F stated that, "[w]e seek to reinforce our integrity every day in the way that we manage our business and treat our customers." (Emphasis added.)

159.    Concerning operational risk, the 2011 Form 20-F stated in relevant part:

*Risk management*

*Operational risk management*

Operational Risk is defined as the risk of direct or indirect impacts resulting from human factors, inadequate or failed internal processes and systems or external events. ***Operational risks are inherent in the Group's business activities and are typical of any large enterprise***.  It is not cost effective to attempt to eliminate all operational risks and in any event it would not be possible to do so.  Losses from operational risks of small significance are expected to occur and are accepted as part of the normal course of business.  ***Those of material significance are rare and the Group seeks to reduce the likelihood of these in accordance with its Risk Appetite***.

Overview

The management of Operational Risk has two key objectives:

– To minimise the impact of losses suffered in the normal course of business (expected losses) and to avoid or reduce the likelihood of suffering a large extreme (or unexpected) loss.

– To improve the effective management of the Barclays Group and strengthen its brand and external reputation.

***Barclays is committed to the management and measurement of operational risk*** and was granted a waiver to operate an Advanced Measurement Approach (AMA) for Operational Risk under Basel 2, which commenced in January 2008.  The majority of the Group calculates regulatory capital using AMA, however in specific areas we apply the Standardised approach or Basic Indicator Approach.  In certain joint ventures and associates, Barclays may not be able to apply the AMA.

- 61 -

Areas where the Group is working towards the rollout of AMA and the Basic Indicator Approach is applied are: the Africa RBB businesses, including Barclays Bank Mozambique and National Bank of Commerce (Tanzania); Barclays Bank PLC Pakistan; Barclays Investment and Loans India Limited; the business activities acquired from Lehman Brothers; and the portfolios of assets purchased from Woolworths Financial Services in South Africa, Citi Cards Portugal and Italy, Standard Life Bank, MBNA Corporate Cards, Upromise and Egg Cards.

***Barclays works to benchmark its internal operational risk practices with peer banks and to drive the development of advanced operational risk techniques across the industry.* . . .**

***Barclays operates within a robust system of internal control that enables business to be transacted and risk taken without exposure to unacceptable potential losses or reputational damage.*** To this end, Barclays has implemented the Group Internal Control and Assurance Framework (GICAF) which is aligned with the internationally recognised Committee of Sponsoring Organisations of the Treadway Commission Framework (COSO). (Emphasis added.)

160. The *Risk Factors* section in the 2011 Form 20-F contains a subsection on page 269

concerning the Company's Legal and Litigation Risk, which stated in pertinent part:

The Group is subject to a comprehensive range of legal obligations in all countries in which it operates. As a result, the Group is exposed to many forms of legal risk, which may arise in a number of ways: ***business may not be conducted in accordance with applicable laws around the world.* . . .** Adverse regulatory action or adverse judgments in legal proceedings could result in significant financial penalties and losses, restrictions or limitations on the Group's operations or have a significant adverse effect on the Group's reputation or results of operations, financial condition or prospects or result in a loss of value in securities issued by the Group. (Emphasis added.)

161. In its *Notes to the Financial Statements* on page 223 of the 2011 Form 20-F, the

Company made the following disclosure concerning investigations into its role in fixing Libor rates:

The FSA, the US Commodity Futures Trading Commission, the SEC, the US Department of Justice Fraud Section of the Criminal Division and Antitrust Division and the European Commission are amongst various authorities conducting investigations into submissions made by Barclays and other panel members to the bodies that set various interbank offered rates. Barclays is co-operating in the relevant investigations and is keeping regulators informed. In addition, Barclays has been named as a defendant in a number of class action lawsuits filed in US federal courts involving claims by purported classes of purchasers and sellers of LIBOR-based derivative products or Eurodollar futures or options contracts between 2006 and 2009. The complaints are substantially similar and allege, amongst other things,

that Barclays and other banks individually and collectively violated US antitrust and commodities laws and state common law by suppressing LIBOR rates during the relevant period. Barclays has been informed by certain of the authorities investigating these matters that proceedings against Barclays may be recommended with respect to some aspects of the matters under investigation, and Barclays is engaged in discussions with those authorities about potential resolution of those aspects. It is not currently possible to predict the ultimate resolution of the issues covered by the various investigations and lawsuits, including the timing and the scale of the potential impact on the Group of any resolution.

162.    In an August 20, 2012 letter from Sants, the head of the FSA, to the House of Commons Treasury Committee, Sants stated that, "The FSA was fully aware that the ongoing investigation might come to conclusions which would be relevant to Mr. Diamond's suitability."

163.    The statements referenced above in ¶¶154-161 regarding the Company's commitment to operating within a strong system of internal control that enables business to be transacted and risk taken without exposing itself to unacceptable potential losses or reputational damage; the processes that are in place for identifying, evaluating and managing the significant risks facing the Company; the importance of banks becoming better citizens; the Company's efforts to reinforce its integrity every day in the way that it manages its business; the rarity of significant operational risk; the Company's working relationship with peer banks to benchmark its internal operational risk practices; the operation of the Company within a robust system of internal control that enables the Company to conduct business and take risk without exposure to unacceptable potential losses or reputational damage; the risk that the Company's business *may* not be conducted in accordance with applicable laws around the world; among other statements, were materially false and misleading for the reasons set forth in ¶90.

164.    Finally, the Forms 20-F filed with the SEC during the Class Period by the Company incorporated by reference Codes of Ethics (Exhibit 11.1) which all contained statements that were substantially similar to the following:

- 63 -

Under the Sarbanes Oxley Act 2002 section 406 and the relevant Securities and Exchange Commission (SEC) rules (17 CFR Parts 228 & 229) *Barclays Group (Barclays PLC, Barclays Bank PLC and their subsidiaries) is required to adopt and disclose a Code of Ethics for Senior Financial Officers*.

This Code of Ethics ('the Code') embodies the commitment of Barclays PLC, Barclays Bank PLC and their subsidiaries to promote:

- *Honest and ethical conduct*, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- *Full, fair, accurate, timely, and understandable disclosure in reports and documents that a registrant files with, or submits to, the Commission and in other public communications made by the registrant*;

- *Compliance with applicable governmental laws, rules and regulations*;

- *The prompt internal reporting to an appropriate person or persons identified in the code of violations of the code*; and

- *Accountability for adherence to the code*.  (Emphasis added.)

165.   The statements referenced above in ¶164 regarding the codes of ethics adopted by the Company were materially false and misleading for the reasons set forth in ¶90.

166.   Each Form 20-F filed by the Company with the SEC, which was in effect during at least part of the Class Period, identifies another report issued, at least annually, by Barclays entitled "Corporate Governance in Barclays" ("CGB").  During their respective, operative time periods, the CGB was available on Barclays's website.

167.   The CGB Report issued in February 2012 stated in part, in the sections entitled "Role and Responsibilities of the Board" (page 4) and again in "Role Profile – Directors" (page 12 of Board Governance, Role Profiles and Charter of Expectations):

The Board is responsible to shareholders for creating and delivering sustainable shareholder value through the management of the Group's businesses.  It should therefore determine the objectives and policies of the Group to deliver such long-term value, providing overall strategic direction within a framework of rewards, incentives and controls.  The Board must ensure that management strikes an appropriate balance between promoting long-term growth and delivering short-term objectives.  Directors must act in a way they consider, in good faith, would promote

the success of the company for the benefit of the shareholders as a whole . . . . ***The Board is also responsible for ensuring that management maintain a system of internal control which provides assurance of effective and efficient operations, internal financial controls and compliance with law and regulation***. In addition, the Board is responsible for ensuring that management maintain an effective risk management and oversight process at the highest level across the Group. In carrying out these responsibilities, the board must have regard to what is appropriate for the Group's business and reputation, the materiality of the financial and other risks inherent in the business and the relative costs and benefits of implementing specific controls. (Emphasis added.)

168.    The February 2012 CGB report also stated at page 10:

The Board has delegated the responsibility for the day-to-day management of the Group to the Chief Executive, who is responsible for leading the Executive Directors and for making and implementing operational decisions. The Chief Executive is supported by the Group Executive Committee, which he chairs.

169.    The statements referenced above in ¶¶164-168 regarding the Board's responsibility and efforts to ensure that management maintains a system of internal control that provides assurance of effective and efficient operations, internal financial controls and compliance with law and regulations, among other statements, were materially false and misleading for the reasons set forth in ¶90.

170.    Upon information and belief, each of the prior CGB reports that were either identified in an annual 20-F filing that was in effect during at least part of the Class Period or which was otherwise published by Barclays (including but not limited to publication on its website) contained essentially the same material language.

**The Submission Rates Themselves Were Materially False and Misleading Statements**

171.    In addition to the above statements made by Defendants in SEC filings and conference calls, the Dollar Libor Rate Submission Rates submitted by Barclays' London Money Market Desk from August 2007 through January 2009, in consultation with defendant Diamond, del Missier, and Dearlove, among others, were themselves materially false and misleading statements. According to the DOJ Statement of Facts:

From approximately August 2007 through at least approximately January 2009, Barclays often submitted inaccurate Dollar LIBORs that under-reported its perception of its borrowing costs and its assessment of where its Dollar LIBOR submission should have been. ***Certain members of management of Barclays, including senior managers in the treasury department and managers of the money markets desk, directed that the Barclays Dollar LIBOR submitters contribute rates that were nearer to the expected rates of other Contributor Panel banks rather than submitting the proper, higher LIBORs.*** Barclays Dollar LIBOR submitters, following the direction from certain members of management, submitted rates that they believed would be consistent with the submissions of other Dollar LIBOR Contributor Panel banks, or at least, that would not be too far above the expected rates of other members of the Contributor Panel. ***Consequently, on some occasions, Barclays submitted rates that were false because they were lower than Barclays otherwise would have submitted and contrary to the definition of LIBOR.*** DOJ ¶36 (Emphasis added).

172.    For example, on November 29, 2007, a Barclays Dollar Libor submitter entered a Submission Rate of 5.30 when the true rate would have been 5.5. Also, in early December 2007, a Barclays Dollar Libor submitter entered a Submission Rate of 5.3 when the true rate was closer to 5.4. And on or around April 16, 2008, a Barclays Dollar Libor submitter entered a Submission Rate of 2.74 when the true rate was closer to 2.98. Further false submissions were made by Barclays Libor submitters on November 16, 2007, November 28, 2007, November 30, 2007 and March 19, 2008.

173.    The statements referenced above in ¶172 regarding the Submission Rates submitted by Barclays were materially false and misleading, as conceded by Defendants in the DOJ Statement of Facts, and these statements were made with the intent to deceive the market about the rate at which Barclays truly believed it could borrow funds.

**Barclays Discloses Its Agreement to Pay $453 Million For Its Wrongful Conduct**

174.    In February 2012, British and U.S. regulators provided Barclays's general counsel with an ultimatum: Barclays must either enter into a settlement over its conduct in manipulating Libor or face criminal and civil charges. The settlement negotiations continued for months until the settlement was ultimately announced on June 27, 2012. According to an article in *The Wall Street*

*Journal*, during negotiations, "Barclays had secured an oral understanding from regulators that they wouldn't divulge the names of . . . Diamond and del Missier in the settlement documents or afterwards."

175.     Then, on June 27, 2012, Barclays issued a press release announcing that it had reached settlement agreements with the FSA, the CFTC and the DOJ in response to their investigations into Barclays's manipulation and making of false reports related to setting key global interest rates. ***As a result of its admission of wrongful conduct, Barclays disclosed that it had agreed to pay more than $450 million to the three authorities***. With regard to the settlements, defendants Diamond and Agius stated, in pertinent part:

> Barclays Chief Executive, Bob Diamond, said: "The events which gave rise to today's resolutions relate to past actions which fell well short of the standards to which Barclays aspires in the conduct of its business. When we identified those issues, we took prompt action to fix them and co-operated extensively and proactively with the Authorities. Nothing is more important to me than having a strong culture at Barclays; I am sorry that some people acted in a manner not consistent with our culture and values. To reflect our collective responsibility as leaders, Chris Lucas, Jerry del Missier, Rich Ricci and I have voluntarily agreed with the board to forgo any consideration for an annual bonus this year."

> Barclays Chairman, Marcus Agius, said: "The Board takes the issues underlying today's announcement extremely seriously and views them with the utmost regret. Since these issues were identified, the Authorities acknowledge that Barclays management has co-operated fully with their investigations and taken, and continues to take, prompt and decisive action to correct them. In addition, the Board welcomes the example set by Bob Diamond, Chris Lucas, Jerry del Missier and Rich Ricci in recognising their collective responsibility as leaders of Barclays."

176.     In response to this announcement, Barclays ADSs declined 12% to close at $10.84 per ADS.

## The Aftermath

177.     In the aftermath of the revelation of the scandal and the subsequent settlements, the Company announced several resignations and additional investigations into other alleged wrongdoings by the Company. On July 2, 2012, defendant Agius announced his resignation, but

said that he would continue as Chairman until the Company found a successor. Defendant Agius also announced that he would resign as Chairman of the BBA.

178.   In announcing his resignation, Agius stated, in pertinent part:

*[L]ast week's events - evidencing as they do unacceptable standards of behaviour within the bank - have dealt a devastating blow to Barclays reputation.* As Chairman, I am the ultimate guardian of the bank's reputation. Accordingly, the buck stops with me and I must acknowledge responsibility by standing aside.

The Board has also agreed to launch an audit of our business practices.

\*     \*     \*

This exercise will be part of a broader programme of activity intended to restore Barclays reputation and we will establish a zero tolerance policy for any actions that harm the reputation of the bank.

I am truly sorry that our customers, clients, employees and shareholders have been let down. Barclays is full of hard working, talented individuals whose integrity is not in question. (Emphasis added.)

179.   On July 3, 2012, following days of pressure to resign, both defendant Diamond, the CEO, and del Missier, the COO, stepped down as well.

180.   On October 31, 2012, Barclays Bank PLC also disclosed that it is facing investigations into other wrongdoings. In addition to manipulating Libor Submission Rates, Barclays Bank PLC and its traders are being accused by the FERC of manipulating the electricity market in and around California from November 2006 to December 2008. After a lengthy investigation, the FERC ordered Barclays Bank PLC to show cause: (i) why it should not be found to have manipulated the electric energy market; and (ii) *why it should not be assessed a civil penalty of $435 million – the largest penalty ever sought by the FERC – and disgorge $34.9 million plus interest.* The FERC's Office of Enforcement alleges that Barclays Bank PLC engaged in a scheme to manipulate the prices of energy so that the Company could profit from its positions in financial swaps, which settled against the index.

181.    The FERC also found that Barclays Bank PLC's compliance program was inadequate.  Indeed, although the compliance department "recognized that uneconomic trading raised serious legal and compliance issues," Barclays Bank PLC did not have systems in place to detect those issues.

182.    The FERC also concluded "that high-level personnel at Barclays were not only involved in but designed and supervised the manipulation."  The FERC also concluded that Barclays's involvement in the Libor scandal added to its culpability.

183.    In addition to being investigated for possibly manipulating energy markets, Barclays also disclosed that the DOJ and SEC are investigating the Company for possible violations of the FCPA.

**Additional Scienter Allegations**

184.    During the Class Period, Defendants acted with scienter in that they either knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; that such statements or documents would be issued or disseminated to the investing public; and they substantially participated or acquiesced in the issuance or dissemination of such statements or documents.

185.    As set forth elsewhere herein in detail, each of the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Barclays, their control over and/or receipt of Barclays's allegedly materially misleading statements, knowingly participated in the fraudulent scheme alleged herein.

186.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Barclays's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each of the Individual Defendants was provided with copies of the Company's SEC

- 69 -

filings and press releases alleged herein to be false and misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading. The Individual Defendants signed and/or certified the Forms 20-F for the years 2006 through 2011, and issued false statements to analysts and investors in one or more of the investor conference calls (as set forth above).

187.    The allegations above also establish a strong inference that Barclays as an entity acted with corporate scienter throughout the Class Period, as its officers, management, and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing Barclays's true operating condition from the investing public. By concealing these material facts from investors, Barclays maintained its artificially inflated ADS price throughout the Class Period.

### The Company's Materially False and Misleading Financial Statements

188.    International Financial Reporting Standards ("IFRS") require certain disclosures to be included in financial statements to prevent them from being false and misleading. In April 2001, the International Accounting Standards Board adopted International Accounting Standard ("IAS") 37, *Provisions, Contingent Liabilities and Contingent Assets*. Specifically, IAS 37 provides that a contingent liability must be disclosed in financial statements unless the likelihood of the occurrence of such contingency is "remote." In such instances, financial statements are to disclose the nature of

the contingency and, where practicable, give an estimate of possible loss or range of loss or state that such an estimate cannot be made.

189.    IFRS makes clear that the disclosure obligation under IAS 37 applies equally to interim and annual financial statements:

> the principles for recognising assets, liabilities, income, and expenses for interim periods are the same as in annual financial statements.

IAS 34.

190.    The disclosure of loss contingencies is so important to an informed investment decision that the SEC issued Article 10-01 of Regulation SX [17 C.F.R. §210.10-01], which provides that disclosures in interim period financial statements may be abbreviated and need not duplicate the disclosure contained in the most recent audited financial statements, except that "where material contingencies exist, disclosure of such matters shall be provided even though a significant change since year end may not have occurred."

191.    During the Class Period, Defendants knew or recklessly disregarded that IFRS required Barclays's financial statements to provide full and fair disclosure about the nature of the greater than remotely possible loss associated with its involvement in the Libor scandal. Defendants' failure to disclose this contingent liability violated the above provisions of IFRS.

192.    Indeed, Barclays's Forms 20-F referenced above and many of its 6-Ks that were filed during the Class Period disclosed numerous contingent liabilities, including lawsuits, but failed to make any mention of the Company's Libor interest rate manipulation and understating of Libor Submission Rates and the potential material adverse financial consequences ensuing therefrom.

193.    For example, on August 2, 2007, Barclays filed a Form 6-K with the SEC to which it attached the Company's unaudited interim results for the six months ended June 30, 2007. These

results included a section labeled "Contingent Liabilities and Commitments" in which the Company purported to disclose all of its contingent liabilities.

194.    This Form 6-K was materially false and misleading because the Company failed to disclose as part of its contingent liabilities that its knowing participation in a scheme to understate Libor Submission Rates would subject the Company to increased scrutiny, the imposition of substantial fines and/or penalties and damaging reputational harm.  Moreover, the Form 6-K was also materially false and misleading because the Company failed to disclose as part of its contingent liabilities that its failure to maintain adequate internal controls allowed Company personnel, including members of management, to participate in a scheme to manipulate Libor that would subject the Company to increased scrutiny, the imposition of substantial fines and/or penalties and damaging reputational harm.

195.    Barclays filed similar Forms 6-K on February 19, 2008, August 7, 2008, February 9, 2009, August 3, 2009, February 16, 2010, August 5, 2010, August 31, 2010 and February 15, 2011, which included the Company's financial results for various periods (including audited results at times) and included a section labeled "Contingent Liabilities and Commitments" in which the Company purported to disclose all of its contingent liabilities.  The Company's Forms 20-F filed during the Class Period, and cited to above, contained similar representations concerning the Company's disclosure of its contingent liabilities.  These Forms 6-K and 20-F were materially false and misleading for the reasons set forth above in ¶194.

### Loss Causation/Economic Loss

196.    The market for Barclays ADSs was open, well-developed, and efficient at all relevant times.  During the Class Period, as detailed herein, Defendants engaged in a course of conduct and a scheme to deceive the market that artificially inflated Barclays ADSs and operated as a fraud or deceit on Class Period purchasers of Barclays ADSs by misrepresenting the Company's then current

- 72 -

state of affairs. Defendants achieved this facade by making knowing misrepresentations and/or omissions about, among other things, the interest rates at which the Company believed it could borrow funds, the Company's involvement in the Libor-rigging scandal, its dedication to being a responsible global citizen and to conducting its business ethically, and its rigorous internal controls and compliance with these controls. As detailed above, at the end of the Class Period, when Defendants' prior misrepresentations became known to the public, the price of Barclays's ADSs fell precipitously, as the prior artificial inflation came out of the price of the ADSs. Plaintiffs and other members of the Class purchased or otherwise acquired Barclays's ADSs relying upon the integrity of the market price of Barclays's ADSs and market information regarding Barclays. As a result of their purchases of Barclays ADSs during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

197. By improperly concealing their conduct, Defendants presented a misleading picture of Barclays's financial condition, its conduct, its dedication to being responsible, its internal controls, and its compliance with such controls during the Class Period. Thus, instead of disclosing the truth about these matters, Defendants caused Barclays to conceal the truth. These actions caused Barclays ADSs to trade at artificially inflated prices throughout the Class Period and until the truth was revealed to the market.

198. On June 27, 2012, after Barclays issued a press release disclosing its participation in a scheme to manipulate Libor and announcing that it had reached settlements with the FSA, the CFTC and the DOJ for nearly half a billion dollars, it became apparent to investors that the Company's Libor Submission Rates, as well as numerous other Class Period statements, had been false and misleading. The price of Barclays ADSs dropped 12% the following day, falling from a close of $12.33 per ADS on June 27, 2012 to a close of $10.84 per ADS on June 28, 2012.

- 73 -

199.   The decline in Barclays's ADSs at the end of the Class Period was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The market now knew, among other things, that Barclays was involved in a Libor-rigging scandal, that Barclays and its senior officers had acted unlawfully and unethically, that Barclays had misrepresented the rates at which it believed it could borrow funds, and that the Company's internal controls and compliance were not as rigorous as represented. The timing and magnitude of the decline in the price of Barclays ADSs negates any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

200.   The economic loss, *i.e.*, damages, suffered by Plaintiffs and other members of the Class was a direct result of Defendants' fraudulent scheme to artificially inflate Barclays's ADS price and the subsequent significant decline in the value of Barclays ADSs when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

## Fraudulent Scheme and Course of Business

201.   During the Class Period, Defendants had actual knowledge of the misleading nature of the statements they made or acted in reckless disregard of the true information known to them at the time. In so doing, Defendants participated in a scheme to defraud and committed acts, practices and participated in a course of business that operated as a fraud or deceit on purchasers of Barclays ADSs during the Class Period. The fraudulent scheme: (i) deceived the investing public regarding Barclays's corporate governance, risk management, and internal controls; and (iii) caused Plaintiffs and other Class members to purchase Barclays ADSs at artificially inflated prices, causing them damage.

**Applicability of Presumption of Reliance:**
**Fraud on the Market Doctrine**

202.    At all relevant times, the market for Barclays ADSs was an efficient market for the following reasons, among others:

(a)    Barclays ADSs met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient, electronic stock market;

(b)    as a regulated issuer, Barclays filed periodic public reports with the SEC and the NYSE;

(c)    Barclays regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Barclays was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

203.    As a result of the foregoing, the market for Barclays ADSs promptly digested current information regarding Barclays from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of Barclays ADSs during the Class Period suffered similar injury through their purchase of Barclays ADSs at artificially inflated prices and a presumption of reliance applies.

**No Safe Harbor**

204.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Barclays who knew that those statements were false when made.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder Against All Defendants

205.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

206.     During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

207.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's ADSs during the Class Period.

- 76 -

208.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Barclays ADSs.  Plaintiffs and the Class would not have purchased Barclays ADSs at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

209.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Barclays ADSs during the Class Period.

## COUNT II

### Violation of Section 20(a) of
### the Exchange Act Against the Individual Defendants

210.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

211.    The Individual Defendants acted as controlling persons of Barclays within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of Barclays, and their ownership of Barclays ADSs, the Individual Defendants had the power and authority to cause Barclays to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.      Determining that this action is a proper class action, certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel;

- 77 -

B.      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: January 31, 2013                    ROBBINS GELLER RUDMAN
                                              & DOWD LLP
                                           SAMUEL H. RUDMAN
                                           DAVID A. ROSENFELD
                                           CHRISTOPHER M. BARRETT


                                           _____
                                                  DAVID A. ROSENFELD

                                           58 South Service Road, Suite 200
                                           Melville, NY  11747
                                           Telephone:  631/367-7100
                                           631/367-1173 (fax)
                                           srudman@rgrdlaw.com
                                           drosenfeld@rgrdlaw.com
                                           cbarrett@rgrdlaw.com

                                           *Lead Counsel for Plaintiff*

                                           VANOVERBEKE MICHAUD & TIMMONY, P.C.
                                           THOMAS C. MICHAUD
                                           79 Alfred Street
                                           Detroit, MI  48201
                                           Telephone:  313/578-1200
                                           313/578-1201 (fax)
                                           tmichaud@vmtlaw.com

SAXENA WHITE P.A.
JOSEPH E. WHITE III
2424 N. Federal Highway, Suite 257
Boca Raton, FL 33431
Telephone: 561/394-3399
561/394-3082 (fax)
jwhite@saxenawhite.com

WOLF HALDENSTEIN ADLER FREEMAN &
   HERZ LLP
GREGORY M. NESPOLE
ROBERT B. WEINTRAUB
270 Madison Avenue
New York, NY 10016
Telephone: 212/545-4600
212/545-4653 (fax)
nespole@whafh.com
weintraub@whafh.com

*Additional Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I, David A. Rosenfeld, hereby certify that, on January 31, 2013, I caused a true and correct copy of the attached:

Second Amended Complaint for Violation of the Federal Securities Laws

to be: (i) filed by hand with the Clerk of the Court; and (ii) served by first-class mail and electronic mail on all counsel on the attached service list.

David A. Rosenfeld

BARCLAYS 12

Service List - 11/27/2012  (12-0136)

Page 1 of  2

### Counsel For Defendant(s)

Jonathan D. Schiller
James B. Meadows
Alanna Cyreeta Rutherford
Boies Schiller & Flexner LLP
575 Lexington Avenue, 7th Floor
New York, NY  10022
   212/446-2300
   212/446-2350 (Fax)

David R. Boyd
Boies, Schiller & Flexner, LLP
5301 Wisconsin Avenue, N.W., Suite 800
Washington, DC  20015-2015
   202/237-2727
   202/237-6131 (Fax)

Robert B. Silver
Boies, Schiller & Flexner, LLP
333 Main Street
Armonk, NY  10504
   914/749-8200
   914/749-8300 (Fax)

Andrew J. Levander
Dechert LLP
1095 Avenue of the Americas
New York, NY  10036-6797
   212/698-3500
   212/698-3599 (Fax)

Cheryl Ann Krause
Dechert LLP
Cira Centre, 2929 Arch Street
Philadelphia, PA  19104
   215/994-4000
   215/994-2222 (Fax)

David H. Braff
Jeffrey T. Scott
Matthew S. Fitzwater
Sullivan & Cromwell LLP
125 Broad Street
New York, NY  10004-2498
   212/558-4000
   212/558-3588 (Fax)

### Counsel For Plaintiff(s)

James E. Robertson
Millar, Schaefer, Hoffmann & Robertson
230 S. Bemiston, Suite 1110
St. Louis, MO  63105
   314/862-0983
   314/862-3490 (Fax)

Samuel H. Rudman
David A. Rosenfeld
Christopher M. Barrett
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, NY  11747
   631/367-7100
   631/367-1173 (Fax)

BARCLAYS 12

Service List - 11/27/2012  (12-0136)

Page 2 of  2

Joseph E. White III
Saxena White P.A.
2424 N. Federal Highway, Suite 257
Boca Raton, FL  33431
    561/394-3399
    561/394-3382 (Fax)

Thomas C. Michaud
VanOverbeke Michaud & Timmony, P.C.
79 Alfred Street
Detroit, MI  48201
    313/578-1200
    313/578-1201 (Fax)

Daniel W. Krasner
Gregory M. Nespole
Robert B. Weintraub
Wolf Haldenstein Adler Freeman & Herz, LLP
270 Madison Avenue
New York, NY  10016
    212/545-4600
    212/545-4653 (Fax)