# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x

VLADIMIR GUSINSKY, TRUSTEE, FOR  :
THE VLADIMIR GUSINSKY LIVING   :
TRUST, Individually and on Behalf of All  :   Case No. 1:12-cv-5329-SAS
Others Similarly Situated,       :
        Plaintiff,   :     ECF CASE
   v.           :  **ORAL ARGUMENT REQUESTED**
             :
BARCLAYS PLC, et al.,     :
       Defendants. :
             :

-------------------------------------------------------- x

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
## OF THEIR MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

BOIES, SCHILLER & FLEXNER LLP
Jonathan D. Schiller
James Meadows
575 Lexington Avenue
New York, New York  10022
(212) 446-2300

Michael Brille
5301 Wisconsin Ave. NW
Washington, D.C.  20015
(202) 237-2727

DECHERT LLP
Andrew J. Levander
1095 Avenue of the Americas
New York, New York  10036
(212) 698-3500

Cheryl A. Krause
Cira Centre
2929 Arch Street
Philadelphia, Pennsylvania  19104
(215) 994-4000

SULLIVAN & CROMWELL LLP
David H. Braff
Jeffrey T. Scott
Matthew S. Fitzwater
Matthew J. Porpora
125 Broad Street
New York, New York  10004
(212) 558-4000

March 1, 2013

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ................................................................................................... 4

     A.    The Parties and Claims ...................................................................... 4

     B.    Barclays' Settlements of LIBOR-Related Conduct ............................ 5

     C.    Plaintiffs' Allegations ........................................................................ 9

ARGUMENT ...................................................................................................... 11

I.    THE SAC FAILS TO PLEAD ANY ACTIONABLE MISREPRESENTATIONS ......... 12

     A.    Barclays' General Statements About Its Business Practices Were Neither
False Nor Misleading ...................................................................... 13

     B.    Barclays' General Statements Regarding Its Business Practices Are
Inactionable Puffery ......................................................................... 16

     C.    Plaintiffs Have Not Adequately Alleged That Barclays' LIBOR
Submissions Were Materially False Statements ................................. 18

     D.    Plaintiffs Fail to Allege Any Facts in Support of Their Claim That Mr.
Diamond's October 31, 2008 Statements Were Materially False ......... 22

     E.    Plaintiffs' Allegation That Barclays' Financial Statements Were False and
Misleading Is Similarly Deficient ...................................................... 24

II.    THE SAC DOES NOT ADEQUATELY PLEAD SCIENTER ....................................... 26

     A.    Plaintiffs Fail to Adequately Allege Scienter with Respect to the
Individual Defendants ...................................................................... 27

          1.    Plaintiffs Have Not Adequately Alleged Conscious Misbehavior as
to Any Individual Defendant ................................................. 28

          2.    Plaintiffs Have Not Adequately Alleged That Any Individual
Defendant Acted with Recklessness ...................................... 30

     B.    Plaintiffs Fail to Adequately Allege Scienter Imputable to Barclays ... 32

          1.    Plaintiffs Have Not Adequately Alleged Scienter as to Barclays'
LIBOR Submissions ............................................................ 33

2.      Plaintiffs Have Not Adequately Alleged Scienter with Respect to the
        Alleged Misstatements Regarding Barclays' Business Practices .............36

3.      Plaintiffs Have Not Adequately Alleged Scienter with Respect to
        Barclays' Financial Statements..................................................................36

III.    THE SAC DOES NOT ADEQUATELY PLEAD LOSS CAUSATION ........................37

        A.      Barclays' Business Practices Statements Did Not Cause Plaintiffs' Alleged
                Losses........................................................................................................38

        B.      Barclays' LIBOR Submissions Did Not Cause Plaintiffs' Alleged Losses..........40

IV.     CERTAIN OF THE ALLEGED MISSTATEMENTS ARE FORWARD-
        LOOKING STATEMENTS PROTECTED BY THE SAFE HARBOR
        PROVISION OF THE PSLRA ..........................................................................43

V.      PLAINTIFFS FAIL TO STATE A CLAIM AGAINST THE INDIVIDUAL
        DEFENDANTS ................................................................................................44

CONCLUSION.................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anschutz Corp.* v. *Merrill Lynch & Co.*,
    690 F.3d 98 (2d Cir. 2012).................................................................12

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007).................................................................26

*Auto. Indus. Pension Trust Fund* v. *Textron Inc.*,
    682 F.3d 34 (1st Cir. 2012)............................................................32, 34

*Basic Inc.* v. *Levinson*,
    485 U.S. 224 (1988)................................................................19, 24, 41

*Bauer* v. *Prudential Fin. Inc.*,
    No. 09 Civ. 1120 (JLL), 2010 WL 2710443 (D.N.J. June 29, 2010) ....................................25

*Bd. of Trs. of the City of Ft. Lauderdale Gen. Emps. Ret. Sys.* v. *Mechel OAO*,
    811 F. Supp. 2d 853 (S.D.N.Y. 2011)...........................................27, 34, 35

*Bell Atl. Corp.* v. *Twombly*,
    550 U.S. 544 (2007)..........................................................................11

*Boca Raton Firefighters & Police Pension Fund* v. *Bahash*,
    No. 12 Civ. 1776, 2012 WL 6621391 (2d Cir. Dec. 20, 2012) ............................12, 14, 17, 18

*Charter Twp. of Clinton Police & Fire Ret. Sys.* v. *KKR Fin. Holdings LLC*,
    No. 08 Civ. 7062 (PAC), 2010 WL 4642554 (S.D.N.Y. Nov. 17, 2010)........................24, 25

*Chill* v. *Gen. Elec. Corp.*,
    101 F.3d 263 (2d Cir. 1996).........................................................33-34, 36

*Ciresi* v. *Citicorp*,
    782 F. Supp. 819 (S.D.N.Y. 1991)....................................................26

*City of Brockton Ret. Sys.* v. *Shaw Grp. Inc.*,
    540 F. Supp. 2d 464 (S.D.N.Y. 2008)................................................31

*Davidoff* v. *Farina*,
    No. 04 Civ. 7617 (NRB), 2005 WL 2030501 (S.D.N.Y. Aug. 22, 2005) ........................37

*Dura Pharms., Inc.* v. *Broudo*,
    544 U.S. 336 (2005)................................................................11, 40, 43

*ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)......................................................................................... passim

*Finn* v. *Barney*,
    471 F. App'x 30 (2d Cir. 2012) .......................................................................................8

*Foley* v. *Transocean Ltd.*,
    861 F. Supp. 2d 197 (S.D.N.Y. 2012)......................................................................30, 31

*Furher* v. *Ericsson LM Tel. Co.*,
    363 F. App'x 763 (2d Cir. 2009) ...................................................................................23

*Garcia* v. *Cordova*,
    930 F.2d 826 (10th Cir. 1991) ......................................................................................21

*Gould* v. *Winstar Commc'ns, Inc.*,
    692 F.3d 148 (2d Cir. 2012)..........................................................................................27

*Hutchinson* v. *Perez*,
    No. 12 Civ. 1073 (HB), 2012 WL 5451258 (S.D.N.Y. Nov. 8, 2012) ..........................26-27

*I. Meyer Pincus & Assocs.* v. *Oppenheimer & Co.*,
    936 F.2d 759 (2d Cir. 1991).............................................................................................6

*In re Alstom SA Sec. Litig.*,
    406 F. Supp. 2d 433 (S.D.N.Y. 2005)............................................................................43

*In re AOL Time Warner Inc. Sec. Litig.*,
    503 F. Supp. 2d 666 (S.D.N.Y. 2007)............................................................................37

*In re Austl. & N.Z. Banking Grp., Sec. Litig.*,
    No. 08 Civ. 11278 (DLC), 2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009)............14-15, 16, 17

*In re Barclays Bank PLC Sec. Litig.*,
    No. 09 Civ. 1989 (PAC), 2011 WL 31548 (S.D.N.Y. Jan. 5, 2011) ................................17-18

*In re Bristol Myers Squibb Co. Sec. Litig.*,
    586 F. Supp. 2d 148 (S.D.N.Y. 2008)............................................................................38

*In re Citigroup, Inc. Sec. Litig.*,
    330 F. Supp. 2d 367 (S.D.N.Y. 2004)....................................................................15, 25-26

*In re FBR Inc. Sec. Litig.*,
    544 F. Supp. 2d 346 (S.D.N.Y. 2008)........................................................................13, 15

*In re IAC/InterActiveCorp Sec. Litig.*,
    478 F. Supp. 2d 574 (S.D.N.Y. 2007)............................................................................28

*In re Initial Pub. Offering Sec. Litig.*,
    544 F. Supp. 2d 277 (S.D.N.Y. 2008)............................................................6

*In re Initial Pub. Offering Sec. Litig.*,
    241 F. Supp. 2d 281 (S.D.N.Y. 2003)..........................................................45

*In re Intelligroup Sec. Litig.*,
    468 F. Supp. 2d 670 (D.N.J. 2006) ..............................................................41

*In re JP Morgan Chase Sec. Litig.*,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005)..........................................................18

*In re Livent, Inc. Noteholders Sec. Litig.*,
    151 F. Supp. 2d 371 (S.D.N.Y. 2001)..................................................11, 29

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    289 F. Supp. 2d 416 (S.D.N.Y. 2003)..........................................................33

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    218 F.R.D. 76 (S.D.N.Y. 2003) ...................................................................11

*In re Moody's Corp. Sec. Litig.*,
    274 F.R.D. 480 (S.D.N.Y. 2011) .................................................................38

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
    423 F. Supp. 2d 364 (S.D.N.Y. 2006)..........................................................22

*In re Northern Telecom Ltd. Sec. Litig.*,
    116 F. Supp. 2d 446 (S.D.N.Y. 2000)..........................................................32

*In re Omnicom Grp., Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010).........................................................................11

*In re Optimal U.S. Litig.*,
    No. 10 Civ. 4095 (SAS), 2011 WL 4908745 (S.D.N.Y. Oct. 14, 2011) ................................18

*In re Parmalat Sec. Litig.*,
    376 F. Supp. 2d 472 (S.D.N.Y. 2005)..........................................................38

*In re Platinum & Palladium Commodities Litig.*,
    828 F. Supp. 2d 588 (S.D.N.Y. 2011)..........................................................11

*In re PXRE Grp. Ltd. Sec. Litig.*,
    600 F. Supp. 2d 510 (S.D.N.Y. 2009)..................................................31, 36

*In re Sanofi-Aventis Sec. Litig.*,
    774 F. Supp. 2d 549 (S.D.N.Y. 2011)..........................................................45

*In re Sanofi-Aventis Sec. Litig.*,
  No. 07 Civ. 10279 (GBD), 2009 WL 3094957 (S.D.N.Y. Sept. 25, 2009)............................34

*In re State Street Bank & Trust Co. Fixed Income Funds Inv. Litig.*,
  774 F. Supp. 2d 584 (S.D.N.Y. 2011)....................................................................................40

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008)....................................................................................45

*In re UBS AG Sec. Litig.*,
  No. 07 Civ. 11225 (RJS), 2012 WL 4471265 (Sept. 28, 2012)........................................17, 18

*In re Vivendi Universal, S.A. Sec. Litig.*,
  634 F. Supp. 2d 352 (S.D.N.Y. 2009)....................................................................................40

*In re Wachovia Equity Sec. Litig.*,
  753 F. Supp. 2d 326 (S.D.N.Y. 2011)........................................................... 26, 31, 34-35

*In re Yukos Oil Co. Sec. Litig.*,
  No. 04 Civ. 5243 (WHP), 2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006)...............................25

*Int'l Fund Mgmt. S.A. v. Citigroup Inc.*,
  822 F. Supp. 2d 368 (S.D.N.Y. 2011).............................................................................. 24-25

*Janus Capital Grp., Inc. v. First Deriv. Traders*,
  131 S. Ct. 2296 (2011)....................................................................................................13, 18

*Johnson v. Siemens AG*,
  No. 09 Civ. 5310 (JG), 2011 WL 1304267 (E.D.N.Y. Mar. 31, 2011) ..................................14

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001)..............................................................................................27, 37

*Kalnit v. Eichler*,
  85 F. Supp. 2d 232 (S.D.N.Y. 1999)......................................................................................34

*Koncelik v. Savient Pharm., Inc.*,
  No. 08 Civ. 10262 (GBD), 2010 WL 3910307 (S.D.N.Y. Sept. 29, 2010)............................21

*Kuriakose v. Fed. Home Loan Mortg. Corp. (Kuriakose I)*,
  No. 08 Civ. 7281 (JFK), 2011 WL 1158028 (S.D.N.Y. Mar. 30, 2011) ................................39

*Kuriakose v. Fed. Home Loan Mortg. Corp. (Kuriakose II)*,
  No. 08 Civ. 7281 (JFK), 2012 WL 4364344 (S.D.N.Y. Sept. 24, 2012)...........................26, 39

*Lattanzio v. Deloitte & Touche LLP*,
  476 F.3d 147 (2d Cir. 2007)...................................................................................................40

*Lentell* v. *Merrill Lynch & Co.*,
     396 F.3d 161 (2d Cir. 2005)...................................................................... passim

*Local No. 38 IBEW Pension Fund* v. *Am. Express Co.*,
     724 F. Supp. 2d 447 (S.D.N.Y. 2010).....................................................30, 31, 32

*Novak* v. *Kasaks*,
     216 F.3d 300 (2d Cir. 2000)....................................................................27, 30, 36

*Plumbers & Pipefitters Local Union No. 719 Pension Trust Fund* v. *Conseco Inc.*,
     No. 09 Civ. 6966 (JGK), 2011 WL 1198712 (S.D.N.Y. Mar. 30 2011) ................................36

*Plumbers & Steamfitters Local 773 Pension Fund* v. *Canadian Imperial Bank of
     Commerce*,
     694 F. Supp. 2d 287 (S.D.N.Y. 2010)..............................................................28, 30

*Podany* v. *Robertson Stephens, Inc.*,
     318 F. Supp. 2d 146 (S.D.N.Y. 2004)..................................................................16

*Richman* v. *Goldman Sachs Grp., Inc.*,
     868 F. Supp. 2d 261 (S.D.N.Y. 2012)..................................................................18

*Rombach* v. *Chang*,
     355 F.3d 164 (2d Cir. 2004)........................................................................12, 22

*Ross* v. *Lloyds Banking Grp., PLC*,
     No. 11 Civ. 8530 (PKC), 2012 WL 4891759 (S.D.N.Y. Oct. 16, 2012).........................16, 18

*Russo* v. *Bruce*,
     777 F. Supp. 2d 505 (S.D.N.Y. 2011)..............................................................35, 36

*SEC* v. *Kelly*,
     817 F. Supp. 2d 340 (S.D.N.Y. 2011)..................................................................43

*Slayton* v. *Am. Express Co.*,
     604 F.3d 758 (2d Cir. 2010)..........................................................................44

*Starr* v. *Georgeson S'holder, Inc.*,
     412 F.3d 103 (2d Cir. 2005)..........................................................................19

*Stratte-McClure* v. *Morgan Stanley*,
     No. 09 Civ. 2017 (DAB), 2013 WL 297954 (S.D.N.Y. Jan. 18, 2013)........................37

*Suez Equity Investors, L.P.* v. *Toronto-Dominion Bank*,
     250 F.3d 87 (2d Cir. 2001)...........................................................................40

*Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*,
     531 F.3d 190 (2d Cir. 2008)....................................................................26, 32, 36

*TSC Indus., Inc.* v. *Northway, Inc.*,
   426 U.S. 438 (1976) ............................................................................................19

*Westwood* v. *Cohen*,
   838 F. Supp. 126 (S.D.N.Y. 1993)......................................................................41

STATUTES & RULES

15 U.S.C. § 78j................................................................................................... passim

15 U.S.C. § 78t(a) .......................................................................................3, 4, 44, 45

15 U.S.C. § 78u-4(b)(1) .......................................................................................... 12

15 U.S.C. § 78u-4(b)(2) .....................................................................................12, 26

15 U.S.C. § 78u-5(c)(1) ...........................................................................................44

17 C.F.R. § 240.10b-5 ......................................................................................... passim

Fed. R. Civ. P. 9(b) ............................................................................................. passim

Fed. R. Civ. P. 12(b)(6)..........................................................................................1, 11

OTHER AUTHORITIES

Allen Ferrell & Atanu Saha, *The Loss Causation Requirement for Rule 10b-5 Causes of
   Action: The Implications of* Dura Pharmaceuticals, Inc. v. Broudo, 63 BUS. LAW 163
   (2007)...................................................................................................................42

Bank of England, Bank of England Sterling Money Markets Liaison Group Minutes of
   Nov. 15, 2007........................................................................................................8

Black's Law Dictionary 670 (7th ed. 1999)................................................................33

Bradford Cornell and James C. Rutten, *Collateral Damage and Securities Litigation*,
   2009 UTAH L. REV. 717 (2009) ............................................................................42

Carrick Mollenkamp, *Libor Fog: Bankers Cast Doubt on Key Rate Amid Crisis*, WSJ
   (Apr. 16, 2008)..................................................................................................8, 35

Carrick Mollenkamp & Mark Whitehouse, *Study Casts Doubt on Key Rate*, WSJ
   (May 29, 2008)..................................................................................................8, 20

Dow Jones, *Market Participants Doubt Libor Rates Reflect Market Rates—Survey*, Dow
   Jones Capital Markets Report (June 19, 2008) .......................................................8

Duncan Wood, *Libor's True Colors*, RM (Jan. 1, 2008)............................................8

Francois-Louis Michaud & Christian Upper, *What drives interbank rates? Evidence from the Libor panel*, BQR (Mar. 2008) ....................................................................................8, 20

Gillian Tett, *Libor's value is called into question*, FT (Sept. 25, 2007).....................................8, 20

House of Commons, Treasury Committee, *Fixing LIBOR: some preliminary findings, Vol. II* (Aug. 9, 2012)..............................................................................................15, 28, 29

*IAS 37: Provisions, Contingent Liabilities and Contingent Assets* (Sept. 1998).........................24

Jacob Gyntelberg & Philip Wooldridge, *Interbank rate fixings during the recent turmoil*, BQR (Mar. 2008) ......................................................................................................8, 20

Marissa P. Viccaro, *Can Regulation Fair Disclosure Survive the Aftermath of Enron?*, 40 Duq. L. Rev. 695 (2002) ....................................................................................41

Scott Peng *et al.*, *Is Libor Broken?*, Citigroup Research Report (Apr. 10, 2008) ..........................8

## TABLE OF ABBREVIATIONS AND DEFINED TERMS

**ADS:**  American Depositary Shares

**Appendix A:**  A chart comparing the alleged misstatements with similar statements that courts in the Second Circuit have found to constitute inactionable puffery

**Appendix B:**  A chart listing the forward-looking statements from Barclays' SEC filings alleged to be false and misleading

**Barclays:**  Barclays PLC, Barclays Bank PLC, and Barclays Capital Inc.

**BBA:**  British Bankers' Association

**BCI:**  Barclays Capital Inc.

**BQR:**  *Bank for International Settlements Quarterly Review*

**Business Practices:**  Barclays' practices with respect to risk management, internal controls, corporate citizenship, ethics, and governance that are the subject of Plaintiffs' misrepresentation claims

**CFTC:**  United States Commodity Futures Trading Commission

**CFTCS:**  The settlement agreement between Barclays and the CFTC, dated June 27, 2012, *available at* http://www.cftc.gov/ucm/groups/public/@lrenforcementactions/documents/legalpleading/enfbarclaysorder062712.pdf

**Class Period:**  July 10, 2007 through June 27, 2012

**Defendants:**  Barclays PLC, Barclays Bank PLC, Barclays Capital Inc., Marcus A.P. Agius, Robert Diamond, Christopher Lucas, and John Varley

**DOJ:**  United States Department of Justice

**DOJS:**  The Non-Prosecution Agreement entered into between Barclays and the DOJ, dated June 27, 2012.  Non-Prosecution Agreement *available at* http://www.justice.gov/iso/opa/resources/337201271017335469822.pdf; Statement of Facts, appended to the Non-Prosecution Agreement, *available at* http://www.justice.gov/iso/opa/resources/9312012710173426365941.pdf

**EC:**  European Commission

**EURIBOR:**  Euro Interbank Offered Rate

**Exchange Act:**  Securities Exchange Act of 1934, 15 U.S.C. §§ 78a *et seq*.

| | |
|---|---|
| **Financial Crisis Period Conduct:** | As described and defined in the SOF ¶¶ 34-49, the conduct relating to the instruction by certain Barclays senior managers to Barclays' LIBOR submitters to contribute rates that were nearer to the expected rates of other contributing panel banks so that Barclays would not be perceived as an "outlier" on the panel |
| **FRCP:** | Federal Rules of Civil Procedure |
| **FSA:** | United Kingdom Financial Services Authority |
| **FSAS:** | The settlement agreement between Barclays and the FSA, dated June 27, 2012, *available at* http://www.fsa.gov.uk/static/pubs/final/barclays-jun12.pdf |
| **FT:** | *Financial Times* |
| **GAAP:** | Generally Accepted Accounting Principles |
| **IAS:** | International Accounting Standards |
| **IASB:** | International Accounting Standards Board |
| **IASC:** | International Accounting Standards Committee |
| **IFRS:** | International Financial Reporting Standards |
| **Individual Defendants:** | Marcus A.P. Agius, Robert Diamond, Christopher Lucas, and John Varley |
| **LIBOR:** | London Interbank Offered Rate |
| **NPA:** | Non-Prosecution Agreement |
| **PSLRA:** | Private Securities Litigation Reform Act of 1995 (codified as amended throughout 15 U.S.C.) |
| **RM:** | *Risk Management* |
| **Porpora Decl.:** | The Declaration of Matthew J. Porpora, dated March 1, 2013, in support of Defendants' Motion to Dismiss the Second Amended Complaint |
| **SAC:** | The Second Amended Complaint filed in the above-captioned action |
| **SEC:** | United States Securities and Exchange Commission |
| **Settlements:** | The settlement agreements, which were publicly announced on June 27, 2012, that Barclays entered into with the DOJ, CFTC, and FSA to resolve those authorities' respective investigations into certain conduct relating to Barclays' submissions to LIBOR and other benchmark interest rates |

| | |
|---|---|
| **SOF:** | The Statement of Facts included as Appendix A of the DOJS |
| **Submitter(s):** | The Barclays employee(s) charged with determining a particular day's LIBOR or EURIBOR fixing and transmitting that information to the appropriate external entity |
| **Trader Conduct:** | As described and defined in the SOF ¶¶ 11-29, the conduct involving certain Barclays swaps traders making requests to Barclays' LIBOR and EURIBOR submitters to alter Barclays' submissions to benefit those traders' positions or, on a few occasions, the trading positions of former colleagues who had moved to other institutions |
| **Treasury Committee Preliminary Findings:** | House of Commons, Treasury Committee, *Fixing LIBOR: some preliminary findings, Vol. II* (Aug. 9, 2012) |
| **USD LIBOR:** | U.S. Dollar LIBOR |
| **WSJ:** | *Wall Street Journal* |

Defendants Barclays PLC, Barclays Bank PLC ("Barclays Bank"), and Barclays Capital Inc. ("BCI" and, together with Barclays PLC and Barclays Bank, "Barclays") and Individual Defendants John Varley, Robert Diamond, Christopher Lucas, and Marcus A.P. Agius submit this memorandum of law in support of their motion, pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the Second Amended Complaint (the "SAC").

## PRELIMINARY STATEMENT

On June 27, 2012, Barclays announced settlements of certain governmental and regulatory investigations concerning its conduct in connection with the process for setting various interbank offered rates, including LIBOR and EURIBOR.  In the wake of that announcement, the price of Barclays' ADS fell, and plaintiffs quickly filed this action seeking to capitalize on that temporary decline.  Yet, by the time Plaintiffs had amended their complaint for a second time, just more than six months later, the price of those shares had *increased* more than 50% from their opening price on the day before the Settlements were announced.

In their first complaint, Plaintiffs alleged that the Settlements revealed that certain of Barclays' public statements about its risk management practices, internal controls, corporate citizenship, ethics, and governance—all immaterial, generalized statements that have little or nothing to do with the conduct described in the Settlements—constitute actionable misstatements under the federal securities laws.  Presumably recognizing that courts in this Circuit have dismissed securities fraud actions based on these same types of alleged misstatements because such statements are typically too general to be relied upon by a reasonable investor, Plaintiffs attempted to ward off dismissal by amending their complaint to add three new categories of allegations:  (1) that Barclays' USD LIBOR submissions made between August 2007 and January 2009 were themselves actionable misstatements; (2) that two comments made by defendant Robert Diamond on an October 2008 conference call constitute actionable

misstatements; and (3) that Barclays' financial statements issued during the Class Period were false and misleading because they failed to disclose as contingent liabilities purportedly foreseeable losses that Barclays would later incur as a result of its LIBOR-related conduct.

At the conference before the Court on January 10, 2013, Defendants highlighted the deficiencies in the First Amended Complaint, and, in accordance with the Court's Rules, presented those deficiencies in detail to Plaintiffs by pre-motion letter, dated January 16, 2013. Plaintiffs responded with a one-page letter in which they summarily disagreed with Defendants' positions and failed to respond directly to any of Defendants' arguments for dismissal, but nevertheless indicated that they would amend their complaint yet again. Plaintiffs did so on January 31 with a complaint that is largely identical to the First Amended Complaint. Plaintiffs have not narrowed the scope of their impermissibly broad pleadings, dropped any parties against whom an action cannot lie on the facts alleged, or attempted to provide the factual support that is necessary to sustain their deficient allegations. Rather, Plaintiffs made only cosmetic changes and added even more conclusory allegations—changes that fail to cure the fatal deficiencies in their pleading.

As a result, despite twice amending their complaint, Plaintiffs are still unable to state viable claims under the federal securities laws. Their claims fail as a matter of law for the following five reasons.

*First*, Plaintiffs fail to plead any actionable misrepresentations. The allegations regarding Barclays' statements in its public filings about its risk management practices, internal controls, corporate citizenship, ethics, and governance (referred to herein as Barclays' "Business Practices") fail to demonstrate (as required by the heightened pleading standards applicable to these claims) how those statements were false when made. In addition, these alleged

"misstatements" are exactly the type of generalized statements that courts within this Circuit have routinely dismissed as legally non-actionable.  Further, Plaintiffs' attempts to plead actionable misstatements in connection with Mr. Diamond's October 2008 statements, Barclays' LIBOR submissions, and Barclays' accounting practices likewise fail because of the conspicuous absence of any particularized factual allegations sufficient to show that the statements were materially false.

*Second*, Plaintiffs have failed to plead with particularity facts giving rise to a strong inference that any Defendant acted with scienter.  The Settlements on which Plaintiffs so heavily rely flatly contradict any inference of intent to defraud or mislead investors, and Plaintiffs fail to present any factual allegation to establish that Defendants acted with knowledge or recklessness in making any alleged misrepresentations.

*Third*, Plaintiffs have failed to plead loss causation adequately because their allegations fail to connect the temporary drop in Barclays' share price following the June 27, 2012 announcement to any alleged misstatement.  Nor could they have made this connection, because Plaintiffs have not identified a single misstatement that was in fact corrected by the announcement of the Settlements.

*Fourth*, many of the alleged misstatements are not actionable because they are protected by the PSLRA's safe harbor provision or the bespeaks caution doctrine.

*Fifth*, and finally, Plaintiffs' § 20(a) claims for control person liability must also be dismissed because Plaintiffs have failed to demonstrate a primary violation of § 10(b) or culpable participation on the part of the Individual Defendants.

In sum, Plaintiffs have had ample opportunity to plead their claims, but have failed to do so.  Even after this Court advised Plaintiffs to come forward with nothing "less than

[their] best complaint"—so that the Court "won't need to grant leave to amend [later]"—the SAC still fails to state a single viable claim.  (Conference Tr. 5:21-6:2, 13:22-14:1, Jan. 10, 2013 [Doc. No. 57].)  The Court should therefore dismiss those claims with prejudice.

## BACKGROUND

### A.    The Parties and Claims

Plaintiffs purport to represent a class of persons or entities that purchased Barclays ADS between July 10, 2007 and June 27, 2012.  (SAC ¶ 1.)  The SAC asserts claims under § 10(b) of the Exchange Act and Rule 10b-5 thereunder against all Defendants, and under § 20(a) of the Exchange Act against the Individual Defendants.  (SAC ¶¶ 205-11.)

Defendant Barclays PLC is a publicly held corporation, based in the United Kingdom, that provides global financial services.  (SAC ¶ 10.)  Barclays Bank PLC is a wholly owned subsidiary of Barclays PLC and is also a global financial services provider, with banking subsidiaries around the world.  (DOJS ¶ 10.)  BCI is a registered securities broker-dealer and futures commission merchant that is incorporated in Connecticut and headquartered in New York City.[1]  BCI's direct parent and sole stockholder is Barclays Group U.S., Inc., a U.S. bank holding company, that is a wholly owned subsidiary of Barclays Bank.  (*Id.*)  Individual Defendants John S. Varley, Christopher Lucas, and Marcus A.P. Agius served as Barclays Bank's Group Chief Executive, Chief Executive Officer, Finance Director, and Chairman of the Board, respectively, during the Class Period.  (SAC ¶¶ 13-17.)  Individual Defendant Robert Diamond served as President of Barclays from the start of the Class Period until January 1, 2011, when he became Barclays' Chief Executive Officer.  (SAC ¶ 14.)

---

[1]    *See* Ex. A to Porpora Decl. (Barclays Capital Inc., Annual Audited Report, Form X-17A-5 (Dec. 31, 2011)) at 3.  (All exhibits referenced herein are exhibits to the Porpora Decl. and are hereinafter cited as "Ex. [  ]").  BCI does not have a London branch office.  *See id.*

B.     **Barclays' Settlements of LIBOR-Related Conduct**

Throughout the Class Period, Barclays Bank served as a contributing panel bank for LIBOR, a benchmark interest rate calculated daily and published by the BBA.[2]  (SAC ¶ 42.) During the Class Period, employees on Barclays Bank's London Non-Sterling Liquidity Management Desk (the "London Money Market Desk") made the LIBOR submissions on behalf of Barclays Bank.  (CFTCS at 7.)

Panel banks make daily LIBOR submissions for a variety of currencies and maturities based on a narrow, hypothetical question:  "At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in reasonable market size, just prior to 11:00 am [London time]?"  (SAC ¶ 34.)  The published LIBOR fixing is calculated by disregarding the upper and lower quartile of submissions from the contributing panel banks and then averaging the remaining submissions.  (SAC ¶ 39.)  LIBOR submissions are necessarily subjective, as the definition asks for the rate at which the bank "*perceives* it could go into the London interbank money market and borrow money in a *reasonable market size*," not the rate at which it actually transacts.  (*See* SAC ¶ 35 (emphasis added).)

On April 27, 2011, Barclays publicly disclosed in its first quarter 2011 interim management statement that it was being investigated by the FSA, the CFTC, the SEC, and the DOJ concerning its LIBOR submissions.  (SAC ¶ 153.)  In Barclays' 2011 Form 20-F, Barclays made additional disclosures to investors that it was being investigated by the FSA, CFTC, SEC, DOJ Fraud Section, DOJ Antitrust Division, and the EC in connection with its submissions for

---

[2]     Barclays Bank was also a EURIBOR panel bank throughout the Class Period, and its role as a EURIBOR panel bank was similar to its role as a LIBOR panel bank.  (SAC ¶ 42.)  Neither Barclays PLC nor BCI was a member of the LIBOR or EURIBOR panels.

various interbank offered rates, and that Barclays was engaged in discussions with the authorities about potential resolution of the investigations.  (SAC ¶ 161.)

On June 27, 2012, Barclays announced that it had entered into an NPA with the DOJ, as well as settlements with the CFTC and FSA, resolving their investigations into Barclays' LIBOR and EURIBOR submission practices.  (SAC ¶ 175.)  In those Settlements, Barclays admitted to no violations of law, including the U.S. securities laws.  Further, Barclays made factual admissions only in connection with the SOF that accompanied its NPA with the DOJ.[3]

In that SOF, Barclays acknowledged that, at times from approximately 2005 to 2007, and occasionally thereafter through approximately 2009, certain Barclays swaps traders made requests to Barclays' LIBOR and EURIBOR Submitters to alter Barclays' submissions to benefit the traders' positions.[4]  (DOJS ¶¶ 11-12.)  The SOF confirms that the Trader Conduct was motivated by the traders' desire to benefit their derivatives trading positions or, on a few occasions, the trading positions of former colleagues who had moved to other institutions.  (*See* DOJS ¶¶ 11-12, 21, 23-24.)  Nowhere in the Settlements is there any suggestion that this conduct was intended to deceive Barclays' shareholders or investors or that the conduct was known by anyone more senior than trading desk managers; nor is there any finding that Barclays as a whole

---

[3]     A statement of facts also accompanies the CFTC settlement, but the CFTC settlement makes clear that Barclays admitted facts contained in that settlement only if and to the extent those same facts were admitted in its settlement with other governmental authorities.  (CFTCS at 1, 29.)  Nothing in Barclays' settlement with the FSA constitutes an admission of fact.

[4]     Plaintiffs expressly rely upon the DOJS, CFTCS, and FSAS in formulating the SAC.  (SAC at 1.)  In deciding a motion to dismiss, a court may "consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 284 (S.D.N.Y. 2008) (quotations omitted).  Where plaintiffs quote selectively from a document incorporated by reference or of which the court may take judicial notice, the court may consider the full text of the document.  *See, e.g.*, *I. Meyer Pincus & Assocs.* v. *Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir. 1991).

profited from the Trader Conduct.  Significantly, none of the Settlements contains any finding that the Individual Defendants themselves were involved in determining Barclays' actual LIBOR submissions or were aware of the Trader Conduct.

Barclays also acknowledged in the SOF that, from approximately August 2007 through approximately January 2009, Barclays at times provided USD LIBOR submissions that were not consistent with the BBA definition of LIBOR.  (DOJS ¶ 36.)  The SOF provides that Barclays' LIBOR submissions at times underreported Barclays' perception of borrowing costs because certain senior managers instructed Barclays' LIBOR Submitters to contribute rates that were nearer to the expected rates of other contributing panel banks so that Barclays would not be perceived as an "outlier" on the panel.  (DOJS ¶¶ 36-37.)

The SOF contains no finding that this Financial Crisis Period Conduct was intended to deceive Barclays' shareholders or investors; on the contrary, the SOF makes clear that the individuals involved in issuing the instruction believed that other contributor panel banks were submitting unrealistically low USD LIBOR rates, and issued the instruction to correct an inaccurate perception in the market concerning Barclays' financial position relative to other panel banks.  (DOJS ¶ 40.)  According to the SOF, the instruction was intended to convey what Barclays believed to be the truth—that its liquidity position was good and that Barclays was not an outlier relative to other banks.[5]  Further, the SOF is clear that, in lowering its USD LIBOR submissions, Barclays did not intend to affect the actual LIBOR fixings.  (DOJS ¶ 41.)

---

[5]     During this period, Barclays made full disclosures regarding its liquidity position and liquidity risk to investors in public filings.  *See, e.g.*, Ex. B (Barclays, 2007 Form 20-F (Mar. 26, 2008)) at 45, 91-92, 241-43; Ex. C (Barclays, 2008 Form 20-F (Mar. 24, 2009)) at 18, 111-13, 268-72; Ex. D (Barclays, 2009 Form 20-F (Mar. 16, 2010)) at 19, 102-03, 261-66; *see also* DOJS ¶ 40.

Notably, during the financial crisis, the questionable accuracy and integrity of LIBOR submissions was well known to the market.  As recognized in Barclays' resolution with the FSA, liquidity conditions in the money markets changed significantly beginning in the fall of 2007.  (FSAS ¶ 103.)  These changes affected the way banks determined LIBOR submissions, as there were a limited number of transactions occurring in the money markets at that time.  (FSAS ¶ 105.)  Beginning in fall 2007, public reports[6] openly questioned the integrity of USD LIBOR submissions.[7]  By April 2008, media reports regarding the perceived inaccuracy of LIBOR submissions were widespread.[8]

Far from describing a scheme by which Barclays attempted to mislead regulators or conceal its approach to LIBOR submissions, the SOF provides that, during the financial crisis, individuals at Barclays contemporaneously "raised concerns with individuals at the BBA, the Financial Services Authority, the Bank of England, and the Federal Reserve Bank of New York" regarding the accuracy of LIBOR and, in certain of those communications, advised that the

---

[6]     The Court may take judicial notice of such reports to establish that information therein was publicly available.  *Finn* v. *Barney*, 471 F. App'x 30, 32 (2d Cir. 2012) (summary order).

[7]     *See, e.g.*, Ex. E (Gillian Tett, *Libor's value is called into question*, FT (Sept. 25, 2007)) (describing LIBOR as a "fiction"); Ex. E (Bank of England, Bank of England Sterling Money Markets Liaison Group Minutes of Nov. 15, 2007) ¶ 2.1 (market participants "thought that Libor fixings had been lower than actual traded interbank rates through the period of stress"); Ex. E Duncan Wood, *Libor's True Colors*, RM (Jan. 1, 2008)) ("Libor no longer reflects reality"); Francois-Louis Michaud & Christian Upper, *What drives interbank rates? Evidence from the Libor panel* at 48, BQR (Mar. 2008) (discussing strategic misrepresentation of LIBOR); Jacob Gyntelberg & Philip Wooldridge, *Interbank rate fixings during the recent turmoil* at 65, BQR (Mar. 2008) (discussing incentives for misquoting).

[8]     *See, e.g.*, Ex. F (Scott Peng *et al.*, *Is Libor Broken?*, Citigroup Research Report (Apr. 10, 2008)) (LIBOR deviates significantly from real transaction rates, likely due to fear "of being perceived as a weak hand in this fragile market environment"); Ex. G (Carrick Mollenkamp, *Libor Fog:  Bankers Cast Doubt on Key Rate Amid Crisis*, WSJ (Apr. 16, 2008)); Ex. G (Carrick Mollenkamp & Mark Whitehouse, *Study Casts Doubt on Key Rate*, WSJ (May 29, 2008)) (panel banks significantly underreporting borrowing costs); Ex. G (Dow Jones, *Market Participants Doubt Libor Rates Reflect Market Rates—Survey*, Dow Jones Capital Markets Report (June 19, 2008)) (LIBOR did not reflect true money market rates).

LIBOR panel banks, including Barclays, were contributing rates that were too low given current market conditions.  (DOJS ¶ 42; *see also* DOJ ¶¶ 42-46; FSAS ¶¶ 102, 119, 125, 128, 131; CFTCS at 21-23.)  The SOF provides that, through these communications, Barclays employees sought "a solution that would allow Barclays to submit honest rates without standing out from other members of the Contributor Panel," and "expressed the view that Barclays could achieve that goal if other banks submitted honest rates."  (DOJS ¶ 42.)

The SOF also provides that, on October 28, 2008, "a senior Bank of England official contacted a senior Barclays manager" and "discussed external perceptions of Barclays's LIBOR submissions and questioned why Barclays's submissions were high compared to other Contributor Panel banks."  (DOJS ¶ 47.)  "As the substance of the conversation was passed to other Barclays employees, certain Barclays managers formed the understanding that they had been instructed by the Bank of England to lower Barclays's LIBOR submissions" and instructed Barclays U.S. Dollar and Sterling LIBOR Submitters accordingly.  (*Id*.)  The SOF makes clear that this instruction did not have a lasting effect.  It states that, "[b]eginning on November 6, 2008, as a result of increased liquidity in the market, Barclays no longer needed to take into account the perceived instruction from the Bank of England."  (*Id*.)  Furthermore, the Settlements contain no suggestion that Barclays' actions in response to this perceived instruction were in any way intended to deceive the public or investors.

C.    **Plaintiffs' Allegations**

Plaintiffs allege the Settlements establish that Barclays' financial statements and other public filings during the financial crisis were false and misleading in light of Barclays' LIBOR-related conduct during the Class Period.  (*See, e.g.*, SAC ¶ 2.)  The SAC principally alleges that general language from Barclays' public filings describing three different categories of Business Practices contains actionable misstatements under § 10(b).  (SAC ¶¶ 87-170.)  The

-9-

first category consists of statements regarding Barclays' internal controls and risk management systems, and the duties of those involved in supervising and maintaining them.  (*See, e.g.*, SAC ¶¶ 88, 89, 99, 144.)  For example, the SAC alleges that Barclays' statements that "Barclays is committed to the advanced management of operational risks," and that Barclays has "implemented improved management and measurement approaches for operational risk to strengthen control, improve customer service and minimise operating losses" were false.  (SAC ¶ 98.)  As to the second category of Business Practices statements, the SAC alleges that Barclays made false statements regarding its corporate responsibility and ethics.  (*See, e.g.*, SAC ¶¶ 87, 111, 137, 154, 158.)  For example, it alleges that Barclays falsely stated that it was focused on "ensuring we behave at all times as a responsible global citizen" and "doing business ethically." (SAC ¶¶ 110-11.)  Finally, the third category of Business Practices statements consists of allegations that Barclays made false statements regarding its compliance with the law.  (*See, e.g.*, SAC ¶¶ 132, 150.)  For example, the SAC alleges that Barclays falsely stated that it encourages "complying with relevant legal and regulatory requirements."  (SAC ¶ 132.)  In short, Plaintiffs claim that the conduct described in the SOF, standing alone, establishes that all of these Business Practices statements were false when made.

The SAC also alleges that two general statements made by Mr. Diamond on an October 2008 conference call in response to an analyst's question were false and misleading. (SAC ¶¶ 108-09.)  Specifically, the analyst asked how deposit flows "tie[d] . . . together" with the analyst's observation that Barclays was "consistently paying slightly higher than most of the other UK banks in the LIBOR rate."  (SAC ¶ 108.)  Plaintiffs allege that Mr. Diamond replied falsely by stating, "we're categorically not paying higher rates in any currency," and "we benefit in times of turmoil, so we post where we're transacting, and it's clearly not at high levels."

(SAC ¶¶ 108-09.)  In addition, the SAC alleges that Barclays' USD LIBOR submissions from August 2007 to January 2009 constituted materially false and misleading statements that deceived investors regarding Barclays' true borrowing costs.  (SAC ¶¶ 171-73.)  Finally, the SAC alleges that Barclays' financial statements during the Class Period were false and misleading because they failed to disclose as contingent liabilities purportedly foreseeable losses that Barclays would later incur as a result of its LIBOR-related conduct.  (SAC ¶¶ 188-95.)[9]

## ARGUMENT

Under FRCP 12(b)(6), this Court must dismiss a complaint if it fails to plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007).  Although a court is generally bound to accept the well pleaded allegations of a complaint, a court may disregard pleadings "that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice."  *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405-06 (S.D.N.Y. 2001).

"To sustain a claim under Section 10(b), [a plaintiff] must show (i) a material misrepresentation or omission; (ii) scienter; (iii) 'a connection with the purchase or sale of a security[;]' (iv) reliance by the plaintiff(s); (v) economic loss; and (vi) loss causation."  *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (quoting *Dura Pharms., Inc.* v. *Broudo*, 544 U.S. 336, 341-42 (2005)).  To survive dismissal, the complaint must also satisfy the

---

[9]    In another effort to bolster their deficient securities fraud allegations, Plaintiffs ask this Court to consider the fact that Barclays is under investigation for two other matters wholly unrelated to this action.  (*See* SAC ¶¶ 180-83.)  Because neither investigation has resulted in a single finding of fact, been adjudicated by any tribunal, or withstood the rigors of an adversarial proceeding, Plaintiffs are prohibited from relying on such allegations, and the Court should strike references to these investigations from the SAC.  *See, e.g.*, *In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 593-94 (S.D.N.Y. 2011); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 218 F.R.D. 76, 78-79 (S.D.N.Y. 2003).

heightened pleading requirements of FRCP 9(b) and the PSLRA.  *Anschutz Corp.* v. *Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012).  Rule 9(b) requires that a plaintiff: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Id.*  The PSLRA requires plaintiffs to "specify each misleading statement," "set forth the facts on which a belief that a statement is misleading was formed," and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Id.* (internal quotations and citation omitted); 15 U.S.C. §§ 78u-4(b)(1), (2).

I.      **THE SAC FAILS TO PLEAD ANY ACTIONABLE MISREPRESENTATIONS.**

The Court should dismiss Plaintiffs' § 10(b) claims because the SAC fails to plead any actionable misstatement or omission of material fact.  Plaintiffs devote over forty pages of the SAC to reciting and declaring false Barclays' public statements regarding its general Business Practices, but they do not come remotely close to alleging *any facts* that suggest, let alone establish, that the statements were untrue at the time they were made.  Instead, Plaintiffs quote large sections of Barclays' public filings and summarily declare them false—a tactic that has been repeatedly rejected by the Second Circuit as insufficient to plead a federal securities law claim.[10]  Regardless, Plaintiffs cannot avoid the undeniable fact that Barclays' Business Practices statements are exactly the types of statements that the Second Circuit has held to be inactionable.

---

[10]     *See Boca Raton Firefighters & Police Pension Fund* v. *Bahash*, No. 12 Civ. 1776, 2012 WL 6621391, at *4 (2d Cir. Dec. 20, 2012) (summary order).  This approach "basically leav[es] the District Court to search the long quotations in the complaint for particular false statements, and then determine on its own initiative how and why the statements were false and how other facts might show a strong inference of scienter."  *Id.*  As the court held in *Bahash*, this "does not comport with [the Second Circuit's] exhortation that plaintiffs 'must demonstrate with specificity why and how' each statement is materially false and misleading."  *Id.* (quoting *Rombach* v. *Chang*, 355 F.3d 164, 174 (2d Cir. 2004)).

Plaintiffs' three categories of additional allegations also cannot save the SAC from dismissal because, like the allegations in the original complaint, Plaintiffs fail to provide sufficient factual support that these statements were materially false and misleading when made. Without this most basic element of their § 10(b) claim—the purported falsity of a material statement—the SAC should be dismissed.

### A.    Barclays' General Statements About Its Business Practices Were Neither False Nor Misleading.

Plaintiffs allege that Barclays' public statements in its Forms 20-F, 6-K and "Corporate Governance in Barclays" reports regarding Business Practices were materially false and misleading because of the conduct described in the Settlements.  (*See, e.g.*, SAC ¶¶ 87-170.)[11]  Plaintiffs allege nothing, however, that could plausibly lead to the conclusion that these generalized statements were false or misleading when made.  For example, Plaintiffs allege that Barclays made a number of misstatements regarding its internal controls and risk management systems.  (*See, e.g.*, SAC ¶¶ 98, 113, 114, 147, 149.)  Similarly, Plaintiffs allege that Barclays made misstatements regarding the duties of those involved in supervising and maintaining Barclays' internal controls.  (*See, e.g.*, SAC ¶¶ 97, 101, 117, 126, 131.)  But the SAC is devoid of any specific factual allegations that these statements were not, in fact, true.  *See In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 359-60 (S.D.N.Y. 2008) (plaintiffs failed to state a claim where the complaint "[did] not allege that the risk management program did not exist, or that it did not have the abovementioned aims").  Instead, the SAC leaps to declare these

---

[11]    Barclays PLC and Barclays Bank are the only corporate entities that signed any of the SEC filings that Plaintiffs allege contain purported (1) misstatements regarding Barclays' Business Practices and (2) false and misleading financial statements.  (*See, e.g.*, Ex. B (2007 Form 20-F) at 277.)  BCI did not sign these statements and Plaintiffs have not alleged how BCI could be said to have made them.  *See Janus Capital Grp., Inc.* v. *First Deriv. Traders*, 131 S. Ct. 2296, 2302 (2011).  Thus, Plaintiffs' claims should be dismissed as to BCI.

statements false without any supporting detail, and that is insufficient as a matter of law. *Bahash*, 2012 WL 6621391, at *4.[12]

In an attempt to suggest that Barclays' statements regarding its Business Practices actually touch on the conduct described in the SOF, Plaintiffs summarily allege that Barclays represented to the market that "specific internal controls were in place which were designed to prevent the [LIBOR-related] conduct that actually occurred." (SAC ¶ 90(d).) But Plaintiffs have failed to identify any such representation specifically directed at LIBOR. Nor could they have—Barclays never represented in any public filing referenced in the SAC that its compliance or other internal controls were directed specifically at Barclays' LIBOR submission process. Plaintiffs' failure to identify such a representation is hardly surprising: as stated in the FSAS, Barclays did not believe the submission of LIBOR "was an area of significant risk." (FSAS ¶¶ 148, 161; *see also* SAC ¶ 85 (noting that LIBOR "was considered low-risk").)[13] Thus, the SAC suffers from a "core weakness": Plaintiffs have failed to "match" their "theory of fraud to the public statements made by" Barclays. *See In re Austl. & N.Z. Banking Grp., Sec. Litig.*, No. 08 Civ. 11278 (DLC), 2009 WL 4823923, at *14 (S.D.N.Y. Dec. 14, 2009).

---

[12]    Plaintiffs also allege that Barclays falsely or misleadingly stated that its business "may not be conducted in accordance with applicable laws around the world" and made other false statements about legal compliance. (*See, e.g.*, SAC ¶¶ 112, 118.) But Plaintiffs have failed to adequately allege how these statements were false or misleading when made.

[13]    With the full advantage of hindsight, Plaintiffs take issue with how Barclays' Compliance function allegedly responded to issues related to the Trader Conduct and the Financial Crisis Period Conduct that were brought to its attention. (SAC ¶¶ 82-84.) But these allegations do not support Plaintiffs' broad claim that "Defendants falsely stated that the internal controls were being utilized when, in fact they were being knowingly or recklessly ignored." (SAC ¶ 90(e).) Moreover, allegations that Barclays' Compliance function should have "better anticipated the severity" of the risks associated with making LIBOR submissions are exactly the kind of allegations of "fraud by hindsight" that the "securities laws do not allow." *See Johnson* v. *Siemens AG*, No. 09 Civ. 5310 (JG), 2011 WL 1304267, at *17 (E.D.N.Y. Mar. 31, 2011) (quotations omitted).

At best, Plaintiffs have alleged that Barclays' internal controls failed to be completely effective, but such allegations do not give rise to a securities fraud claim. *See In re FBR*, 544 F. Supp. 2d at 360. Indeed, allegations that a "compliance program's aims misled investors into believing that they had an effective compliance program that would root out any impropriety, including the alleged [fraud] . . . fails to state a claim of securities fraud." *Id.* That Barclays allegedly did not, during the Class Period, recognize specific risks associated with making LIBOR submissions does not mean that Barclays lacked the compliance and risk management structures described in its Business Practices statements.[14] Plaintiffs' allegations regarding these statements are exactly the kind of "fraud by hindsight" regarding mismanagement that cannot give rise to a Section 10(b) claim. *See In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 375, 377 (S.D.N.Y. 2004) ("[t]he securities laws were not designed to provide an umbrella cause of action for the review of management practices").

In fact, Plaintiffs cite only one instance in which Barclays referenced LIBOR at all in a public filing—*i.e.*, when Barclays stated, in its 2007 Form 20-F, that "term LIBOR premiums rose" in the second half of 2007 and that "the Group's liquidity position remained strong"—and that lone filing makes no representation about Barclays' activities as a LIBOR panel bank, let alone about the controls surrounding Barclays' submission process. (*See* SAC

---

[14]     Instead of alleging additional facts in the SAC to remedy this deficiency, Plaintiffs improperly rely on unadjudicated, conclusory and disputed statements from the House of Commons Treasury Committee to support their contention that Barclays' Business Practices statements were false. (SAC ¶ 85 (citing Treasury Committee Preliminary Findings).) But these allegations fail to establish the falsity of the Business Practices statements because, like all of Plaintiffs' allegations, they do not support an inference that Barclays did not have the firm-wide systems and controls it claimed to have. Rather, they reflect the fact that Barclays' Compliance function was not completely effective.

¶ 104.)[15]  Plaintiffs' allegations of falsity are, therefore, insufficient because they are focused on practices that were "not the subject of the representations cited in the Complaint."  *See Austl. & N.Z. Banking Grp.*, 2009 WL 4823923, at *14.[16]

      **B.**     **Barclays' General Statements Regarding Its Business Practices Are Inactionable Puffery.**

          In addition to not being false, Barclays' statements regarding its Business Practices are so general that a reasonable investor would not rely on them and thus are not material as a matter of law under § 10(b).  As the Second Circuit has held, statements that are "too general to cause a reasonable investor to rely upon them" are not actionable under the securities laws.  *ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009).

          As shown in Appendix A, the great majority of the SAC focuses on precisely the sort of general statements that courts within the Second Circuit have repeatedly held to be inactionable.  For example, Plaintiffs allege that Barclays' statements that it encourages "acting with the highest levels of integrity" (SAC ¶ 132), and that it "operates within a robust system of internal control that enables business to be transacted and risk taken without exposure to unacceptable potential losses or reputational damage" (SAC ¶¶ 147, 159), constitute actionable

---

[15]     Moreover, Plaintiffs do not adequately allege that Barclays' opinion that its "liquidity position remained strong" was actionably false.  *See, e.g.*, *Ross* v. *Lloyds Banking Grp., PLC*, No. 11 Civ. 8530 (PKC), 2012 WL 4891759, at *6 (S.D.N.Y. Oct. 16, 2012) (defendant's statement regarding "very strong liquidity" was an opinion).  Plaintiffs have failed to allege "specific provable words and actions . . . from which a reasonable factfinder could infer" that this opinion was not a "truly held belief" when stated.  *Podany* v. *Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 155 (S.D.N.Y. 2004).  Moreover, the SOF undermines any inference that this belief was not honestly held.  (*See* DOJS ¶ 40.)

[16]     The SAC also alleges that the Business Practices statements were false and misleading because Defendants had "knowingly violated" certain provisions of the Commodity Exchange Act and principles of the FSA.  (SAC ¶ 90(f).)  Barclays did not admit to any such violations—much less "knowing" violations.  (CFTCS at 1.)

misstatements.  In *JP Morgan*, however, the Second Circuit held that defendant's statements that it had "risk management processes [that] are highly disciplined and designed to preserve the integrity of the risk management process," that it "set the standard for integrity," and that it would "continue to reposition and strengthen [its] franchises with a focus on financial discipline," were "so general that a reasonable investor would not depend on [them] as a guarantee that [defendant] would never take a step that might adversely affect its reputation." 553 F.3d at 205-06.  The court went on to explain that such statements cannot form the basis of a federal securities law claim because "[n]o investor would take such statements seriously in assessing a potential investment, for the simple fact that almost every investment bank makes these statements."  *Id*. at 206.  The Second Circuit recently reaffirmed these principles in *Bahash* and held that statements about a defendant's credibility, reliability, and integrity were "the type of mere 'puffery' that we have previously held to be not actionable."  2012 WL 6621391, at *3-4.  The same is true with respect to the statements on which Plaintiffs rely here.

Similarly, in *In re UBS AG Securities Litigation*, the court held that statements that "[t]he diversification of risks and avoidance of undue concentrations remain key pillars of our risk control process," that "[w]e rigorously want to avoid risk concentrations," and that "[w]e are basically obsessed with risk diversification," were non-actionable statements of puffery because they were "too general to cause a reasonable investor to rely on them."  No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *14 (S.D.N.Y. Sept. 28, 2012) (citations omitted).  Likewise, in *In re Australia & New Zealand Banking Group Limited Securities Litigation*, the court held inactionable statements that the defendant bank "recognises the importance of effective risk management" and "is committed to achieving a strong risk control, resulting in 'no surprises' and a distinctive risk management capability."  2009 WL 4823923, at *8, 11; *see also In re*

-17-

*Barclays Bank PLC Sec. Litig.*, No. 09 Civ. 1989 (PAC), 2011 WL 31548, at *10 (S.D.N.Y. Jan.

5, 2011) ("Generalizations regarding integrity, fiscal discipline, and risk management . . . are not

actionable misstatements.") (quoting *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595,

632-33 (S.D.N.Y. 2005)); *Ross*, 2012 WL 4891759, at *6 ("[G]eneralizations regarding business

practices do not amount to a guarantee to shareholders.") (internal quotations omitted).[17]

> C.    **Plaintiffs Have Not Adequately Alleged That Barclays'
>        LIBOR Submissions Were Materially False Statements.**

Tacitly acknowledging that their claims concerning Barclays' Business Practices

are not actionable, Plaintiffs have concocted an alternate theory of liability—*i.e.*, that Barclays'

August 2007 to January 2009 USD LIBOR submissions are themselves actionable misstatements

under § 10(b).[18]  These allegations are so rife with defects that Plaintiffs raise them only briefly

near the end of the SAC and devote a mere *three paragraphs* out of 211 to them.  (*See* SAC

---

[17]    To the extent that *Richman* v. *Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261 (S.D.N.Y. 2012), suggests that Plaintiffs might be permitted to proceed on statements "too general to cause a reasonable investor to rely upon them," it conflicts with well-established Circuit law.  *JP Morgan Chase Co.*, 553 F.3d at 206.  The Second Circuit recently considered whether statements similar to those alleged here were actionable and declined to follow *Richman*.  Instead, the court reaffirmed the holding of *JP Morgan* and found the alleged statements to be inactionable puffery.  *Bahash*, 2012 WL 6621391, at *4 ("The 'puffery' designation . . . stems from the generic, indefinite nature of the statements at issue, not their scope.").  In any event, the facts in *Richman* are distinguishable from those before the Court.

[18]    Plaintiffs allege that "Defendants disseminated or approved" every single allegedly false or misleading statement discussed in the SAC, including the LIBOR submissions.  (SAC ¶ 206.) Such group pleading fails because it does not establish that each Individual Defendant had "ultimate authority" over each statement such that he could be said to have "made" the statement.  *See UBS AG*, 2012 WL 4471265, at *9-11 ("[A] theory of liability premised on treating corporate insiders as a group cannot survive a plain reading of the *Janus* decision."). Similarly, only Barclays Bank PLC is on the LIBOR panel, and each LIBOR submission is made on behalf of Barclays Bank PLC.  Under *Janus*, it is irrelevant whether BCI allegedly shared employees with Barclays Bank PLC or otherwise influenced any submission, because Barclays Bank PLC is a distinct corporate entity that has ultimate authority over the LIBOR submission. *See In re Optimal U.S. Litig.*, No. 10 Civ. 4095 (SAS), 2011 WL 4908745, at *5-6 (S.D.N.Y. Oct. 14, 2011)  (declining to expand liability to corporate parent company, even though parent company was identified as being responsible for supplying false statements to subsidiary group that made the statements).

¶¶ 171-73.)  Indeed, rather than allege adequate facts as the heightened pleading standards require, Plaintiffs falsely suggest that Barclays "conceded," in the SOF, that the submissions at issue "were materially false and misleading."  (SAC ¶ 173.)  Not so.  Barclays never admitted in the SOF or anywhere else that its USD LIBOR submissions constitute materially false statements within the meaning of the U.S. securities laws.  Because Plaintiffs have failed to allege facts supporting the notion that the submissions were materially false, Plaintiffs' claims fail as a matter of law.  *See, e.g.*, *Starr* v. *Georgeson S'holder, Inc.*, 412 F.3d 103, 109 (2d Cir. 2005) (affirming dismissal of a complaint for "fail[ure] to allege facts that would meet the materiality requirement of § 10(b)").

Plaintiffs have also failed to explain, as they are required to do, how any LIBOR submissions were *materially* false.  In order to state a Rule 10b-5 claim, Plaintiffs "must show that the statements were *misleading* as to a *material* fact."  *Basic Inc.* v. *Levinson*, 485 U.S. 224, 238 (1988).  For a statement or omission to be considered materially false, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Id.* at 231-32 (quoting *TSC Indus., Inc.* v. *Northway, Inc.*, 426 U.S. 438, 449 (1976)).  Plaintiffs allege that Barclays' LIBOR submissions were "made with the intent to deceive the market about the rate at which Barclays truly believed it could borrow funds."  (SAC ¶ 173.)  But Plaintiffs allege no facts to establish how such an alleged misrepresentation would have been material.  At most, the SAC attempts to suggest that the submissions conveyed information to the market regarding Barclays' borrowing costs that could be used to make inferences about Barclays' "operating condition."  (*See* SAC ¶ 173, 187.)  Yet Plaintiffs allege no facts to show how any submissions Barclays made provided investors with an inaccurate picture of Barclays'

financial health or liquidity position relative to other banks.[19]  During the financial crisis, no reasonable investor would have relied upon Barclays' LIBOR submissions to measure Barclays' borrowing costs because (1) it was widely reported at that time that LIBOR had ceased to accurately reflect real prices at which funds could be borrowed; and (2) Barclays provided detailed disclosures to the market regarding its actual sources of funding and the financial figures underlying its liquidity position—which are not alleged to have been false.[20]

During the financial crisis, it was reported in the press and disclosed by Barclays that "term funding in the interbank markets substantially disappeared."[21]  A LIBOR submission is, however, a bank's perception of the price at which it could potentially borrow funds *in the London interbank market*.  (SAC ¶¶ 34-35.)  As early as September 2007, LIBOR submissions were publicly reported to be "fiction" because the interbank market had become highly illiquid and ceased to function.[22]  Thus, any reasonable investor would have known that LIBOR

---

[19]    As discussed below (*see infra* Section II.B.1), to the extent the lowered LIBOR submissions conveyed to anyone meaningful information regarding Barclays' liquidity relative to other banks, those submissions were intended to correct a possible *mis*impression that Barclays was experiencing unique liquidity problems and would have done so.

[20]    At most, Plaintiffs allege—without any factual support—that one general statement regarding Barclays' liquidity position from Barclays' 2007 Form 20-F was false.  (SAC ¶¶ 104-05.)  Plaintiffs do not allege that other similar disclosures were false or that the financial figures related to these disclosures were false.  (*Compare* SAC ¶¶ 104-05 (alleging the falsity of a statement on p. 66 of the 2007 Form 20-F), *with* Ex. B (2007 Form 20-F) at 45, 91-92, 241-43.)

[21]    Ex. B (2007 Form 20-F) at 92; *accord* Michaud & Upper, *supra* n.7, at 47 (observing that, by the second half of 2007, "[t]he functioning of interbank money markets was severely impaired"); Gyntelberg & Wooldridge, *supra* n.7, at 59 (discussing the "evaporation of liquidity" in major interbank markets in the second half of 2007, as "[f]inancing for terms of more than a few days was reportedly not readily available at some commonly referenced interest rates," such as LIBOR); Ex. G (Mollenkamp & Whitehouse, *supra* n.8) ("since the financial crisis began, banks have all but stopped lending to each other for periods of three months or more"); *see also* FSAS ¶¶ 103-05 ("lending in London for maturities longer than overnight came to a virtual standstill").

[22]    *See* Ex. E (Tett, *supra* n.7) (quoting the treasurer of a large financial institution describing LIBOR as a "fiction").

submissions could reflect only opinions regarding hypothetical transactions and not actual transaction prices.  (*See* SAC ¶ 34.)  And by at least April 2008, it was widely known and reported that LIBOR submissions did not even reflect accurate opinions because banks were reportedly making artificially low LIBOR submissions.  *See supra* p. 8.  Simply put, LIBOR submissions were too "unreliable and unsubstantiated" to provide a reasonable investor with any meaningful information about Barclays during the financial crisis.  *See Koncelik* v. *Savient Pharmaceuticals, Inc.*, No. 08 Civ. 10262 (GBD), 2010 WL 3910307, at *10 (S.D.N.Y. Sept. 29, 2010).

Barclays' LIBOR submissions could not have significantly altered the "total mix" of information available to investors in light of Barclays' detailed disclosures regarding its liquidity position and funding sources.  (*See, e.g.*, Ex. B (2007 Form 20-F) at 45, 91-92, 241-43.) In its 2007 Form 20-F, Barclays disclosed that "term funding in the interbank markets substantially disappeared," but "liquidity remained good for Barclays" because of Barclays' strong deposit base, access to short-term funds through repurchase transactions, and the strong demand for Barclays' commercial paper.  (*Id.* at 45, 92.)  These clear statements were supplemented by Barclays' disclosures regarding its short-term borrowings and liquidity risk. (*Id.* at 45, 241-43.)  In light of this publicly available information, which is not alleged to be false, Barclays' LIBOR submissions did not convey any meaningful assessment of Barclays' total funding costs or overall liquidity position.  *See Garcia* v. *Cordova*, 930 F.2d 826, 831 (10th Cir. 1991) (finding the valuation of a small part of a company's holdings to be immaterial because it was "unreliable" information that did not have any "real relevance to the total value" of corporate assets or shares).

**D.**   **Plaintiffs Fail to Allege Any Facts in Support of Their Claim That Mr. Diamond's October 31, 2008 Statements Were Materially False.**

Plaintiffs' attempt to isolate two statements made by Mr. Diamond during a one-hour conference call on October 31, 2008—that "we're categorically not paying higher rates in any currency," and that "we benefit in times of turmoil, so we post where we're transacting, and it's clearly not at high levels" (SAC ¶¶ 108-09)—also fails to support a securities fraud claim because Plaintiffs do not "adequately allege how or why . . . these statements were either false or misleading" at the time they were made. *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 393 (S.D.N.Y. 2006).

Plaintiffs make no particularized factual allegations regarding the prices at which Barclays was able to borrow money at the time of Mr. Diamond's statements. Accordingly, Plaintiffs have failed to allege facts to demonstrate how Mr. Diamond's statements—that Barclays was "not paying higher rates" or that "we post where we're transacting"—were false. *See Rombach*, 355 F.3d at 172 (complaint must "state with particularity the specific facts in support of [plaintiffs'] belief that [defendants'] statements were false when made").

At most, Barclays admitted in the SOF that it made LIBOR submissions that were, on occasion, "lower than Barclays otherwise would have submitted and contrary to the definition of LIBOR." (DOJS ¶ 36.) But that admission does not suggest that Mr. Diamond's statement—that, as of October 2008, Barclays' LIBOR submissions reflected the relative rates at which Barclays was transacting in the market—was false. To the extent the SOF has any bearing on the truth or falsity of Mr. Diamond's statements, it supports the conclusion that his statement that Barclays was "not paying higher rates in any currency" was accurate. As noted in the SAC, Mr. Diamond was responding to an analyst's question regarding how deposit flows "tie[d] . . . together" with the analyst's observation that Barclays was "consistently paying slightly higher

than most of the other UK banks in the LIBOR rate." (SAC ¶ 108.) Mr. Diamond's response indicated that Barclays was not an outlier with respect to other U.K. banks in terms of the rates it was paying to borrow funds, which is consistent with the SOF's description of the difficulties Barclays faced in 2007 and 2008 in light of what Barclays believed to be unrealistic submissions by other LIBOR panel banks. (*See* DOJS ¶ 40 (Barclays' managers believed "other Contributor Panel banks were submitting unrealistically lower Dollar LIBORs" and wanted to avoid the "inaccurate perception" that Barclays was "not in good financial shape").)

              In addition, it is unclear what useful information an investor would have gleaned from Mr. Diamond's comments, given that they did not reference a specific maturity or even a specific currency. Mr. Diamond's statement that "we benefit in times of turmoil, so we post where we're transacting" is an inactionable statement "too general to cause a reasonable investor to rely" upon it. *JP Morgan Chase Co.*, 553 F.3d at 206. Indeed, although Plaintiffs claim to have conducted an investigation into "securities analysts' reports" and "media reports" concerning Barclays (SAC at 1), they fail to identify a single publication that reported on, or in any way referenced, Mr. Diamond's allegedly false statements, thus demonstrating the investing public's lack of interest in those statements. Further, Mr. Diamond's comments were an imprecise answer to a vague question, and thus could not have been relied upon by a reasonable investor. *See Furher* v. *Ericsson LM Tel. Co.*, 363 F. App'x 763, 765 (2d Cir. 2009) (finding statements not misleading, in part, because they were made "in the context of an informal back-and-forth with analysts—partially in response to questions that were themselves imprecise and potentially ambiguous"). In light of the lack of specificity of both the analyst's question and Mr. Diamond's answer, there is no "substantial likelihood" that Mr. Diamond's statements would

have been viewed by a reasonable investor as having "significantly altered" the total mix of information available.  *See Basic Inc.*, 485 U.S. at 231-32.

E.    **Plaintiffs' Allegation That Barclays' Financial Statements Were False and Misleading Is Similarly Deficient.**

Barclays' financial statements make clear that they are prepared in accordance with International Financial Reporting Standards as issued by the IASB.  (*See, e.g.*, Ex. B (2007 Form 20-F) at i.)  IAS 37 requires an entity to disclose the existence of a contingent liability (*i.e.*, a possible obligation arising from past events whose existence will be confirmed only by uncertain future events) "unless the possibility of an outflow of resources embodying economic benefits is remote."  (Ex. H (IASC, *IAS 37: Provisions, Contingent Liabilities and Contingent Assets* 937 (Sept. 1998)); *see also* SAC ¶ 188.)  Plaintiffs allege that Barclays' financial statements were materially false and misleading because the filings did not disclose the "Libor interest rate manipulation and understating of Libor Submission Rates and the potential material adverse financial consequences ensuing therefrom" as a contingent liability, as purportedly required by IAS 37.  (SAC ¶¶ 191-92.)

Plaintiffs "assume[], without supporting factual allegations," that Barclays became subject to an obligation to disclose its LIBOR-related conduct as a contingent liability at some point during the Class Period prior to June 27, 2012, but because they fail to provide any factual allegations to suggest when Barclays became subject to such an obligation to disclose, their claim must be dismissed.  *Charter Twp. of Clinton Police & Fire Ret. Sys.* v. *KKR Fin. Holdings LLC*, No. 08 Civ. 7062 (PAC), 2010 WL 4642554, at *19 (S.D.N.Y. Nov. 17, 2010); *see also Int'l Fund Mgmt. S.A.* v. *Citigroup Inc.*, 822 F. Supp. 2d 368, 379 (S.D.N.Y. 2011) (dismissing plaintiffs' claim that defendant violated an accounting standard because plaintiffs failed to adequately allege "at what point prior to [the date the liability was incurred], if ever"

defendant had a duty to disclose).  Plaintiffs' attempt to establish liability by alleging generally that *all financial statements filed during the Class Period* were materially false and misleading presents a classic "naked form of hindsight pleading."  *See Charter Twp.*, 2010 WL 4642554, at *19.

Furthermore, as Plaintiffs acknowledge, beginning on April 27, 2011, Barclays disclosed the existence of investigations by the FSA, CFTC, and DOJ into Barclays' LIBOR-submission practices.  In the disclosures, Barclays stated:  "It is not currently possible to predict the ultimate resolution of the issues covered by the various investigations and lawsuits, including the timing and the scale of the potential impact on the Group of any resolution."  (*See* SAC ¶¶ 153, 161.)  Plaintiffs fail to demonstrate how any of Barclays' filings following these disclosures could be considered false and misleading by failing to have disclosed a LIBOR-related contingent liability.  Because Plaintiffs "ha[ve] not alleged facts to support a claim that," as of a certain date, "[defendant] knew that losses related [to alleged undisclosed contingent liability] were probable, or even possible, and that [defendant] had information from which it could reasonably estimate any contingency," this claim must be dismissed.  *Bauer* v. *Prudential Fin. Inc.*, No. 09 Civ. 1120 (JLL), 2010 WL 2710443, at *10 (D.N.J. June 29, 2010).

Moreover, Barclays had no duty under the securities laws to disclose alleged corporate mismanagement or uncharged criminal conduct, nor was it required to speculate as to the myriad of consequences that could flow from discovery of an unlawful scheme.  *See In re Yukos Oil Co. Sec. Litig.*, No. 04 Civ. 5243 (WHP), 2006 WL 3026024, at *14-16 (S.D.N.Y. Oct. 25, 2006) (defendant could "hardly have been expected to disclose the speculative possibility" of regulatory scrutiny); *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) ("[F]ederal securities laws do not require a company to accuse itself of

wrongdoing."); *Ciresi* v. *Citicorp*, 782 F. Supp. 819, 823 (S.D.N.Y. 1991) (securities laws do not "impose a duty to disclose uncharged, unadjudicated wrongdoing or mismanagement").

## II.    THE SAC DOES NOT ADEQUATELY PLEAD SCIENTER.

To plead scienter under the PSLRA, a plaintiff "must plead 'with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *JP Morgan Chase Co.*, 553 F.3d at 198 (quoting 15 U.S.C. § 78u-4(b)(2)).  "[A] weak yet reasonable inference of scienter will not suffice."  *Kuriakose* v. *Fed. Home Loan Mortg. Corp.* (*Kuriakose II*), No. 08 Civ. 7281 (JFK), 2012 WL 4364344, at *12 (S.D.N.Y. Sept. 24, 2012) (internal quotation omitted).  A complaint will give rise to this required strong inference of scienter only if it alleges particularized facts that "(1) show[] that the defendants had both motive and opportunity to commit the fraud or (2) constitut[e] strong circumstantial evidence of conscious misbehavior or recklessness."  *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

In order to adequately allege scienter imputable to a corporate entity, a plaintiff must plead that "an agent of the corporation committed a culpable act with the requisite scienter, and that the act (and accompanying mental state) are attributable to the corporation."  *Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).  This can be accomplished either by raising a strong inference that a named individual defendant spoke with the requisite scienter or that the corporation issued a statement of such obvious falsity that scienter must be fairly imputable to someone responsible for it.  *Id.*  Here, Plaintiffs make no colorable attempt to allege motive and opportunity,[23] and instead proceed on flawed and

---

[23]    At most, Plaintiffs allege that the Individual Defendants were motivated by a desire to inflate Barclays PLC's share price.  (*See, e.g.*, SAC ¶ 2.)  Such generic allegations of motive are plainly deficient.  *See, e.g.*, *JP Morgan Chase Co.*, 553 F.3d at 201; *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 349 (S.D.N.Y. 2011).  "According to the Second Circuit,

unsustainable theories of conscious misbehavior and recklessness as to both the Individual

Defendants and Barclays.

      A.      **Plaintiffs Fail to Adequately Allege Scienter with**
                     **Respect to the Individual Defendants.**

      "Scienter based on conscious misbehavior . . . requires a showing of deliberate

illegal behavior, a standard met when it is clear that [the conduct], viewed broadly, is necessarily

going to injure." *Gould* v. *Winstar Commc'ns, Inc.*, 692 F.3d 148, 158 (2d Cir. 2012) (internal

citations and quotations omitted).  Plaintiffs do not come close to meeting that standard with

regard to any Individual Defendant.  The SAC contains no allegation that any Individual

Defendant participated in the Trader Conduct (SAC ¶¶ 46-51), and to the extent that the

Financial Crisis Period Conduct could be classified as conscious misbehavior—which it

cannot—the SAC contains no credible allegation that any Individual Defendant participated in

that conduct either.  (*See* SAC ¶¶ 52-76.)  Indeed, Plaintiffs distort the public record to suggest

that Mr. Diamond issued an instruction to lower LIBOR (*see* SAC ¶ 74), and that allegation,

even if accepted, does not establish that Mr. Diamond engaged in the kind of deliberate illegal

behavior that can be classified as conscious misbehavior.[24]

---

'[m]otives . . . generally possessed by most corporate directors and officers,' such as 'the desire
for the corporation to appear profitable and . . . the desire to keep stock prices high to increase
officer compensation,' do not suffice."  *Hutchinson* v. *Perez*, No. 12 Civ. 1073 (HB), 2012 WL
5451258, at *6 (S.D.N.Y. Nov. 8, 2012) (quoting *Kalnit* v. *Eichler*, 264 F.3d 131, 139 (2d Cir.
2001)).

[24]     "Intentional misconduct is easily identified since it encompasses deliberate illegal
behavior, such as securities trading by insiders privy to undisclosed and material information."
*Novak* v. *Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (citations omitted).  Barclays' admissions in
the DOJS do nothing to establish that, even if Mr. Diamond issued an instruction to lower
LIBOR in 2008 (based on what others understood to be an instruction from the Bank of England
to Barclays), he did so *knowing* that it would constitute a violation of the law.  *See Bd. of Trs. of
the City of Ft. Lauderdale Gen. Emps. Ret. Sys.* v. *Mechel OAO*, 811 F. Supp. 2d 853, 877
(S.D.N.Y. 2011).

Plaintiffs' allegations of recklessness against the Individual Defendants are equally flawed, as they are premised on the blanket assertion that "[b]ecause of their positions with Barclays," the Individual Defendants "had access to material adverse non-public information" regarding the Trader Conduct and Financial Crisis Period Conduct.  (SAC ¶ 18.) That allegation does not suffice:  "Courts in this Circuit have long held that accusations founded on nothing more than a defendant's corporate position are entitled to no weight."  *Plumbers & Steamfitters Local 773 Pension Fund* v. *Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010).

<blockquote>

1. **Plaintiffs Have Not Adequately Alleged Conscious Misbehavior as to Any Individual Defendant.**

</blockquote>

Plaintiffs attempt to allege, at most, that only one Individual Defendant, Mr. Diamond, engaged in conscious misbehavior.  In the SAC, Plaintiffs now—for the first time—summarily allege that Barclays' LIBOR submissions from August 2007 to January 2009 were made "in consultation with" Mr. Diamond.[25]  (SAC ¶ 171.)  This conclusory allegation clearly fails to comport with the heightened pleading standards of Rule 9(b) and the PSLRA because "plaintiffs have proffered no facts to support" it.  *See, e.g.*, *In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 589 (S.D.N.Y. 2007).

Plaintiffs' other allegation against Mr. Diamond is equally baseless because the "factual support" offered for it is incorrect (as demonstrated by information that Plaintiffs have

---

[25]   Although not necessary to resolve for the purposes of this motion, Plaintiffs' allegation regarding Mr. Diamond's involvement with Barclays' daily LIBOR submissions not only is devoid of factual support but is also directly contrary to Mr. Diamond's public testimony in the very proceedings upon which Plaintiffs rely to make their allegations against Mr. Diamond.  *See* Ex. I (Treasury Committee Preliminary Findings) at Ev 8-Ev 9 (Q87-Q100). Plaintiffs' selective reference to testimony in those proceedings undermines their allegations against Mr. Diamond, and the Court should disregard them in their entirety.

incorporated by reference into the SAC).  Plaintiffs allege that, "[a]ccording to [Jerry] del Missier," in October 2008, Mr. Diamond "told [Mr. del Missier] to get Barclays' LIBOR rates down and not be an outlier" and that Mr. del Missier "passed down the instruction as he had received it on to" Mark Dearlove, then head of the London Money Market Desk, which set LIBOR.  (SAC ¶ 74.)  That allegation is based entirely upon Plaintiffs' demonstrably false claim that, in his testimony before Parliament, Mr. del Missier said that Mr. Diamond issued an instruction to lower LIBOR.  (*Id*.)  In fact, Mr. del Missier testified that he believed the instruction that Barclays lower its LIBOR submissions emanated from the Bank of England—not from Mr. Diamond.[26]  Moreover, the Settlements upon which Plaintiffs rely reflect the version of events contained in Mr. del Missier's actual testimony and not Plaintiffs' distorted pleadings.[27]  Because Plaintiffs' allegation is premised on a mischaracterization of the public record, that allegation should be rejected.  *In re Livent*, 151 F. Supp. 2d at 405-06, 427 (according no weight to allegations "contradicted by the very public [documents] on which [plaintiffs] rely").

---

[26]    *See* Ex. I (Treasury Committee Preliminary Findings) at Ev 79-Ev 80 (Q879, Q888-889).  Mr. del Missier testified that he understood that Paul Tucker, on behalf of the Bank of England, communicated the instruction to Mr. Diamond and Mr. Diamond relayed that communication to Mr. del Missier.  (*Id*. at Ev 79 (Q881-882).)  In direct contrast to Plaintiffs' characterization, Mr. del Missier testified explicitly that, had he believed Mr. Diamond or anyone else internal to Barclays initiated the instruction, he would not have followed it.  (*Id*. at Ev 79 (Q880).)

[27]    *See, e.g.*, DOJS ¶ 47 ("As the substance of the conversation was passed to other Barclays employees, certain Barclays managers formed the understanding that they had been instructed by the Bank of England to lower Barclays's LIBOR submissions."); FSAS ¶ 176 ("[A]s the substance of the telephone conversation was relayed down the chain of command at Barclays, a misunderstanding or miscommunication occurred.  This meant that Barclays Submitters believed mistakenly that they were operating under an instruction from the Bank of England . . . to reduce Barclays' LIBOR submissions.").

### 2.   Plaintiffs Have Not Adequately Alleged That Any Individual Defendant Acted with Recklessness.

Plaintiffs similarly fail to allege any facts that support a claim that any of the Individual Defendants acted with recklessness, despite their attempts to suggest that (1) the Individual Defendants recklessly made statements concerning Barclays' Business Practices, and (2) Mr. Diamond recklessly made statements to an analyst on an October 31, 2008 conference call.  In general, recklessness may be adequately alleged by pleading particularized facts sufficient to give rise to a strong inference that (1) defendants "knew facts or had access to information suggesting that their public statements were not accurate," or (2) "failed to check information they had a duty to monitor."  *See Novak*, 216 F.3d at 311 (internal citations omitted). "To make this showing, a complaint '*must specifically identify* the reports or statements' that are contradictory to the statements made."  *Plumbers & Steamfitters*, 694 F. Supp. 2d at 299 (emphasis in original) (quoting *Novak*, 216 F.3d at 309).

Plaintiffs make no particularized allegations regarding "what specific contradictory information the Individual Defendants received or when they received it" such that they knew or should have known that their statements regarding Barclays' Business Practices were false when made.  *See, e.g.*, *Local No. 38 IBEW Pension Fund* v. *Am. Express Co.*, 724 F. Supp. 2d 447, 461 (S.D.N.Y. 2010).  Accordingly, those allegations cannot survive a motion to dismiss.  *Id.*

"For obvious reasons, a showing of recklessness cannot be premised on information that was not reasonably available to the speaker at the time of the alleged misrepresentations."  *Foley* v. *Transocean Ltd.*, 861 F. Supp. 2d 197, 213-14 (S.D.N.Y. 2012). Plaintiffs' allegations assume that the Individual Defendants had contemporaneous knowledge of the Trader Conduct—the same conduct that came to light only as a result of Barclays' extensive

cooperation with governmental investigations.  (*See* DOJS at 1; CFTCS at 4; FSAS ¶ 21.)  The Trader Conduct consisted entirely of low-level Barclays employees making requests to Submitters who were no more senior in the organization.  (*See, e.g.*, SAC ¶ 51; CFTCS at 8.) Accordingly, Plaintiffs fail to adequately allege recklessness because the SAC does not even suggest that information regarding the Trader Conduct was ever "readily accessible" to the Individual Defendants or presented to them "in a manner that would have alerted [them] of the existence of systemic problems."  *Foley*, 861 F. Supp. 2d at 215.

Plaintiffs' allegations that "senior managers" engaged in the Financial Crisis Period Conduct (SAC ¶ 53) also fail because Plaintiffs make no particularized factual allegations to connect the alleged actions of "senior managers" to the Individual Defendants, and thus fail to meet the heightened pleading standards of Rule 9(b) and the PSLRA.[28]  *See In re Wachovia,* 753 F. Supp. 2d at 352 (dismissing claims because of this "missing link" problem).  Nothing in the Settlements or the SAC indicates a "form of direct communication" between the "senior managers" and the Individual Defendants.  *See In re PXRE Grp.*, 600 F. Supp. 2d at 537. Further, the mere existence of a channel through which information may have flowed to the Individual Defendants is insufficient to adequately allege scienter.  *See Local No. 38*, 724 F. Supp. 2d at 462.

Nor do Plaintiffs adequately allege that Mr. Diamond was reckless in his comments during the October 31, 2008 conference call.  (SAC ¶ 108.)  Plaintiffs allege no facts

---

[28]     *See In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 537-38 (S.D.N.Y. 2009) (allegations that certain facts could not have gone unnoticed by top executives due to a company's small size and "intimate corporate culture" were insufficient to give rise to an inference of scienter); *City of Brockton Ret. Sys.* v. *Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 473 (S.D.N.Y. 2008) (allegations that knowledge of accounting weaknesses was "widespread" within the company and that executives were "hands on" were insufficient to give rise to an inference of scienter in the absence of "identified internal reports" signaling the falsity of financial reports).

to establish whether or when Mr. Diamond ever learned of either the Trader Conduct or the Financial Crisis Period Conduct, and allege no facts to suggest that Mr. Diamond was aware of any such conduct at the time those statements were made.  *See, e.g.*, *Local No. 38*, 724 F. Supp. 2d at 460-61.  Similarly, Plaintiffs allege no facts regarding the rates at which Barclays was borrowing unsecured cash in the London market when Mr. Diamond made his statements.  As a result, Plaintiffs have failed to allege facts sufficient to rebut the more compelling inference that Mr. Diamond's statements, even if false, "were the result of merely careless mistakes . . . based on false information fed [to him] from below."  *Dynex*, 531 F.3d at 197 (internal quotations omitted).

### B.   Plaintiffs Fail to Adequately Allege Scienter Imputable to Barclays.

Plaintiffs' allegations of scienter with respect to Barclays are equally flawed. First, Plaintiffs make no particularized factual allegations sufficient to establish that the LIBOR submissions made in connection with the Financial Crisis Period Conduct constitute conscious misbehavior intended "to deceive, manipulate, or defraud" investors,[29] or reckless conduct that evidences an "indifference to deceit."[30]  Second, with respect to the statements concerning Barclays' Business Practices, Plaintiffs plead no facts sufficient to give rise to any inference that someone who "was responsible for the statements" was at least reckless when they were made, because the statements were not obviously false.  *Dynex*, 531 F.3d at 195, 197.  Third, Plaintiffs

---

[29]   *See In re Northern Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 462, 464 (S.D.N.Y. 2000) ("The requisite intent exists only when it is clear that a scheme, viewed broadly, is necessarily going to injure.") (quotations omitted).

[30]   *See Auto. Indus. Pension Trust Fund* v. *Textron Inc.*, 682 F.3d 34, 39 (1st Cir. 2012) (scienter requires allegations of either intent to deceive or "a high degree of recklessness suggesting an indifference to deceit").

fail to plead any particularized facts that could reasonably lead to a conclusion that Barclays issued false financial statements with scienter.

> ### 1.  Plaintiffs Have Not Adequately Alleged Scienter as to Barclays' LIBOR Submissions.

In their recent amendments to their pleadings, Plaintiffs allege that Barclays made lower LIBOR submissions during the financial crisis period "with the intent to deceive the market about the rate at which Barclays truly believed it could borrow funds."  (SAC ¶ 173.) Plaintiffs provide no factual support for their conclusory assertion that Barclays had an "intent to deceive," or for their claim that Barclays made lower LIBOR submissions "for the purpose and effect of concealing Barclays's true operating condition from the investing public."  (SAC ¶ 187.)  These allegations fail to give rise to the required "strong inference" of scienter because they are contradicted by the facts set forth in the Settlements upon which they rely.  (*See, e.g.*, DOJS ¶ 40.)  Indeed, the Settlements give rise to a compelling and more cogent inference of *non-fraudulent* intent because they show that Barclays lowered its LIBOR submissions on certain occasions to *avoid* sending false signals to the market regarding its financial health and liquidity position.  (*Id*.)

Barclays' violation of BBA's rules in making LIBOR submissions also does not constitute proof of intent to defraud.  (*See* SAC ¶¶ 171-73.)  "A 'fraud' is a 'knowing misrepresentation of the truth or concealment of a material fact to induce another to act to his or her detriment.'  Thus, an 'intent to defraud' is the intent 'to cause injury or loss to (a person) by deceit.'"  *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 427 (S.D.N.Y. 2003) (quoting Black's Law Dictionary 670 (7th ed. 1999)).  Pointing to a violation of a regulation or a rule is not sufficient to adequately allege scienter.  *See, e.g.*, *Chill* v. *Gen. Elec. Corp.*, 101 F.3d 263, 270 (2d Cir. 1996) ("Allegations of a violation of GAAP provisions or SEC

regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim.").  Even when a plaintiff attempts to establish scienter through allegations of recklessness, well pled factual allegations must give rise to an inference of "a high degree of recklessness suggesting an indifference to deceit."  *Auto. Indus. Pension Trust Fund*, 682 F.3d at 39.[31]

Indeed, the very Settlements on which Plaintiffs rely undermine the allegation that Barclays acted with scienter.  With the onset of the financial crisis in August 2007, interbank lending dried up and "made determining Barclays' LIBOR submissions more difficult." (CFTCS at 19.)  In this difficult environment, Barclays' Submitters came to believe that other LIBOR panel banks were making "unrealistically low" LIBOR submissions that failed to accurately reflect the illiquidity in the money markets.  (*See* DOJS ¶ 42, CFTCS at 19.)  When Barclays' LIBOR Submitters made what they believed to be "accurate" LIBOR submissions in early September 2007, Barclays became subject to what it believed was unfounded and inaccurate media speculation regarding its financial health and liquidity.  (DOJS ¶¶ 39-40.) Thus, the instruction to lower Barclays' LIBOR submissions was made in order to correct a *misimpression* regarding Barclays' overall financial health and liquidity.  (DOJS ¶¶ 40, 42.)

Moreover, Barclays' repeated disclosures to regulators and the BBA concerning its LIBOR submission practices and industry-wide problems with LIBOR undermine any inference of scienter.[32]  As stated in the SOF, Barclays employees "raised concerns with

---

[31]     *See also In re Sanofi-Aventis Sec. Litig.*, No. 07 Civ. 10279 (GBD), 2009 WL 3094957, at *6 (S.D.N.Y. Sept. 25, 2009) (defining scienter as "an intent 'to deceive, manipulate, or defraud, or reckless disregard for the resultant deception'") (citations omitted); *Kalnit* v. *Eichler*, 85 F. Supp. 2d 232, 244 (S.D.N.Y. 1999) ("[A]ny showing of recklessness 'must be such that it gives rise to a strong inference of fraudulent intent.'") (quoting *Chill*, 101 F.3d at 269).

[32]     *See Mechel OAO*, 811 F. Supp. 2d at 876 (finding that a letter to another company disclosing what was alleged to be deliberate illegal behavior undermined the inference of scienter); *cf. In re Wachovia*, 753 F. Supp. 2d at 356 ("Wachovia executives disclosed the Company's use of stated income lending as early as January 2007 during public testimony before

individuals at the BBA, the Financial Services Authority, the Bank of England, and the Federal

Reserve Bank of New York concerning . . . their views that Dollar LIBOR fixes were too low."

(DOJS ¶ 42.)  In certain communications, Barclays "employees advised that all of the

Contributor Panel banks, including Barclays, were contributing rates that were too low."  (DOJS

¶ 42.)  For example, on November 29, 2007, a Barclays manager contacted a representative of

the BBA and said, "'LIBORs are being set lower than where they ought to be'" because "'banks

are afraid to stick their heads above the parapet and post higher numbers because of what

happened to [Barclays] when [Barclays] did.'"  (DOJS ¶ 43.)  On April 17, 2008—the day after

the *Wall Street Journal* ran a major article questioning the accuracy of LIBOR[33]—a Barclays

manager told the FSA, the bank's primary regulator, that "'to the extent that . . . the LIBORs

have been understated, are we guilty of being part of the pack?  You could say we are.'"  (FSAS

¶ 131.)  This same day, "Barclays made similar comments to the BBA and the Federal Reserve

Bank of New York."  (FSAS ¶ 131.)  The fact that Barclays employees engaged in such

discussions throughout the financial crisis period[34] is patently inconsistent with an intent to

secretly profit by defrauding investors.  *See Mechel OAO*, 811 F. Supp. 2d at 876; *cf. In re

Wachovia*, 753 F. Supp. 2d at 356; *Russo*, 777 F. Supp. 2d at 526.

---

the California Senate Committee on Banking, Finance and Insurance.  The mere fact of that
disclosure undermines any credible theory of scienter.") (citations omitted); *Russo* v. *Bruce*, 777
F. Supp. 2d 505, 526 (S.D.N.Y. 2011) ("[Defendant] made known publicly many of the
hiccoughs in the permit application process that are seized upon in the Complaint. This
candidness undermines an inference of fraudulent intent.").

[33]      Carrick Mollenkamp, *Bankers Cast Doubt on Key Rate Amid Crisis*, WSJ (Apr. 16,
2008).

[34]      *See* DOJS ¶¶ 42-46; CFTCS at 22-24; FSAS ¶¶ 125-31.

2.      **Plaintiffs Have Not Adequately Alleged Scienter
with Respect to the Alleged Misstatements
Regarding Barclays' Business Practices.**

Plaintiffs have also failed to adequately allege scienter imputable to Barclays with
respect to the general statements regarding Business Practices.  Plaintiffs' allegations fall far
short of raising a strong inference that either (1) an Individual Defendant spoke with the requisite
scienter, or (2) the corporation issued a statement of such obvious falsity that scienter must be
fairly imputable to someone who "was responsible for the statements made."  *See Dynex*, 531
F.3d at 195-97.  As shown above, Plaintiffs have failed to adequately allege that the Individual
Defendants—or anyone else at Barclays who might be said to have been responsible for the
statements in Barclays' securities filings—had knowledge of the alleged LIBOR-related conduct
such that they could have been said to have acted with scienter when making the alleged
misstatements about Barclays' Business Practices.  *See id.* at 197; *In re PXRE Grp.*, 600 F. Supp.
2d at 529 n.22, 537-38.  Nor are the alleged Business Practices "misstatements" either "blatantly
false" or of such "magnitude" that scienter could be imputed to Barclays in the absence of a
finding of scienter with respect to a specific Individual Defendant.[35]

3.      **Plaintiffs Have Not Adequately Alleged Scienter
with Respect to Barclays' Financial Statements.**

Even if Plaintiffs had pled facts sufficient to adequately allege a violation of
accounting principles—which they have not—"allegations of . . . accounting irregularities,
standing alone, are insufficient to state a securities fraud claim" unless "such allegations are
coupled with evidence of 'corresponding fraudulent intent.'"  *Novak*, 216 F.3d at 309 (quoting
*Chill*, 101 F.3d at 270).  Plaintiffs must therefore plead particularized facts regarding the

---

[35]      *See Russo*, 777 F. Supp. 2d at 527 n.5 (S.D.N.Y. 2011) (applying *Dynex*); *Plumbers &
Pipefitters Local Union No. 719 Pension Trust Fund* v. *Conseco Inc.*, No. 09 Civ. 6966 (JGK),
2011 WL 1198712, at *23-24 (S.D.N.Y. Mar. 30, 2011) (same).

Defendants' mental state in order to prevail on their accounting claims.[36]  Plaintiffs have made

no such allegations here, and instead offer the blanket assertion that "Defendants knew or

recklessly disregarded that IFRS required Barclays's financial statements to provide full and fair

disclosure about . . . the Libor scandal."  (SAC ¶ 191.)  Such conclusory pleadings are plainly

insufficient to satisfy Rule 9(b) and the PSLRA.  *See Kalnit*, 264 F.3d at 138, 142.

## III.    THE SAC DOES NOT ADEQUATELY PLEAD LOSS CAUSATION.

The SAC must also be dismissed because Plaintiffs fail to plead adequately that

any loss they suffered was caused by Defendants' alleged misstatements or omissions.  To plead

loss causation, Plaintiffs must allege (1) "that the market reacted negatively to a 'corrective

disclosure' which revealed an alleged misstatement's falsity or disclosed that allegedly material

information had been omitted," or (2) "that a defendant's misstatements or omissions concealed

a risk that later materialized to cause the plaintiff's loss."  *In re AOL Time Warner, Inc. Sec.

Litig.*, 503 F. Supp. 2d 666, 677 (S.D.N.Y. 2007) (internal quotations omitted).  "[I]f the

connection is attenuated, or if the plaintiff fails to demonstrate a causal connection between the

content of the alleged misstatements or omissions and the harm actually suffered, a fraud claim

will not lie."  *Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005) (internal

quotations and citations omitted).  "[A] misstatement or omission is [causally related to] an

investment loss if the risk that *caused* the loss was within the zone of risk *concealed* by the

---

[36]    *See, e.g.*, *Stratte-McClure* v. *Morgan Stanley*, No. 09 Civ. 2017 (DAB), 2013 WL
297954, at *9 (S.D.N.Y. Jan. 18, 2013) (dismissing claims related to GAAP violations when
plaintiffs failed to allege facts to show that defendants "knew their disclosures were incomplete
or that they benefitted from the lack of disclosure"); *Davidoff* v. *Farina*, No. 04 Civ. 7617
(NRB), 2005 WL 2030501, at *17 (S.D.N.Y. Aug. 22, 2005) ("[E]ven if it could be established
that the Individual Defendants were each aware of the allegedly improper accounting activity,
plaintiffs would nevertheless have to establish that the Individual Defendants intended to defraud
the public . . . .").

misrepresentations and omissions alleged by a disappointed investor." *Id.* at 173 (first emphasis added).

A.      **Barclays' Business Practices Statements Did Not Cause Plaintiffs' Alleged Losses.**

Plaintiffs allege that the public release of the Settlements constituted a corrective disclosure revealing that Barclays' prior public statements regarding its Business Practices had been false and misleading.  A corrective disclosure, however, is a public statement that "reveals to the market the falsity of a prior representation." *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 487 (S.D.N.Y. 2011).  To show loss causation, Plaintiffs must allege not only that their loss was foreseeable, but also that the alleged "misstatement or omission *concealed* something from the market that, when disclosed, negatively affected the value of the security." *Lentell*, 396 F.3d at 173 (emphasis added).  Thus, Barclays' alleged misrepresentations must have "had the effect of concealing the circumstances that bore on the ultimate loss." *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 510 (S.D.N.Y. 2005).  Nothing contained in the Settlements establishes the alleged falsity of Barclays' generalized statements concerning its Business Practices, and a decline in stock price following a public announcement of "bad news" cannot, without more, establish loss causation. *See In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 163 (S.D.N.Y. 2008).

Plaintiffs assert that the references in the Settlements to Barclays' LIBOR submission controls revealed the falsity of Barclays' generalized Business Practices statements. (*See* SAC ¶¶ 77-81.)  But Plaintiffs point to no instance (including in the public statements referenced in the SAC) in which Barclays ever made a representation regarding its internal controls related to the LIBOR submission process that was corrected by the Settlements.  Instead, Plaintiffs allege that Barclays had already disclosed the risk of an investigation into LIBOR on

-38-

April 27, 2011.  (SAC ¶ 153.)  Plaintiffs cannot plausibly argue that Barclays concealed problems related to LIBOR through generic risk statements when the Bank disclosed the specific risk of the global investigation into LIBOR over a year before the Settlements were announced. *See Lentell*, 396 F.3d at 173.  Moreover, as Plaintiffs recognize, the same financial statements alleged to have been misleading were also "replete with warnings"[37] regarding the fact that Barclays' internal controls or risk management processes were not foolproof.  *See Kuriakose II*, 2012 WL 4364344 at *5.  Thus, "there are simply no facts in the . . . Complaint from which one could reasonably infer a causal link between [Defendant's] statements about its . . . internal controls and any loss suffered by purchasers of its equity securities during the Class Period." *Kuriakose* v. *Fed. Home Loan Mortg. Corp.* (*Kuriakose I*), No. 08 Civ. 7281(JFK), 2011 WL 1158028, at *13 (S.D.N.Y. Mar. 30, 2011).  Plaintiffs attempt to bolster their loss causation allegations in their most recent amendments by summarily concluding that Barclays had misrepresented, in its Business Practices statements, "its dedication to being responsible, its internal controls, and its compliance with such controls."  (SAC ¶ 197.)  But the Settlements only address Barclays' conduct related to LIBOR.  They contain no information regarding such generalized and broad topics as Barclays' "dedication to being responsible," and thus could not have acted as broad corrective statements.

Plaintiffs' theory that the references in the Settlements to Barclays' inadequate LIBOR oversight *corrected* Barclays' prior generalized Business Practices statements is simply unworkable.  Under that theory, every regulatory or criminal settlement announcing wrongful conduct would function as a corrective disclosure to all of the company's statements regarding

---

[37]     *See, e.g.,* Ex. B (2007 Form 20-F) at 64 ("Although the Group has processes and controls to manage legal risks, failure to manage these risks could impact the Group adversely, both financially and by reputation.").

good business practices, and the loss causation requirement would be rendered meaningless.  But the function of the securities laws is "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura Pharms. Inc.*, 544 U.S. at 345.  Indeed, courts have warned against allowing the "zone of risk" to grow too large; otherwise, "loss causation as an element of § 10(b) liability would be completely subsumed by the element of misstatement." *Lattanzio* v. *Deloitte & Touche LLP*, 476 F.3d 147, 157 (2d Cir. 2007).

**B.      Barclays' LIBOR Submissions Did Not Cause**
**Plaintiffs' Alleged Losses.**

Plaintiffs also allege that Barclays' LIBOR submissions between August 2007 and January 2009 constituted violations of the securities law (SAC ¶¶ 171-73), but assert no facts whatsoever that could reasonably lead to the conclusion that the Settlements corrected the allegedly false LIBOR submissions and, in turn, led to a drop in Barclays' share price.  To plead loss causation, Plaintiffs must "allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered."  *Lentell*, 396 F.3d at 175 (quoting *Suez Equity Investors, L.P.* v. *Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001)).  Thus, loss causation requires that "the loss be foreseeable *and* that the loss be caused by the materialization of the concealed risk."  *Id*. at 173.  Although loss causation is like proximate cause in torts, the difference is that stock prices must "decline in reaction to information released into the market rather than in reaction to the fraudulent statements themselves."  *In re State Street Bank & Trust Co. Fixed Income Funds Inv. Litig.*, 774 F. Supp. 2d 584, 589-90 (S.D.N.Y. 2011) (quoting *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 363 (S.D.N.Y. 2009)).

Significantly, Plaintiffs do not allege that any of Barclays' LIBOR submissions made between 2009 and 2012 were false.  (SAC ¶ 171.)  This is hardly surprising given that the

Settlements contain no findings whatsoever that Barclays engaged in any LIBOR-related conduct after 2009.  Indeed, the most recent LIBOR-related conduct referenced in the Settlements occurred in June 2009 (DOJS ¶ 20; FSAS ¶ 53).  Therefore, according to Plaintiffs' own allegations, Barclays had not engaged in this conduct for over three years prior to the announcement of the Settlements.  In the "efficient market" alleged by Plaintiffs (SAC ¶¶ 196, 202), all information publicly disclosed is "incorporated quickly" into a company's stock price. *Westwood* v. *Cohen*, 838 F. Supp. 126, 133 (S.D.N.Y. 1993) (citing *Basic Inc.*, 485 U.S. at 241-45).  Further, Plaintiffs allege no facts to suggest that Barclays' LIBOR submissions from 2007 to 2009 could have inflated Barclays' share price until the time that the ADS price dropped following the Settlements in 2012.  Corporate "information issued periodically quickly becomes stale."  *In re Intelligroup Sec. Litig.*, 468 F. Supp. 2d 670, 699 (D.N.J. 2006) (citing Marissa P. Viccaro, *Can Regulation Fair Disclosure Survive the Aftermath of Enron*?, 40 DUQ. L. REV. 695, 714 (2002)).  The Settlements simply "could not have affected the market's pricing tendencies since th[eir] disclosure[s] addressed financial [information from] *long in the past*, and upon which [Barclays'] *future* earnings did *not* depend."  *In re Intelligroup*, 468 F. Supp. 2d at 699.

For the first time—after two amendments of their pleadings and on their third attempt to articulate a colorable theory of loss causation—Plaintiffs allege that, by announcing Barclays' LIBOR-related misconduct, the Settlements informed the market that "Barclays and its senior officers had acted unlawfully and unethically, that Barclays had misrepresented the rates at which it believed it could borrow funds, and that the Company's internal controls and compliance were not as rigorous as represented."  (SAC ¶ 199; *see also* SAC ¶ 173.)  This unsupported assertion is representative of the wholly conclusory allegations that Plaintiffs have added to the SAC in a last-ditch attempt to avoid dismissal.  Indeed, the allegation illogically

concludes that the Settlements served as a corrective disclosure to a variety of purported

misstatements without providing any facts whatsoever to support such a conclusion.  Such

conclusory pleading cannot save Plaintiffs' claims or excuse their failure to plead facts to

establish loss causation.  Even after two opportunities to amend, Plaintiffs still have not

attempted to allege a connection to explain how the revelation that Barclays misstated its cost of

borrowing from 2007 through 2009 could have caused a corrective decrease in share price

following the Settlements in 2012 when there is no allegation that Barclays had misstated its

borrowing costs in 2010 through 2012.

   A share price drop caused by reasons other than the "content of the alleged

misstatements," such as Barclays' reputational damage from admitting certain misconduct, does

not satisfy the loss causation requirement.  *See Lentell*, 396 F.3d at 174.[38]  Plaintiffs' attempt to

address the loss causation requirements by alleging that the public learned that Barclays was

involved in a "LIBOR rigging scandal" only after the Settlements is telling.  (SAC ¶ 199.)  Such

vague, reputational harm stemming from revelation of general wrongdoing is exactly the kind of

harm that does *not* satisfy the loss causation requirement.  *See Lentell*, 396 F.3d at 174 (internal

quotations and citation omitted).  Because Plaintiffs' allegations indicate that Barclays' ADS

price already incorporated Barclays' accurate LIBOR submissions at the time of the Settlements,

Plaintiffs' allegations effectively foreclose the possibility that the LIBOR submissions

---

[38] "Collateral risk," including reputational harm and potential sanction risk, does not satisfy
the loss causation requirement.  *See, e.g.*, Bradford Cornell and James C. Rutten, *Collateral
Damage and Securities Litigation*, 2009 UTAH L. REV. 717, 730, 744-45 (2009) ("[P]ermitting
recovery for collateral damage would be contrary to nearly every element of the section 10(b)
cause of action."); Allen Ferrell & Atanu Saha, *The Loss Causation Requirement for Rule 10b-5
Causes of Action: The Implications of* Dura Pharmaceuticals, Inc. v. Broudo, 63 BUS. LAW 163,
180-81, 185 (2007) ("The price decline [due to future litigation risk] would be due to new 'firm-
specific facts' as opposed to firm revaluation resulting from the market learning the truth about
corporate holdings which was the subject of the earlier fraudulent representation.").

themselves could have caused any drop in ADS prices following the Settlements, as the decrease necessarily must have been related to "changed investor expectations [and] new industry-specific or firm-specific facts." *See Dura Pharms., Inc.*, 544 U.S. at 342-43.  Additionally, Plaintiffs appear to suggest that Barclays' LIBOR submissions masked Barclays' liquidity problems from the market.  (*See* SAC ¶ 36.)  But announcement of the Settlements did not reveal that Barclays had faced liquidity problems.  In fact, the SOF states the opposite:  Barclays all along believed its liquidity was good.  (DOJS ¶ 40.)  Thus, the Settlements could not have acted as a corrective disclosure, as they could not have revealed any previously concealed risk to the market.  *See Lentell*, 396 F.3d at 173.  Any information they contained regarding Barclays' LIBOR submissions concerned only submissions from 2007 through 2009, which have no bearing on the market in 2012.[39]

## IV.  CERTAIN OF THE ALLEGED MISSTATEMENTS ARE FORWARD-LOOKING STATEMENTS PROTECTED BY THE SAFE HARBOR PROVISION OF THE PSLRA.

A number of the statements alleged to be false or misleading in the SAC constitute forward-looking statements that are protected from liability by the safe harbor provision of the PSLRA.[40]  Pursuant to the PSLRA, a statement is not actionable if it is "identified as a forward-looking statement, and is accompanied by meaningful cautionary

---

[39]     In what appears to be a recognition that their 10b-5(b) claims are fatally flawed, Plaintiffs appear to raise the specter of scheme liability as a means of avoiding dismissal.  To the extent the Plaintiffs do allege a scheme, those allegations fail.  In order to properly allege scheme liability, a plaintiff must plead that the defendant undertook some "course of conduct that went *beyond the misrepresentations*."  *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 475 (S.D.N.Y. 2005) (emphasis added).  Scheme liability is not permissible "where the primary purpose and effect of a purported scheme is to make a public misrepresentation or omission."  *SEC v. Kelly*, 817 F. Supp. 2d 340, 343 (S.D.N.Y. 2011).  By Plaintiffs' own account, Defendants' "scheme" consisted of nothing more than the alleged making of the same "misstatements" at issue in Plaintiffs' Rule 10b-5(b) claims.  (*See, e.g.*, SAC ¶¶ 22, 201.)

[40]     These statements are identified in Appendix B.

statements identifying important factors that could cause actual results to differ materially."
15 U.S.C. § 78u-5(c)(1)(A)(i); *Slayton* v. *Am. Express Co.*, 604 F.3d 758, 765 (2d Cir. 2010).
Each of Barclays' Form 20-F and 6-K filings with the SEC begins with a warning identifying
itself as containing "forward-looking statements."[41]  Moreover, Appendix B lists the forward-
looking statements that Plaintiffs allege to be false and misleading in Barclays' Form 20-F and
6-K filings.  These statements relate generally to Barclays' ambitions and plans with respect to
corporate responsibility, ethics, risk management, and general compliance with the law, and are
accompanied by "meaningful cautionary statements."[42]  As such, they are forward-looking
statements protected by the PSLRA safe harbor provision or the bespeaks caution doctrine and
are not actionable under the securities laws.[43]

## V.    PLAINTIFFS FAIL TO STATE A CLAIM AGAINST THE INDIVIDUAL DEFENDANTS.

For the reasons set forth above, Plaintiffs have failed to adequately allege a
primary violation of § 10(b) and Rule 10b-5, and thus cannot state a claim against the Individual
Defendants for violation of § 20(a).  Should the Court find that Plaintiffs have sufficiently

---

[41]    These filings provide firm-specific and substantive warnings of the company-specific risks applicable to the forward-looking statements included in the filings, stating that "[b]y their nature, forward-looking statements involve risk and uncertainty because they relate to future events and circumstances . . . .  Any forward-looking statements made by or on behalf of Barclays speak only as of the date they are made."  (Ex. J (Barclays 2006 Form 20-F (Mar. 26, 2007)) at i.)

[42]    *See, e.g.*, SAC ¶ 94 (quoting 2007 Form 20-F) ("Our ambition is to develop both of these complimentary strands [providing sound returns for shareholders and ethical business conduct] as we move forward."); SAC ¶ 95 (quoting 2007 Form 20-F) ("the Group is exposed to many forms of legal risk . . . [including that] the Group's business may not be conducted in accordance with applicable laws around the world . . . [and] the Group may be liable for damages to third parties harmed by the conduct of its business").

[43]    A forward-looking statement also is not actionable if the complaint fails to plead it was made "with actual knowledge . . . that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(B)(i)-(ii).  Plaintiffs have failed to adequately allege "actual knowledge" for the same reasons they have failed to adequately allege scienter.  *See Slayton*, 604 F.3d at 773, 777.

alleged a primary violation, Plaintiffs have failed to adequately allege that the Individual

Defendants were culpable participants.

First, Plaintiffs have failed to adequately allege that any of the Individual

Defendants participated in or otherwise controlled the making of Barclays' LIBOR submissions.

"Merely generally alleging that [the] Individual Defendants were decision-making officials or

had access to material information is inadequate" because it does not "indicate involvement in

perpetrating [the alleged] fraud."  *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 572

(S.D.N.Y. 2011).

Second, Plaintiffs fail to adequately allege that any of the Individual Defendants

were reckless with respect to any LIBOR submissions or any other alleged misstatements over

which they might have exerted control.  Most courts within this District have held that a plaintiff

must plead at least recklessness to establish culpable participation.[44]  As set forth above,

Plaintiffs have failed to adequately allege that any of the Individual Defendants were reckless

with respect to either the general statements regarding Barclays' Business Practices or Barclays'

LIBOR submissions.  Plaintiffs' § 20(a) claims should, therefore, be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss

the SAC in its entirety, with prejudice, and grant to Defendants such other and further relief as

the Court deems just and proper.

---

[44]     *See, e.g.*, *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 307-08 (S.D.N.Y. 2008) ("culpable participation" requires a plaintiff to adequately allege that each defendant acted with at least recklessness); *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 572 (S.D.N.Y. 2011) (same).  *But see In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 396 (S.D.N.Y. 2003) (holding that scienter is not an essential element of a § 20(a) claim).

Dated:  March 1, 2013
        New York, New York

Respectfully submitted,

BOIES, SCHILLER & FLEXNER LLP

/s/ Jonathan D. Schiller
Jonathan D. Schiller (jschiller@bsfllp.com)
James Meadows (jmeadows@bsfllp.com)
575 Lexington Avenue
New York, New York  10022
(212) 446-2300

Michael Brille (mbrille@bsfllp.com)
5301 Wisconsin Avenue NW
Washington, D.C.  20015
(202) 237-2727

Respectfully submitted,

SULLIVAN & CROMWELL LLP

/s/ Jeffrey T. Scott
David H. Braff (braffd@sullcrom.com)
Jeffrey T. Scott (scottj@sullcrom.com)
Matthew S. Fitzwater (fitzwaterm@sullcrom.com)
Matthew J. Porpora (porporam@sullcrom.com)
125 Broad Street
New York, New York  10004
(212) 558-4000

*Attorneys for Defendants Barclays PLC, Barclays Bank PLC, Barclays Capital Inc., Marcus A.P. Agius, Christopher Lucas, and John Varley*

Respectfully submitted,

DECHERT LLP

/s/ Andrew J. Levander
Andrew J. Levander
(andrew.levander@dechert.com)
1095 Avenue of the Americas
New York, New York  10036
(212) 698-3500

Cheryl A. Krause
(cheryl.krause@dechert.com)
Cira Centre
2929 Arch Street
Philadelphia, Pennsylvania  19104
(215) 994-4000

*Attorneys for Defendant Robert Diamond*