**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X

VLADIMIR GUSINSKY, TRUSTEE, FOR THE
VLADIMIR GUSINSKY LIVING TRUST,
**Individually and on Behalf of All Others**
**Similarly Situated,**

          **Plaintiff,**

          **v.**

BARCLAYS PLC, et al.,

          **Defendants.**

------------------------------------------------------------X

**OPINION AND ORDER**

**12 Civ. 5329 (SAS)**



**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

      Plaintiffs[1] bring this putative class action on behalf of themselves and

others similarly situated (the "Class") against Barclays PLC, Barclays Bank PLC

("Barclays Bank"), and Barclays Capital Inc., ("BCI") (collectively, "Barclays"),

and John Varley, Robert Diamond, Christopher Lucas, and Marcus Agius

("Individual Defendants" and, together with Barclays, "Defendants").  The Class

---

      [1]    Lead plaintiffs are Carpenters Pension Trust Fund of St. Louis and St.
Clair Shores Police & Fire Retirement System.

-1-

consists of all persons and entities who purchased American Depositary Shares ("ADSs") of Barclays PLC between July 10, 2007 and June 27, 2012, inclusive (the "Class Period"), and were allegedly damaged thereby.  Plaintiffs assert violations of: (1) Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder against all defendants; and (2) Section 20(a) of the Exchange Act against the Individual Defendants.

Defendants move under Federal Rule of Civil Procedure 12(b)(6) to dismiss the Second Amended Complaint ("SAC") on the grounds that: (1) Plaintiffs fail to plead any actionable misrepresentations; (2) Plaintiffs fail to plead facts giving rise to a strong inference of scienter; (3) Plaintiffs fail to plead loss causation; (4) many of the alleged misstatements are not actionable because they are protected by the safe harbor provision in the Private Securities Litigation Reform Act of 1995 ("PSLRA"), or the bespeaks caution doctrine; and (5) Plaintiffs' Section 20(a) claims for control person liability must be dismissed because Plaintiffs have failed to adequately allege a primary violation of Section

10(b) or culpable participation on the part of the Individual Defendants.[2]  For the

following reasons, Defendants' motion to dismiss is granted.[3]

## II.      BACKGROUND[4]

### A.      The Parties

Barclays PLC is a publicly held corporation based in the United

Kingdom ("U.K."), that provides global financial services.[5]  Barclays PLC's ADSs

are registered with the Securities Exchange Commission ("SEC") pursuant to the

Exchange Act and traded on the New York Stock Exchange.  Barclays Bank, a

wholly-owned subsidiary of Barclays PLC, is also a global financial services

---

[2]      Defendants' Memorandum of Law in Support of Their Motion to Dismiss the SAC ("Def. Mem.") at 2-3 (Dkt. No. 62).

[3]      Plaintiffs move to strike Exhibits E, F and G submitted in support of Defendants' motion to dismiss.  *See* Lead Plaintiffs' Memorandum of Law in Support of Motion to Strike Certain Exhibits Attached to the Declaration of Matthew J. Porpora (Dkt. No. 65).  Because I assume in deciding Defendants' motion that the London Interbank Offered Rate ("LIBOR") submissions *were* material misstatements, Exhibits E, F, and G, which Plaintiffs contend were used "to argue that Barclays' LIBOR submission[s] were not material to investors . . . ," *id*. at 1 (citing Def. Mem. at 8), are irrelevant.

[4]      The facts in this section are taken from the SAC and various investigative reports and business documents incorporated by reference therein.

[5]      *See* SAC ¶ 10.

provider.[6]  BCI, also a wholly-owned subsidiary of Barclays PLC, provides

securities brokerage and financial advisory services.[7]

   Varley was Group Chief Executive Officer ("CEO") of Barclays from

2004 until he resigned in 2011 and Diamond took over.[8]  Diamond was CEO from

January 1, 2011 to July 3, 2012, and President and Chief Executive of Corporate

and Investment Banking and Wealth Management prior to 2011.[9]  Lucas was Chief

Financial Officer and Group Finance Director during the Class Period.[10]  Agius

was Chairman of the Board from January 1, 2007 throughout the Class Period.[11]

Plaintiffs purchased Barclays ADSs during the Class Period.[12]

## B. Barclays' Role in Setting LIBOR Rates

---

[6] *See id.* ¶ 11. *See also* Non-Prosecution Agreement Between Barclays and the U.S. Department of Justice ("NPA") ¶ 10.

[7] *See* SAC ¶ 12.  BCI's direct parent is Barclays Group U.S., Inc., a U.S. bank holding company and a wholly owned subsidiary of Barclays PLC.  *See* NPA ¶ 10.

[8] *See* SAC ¶ 13.

[9] *See id.* ¶¶ 14, 74.

[10] *See id.* ¶ 15.

[11] *See id.* ¶ 16.

[12] *See id.* ¶ 23.

Plaintiffs' fraud allegations arise out of Barclays' participation in setting the London Interbank Offered Rate ("LIBOR").  LIBOR is a benchmark reference rate devised by banks in the 1980s at the behest of the British Bankers' Association in order to bring a measure of uniformity to the market for instruments such as interest-rate swaps, forward-rate agreements, and foreign currency options.[13]  Today, LIBOR rates serve as reference rates underlying numerous derivative financial instruments traded in the over-the-counter market and on exchanges all over the world.[14]  In addition, LIBOR rates are the reference rates underlying various types of loan agreements worldwide.[15]

LIBOR rates are produced for ten currencies and fifteen maturities, *i.e.* borrowing periods, per currency.[16]  For each currency there is a bank panel comprised of six to eighteen banks ("Contributor Banks") that is intended to reflect the balance of the market.[17]  Each Contributor Bank is asked to estimate the rate at which it could borrow funds "by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11 am" (the "Submission Rates"), without

---

[13]     *See id.* ¶ 29.

[14]     *See id.* ¶ 30.

[15]     *See id.*

[16]     *See id.* ¶ 32.

[17]     *See id.* ¶ 33.

reference to rates contributed by other Contributor Banks.[18]  Thomson Reuters, the

designated calculation agent for LIBOR, collects the Submission Rates daily,

discards the highest and lowest twenty-five percent of the Submission Rates, and

averages the remaining rates to arrive at the LIBOR rate for a given currency and

maturity.[19]  Thomson Reuters distributes the resulting 150 LIBOR rates to the

market.[20]  Thomson Reuters also posts individual Submission Rates identified with

the responsible Contributor Bank.[21]

From at least 2005 until the present, Barclays has been a member of

all ten LIBOR bank panels.[22]  During the Class Period, Barclays made its daily

submissions through Barclays' London Non-Sterling Liquidity Management Desk

(the "London Money Market Desk"), which was then part of BCI.[23]  Plaintiffs

---

[18]    *Id.* ¶¶ 34-35.  The rates must be submitted by employees with primary responsibility for the management of the Contributor Bank's cash rather than the bank's derivative books.  *See id.* ¶ 37.

[19]    *See id.* ¶¶ 38-39.

[20]    *See id.* ¶ 40.

[21]    *See id.* ¶ 41.

[22]    *See id.* ¶ 42.  Also from 2005 to the present, Barclays has been a member on a bank panel whose submissions are used to calculate the Euro Interbank Offered Rate ("EURIBOR"), a reference rate overseen by the European Banking Federation.  *See id.*

[23]    *See id.* ¶ 43.

allege that Barclays participated in two schemes to manipulate its LIBOR Submission Rates.  *First*, Barclays' traders attempted to influence LIBOR for financial gain by directing LIBOR submitters to submit inaccurate Submission Rates for Barclays.[24]  From 2005 through 2009, Barclays' traders contacted persons responsible for submitting Barclays' Submission Rates to request that they submit a specific rate, or alter the actual rate in a particular manner and in some cases the Barclays submitters accommodated these requests.[25]  Barclays' swap traders also communicated similar requests to submitters from other Contributor Banks with the goal of allowing the traders and their counterparts at other financial institutions to increase profits or minimize losses.[26]

       *Second*, Barclays attempted to enhance market perception of its financial health by directing its LIBOR submitters to submit rates that were lower than the rates at which it legitimately believed it could borrow funds.[27] Specifically, Barclays' management directed its Dollar LIBOR submitters to submit rates that were closer to the expected rates of other Contributor Banks

---

[24]     *See id.* ¶ 45.

[25]     *See id.* ¶¶ 46-49.

[26]     *See id.* ¶ 50.

[27]     *See id.* ¶ 45.

rather than the accurate LIBOR rates, and the Dollar LIBOR submitters acceded to the demands.[28]  The manipulations allegedly began in August 2007 in response to negative publicity regarding Barclays' liquidity and continued throughout at least January 2009.[29]  Plaintiffs allege that "Barclays had no specific systems or controls for its LIBOR or EURIBOR submissions process until December 2009" and did not conduct formal monitoring until mid-2010.[30]  In addition, Barclays' compliance department allegedly was aware of existing conflicts of interest and improper instructions to submitters but did not take remedial action.[31]

###   C.   The Alleged Materially False and Misleading Misstatements

Plaintiffs allege that Barclays' investors were unaware of Barclays' manipulation of LIBOR and EURIBOR rate submissions and lack of internal controls prior to and throughout the Class Period and, in fact, were led to believe that Barclays had robust internal controls based on materially false and misleading statements made during the Class Period.[32]  Plaintiffs allege four categories of

---

[28]     *See id.* ¶¶ 53-55 (quoting NPA ¶¶ 36-37).

[29]     *See id.* ¶¶ 56-76.

[30]     *Id.* ¶¶ 77-79 (citing and quoting 6/27/12 Final Notice Issue by U.K. Financial Services Authority ¶¶ 147, 149).

[31]     *See id.* ¶¶ 80-84.

[32]     *See id.* ¶ 86.

misstatements.  *First*, Plaintiffs cite representations in Barclays' financial

statements from 2006-2011 regarding: (a) risk management and internal controls;

(b) corporate responsibility and ethics; and (c) legal compliance (together,

"Business Practices").[33]  *Second*, Plaintiffs refer to statements Diamond made

during a conference call in response to an analyst's observation that Barclays

appeared to be "consistently paying slightly higher than most of the other U.K.

banks in the LIBOR rate."[34]  *Third*, Plaintiffs allege that the Submission Rates

themselves were actionable misstatements.[35]  *Fourth*, Plaintiffs allege that

Barclays' failure to disclose its contingent liabilities as required by the

International Accounting Standards Board and the SEC was an actionable

omission.[36]

### D.    Barclays' Disclosures Regarding the LIBOR Investigation

On April 27, 2011, Barclays disclosed in its first quarter 2011 interim

management statement that it was being investigated by the U.K. Financial

Services Authority ("FSA"), U.S. Commodity Futures Trading Commission

---

[33]     *See id.* ¶¶ 87-170.

[34]     *Id.* ¶¶ 108-109.

[35]     *See id.* ¶¶ 171-173.

[36]     *See id.* ¶¶ 188-195.

("CFTC"), SEC, and U.S. Department of Justice ("DOJ") concerning its LIBOR submissions (together, the "Investigations").[37]  In February 2012, regulators gave Barclays an ultimatum: enter into a settlement regarding its conduct in manipulating LIBOR rates or face criminal and civil charges.[38]

On June 27, 2012, after several months of negotiation, Barclays announced that it had reached settlement agreements with the FSA, CFTC and DOJ totaling over $450 million (the "Settlements").[39]  That day, Barclays' ADSs declined twelve percent to close at $10.84 per ADS.[40]

## III.   STANDARDS OF REVIEW

### A.   Rule 12(b)(6) Motion to Dismiss

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the court "must accept all non-conclusory factual allegations as true and draw all reasonable inferences in the plaintiff's favor."[41]  "When there are well-pleaded factual

---

[37]   SAC ¶¶ 153, 161.  In its 2011 Form 20-F, Barclays also disclosed a European Commission investigation.

[38]   *See id.* ¶ 174.

[39]   *See id.* ¶ 175.

[40]   *See id.*

[41]   *Simms v. City of New York*, No. 11 Civ. 4568, 2012 WL 1701356, at *1 (2d Cir. May 16, 2012) (citing *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008)).

allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."[42]  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[43]  Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully."[44]

In deciding a motion to dismiss, "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."[45]  A court may also consider a document that is not incorporated by reference "where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint."[46]  When a securities fraud complaint alleges that material misstatements or omissions were made in public documents required to be filed

---

[42]     *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  *Accord Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124 (2d Cir. 2010).

[43]     *Iqbal*, 556 U.S. at 678 (quotation marks omitted).

[44]     *Id.* (quotation marks omitted).

[45]     *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).

[46]     *Id.* (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)).

with the SEC, a court may take judicial notice of such documents, as well as "related documents that bear on the adequacy of the disclosure . . . ."[47]

## B.   Heightened Pleading Standard under Rule 9(b) and the PSLRA

Federal Rule of Civil Procedure 9(b) requires that the circumstances constituting fraud be alleged with particularity, although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." The PSLRA adds that in private securities fraud cases the complaint must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."[48]  In addition, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."[49]

## C.   Leave to Amend

---

[47]     *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991). *Accord Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).

[48]     15 U.S.C. § 78u-4(b)(1)(B).

[49]     *Id.* § 74u-4(b)(2).

Whether to permit a plaintiff to amend its complaint is a matter committed to a court's "sound discretion."[50]  Federal Rule of Civil Procedure 15(a) provides that leave to amend a complaint "shall be freely given when justice so requires."  "When a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint,"[51] particularly when a complaint is dismissed for failure to plead fraud with adequate specificity under Rule 9(b).[52]  Leave to amend should be denied, however, where the proposed amendment would be futile.[53]

## IV.   APPLICABLE LAW

### A.   Section 10(b) of the Exchange Act and SEC Rule 10b-5

Section 10(b) of the Exchange Act makes it illegal to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . ."[54]  Under Rule 10b-5, one may not "make any

---

[50]    *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).

[51]    *Hayden v. County of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999).

[52]    *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).

[53]    *See Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 87 (2d Cir. 2002).

[54]    15 U.S.C. § 78j(b).

untrue statement of a material fact or [] omit to state a material fact necessary in order to make the statements made . . . not misleading . . . in connection with the purchase or sale of any security."[55]

"To sustain a private claim for securities fraud under Section 10(b), 'a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'"[56]

### 1.   Material Misstatements or Omissions

In order to satisfactorily allege misstatements or omissions of material fact, a complaint must "state with particularity the specific facts in support of [plaintiffs'] belief that [defendants'] statements were false when made."[57]  "[A]

---

[55]   17 C.F.R. § 240.10b-5.  Courts have long recognized an implied private right of action under Section 10(b) and Rule 10b-5.  *See Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 13 n.9 (1971) (noting that "[i]t is now established that a private right of action is implied under [Section] 10(b)").

[56]   *Ashland Inc. v. Morgan Stanley & Co., Inc.*, 652 F.3d 333, 337 (2d Cir. 2011) (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).  *Accord Erica P. John Fund, Inc. v. Halliburton Co.*, — U.S. — , 131 S. Ct. 2179, 2184 (2011).  Because this Opinion resolves the claims on the basis of the misstatement and loss causation requirements, I do not address the other elements of fraud.

[57]   *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004) (internal quotation marks omitted).

-14-

fact is to be considered material if there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell [securities] . . . ."[58] Mere "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud."[59]

### 2.    Loss Causation

A securities fraud plaintiff is required to "prove both transaction causation (also known as reliance) and loss causation."[60] Loss causation is "the proximate causal link between the alleged misconduct and the plaintiff's economic harm."[61] "A misrepresentation is 'the proximate cause of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations . . . .'"[62] Therefore, "to plead loss causation, the complaint[] must allege facts that support an inference that [defendant's] misstatements and

---

[58]     *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92–93 (2d Cir. 2010) (internal quotation marks omitted).

[59]     *Id. Accord Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000).

[60]     *ATSI*, 493 F.3d at 106.  Defendants do not dispute transaction causation.

[61]     *Id.* at 106-07 (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005); *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005)). *Accord Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 157 (2d Cir. 2007).

[62]     *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 513 (2d Cir. 2010) (quoting *Lentell*, 396 F.3d at 173) (emphasis in original).

omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud."[63]

### B. Control Person Liability Under Section 20(a) of the Exchange Act

"To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."[64]

## V. DISCUSSION

Plaintiffs raise four categories of misstatements: (1) Barclays' representations about its Business Practices in its Financial Statements; (2) Barclays' contingent liability disclosures in its Financial Statements; (3) Barclays' LIBOR submissions; and (4) Diamond's conference call statements.  As discussed below, the first two categories are not actionable misstatements or omissions.  The second two categories, even if they are actionable, are too attenuated from the 2012 corrective disclosure to establish loss causation.

### A. Material Misstatements or Omissions

---

[63]     *Lentell*, 396 F.3d at 175.

[64]     *ATSI*, 493 F.3d at 108 (citing *S.E.C. v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996)).

### 1.    Barclays' Statements Regarding Its Business Practices Are Not Actionable Misstatements

Plaintiffs devote approximately forty pages of their Complaint to quoting generic statements about Barclays' Business Practices[65] regarding

> adherence to responsible practices; the *possibility* of liability to third parties for its harmful conduct; the Company's commitment to the management of operational risk . . . ; the Company's commitment to promoting good corporate governance; the Company's operation of a system of internal controls which provides reasonable assurance of effective and efficient operations . . . including . . . compliance with laws and regulations; the responsibility of the Board for ensuring that management maintains a system of controls that provides assurance of effective and efficient operations . . . ; the conclusion of the CEO and Group Finance Director that the . . . Company's disclosure controls and procedures were effective; [and] statements concerning LIBOR and the Company's liquidity . . . .[66]

Plaintiffs claim that such statements were materially false and misleading because they failed to disclose that:

> Barclays swap traders had improperly requested that certain Barclays LIBOR submitters submit false LIBOR contribution data . . . ; Barclays swap traders had communicated with swap traders from other LIBOR contributing banks and other financial institutions requesting [favorable] LIBOR contributions . . . ; Barclays, at the direction of senior management, submitted false and inaccurate LIBOR information that underreported its actual knowledge of Barclay's borrowing costs and overall financial

---

[65]    *See* SAC ¶¶ 87-170.

[66]    *Id.* ¶ 105 (discussing 2007 financial statements).  *See also id.* ¶¶ 118, 133, 152, 163 (discussing 2008-2011 financial statements).

stability . . . ; Defendants falsely stated that specific internal controls were in place . . . to prevent the conduct that actually occurred; internal controls were [not] being utilized; [and] Defendants' conduct knowingly violated [various laws].[67]

As a preliminary matter, the Second Circuit has rejected as insufficiently "particular" precisely the style of pleading Plaintiffs use in this case – a "complaint consist[ing] in large part of large block quotations with italicized text, followed by a passage that reads '[t]he statements referenced in [the preceding paragraphs] were each materially false and misleading when made for the reasons set forth in ¶ [90] . . . .'"[68]  In addition, Plaintiffs' allegations with respect to the financial statements are deficient for two substantive reasons.

*First*, the Second Circuit has held, as a blanket matter, that "statements that are 'too general to cause a reasonable investor to rely upon them'" such as "generalizations about a company's business practices and integrity" may not form the basis for a Rule 10b-5 fraud claim.[69]  Many of the statements that

---

[67]     *Id.* ¶ 90.

[68]     *Boca Raton Firefighters & Police Pension Fund v. Bahash*, No. 12 Civ. 1776, 2012 WL 6621391, at *4 (2d Cir. Dec. 20, 2012).  *Accord Rombach*, 355 F.3d at 172 (plaintiffs cannot plead fraud by "catalog[ing] a number of statements made by the individual defendants, [without] explain[ing] with adequate specificity how those statements were actually false or misleading" with respect to the conduct alleged)

[69]     *Bahash*, 2012 WL 6621391, at *3 (quoting *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d

-18-

Plaintiffs identified fall squarely within the Second Circuit's definition of non-actionable puffery – for example statements about being a responsible global citizen and doing business ethically.[70]  The court in *Bahash* found irrelevant the argument that statements about a corporation's integrity were actionable where they "directly related" to the subject of the fraud claim, and clarified that "[t]he 'puffery' designation . . . stems from the generic indefinite nature of the statements at issue, not their scope."[71]

   *Second*, even as to those Business Practices which might not be *per se* non-actionable "puffery," Plaintiffs' allegations fail to connect the statements about Barclays' Business Practices to Barclays' LIBOR practices.[72]  For example, Plaintiffs attempt to clear this hurdle by arguing, with respect to statements about legal compliance, that "when Barclays was telling the public that its 'business *may not be* conducted in accordance with applicable laws around the world' Barclays

---

Cir. 2009)).

  [70] *See, e.g.*, SAC ¶¶ 119-122 (discussing 2008 Financial Statements).

  [71] *Bahash*, 2012 WL 6621391, at *4.

  [72] Plaintiffs cite only one reference to LIBOR in Barclays' public filings, in the 2007 Form 20-F stating that "term LIBOR premiums rose" in the second half of 2007 and that "the Group's liquidity position remained strong."  SAC ¶ 104. However, Plaintiffs do not focus on this statement or specify how it relates to Barclays' submission of allegedly false LIBOR rates.

was, at that time, actively violating laws around the world by manipulating

LIBOR."[73]  If this were sufficient, then every individual who purchased the stock

of a company that was later discovered to have broken *any* law could theoretically

sue for fraud.[74]  This is precisely what the Second Circuit sought to avoid when it

declined to "'bring within the sweep of federal securities laws many routine

representations made by investment institutions.'"[75]

        Plaintiffs' allegations that "statements concerning the Company's

management of risk . . . were materially false and misleading because, when made,

the company knew it 'had no specific systems or controls for its LIBOR or

---

[73]     Lead Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the SAC ("Pl. Opp.") at 14 (emphasis in original).

[74]     The cases Plaintiffs cite for the proposition that "false statements regarding legal compliance [are] actionable," which predate the Second Circuit's summary opinion in *Bahash*, are distinguishable. In those cases, plaintiffs' statements about business practices were directly related to the subject of the fraud. In *Lapin v. Goldman Sachs Grp., Inc.*, the court held that Goldman "attempted to distinguish itself from other institutions based on its 'truly independent investment research' while it allegedly knew . . . about the pervasive conflicts and the effect they had on its research reports and buy recommendations, allegedly one of its core competencies, yet it allegedly failed to disclose such material information to its investors." 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006).  *See also Richman v. Goldman Sachs Grp., Inc*., 868 F. Supp. 2d 261, 279 (S.D.N.Y. 2012) ("Given Goldman's fraudulent acts [involving conflicts of interest], it could not have genuinely believed that its statements about complying with the letter and spirit of the law and that its continued success depends upon it, valuing its reputation, *and* its ability to address potential conflict of interests were accurate and complete.").

[75]     *Bahash*, 2012 WL 6621391, at *4 (quoting *ECA*, 553 F.3d at 206).

EURIBOR submissions process'" also fall short.  None of Barclays' statements regarding its Business Practices reference Barclays' LIBOR submissions or appear to contemplate LIBOR as a risk.[76]  Thus, even if representations about risk management do not constitute "puffery," here the connection between Barclays' statements regarding risk management and its LIBOR practices is too attenuated to find that the alleged LIBOR misconduct rendered the representations regarding risk management materially misleading.[77]  Insofar as Plaintiffs' risk management arguments are based on the fact that Barclays, through its LIBOR practices, was "subjecting itself to reputational damage, and civil and criminal liability," again, finding such statements actionable on these facts would render every financial institution liable to every investor for every act that broke the law or harmed reputation.  In sum, Plaintiffs have not plausibly alleged that Barclays' Business Practices statements contained any material misrepresentations with respect to

---

[76]     *See* Pl. Opp. at 16 (discussing identified risks).

[77]     *Compare In re Austl. & N.Z. Banking Grp., Sec. Litig.*, No. 08 Civ. 11278, 2009 WL 4823923, at *14 (S.D.N.Y. Dec. 14, 2009) ("The core weakness in the Complaint is the plaintiff's failure to match its theory of fraud to the public statements made by ANZ" where "the [alleged] fraud consisted of ANZ's misrepresentation of its 'equity finance practices'" but "[t]hose practices . . . are not the subject of the representations cited in the Complaint.") *with Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 190 (S.D.N.Y. 2010) (fraud adequately alleged "where statements touting risk management were . . . juxtaposed against detailed factual descriptions of the Company's woefully inadequate or non-existent credit risk procedures. . . .").

LIBOR practices.

> ### 2.   Plaintiffs Have Not Alleged that Barclays' Contingent Liability Disclosures Were Materially Misleading

International Accounting Standard ("IAS") 37 requires Barclays to disclose the existence of a contingent liability "unless the possibility of an outflow of resources embodying economic benefits is remote."  A contingent liability is "a possible obligation that arises from past events and whose existence will be confirmed only by the occurrence or non-occurrence of one or more uncertain future events not wholly within the control of the entity . . . ."[78]

Plaintiffs argue that "Barclays' 'possible' obligation stems from the Company's illegal conduct [in manipulating LIBOR rates] and thus the timing [for disclosure] is self evident: it is when Defendants' illegal conduct first occurred."[79] The notion that IAS 37 obligates companies to disclose any potentially illegal conduct the instant it is committed because future liability is always possible, and that failure to do so may form the basis for a material omission under Rule 10b-5, is unrealistic and contrary to precedent.[80]  At most, the disclosure obligation would

---

[78]   IAS 37.

[79]   Pl. Opp. at 25.

[80]   *See, e.g.*, *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004), *aff'd sub nom. Albert Fadem Trust v. Citigroup, Inc.*, 165 F. App'x 928 (2d Cir. 2006) (holding that "the federal securities laws do not require a

arise when an investigation into the conduct began, and the language of IAS 37 suggests that even an investigation does not trigger the duty to disclose where the possibility of liability remains "remote."

Barclays disclosed the existence of the Investigations on April 27, 2011 and stated: "It is not currently possible to predict the ultimate resolution of the issues covered by the various investigations and lawsuits, including the timing and scale of the potential impact on the Group of any resolution."[81]  Because Plaintiffs rely on the theory that the duty to disclose arose as soon as the illegal conduct began, they do not argue that Barclays' duty to disclose the pendency of the *Investigations* arose earlier than 2011, when Barclays did disclose in accordance with the requirements of IAS 37.[82]  Their fraud claims based on failure to disclose under IAS 37 must therefore be dismissed.

---

company to accuse itself of wrongdoing"); *Ciresi v. Citicorp*, 782 F. Supp. 819, 823 (S.D.N.Y. 1991), *aff'd*, 956 F.2d 1161 (2d Cir. 1992) ("the law does not impose a duty to disclose uncharged, unadjudicated wrongdoing or mismanagement"); *Ballan v. Wilfred Am. Educ. Corp.*, 720 F. Supp. 241, 249 (E.D.N.Y. 1989) (securities laws do not require corporate management "to direct conclusory accusations at itself or to characterize its behavior in a pejorative manner").

[81]     SAC ¶¶ 153, 161.

[82]     *See id.* ¶ 188 (where likelihood of the occurrence of a contingent liability is more than remote, "financial statements are to disclose the nature of the contingency and, where practicable, give an estimate of possible loss or range of loss or state that such estimate cannot be made").

-23-

**B.    Loss Causation**

**3.    Plaintiffs Fail to Connect Barclays' LIBOR Submissions to Their Alleged Losses**

Plaintiffs allege that "the Dollar LIBOR Rate Submission Rates submitted by Barclays' London Money Market Desk from August 2007 through January 2009 . . . were themselves materially false and misleading statements."[83] Plaintiffs cite to the NPA statement that, during this time period, "'Barclays often submitted inaccurate Dollar LIBORs that under-reported its perception of its borrowing costs and its assessment of where its Dollar LIBOR submission should have been'" at the direction of "'[c]ertain members of management of Barclays.'"[84] The alleged purpose of this manipulation was to submit rates "'nearer to the expected rates of other Contributor Panel banks'" and to "deceive the market about the rate at which Barclays truly believed it could borrow funds."[85]

Even assuming that Barclays' LIBOR submissions are actionable misstatements, which defendants dispute on the ground that they "'could not have

---

[83]    *Id.* ¶ 171.

[84]    *Id.* (quoting NPA ¶ 36).

[85]    *Id.* ¶¶ 171 (quoting NPA ¶ 36), 173.

signficantly altered the 'total mix' of information made available,'"[86] Plaintiffs do not adequately plead loss causation.  Plaintiffs rely on the efficient market theory to allege that Defendants "engaged in . . . a [course of conduct] to deceive the market that *artificially inflated* Barclays ADSs . . . by misrepresenting the Company's *then current* state of affairs" including "the interest rate at which the company believed it could borrow funds."[87]  Plaintiffs argue that they may plead loss causation by "'identify[ing] particular disclosing event[s] that reveal the false information, and t[ying] dissipation of artificial price inflation to those events.'"[88]  However, the allegations in the SAC utterly fail to make that connection.

The alleged fraudulent submissions occurred between 2007 and

---

[86]     Def. Mem. at 19 (quoting *Basic v. Levinson*, 485 U.S. 224, 231-32, 238 (1988) (emphasis in original)).  Defendants argue that "[d]uring the financial crisis, no reasonable investor would have relied upon Barclays' LIBOR submissions to measure Barclays' borrowing costs because (1) it was widely reported at the time that LIBOR had ceased to accurately reflect real prices at which funds could be borrowed and (2) Barclays provided detailed disclosures to the market regarding its actual sources of funding and the financial figures underlying its liquidity position – which are not alleged to have been false.  *See id.* at 20-21 ("By at least April 2008, it was widely known and reported that LIBOR submissions did not even reflect accurate opinions because banks were reportedly making artificially low LIBOR submissions.").

[87]     Compl. ¶ 196 (emphasis added).

[88]     Pl. Opp. at 36 (quoting *In re IPO Sec. Litig.*, 544 F. Supp. 2d 277, 289 (S.D.N.Y. 2008) (internal quotation omitted)).

2009.[89]  The SAC alleges that the corrective disclosure occurred on June 27, 2012, when Barclays announced the Settlements and the DOJ released its Non-Prosecution Agreement, along with other regulatory documents.[90]  Even if the false LIBOR submissions in 2009 and earlier misled the market regarding Barclays' financial health, and thus artificially inflated the stock price, there is no allegation that the LIBOR submissions between 2009 and 2012 were also false and misleading such that the ADS price would have remained artificially inflated.

The disconnect between the corrective disclosure – publication of the Settlements in 2012 – and the information concealed by the Submission Rates in 2009 and earlier is further amplified by the presence of specific information about Barclays' financial condition in its Financial Statements, both at the time that the allegedly fraudulent rates were being submitted[91] and from 2009 through 2012, when the Submission Rates are not alleged to be fraudulent.[92]  The notion that the

---

[89]    *See* NPA ¶ 20 (finding the most recent LIBOR-related misconduct to have occurred in June 2009).

[90]    *See* SAC ¶¶ 175, 198.

[91]    *See, e.g.*, Barclays' 2007 Form 20-F, Ex. B to Porpora Decl., at 92 (disclosing that "term funding in the interbank markets substantially disappeared" but that "liquidity remained good for Barclays").

[92]    *See Lentell*, 396 F.3d at 177 ("[W]here (as here) substantial indicia of the risk that materialized are unambiguously apparent on the face of the disclosures alleged to conceal the very same risk, a plaintiff must allege (i) facts sufficient to support an inference that it was defendant's fraud – rather than other salient factors

market would fail to digest three years of non-fraudulent Submission Rates and other more detailed financial information, and would instead leave intact artificial inflation as a result of fraudulent Submission Rates during the financial crises is implausible[93] and runs afoul of the Second Circuit's admonition against loss causation based on "attenuated" connections.[94]

Finally, the Second Circuit has rejected the notion that "even if no new financial facts were revealed [to the market]," plaintiffs may establish loss causation by showing that a "temporary share price decline" as a result of negative publicity was a foreseeable risk of the alleged LIBOR misconduct.[95]  Plaintiffs' inability to plausibly allege that the information concealed by the false Submission Rates in 2007 through 2009 was revealed by the 2012 Settlements and caused their losses is fatal under Second Circuit precedent.

---

– that proximately caused plaintiff's loss.").

[93]    *See Westwood v. Cohen*, 838 F. Supp. 126, 133 (S.D.N.Y. 1993) ("Under the efficient market theory [public information] is incorporated quickly into the stock price.") (citing *Basic*, 485 U.S. at 241-45).

[94]    *See Lentell*, 396 F.3d at 175 (quoting *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 199 (2d Cir. 2003)).

[95]    *In re Omnicom*, 597 F.3d at 513-14 (rejecting the argument that "even if no new financial facts were revealed in June 2002, Callander's resignation and the ensuing negative media attention were foreseeable risks of the fraudulent Seneca transaction and caused the temporary share price decline in June 2002").

### 4. Plaintiffs Fail to Connect Diamond's Conference Call Statements to Their Alleged Losses

In response to an analyst's observation during an October 31, 2008 conference call that Barclays was "consistently paying slightly higher rates than most of the other U.K. banks in the LIBOR rate," Diamond stated: "we're categorically not paying higher rates in any currency" and "we benefit in times of turmoil, so we post where we're transacting, and it's clearly not at high levels."[96] Even assuming that Diamond's statements were materially misleading, Plaintiffs fail to connect these 2008 statements to any loss experienced in 2012 for the same reasons that the allegedly false LIBOR Submission Rates bear no relationship to the alleged losses.

### B. Plaintiffs' Control Person Allegations Must Be Dismissed for Failure to Allege a Primary Violation

A primary violation of the securities laws is an element of control person liability under Section 20(a).[97]   Because I have already held that Plaintiffs have not adequately alleged a primary violation, Plaintiffs' control person claim must also be dismissed.

### C. Leave to Amend Is Denied

---

[96]     SAC ¶¶ 108-109.

[97]     *See ATSI*, 493 F.3d at 108.

Plaintiffs are typically granted leave to amend at least once, particularly when claims are dismissed for failure to meet the heightened pleading standards under Rule 9(b).  In this case, however, Plaintiffs received notice of the deficiencies in their First Amended Complaint at a pre-motion conference on January 10, 2013, and in a follow up letter of January 16, 2013, and were given, and took, the opportunity to amend again.[98]  Moreover, the reasons that the allegations in the SAC are insufficient, as set forth above, do not go to lack of specificity but are fundamental deficiencies under the securities laws.  Because amendment would be futile, I will not grant leave to file a third amended complaint.

## VI.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is granted. The Clerk of the Court is ordered to close this motion [Dkt. No. 61] and this case.

SO ORDERED:

_____

Shira A. Scheindlin

---

[98]    See 1/10/13 Transcript ("I am assuming it will be a better motion and I won't need to grant leave to amend. You could have anticipated everything he is saying. I don't need to do this thing twice.").

-29-

U.S.D.J.


Dated:          New York, New York
                May 13, 2013

**-Appearances-**

**For Plaintiffs:**

David Avi Rosenfeld, Esq.
Samuel Howard Rudman, Esq.
Christopher Michael Barrett, Esq.
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, NY 11747
(631) 367-7100

Gregory Mark Nespole, Esq.
Robert B. Weintraub, Esq.
Wolf Haldenstein Adler Freeman & Herz LLP
270 Madison Avenue
New York, NY 10016
(212) 545-4689

**For Defendants:**

Jonathan D. Schiller, Esq.
James Meadows, Esq.
Boies Schiller & Flexner LLP
575 Lexington Avenue
New York, NY 10022
(212) 446-2300

Michael Brille, Esq.
Boies Schiller & Flexner LLP
5301 Wisconsin Avenue NW
Washington, D.C. 20015
(202) 237-2727

David H. Braff, Esq.
Jeffrey T. Scott, Esq.
Matthew S. Fitzwater, Esq.
Matthew J. Porpora, Esq.

Sullivan & Cromwell LLP
125 Broad St.
New York, NY 10004
(212) 558-4000

Andrew J. Levander, Esq.
Dechert LLP
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3500

Cheryl A. Krause, Esq.
Dechert LLP
2929 Arch Street
Philadelphia, PA 19104
(215) 994-4000