**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------- X

**CARPENTERS PENSION TRUST FUND OF**
**ST. LOUIS, ST. CLAIR SHORES POLICE &**
**FIRE RETIREMENT SYSTEM, and**
**POMPANO BEACH POLICE &**
**FIREFIGHTERS' RETIREMENT SYSTEM,**

**Plaintiffs,**

v.

**BARCLAYS PLC, BARCLAYS BANK PLC,**
**BARCLAYS CAPITAL INC., MARCUS A.P.**
**AGIUS, JOHN S. VARLEY, and ROBERT E.**
**DIAMOND, JR.,**

**Defendants.**

------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/20/14

**OPINION AND ORDER**

**12-cv-5329 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

Plaintiffs – a putative class of purchasers of American Depositary Shares of Barclays PLC between July 10, 2007 and June 27, 2012 – bring claims for violations of section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder against three corporate defendants – Barclays PLC, Barclays Bank PLC ("Barclays Bank"), and Barclays Capital Inc. ("BCI") (collectively "Barclays") – and one individual defendant – Robert E. Diamond, Jr.   In addition, they bring claims under section 20(a) of the Exchange

1

Act against individual defendants Diamond, Marcus A.P. Agius, and John S. Varley.[1]

As a result of prior rulings, only two sets of alleged misstatements remain in this case: Barclays's London Interbank Offered Rate ("LIBOR") submissions from August 2007 through January 2009, and Diamond's remarks during a conference call with market analysts on October 31, 2008.[2]  For purposes of this Opinion and Order, familiarity with these prior rulings – including the general background and facts alleged in the Second Amended Complaint ("Complaint" or "SAC") – is assumed.[3]

---

[1]    On August 25, 2014, Plaintiffs voluntarily dismissed all claims against Christopher Lucas, and the section 10(b) claims against Varley and Agius. *See* Docket No. 96.

[2]    *See generally Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227 (2d Cir. 2014) ("*Carpenters*"), *affirming in part and reversing in part Gusinsky v. Barclays PLC*, 944 F. Supp. 2d 279 (S.D.N.Y. 2013).

[3]    The Complaint incorporates by reference several investigative reports, including: (i) the Statement of Facts accompanying the Non-Prosecution Agreement between Barclays and the United States Department of Justice dated June 27, 2012 ("DOJS"); (ii) the settlement agreement between Barclays and the United States Commodity Futures Trading Commission, also dated June 27, 2012 ("CFTCS"); and (iii) the House of Commons Treasury Committee's preliminary findings, titled "Fixing LIBOR: some preliminary findings, Second Reports of Session 2012-13, Vol. II: Oral and written evidence," published on August 18, 2012 ("TCPF").  Furthermore, as Defendants acknowledge, the statements in the DOJS are "factual admissions."  Defendants' Memorandum of Law in Support of Their Renewed Motion to Dismiss the Second Amended Complaint ("Def. Mem."), at 4.

Defendants seek dismissal of the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on grounds raised, but not considered, in their prior motion to dismiss.  They contend that the Complaint does not adequately allege scienter as to any defendant, the materiality of Diamond's statements, that Barclays PLC, BCI, or Diamond made LIBOR submissions, or, with respect to the section 20(a) claims, a primary violation or culpable participation by the individual defendants.[4]  For the following reasons, Defendants' motion is DENIED.

## II.      STANDARD OF REVIEW

### A.      Rule 12(b)(6) Motion to Dismiss

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the court "must accept all non-conclusory factual allegations as true and draw all reasonable inferences in the plaintiff's favor."[5]  "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."[6]  A claim is plausible "when the

---

[4]      *See* Def. Mem. at 11-25; Defendants' Reply Memorandum of Law in Further Support of Their Renewed Motion to Dismiss the Second Amended Complaint ("Reply Mem."), at 2-10.

[5]      *Simms v. City of New York*, No. 11 Civ. 4568, 2012 WL 1701356, at *1 (2d Cir. May 16, 2012) (citing *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008)).

[6]      *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  *Accord Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124 (2d Cir. 2010).

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[7]  Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully."[8]

When deciding a motion to dismiss, "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."[9]  A court may also consider a document that is not incorporated by reference "where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint."[10]  When a securities fraud complaint alleges that material misstatements or omissions were made in public documents required to be filed with the SEC, a court may take judicial notice of such documents, as well as "related documents that bear on the adequacy of the disclosure . . . ."[11]

## B.    Heightened Pleading Standard Under Rule 9(b) and the PSLRA

---

[7]      *Iqbal*, 556 U.S. at 678 (quotation marks omitted).

[8]      *Id.* (quotation marks omitted).

[9]      *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).

[10]      *Id*. (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)).

[11]      *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991). *Accord Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).

4

Federal Rule of Civil Procedure 9(b) requires that the circumstances constituting fraud be alleged with particularity, although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." The Private Securities Litigation Reform Act of 1955 ("PSLRA") adds that in private securities fraud cases the complaint must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."[12]   In addition, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."[13]

## III.   DISCUSSION

### A.   Scienter

I turn first to Defendants' argument that the Complaint fails to adequately plead scienter.  A plaintiff may establish scienter by alleging facts that either (1) show that the defendant had both the "motive and opportunity" to commit the alleged fraud, or (2) "constitute strong circumstantial evidence of conscious misbehavior or recklessness."[14]

---

[12]   15 U.S.C. § 78u-4(b)(1)(B).

[13]   *Id.* § 74u-4(b)(2).

[14]   *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006).

5

### 1.   Corporate Defendants

"When the defendant is a corporate entity, . . . the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter."[15]  In this context, "it is possible to raise the required inference [of scienter] with regard to a corporate defendant without doing so with regard to a specific individual defendant."[16]

The only actionable misstatements attributable to the corporate defendants are the understated "Dollar LIBOR Rate Submission Rates submitted by Barclays' London Money Market Desk from August 2007 through January 2009[.]"[17]  The Complaint and the investigative reports it incorporates by reference contain both general and specific allegations relating to Barclays's scienter.

The DOJS states that "'Barclays often submitted inaccurate Dollar LIBORs that under-reported its perception of its borrowing costs and its assessment of where its Dollar LIBOR submission should have been'" at the direction of "'[c]ertain members of management of Barclays.'"[18]  Likewise, the

---

[15]   *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

[16]   *Id.*

[17]   SAC ¶ 171.

[18]   *Id.* (quoting DOJS ¶ 36).

CFTCS states that "[t]he management directive [to understate LIBOR rates] impacted at least Barclays' U.S. Dollar LIBOR submissions in multiple maturities [ ] on a regular basis throughout the financial crisis period."[19]  These general statements are supported by specific examples – based on internal company documents – of the submission of false LIBOR rates.[20]

Defendants do not dispute that Barclays knowingly engaged in this conduct.  Moreover, I must also assume that the danger of misleading investors here was real because the Second Circuit has held that the materiality of the LIBOR submissions was adequately pled.[21]  While I agree that pointing to a violation of British Banking Authority ("BBA") rules is alone insufficient to adequately allege scienter,[22] Barclays's repeated, long-term, and knowing submission of false rates suggests far more than an intent to violate BBA rules. Rather, this conduct constitutes "strong circumstantial evidence of conscious misbehavior or recklessness."[23]  Accepting the Complaint's allegations as true, and

---

[19]     A complete copy of the CFTCS is available online on the CFTC's website.

[20]     *See* SAC ¶¶ 57-75.

[21]     *See Carpenters*, 750 F.3d at 235.

[22]     *See* Def. Mem. at 13-14.

[23]     *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000).

viewing all inferences in favor of Plaintiffs, Barclays's conduct was – at the very least – "highly unreasonable" and an "extreme departure from the standards of ordinary care."[24]  Thus, the Complaint's allegations are sufficient to give rise to a strong inference that "the danger was either known to [Barclays] or so obvious that [Barclays] must have been aware of it."[25]

Furthermore, the Complaint also plausibly alleges Barclays's motive – to counter negative perceptions about its borrowing costs and, more generally, its financial condition.  Barclays submitted rates "'nearer to the expected rates of other Contributor Panel banks'"[26] to "deceive the market about the rate at which Barclays truly believed it could borrow funds."[27]  The perceptions about Barclays's liquidity problem are well documented.  A September 2007 *Bloomberg* article posed the question, "what the hell is happening at Barclays and its Barclays Capital securities unit that is prompting its peers to charge it premium interest rates in the money market?"[28]  For another example, on October 29, 2008, an official at the

---

[24]     *Chill v. General Elec. Co.*, 101 F.3d 263, 269 (1996) (quotation marks omitted).

[25]     *Id.* (quotation marks omitted).

[26]     SAC ¶ 171 (quoting DOJS ¶ 36).

[27]     *Id.* ¶ 173.

[28]     *Id.* ¶ 57.

Bank of England called Diamond – then Barclays's Chief Executive Officer – to "discuss[ ] the external perceptions of Barclays's LIBOR submissions and questioned why Barclays's submissions were high compared to other Contributor Panel banks."[29]

In the case of Diamond, the Complaint alleges that following the Bank of England call, he issued a directive to lower the LIBOR rates.  Taken together with the allegations concerning Barclays's conduct, these allegations "give rise to a 'cogent and compelling' inference that" Barclays falsified the LIBOR submissions "because it understood their likely effect on the market."[30]

Defendants contend that scienter not been pled because Barclays had an innocent motive for understating LIBOR rates.  They  argue that Barclays was merely attempting "to correct a misimpression in the market, and avoid any 'inaccurate, negative attention about Barclays's financial health' (DOJS ¶¶ 39-40), which might have resulted from making higher LIBOR submissions when other banks were making 'unrealistically low' submissions (CFTCS at 19)."[31]

---

[29]     DOJS ¶ 47.

[30]     *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1324-25 (2011) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)).

[31]     Reply Mem. at 3.

Defendants also argue that Barclays's "repeated disclosures to regulators and the BBA concerning its LIBOR submission practices and suspected industrywide problems with LIBOR also undermine any inference of scienter."[32]

While either of these arguments may create an issue of fact or be persuasive to a jury, the Supreme Court instructs that scienter is adequately pled when "'a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'"[33]  Here, the inference of scienter is cogent and at least as compelling as the competing inference of innocent intent suggested by Defendants.

### 2.    Diamond

Robert E. Diamond, Jr. served as Barclays PLC's President from at least the start of the Class Period until January 1, 2011, when he became Chief Executive Officer.[34]  Plaintiffs seek to hold Diamond liable for (1) the LIBOR submissions and (2) remarks he made during an October 31, 2008 conference call

---

[32]    Def. Mem. at 13.

[33]    *Matrixx Initiatives, Inc.*, 131 S. Ct. at 1324 (quoting *Tellabs, Inc.*, 551 U.S. at 323, 324).  *See also Tellabs, Inc.*, 551 U.S. at 324 ("To determine whether the plaintiff has alleged facts giving rise to the requisite 'strong inference,' a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.").

[34]    *See* Def. Mem. at 3 (citing SAC ¶ 14).

with market analysts.

### a.   LIBOR Submissions

On October 29, 2008, an official at the Bank of England called Diamond to "discuss[ ] the external perceptions of Barclays's LIBOR submissions and questioned why Barclays's submissions were high compared to other Contributor Panel banks."[35]  Following this call, Diamond spoke with Jerry del Missier ("del Missier"), a senior executive who at one point was Barclays's Chief Operating Officer.  In testimony before Parliament in July 2012, del Missier testified that he received an instruction from Diamond to understate LIBOR submissions so that Barclays would "not be an outlier."[36]  Del Missier passed down that instruction to Mark Dearlove ("Dearlove"), the "Managing Director of Barclays Capital Inc. and head of the money market desk" responsible for making daily LIBOR submissions.[37]

Defendants argue that del Missier's testimony does not give rise to an inference of scienter because del Missier testified that he believed that the Bank of

---

[35]     DOJS ¶ 47.

[36]     SAC ¶ 74.

[37]     *Id.*

England had communicated the instruction to Diamond.[38]  Del Missier also

testified that if he had believed someone inside Barclays initiated the instruction,

he would not have followed it.[39]  However, del Missier's state of mind is not

relevant to Diamond's state of mind.  The Complaint alleges that Diamond issued

an instruction to del Missier to post lower rates so that Barclays would not be

perceived as an outlier.  A review of all the allegations, including the House of

Commons Treasury Committee's preliminary findings,[40] which Defendants argue

defeats the inference of scienter, supports a cogent and compelling inference that

Diamond acted with the intent to deceive the market.  This is because the most

compelling inference – given that Barclays employees were not likely submitting

high rates when they could have been submitting lower ones in compliance with

the LIBOR-setting regulations – is that Diamond knew that his instruction would

result in LIBOR submissions that did not comply with the law.

   In addition, October 2008 was roughly a month after Lehman's

collapse, and until that time "Barclays had been submitting relatively high

---

[38]  *See* Def. Mem. at 15-17.

[39]  *See id.* at 15 n.17.

[40]  *See* Ex. G to 8/25/14 Declaration of Matthew J. Porpora in Support of Defendants' Renewed Motion to Dismiss the Second Amended Complaint ("Porpora Decl").

submission rates, suggesting that Barclays was experiencing financial difficulties and liquidity problems."[41]  The Complaint's allegations, including the historical context, provide a clear motive; the fact that Barclays made false LIBOR submissions following Diamond's instruction, evince opportunity.  Finally, when the allegations are viewed as a whole, the competing inferences Defendants urge – that Diamond did not intend to instruct del Missier to lower LIBOR submissions and did not know that del Missier had misinterpreted their conversation – are not stronger than the inference of his fraudulent intent.[42]

> ### b.      Diamond's 2008 Remarks – Materiality and Scienter

On October 31, 2008, Barclays hosted a conference call with analysts. During the call, an analyst asked how deposit flows "tie[d] . . . together" with the analyst's observation that Barclays was "consistently paying slightly higher than most of the other UK banks in the LIBOR rate."[43]  Plaintiffs seek to hold Diamond liable for two statements made in response: (1) "we're categorically not paying higher rates in any currency" and (2) "we benefit in times of turmoil, so we post

---

[41]     Lead Plaintiffs' Memorandum of Law in Opposition to Defendants' Renewed Motion to Dismiss the Second Amended Complaint, at 15 (citing SAC ¶ 74).

[42]     The allegations regarding Diamond's July 2012 resignation from Barclays add further support to this inference.  *See* SAC ¶ 179.

[43]     *Id.* ¶ 108.

where we're transacting, and it's clearly not at high levels."[44]

Defendants argue that the Complaint does not adequately plead either material falsity or scienter.  They contend that Diamond's statements "relate to Barclays' borrowing costs, and were not representations regarding Barclays Bank's allegedly false USD LIBOR submissions."[45]  They argue that the Complaint fails to adequately allege falsity because it does not address Barclays's actual borrowing costs or, for that matter, the actual borrowing costs of other banks.

The Second Circuit has already held that the Complaint adequately alleges that "Diamond's 2008 remarks" are material misrepresentations.[46]  At the very least, Diamond's remarks were misleading.  For example, a reasonable investor could have taken Diamond's statement about *borrowing costs* to be about Barclays's *LIBOR submission rates*.  And the statement that Barclays "posts where [it's] transacting" further concealed the fact that those LIBOR submissions were

---

[44]     *Id.*  Defendants argue that Plaintiffs have waived their right to challenge Diamond's second statement – that "we post where we're transacting, and it's clearly not at high levels" – because Plaintiffs did not argue against dismissal of claims based on that statement before the Second Circuit.  *See* Def. Mem. at 19 n.22.  However, the Second Circuit held that the Complaint adequately alleged that "Diamond's 2008 remark*s*" were materially misleading.  *Carpenters*, 750 F.3d at 235 (emphasis added); *see id.* at 237 (vacating dismissal of claims based on "Diamond's 2008 conference call remark*s*") (emphasis added).

[45]     Def. Mem. at 19.

[46]     *Carpenters*, 750 F.3d at 235.

"lower than Barclays otherwise would have submitted and contrary to the definition of LIBOR."[47]

> With respect to scienter, Defendants contend that the Complaint does not sufficiently allege that Diamond was reckless in making these statements, because it does not allege either the rates at which Barclays was borrowing unsecured cash in the London market at the time the statements were made or that Diamond was or should have been aware of information that contradicted his comments.[48]  However, Diamond's conversations with the Bank of England and del Missier took place just two days before the conference call, and his instruction to del Missier is inconsistent with the truth of either of his statements.  This inconsistency, together with the conduct alleged, creates a cogent and compelling inference that – at the very least – Diamond acted recklessly.

### B.    Dismissal of Claims Against Defendants Who Did Not "Make" LIBOR Submissions

> Defendants contend that because Barclays PLC, BCI, and Diamond did not "make" LIBOR submissions, the claims against them based on those statements must be dismissed under *Janus Capital Group v. First Derivatives*

---

[47]     DOJS ¶ 36.

[48]     Def. Mem. at 19.

*Traders* ("*Janus*").[49]   In *Janus*, the Supreme Court explained that:

> For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it.  Without control, a person or entity can merely suggest what to say, not "make" a statement in its own right.  One who prepares or publishes a statement on behalf of another is not its maker.  And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by – and only by – the party to whom it is attributed.[50]

Defendants argue that "[t]he challenged LIBOR submissions were explicitly attributed to Barclays Bank[,]" and that neither Barclays PLC nor BCI can be said to have made the submissions "simply because they are corporate affiliates of Barclays Bank."[51]  With respect to Diamond, they assert that the Complaint fails to allege that he prepared, reviewed, or submitted LIBOR rates such that he had ultimate authority over these statements.[52]

The Complaint alleges that Barclays PLC is a publicly held corporation, based in the United Kingdom, that provides global financial services.[53] Diamond was Barclays PLC's President from at least the start of the Class Period

---

[49]   *See id.* at 21-22 (citing *Janus*, 131 S. Ct. 2296, 2302 (2011)).

[50]   *Janus*, 131 S. Ct. at 2302.

[51]   Def. Mem. at 21.

[52]   *See id.* at 22.

[53]   *See* SAC ¶ 10.

until January 1, 2011, when he became Chief Executive Officer.  Barclays Bank is

a wholly owned subsidiary of Barclays PLC.  BCI is a registered securities broker-

dealer that is an indirectly owned subsidiary of Barclays PLC.[54]

*Janus* does not warrant dismissal of the claims against Diamond,

Barclays PLC, or BCI.  "[*Janus*] does not imply that there can be only one 'maker'

of a statement in the case of express or implicit attribution."[55]  It also "did not [ ]

alter the well-established rule that a corporation can act only through its employees

and agents."[56]  Thus, while Barclays Bank was the entity on the LIBOR panel,

Diamond, Barclays PLC, and BCI could also be makers provided that the

Complaint adequately alleges that the statements are also attributable to them.[57]  I

---

[54]     *See id.* ¶ 12.

[55]     *City of Roseville Emps. Ret. Sys. v. EnergySolutions, Inc.*, 814 F.
Supp. 2d 395, 417 n.9 (S.D.N.Y. 2011) ("*City of Roseville*").

[56]     *In re Pfizer Inc. Sec. Litig.*, 936 F. Supp. 2d 252, 268 (S.D.N.Y. 2013)
(quotation marks omitted).  *Accord City of Pontiac v. Lockheed Martin Corp.*, 875
F. Supp. 2d 359, 373 (S.D.N.Y. 2012) (stating that *Janus* addressed only whether
third parties can be held liable for statements made by their clients.  Its logic rested
on the distinction between secondary liability and primary liability . . . and has no
bearing on how corporate officers who work together in the same entity can be
held jointly responsible on a theory of primary liability.  It is not inconsistent with
*Janus Capital* to presume that multiple people in a single corporation have the joint
authority to 'make' an SEC filing, such that a misstatement has more than one
'maker.'").

[57]     *See City of Roseville*, 814 F. Supp. 2d at 418 ("*Janus* recognized that
attribution [can] be 'implicit from surrounding circumstances'") (quoting *Janus*,

will first consider the Complaint's allegations as to Diamond and Barclays PLC.

### 1.    Diamond and Barclays PLC

As already discussed, the Complaint plausibly alleges that Diamond – Barclays PLC's President at the time – was able to cause Barclays Bank *to make* false LIBOR statements by *instructing* it to do so.[58]  This alone implies a level of control on the part of Diamond that is sufficient at the pleading stage to withstand scrutiny under *Janus*.[59]  Furthermore, the CFTCS defines "Barclays" to include Barclays PLC, Barclays Bank, and "Barclays Capital."[60]  And according to the CFTCS, "Barclays PLC, Barclays Bank and Barclays Capital . . . repeatedly attempted to manipulate and *made* false, misleading or knowingly inaccurate submissions concerning" LIBOR.[61]  In other words, the CFTCS treats Barclays PLC as a *maker* of the LIBOR submissions.  This is also consistent with the theory

---

131 S. Ct. at 2302).

[58]    *See* SAC ¶ 74.

[59]    *See In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 473 (S.D.N.Y. 2012) ("While it is correct that [defendant] did not sign any of the SEC filings at issue, he still may be found to have made a misstatement.  In the post-*Janus* world, an executive may be held accountable where the executive had ultimate authority over the company's statement; signed the company's statement; ratified and approved the company's statement; or where the statement is attributed to the executive."), *aff'd*, No. 12-3859, 2013 WL 1982534 (2d Cir. May 15, 2013).

[60]    CFTCS at 2.

[61]    *Id.* (emphasis added).

underlying this case that the market *attributed* statements about LIBOR to Barclays PLC in the sense that the LIBOR submissions were regarded as saying something about *its* liquidity and financial condition.  Accordingly, accepting the Complaint's allegations as true, and drawing all inferences in favor of Plaintiffs, it is plausible that Diamond and Barclays PLC are "makers" within the meaning of *Janus*.

### 2.    BCI

The Complaint alleges that Barclays made LIBOR submissions through Barclays's London Money Market Desk and that this Money Market Desk was part of BCI during the relevant time period.[62]  The Complaint also states that the head of the London Money Market Desk was Dearlove, who was the Managing Director of BCI.[63]

Defendants assert that "[p]laintiffs appear to be conflating Barclays Capital, the trade name of the investment banking division of Barclays Bank, with BCI, a totally separate entity, with a different name."[64]  They refer the Court to BCI's December 31, 2011, Annual Audited Report, Form X-17A-5[65] to rebut the

---

[62]    *See* SAC ¶ 43.

[63]    *See id.* ¶ 74.

[64]    Def. Mem. at 21 n.25.

[65]    *See* Ex. H to Porpora Decl.

allegation that "'[t]he London Money Market Desk was, at the time, part of Barclays Capital Inc.'"[66]  But the DOJS defines "Barclays," as Barclays Bank *and* "Barclays Capital *Inc.*"[67]  And it goes on to state that "Barclays often *submitted* inaccurate Dollar LIBORs that under-reported its perception of its borrowing costs and its assessment of where its Dollar LIBOR submission should have been."[68]  Thus, the DOJS implies that BCI *made* the false submissions.  Accordingly, accepting the Complaint's allegations as true, and drawing all reasonable inferences in favor of the Plaintiffs, it is plausible that BCI is a "maker" within the meaning of *Janus*.[69]

### C.    The Section 20(a) Claims Against Diamond, Agius, and Varley

Defendants argue that the section 20(a) claims against Diamond, Agius, and Varley should be dismissed because of the absence of a primary violation and the failure to plead culpable participation.[70]  Based on the above rulings, the motion is denied as to Diamond.  With respect to Agius and Varley, the

---

[66]    Def. Mem. at 21 n.25 (quoting SAC ¶ 43).

[67]    DOJS ¶ 10 (emphasis added).  As noted, the statements in the DOJS Statement of Facts are factual admissions.  *See* Def. Mem. at 4.

[68]    DOJS ¶ 36 (emphasis added).

[69]    The dispute over whether BCI is a proper defendant, if not voluntarily resolved by the parties, will have to be resolved on summary judgment or at trial.

[70]    *See* Def. Mem. at 22-24.

Complaint alleges that they served as Barclays Bank's Group Chairman and Group Chief Executive, respectively, during the class period.[71]  It also alleges that by holding these positions, Agius and Varley were "controlling persons" with the authority to cause Barclays to commit the acts alleged to violate section 10(b).[72] And it states that Agius and Varley, "by virtue of their receipt of information reflecting the true facts regarding Barclays, their control over and/or receipt of Barclays's allegedly materially misleading statements, knowingly participated in the fraudulent scheme alleged herein."[73]

Defendants do not dispute that the Complaint alleges that Agius and Varley are control persons.  Thus, the only open question is whether the motion should be granted as to Agius and Varley on grounds that the Complaint does not plead culpable participation.  It remains unsettled in this District whether control person liability is premised on fraud, and thus whether culpable participation

---

[71]     *See* SAC ¶¶ 13, 16.  Diamond replaced Varley as Chief Executive Officer in 2011.  *See id.* ¶ 13.

[72]     *Id.* ¶ 211.

[73]     *Id.* ¶ 185.  The Complaint also alleges that Agius resigned following disclosure of the false LIBOR reporting.  *See id.* ¶¶ 13, 177-178.  In his press release, Agius acknowledged "unacceptable standards of behaviour within the bank . . . ."  *Id.* ¶ 178.

imports a scienter requirement.[74]  These issues in turn impact whether Rule 8, Rule

9(b), and/or the heightened pleading requirements of the PSLRA apply.  I have

previously held that scienter is not an essential element of a section 20(a) claim and

that neither Rule (9)(b) nor the PSLRA apply,[75] and I continue to adhere to this

_____

[74]     *See generally Special Situations Fund III QP, L.P. v. Deloitte Touche Tochmatsu CPA, Ltd.*, No. 13 Civ. 1094, 2014 WL 3605540, at *24-25 (S.D.N.Y. July 21, 2014) ("While district courts tend to frame the debate as whether 'culpable participation' is a required element of a Section 20(a) claim, the debate is more properly understood as a disagreement over the *meaning* of culpable participation.") (quotation marks and citations omitted) (emphasis in original); *see also id.* at *24 ("[D]istrict courts within the Second Circuit disagree on the question of whether Section 20(a) plaintiffs must also allege 'culpable participation' as a third element of their claim, or, alternatively, whether section 20(a) created a burden-shifting framework where plaintiffs must only plead a primary section 10(b) violation and control, with defendants allowed to raise a good faith defense in their answer that can later be rebutted by plaintiffs.") (quotation marks omitted); *In re Parmalat Sec. Litig.*, 414 F. Supp. 2d 428, 440-41 (S.D.N.Y. 2006).

[75]     *See, e.g.*, *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of America Sec., LLC*, 446 F. Supp. 2d 163, 191 (S.D.N.Y. 2006) ("As this Court has previously held, a plaintiff need not affirmatively plead scienter on the part of a control person under section 20(a).  Moreover, under Rule 8, plaintiffs are not required to plead facts to demonstrate culpable participation.").  While one may quibble with the exact tally, it appears that a majority of courts within this District have required plaintiffs to allege scienter.  *See Special Situations Fund III*, 2014 WL 3605540, at *24.  However, the Second Circuit has not yet ruled on whether scienter needs to be pled, and the Fifth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits have all rejected a scienter requirement, holding that good faith may be asserted as an affirmative defense.  *See G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 958 (5th Cir. 1981); *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992); *Metge v. Baehler*, 762 F.2d 621, 631 (8th Cir. 1985); *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1575 (9th Cir. 1990) (*en banc*); *First Interstate Bank of Denver, N.A. v. Pring*, 969 F.2d 891, 896-97 (10th

view.

While merely identifying the title of a corporate officer is insufficient to state a claim, the Complaint does far more than that. It generally alleges control and participation on the part of Barclays Bank's Group Chairman and Group Chief Executive – the entity Defendants admit was responsible for making LIBOR submissions – and then describes sustained and long-running misconduct that was known to management, including high-ranking corporate officers such as Diamond, del Messier, and Dearlove.[76] These allegations are sufficient to state a claim against Agius and Varley under section 20(a).

---

Cir. 1992), *rev'd on other grounds sub nom. Central Bank v. First Interstate Bank*, 511 U.S. 164 (1994); *Brown v. Enstar Group, Inc.*, 84 F.3d 393, 396 (11th Cir. 1996). And an apparent "majority of courts[ ] have held that a claim for liability [under section 20(a)] requires only notice pleading." Brent A. Olson, 2 Publicly Traded Corporations: Governance and Regulation § 16:2 (2014) (citing cases).

[76]   *See* SAC ¶¶ 53 ("Certain members of management of Barclays, including senior managers . . . , directed that the Barclays Dollar LIBOR submitters contribute rates that were nearer to the expected rates of other Contributor Panel banks rather than submitting the true, higher LIBORs"), 59 (describing internal pressure to understate LIBOR rates), 63 ("On November 27, 2007, Barclays's senior Dollar LIBOR submitter emailed a group of Barclays's employees, including senior Barclays Treasury managers, stating 'LIBORs are not reflecting the true cost of money . . . .'"), 64 (after issue of submitting inaccurate LIBORs was taken "upstairs" the practice continued), 65 (it was the understanding among submitters that senior management had discussed the issue and directed them to continue to understate LIBOR), 67 (same), 74 (describing the interaction between Diamond, del Messier, and Dearlove).

23

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion is DENIED in its

entirety.  A status conference will be held on October 30, 2014, at 4:30 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            October 20, 2014

24

**-Appearances-**

**For Plaintiffs:**

David Avi Rosenfeld, Esq.
Samuel Howard Rudman, Esq.
Christopher Michael Barrett, Esq.
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, NY 11747
(631) 367-7100

Thomas C. Michaud, Esq.
Vanoverbeke Michaud & Timmony, P.C.
79 Alfred Street
Detroit, MI 48201
(313) 578-1200

Joseph E. White III, Esq.
Saxena White P.A.
2424 N. Federal Highway, Suite 257
Boca Raton, FL 33431
(561) 394-3399

Gregory Mark Nespole, Esq.
Robert B. Weintraub, Esq.
Wolf Haldenstein Adler Freeman & Herz LLP
270 Madison Avenue
New York, NY 10016
(212) 545-4689

**For Defendants:**

David H. Braff, Esq.
Jeffrey T. Scott, Esq.
Stephen H. O. Clarke, Esq.
Sullivan & Cromwell LLP

125 Broad St.
New York, NY 10004
(212) 558-4000

Jonathan D. Schiller, Esq.
Boies Schiller & Flexner LLP
575 Lexington Avenue
New York, NY 10022
(212) 446-2300

Michael Brille, Esq.
Boies Schiller & Flexner LLP
5301 Wisconsin Avenue NW
Washington, D.C. 20015
(202) 237-2727

Andrew J. Levander, Esq.
Jeffrey A. Brown, Esq.
Dechert LLP
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3500

Elisa T. Wiygul, Esq.
Dechert LLP
2929 Arch Street
Philadelphia, PA 19104
(215) 994-4000

26