# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

CARPENTERS PENSION TRUST FUND OF
ST. LOUIS, ST. CLAIR SHORES POLICE &
FIRE RETIREMENT SYSTEM, POMPANO
BEACH POLICE & FIREFIGHTERS'
RETIREMENT SYSTEM,

                Plaintiffs,

        v.

BARCLAYS PLC, et al.,

             Defendants.

------------------------------------------------------------ X

Case No. 1:12-cv-5329-SAS

ECF CASE

**Hearing Date:  July 16, 2015**

 

# DEFENDANTS' MEMORANDUM OF LAW
## IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
(212) 558-4000

BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, New York  10022
(212) 446-2300

*Attorneys for Defendants Barclays PLC,*
*Barclays Bank PLC, Barclays Capital Inc.,*
*Marcus A.P. Agius, and John S. Varley*

DECHERT LLP
1095 Avenue of the Americas
New York, New York  10036
(212) 698-3500

*Attorneys for Defendant Robert E. Diamond, Jr.*

June 12, 2015

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ......................................................................................................2

    A.    Barclays' Settlements of LIBOR-Related Conduct. ........................................2

    B.    Plaintiffs Agree that Barclays' ADS Price Did Not React to the Disclosure of Prior LIBOR-Related Conduct on June 27, 2012.................................3

    C.    Barclays' ADS Price Declined Temporarily Following "Anti-Barclays Commentaries" on June 28, 2012. ..............................................4

LEGAL STANDARD...............................................................................................4

ARGUMENT ..........................................................................................................5

I.    PLAINTIFFS HAVE FAILED TO PROVE THAT INDIVIDUALIZED ISSUES REGARDING RELIANCE WILL NOT PREDOMINATE. ...............................5

    A.    The *Basic* Presumption Is Unavailable Because Plaintiffs Failed to Prove that Barclays' ADS Traded in an Efficient Market. .........................5

        1.    Plaintiffs Have Offered No Reliable Evidence of Market Efficiency. ........6

        2.    Dr. Finnerty's First Event Study Is Fatally Flawed. ....................................7

        3.    Dr. Finnerty's Second Event Study Is Equally Deficient and Provides No Reliable Evidence of Market Efficiency.............................10

        4.    Dr. Finnerty Ignores Substantial Evidence of Market Inefficiency..........14

    B.    Even If Plaintiffs Could Invoke the Presumption of Reliance, that Presumption Is Defeated by Plaintiffs' Own Expert Evidence.............................15

        1.    Dr. Finnerty's Analyses Show that the Alleged Misstatements Had No Inflationary Impact on Barclays' ADS Price. .....................................16

        2.    Dr. Finnerty's Testimony Regarding "Corrective Disclosures" on June 27, 2012 Establishes the Absence of Price Impact.............................17

    C.    The *Affiliated Ute* Presumption Has No Application Here...................................20

II.    PLAINTIFFS FAIL TO SHOW THAT INDIVIDUALIZED DAMAGES ISSUES WILL NOT PREDOMINATE.........................................................................21

    A.    Plaintiffs' Generic Damages Arguments Do Not Prove that Individualized Issues Will Not Predominate. ..............................................21

B.     Plaintiffs' Complex Theory of Liability Cannot Be Translated Into a
Reliable Class-Wide Model of Damages. ............................................................23

CONCLUSION ...................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Affiliated Ute Citizens* v. *United States,*
406 U.S. 128 (1972)..................................................................................2, 20

*Aranaz* v. *Catalyst Pharm. Partners Inc.,*
302 F.R.D. 657 (S.D. Fla. 2014)................................................................16, 18

*Basic Inc.* v. *Levinson,*
485 U.S. 224 (1988).................................................................. *passim*

*Bell* v. *Ascendant Solutions, Inc.,*
2004 WL 1490009 (N.D. Tex. July 1, 2004) ...........................................7

*Brown* v. *China Integrated Energy Inc.,*
2014 U.S. Dist. LEXIS 117764 (C.D. Cal. Aug. 4, 2014)....................................11

*Cammer* v. *Bloom,*
711 F. Supp. 1264 (1989) ......................................................................6

*Carpenters Pension Trust Fund of St. Louis* v. *Barclays PLC,*
750 F.3d 227, 237 (2d Cir. 2014).................................................1, 3, 20

*Comcast Corp.* v. *Behrend,*
133 S. Ct. 1426 (2013) ......................................................... *passim*

*Dean* v. *China Agritech,*
2012 WL 1835708 (C.D. Cal. May 3, 2012) .........................................11

*FindWhat Investor Grp.* v. *FindWhat.com,*
658 F.3d 1282 (11th Cir. 2011) ..............................................................18

*Fort Worth Emps.' Ret. Fund* v. *J.P. Morgan Chase & Co.,*
301 F.R.D. 116 (S.D.N.Y. 2014) .............................................................22

*Gen. Elec. Co.* v. *Joiner,*
522 U.S. 136 (1997).................................................................................15

*George* v. *China Auto. Sys. Inc.,*
2013 WL 3357170 (S.D.N.Y. 2013)..............................................4, 8, 14

*Goodman* v. *Genworth Fin. Wealth Mgmt., Inc.,*
300 F.R.D. 90 (E.D.N.Y. 2014)...............................................................20

*Gusinsky* v. *Barclays PLC*,
  944 F. Supp. 2d 279 (S.D.N.Y. 2013)..............................................................1, 19

*Halliburton Co.* v. *Erica P. John Fund, Inc.*,
  134 S. Ct. 2398 (2014)............................................................. *passim*

*IBEW Local 90 Pension Fund* v. *Deutsche Bank AG*,
  2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013)................................. *passim*

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
  265 F.R.D. 157 (S.D.N.Y. 2010) ...........................................9, 12, 17-18

*In re BP p.l.c. Sec. Litig.*,
  2013 WL 6388408 (S.D. Tex. Dec. 6, 2013)..............................21, 23, 25

*In re Credit Suisse First Boston Corp. (Lantronix, Inc.) Analyst Sec. Litig.*,
  250 F.R.D. 137 (S.D.N.Y. 2008) ....................................................17

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  574 F.3d 29 (2d Cir. 2009)..............................................................19

*In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*,
  281 F.R.D 174 (S.D.N.Y. 2012). ............................................. *passim*

*In re Lehman Bros. Sec. & ERISA Litig.*,
  2013 WL 5730020 (S.D.N.Y. Oct. 22, 2013) ......................................21

*In re Moody's Corp. Sec. Litig.*,
  274 F.R.D. 480 (S.D.N.Y. 2011) ..............................................9, 16, 17

*In re Omnicom Grp., Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010)............................................................19

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  725 F.3d 244 (D.C. Cir. 2013)........................................................23

*In re State Street Bank & Trust Co. Fixed Income Funds Inv. Litig.*,
  774 F. Supp. 2d 584 (S.D.N.Y. 2011)...............................................19

*Kerman* v. *City of New York*,
  374 F.3d 93 (2d Cir. 2004)..............................................................20

*Krogman* v. *Sterritt*,
  202 F.R.D. 467 (N.D. Tex. 2001) .......................................................6

*Lentell* v. *Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005)............................................................19

-iv-

*Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund* v. *Regions Fin. Corp.*,
    2014 U.S. Dist. LEXIS 175126 (N.D. Ala. Dec. 18, 2014)................................................18

*Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund* v. *Regions Fin. Corp.*,
    762 F.3d 1248 (11th Cir. 2014) ..........................................................................18

*McIntire* v. *China MediaExpress Holdings, Inc.*,
    38 F. Supp. 3d 415, 435 (S.D.N.Y. 2014)............................................................18

*Roach* v. *T.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015)......................................................................2, 22

*Schleicher* v. *Wendt*,
    618 F.3d 679 (7th Cir. 2010) ..........................................................................18

*Sykes* v. *Mel S. Harris & Assocs. LLC*,
    2015 WL 525904 (2d Cir. Feb. 10, 2015)............................................................21

*Teamsters Local 445 Freight Div. Pension Fund* v. *Bombardier Inc.*,
    546 F.3d 196 (2d Cir. 2008)......................................................................4, 6

*Turnbow* v. *Life Partners, Inc.*,
    2013 WL 3479884 (N.D. Tex. July 9, 2013) ................................................23, 25

*Vaccarino* v. *Midland Nat'l Life Ins. Co.*,
    2013 WL 3200500 (C.D. Cal. June 17, 2013) ......................................................22

## RULE

Fed. R. Civ. P. 23 ....................................................................... *passim*

## <u>TABLE OF ABBREVIATIONS AND DEFINED TERMS</u>

**ADS:**  American Depositary Shares

**Barclays:**  Barclays PLC, Barclays Bank PLC, and Barclays Capital Inc.

**BBA:**  British Bankers' Association

**CFTC:**  United States Commodity Futures Trading Commission

**CFTCS:**  The settlement agreement executed by Barclays and the CFTC, dated June 27, 2012, *available at* http://www.cftc.gov/ucm/ groups/public/@lrenforcementactions/documents/ legalpleading/enfbarclaysorder062712.pdf.

**Class Period:**  The approximately five-year period between July 10, 2007 and June 27, 2012.

**Defendants:**  Barclays PLC, Barclays Bank PLC, Barclays Capital Inc., Marcus A.P. Agius, Robert E. Diamond, Jr., and John S. Varley

**DOJ:**  United States Department of Justice

**DOJS:**  The Non-Prosecution Agreement and accompanying Statement of Facts, executed by Barclays and the DOJ, dated June 27, 2012, *available at* http://www.justice.gov/iso/opa/ resources/ 337201271017335469822.pdf.

**Euribor:**  Euro Interbank Offered Rate

**Exchange Act:**  Securities Exchange Act of 1934, 15 U.S.C. §§ 78a *et seq.*

**Finnerty I:**  Declaration of John D. Finnerty, Ph.D., in Support of Lead Plaintiffs' Motion for Class Certification, dated February 9, 2015 [Dkt. No. 140].

**Finnerty II:**  Supplemental Declaration of John D. Finnerty, Ph.D., in Support of Lead Plaintiffs' Motion for Class Certification, dated April 17, 2015 [Dkt. No. 141].

**Finnerty Dep.:**  Depositions of John D. Finnerty, dated February 25, 2015 and May 19, 2015 (annexed as Exhibits A-B to the Porpora Declaration).

**FRCP:**  Federal Rules of Civil Procedure

| | |
|---|---|
| **FRE:** | Federal Rules of Evidence |
| **FSA:** | United Kingdom Financial Services Authority |
| **FSAS:** | The settlement agreement between Barclays and the FSA, dated June 27, 2012, *available at* https://www.fca.org.uk/static/documents/final-notices/barclays-bank-plc.pdf. |
| **Gompers I:** | Declaration of Paul A. Gompers, Ph.D., dated March 3, 2015 [Dkt. No. 137-1]. |
| **Gompers II:** | Supplemental Declaration of Paul A. Gompers, Ph.D., dated May 29, 2015 (annexed as Exhibit C to the Porpora Declaration). |
| **LIBOR:** | London Interbank Offered Rate |
| **Motion:** | Plaintiffs' Motion for Class Certification, filed April 20, 2015 [Dkt. No. 135]. |
| **NPA:** | Non-Prosecution Agreement |
| **Pls.' Mem.:** | Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Class Certification, filed April 20, 2015 [Dkt. No. 136]. |
| **Porpora Decl.:** | Declaration of Matthew J. Porpora, dated June 12, 2015. |
| **SAC:** | The Second Amended Complaint filed in the above-captioned action. |
| **SOF:** | The Statement of Facts included as Appendix A of the DOJS, *available at* http://www.justice.gov/iso/opa/resources/9312012710173426365941.pdf. |

## PRELIMINARY STATEMENT

Plaintiffs ask this Court to rubberstamp their proposed class of purchasers of Barclays' ADS, ignoring their burden to "*prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23." *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2412 (2014) ("*Halliburton II*").[1]  Plaintiffs brought this action asserting claims under Sections 10(b) and 20(a) of the Exchange Act on behalf of investors who purchased Barclays' ADS during the five-year period Class Period.  Following prior rulings of this Court that narrowed significantly Plaintiffs' theories,[2] the action is now limited to allegations concerning (i) Barclays Bank's U.S. Dollar LIBOR submissions from August 2007 through January 2009; and (ii) statements made by Barclays' former CEO Robert Diamond about Barclays' borrowing costs on an October 31, 2008 conference call.  (SAC ¶¶ 61, 63-64, 70, 108.)  Plaintiffs' surviving claims cannot be certified for class-wide adjudication because Plaintiffs fail to show that individualized questions of fact and law will not predominate under Rule 23(b)(3) for at least three independent reasons:

*First*, Plaintiffs cannot invoke the "fraud-on-the-market" presumption of class-wide reliance under *Basic Inc.* v. *Levinson*, 485 U.S. 224 (1988), because they have not met their burden of proving by a preponderance of the reliable and admissible evidence that Barclays' ADS traded efficiently throughout the Class Period.  Plaintiffs' expert, Dr. John D. Finnerty, twice tried (and failed) to demonstrate market efficiency through two equally flawed and internally inconsistent event studies, which yielded unreliable and irreconcilable results.  Further, because Plaintiffs' allegations primarily concern misrepresentations rather than omissions, Plaintiffs cannot avoid individualized proof of reliance by invoking the presumption under

---

[1] All internal citations and quotations marks are omitted, unless otherwise specified.

[2] *See Gusinsky* v. *Barclays PLC*, 944 F. Supp. 2d 279, 288-93 (S.D.N.Y. 2013), *rev'd in part sub nom. Carpenters Pension Trust Fund of St. Louis* v. *Barclays PLC*, 750 F.3d 227 (2d Cir. 2014).

*Affiliated Ute Citizens* v. *United States*, 406 U.S. 128 (1972). "[W]ithout the presumption of reliance, a Rule 10b-5 suit cannot proceed as a class action." *Halliburton II*, 134 S. Ct. at 2416.

*Second*, Plaintiffs cannot invoke the *Basic* presumption of reliance for the separate reason that their own expert established conclusively that the alleged misstatements had no impact on Barclays' ADS price. "In the absence of price impact, *Basic*'s fraud-on-the-market theory and presumption of reliance collapse." *Id.* at 2414. All of the evidence—including the sworn testimony of Dr. Finnerty—establishes that the "alleged misrepresentation[s] did not actually affect the market price of the stock." *Id.* at 2417.

*Third*, Plaintiffs fail to prove that individualized damages issues would not overwhelm any common issues at trial. A damages model might assist in proving compliance with Rule 23(b)(3)'s predominance requirement only if the model "actually measure[s] damages that result from the class's asserted theory of injury." *Roach* v. *T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015). Here, however, Plaintiffs offered only an admittedly generic description of a "model" for calculating losses in a typical Section 10(b) putative class action untethered to the facts of this case. Among other things, Plaintiffs' damages theory (a) rests upon a liability theory that is not in this case, (b) ignores that any supposed inflation from Barclays' borrowing cost statements varied over time, and (c) provides no model for isolating the incremental impact of the challenged statements on ADS prices. Because resolution of Plaintiffs' claims would require countless individualized damage and causation inquiries that will no doubt swallow common ones, Plaintiffs have not met their burden to prove compliance with Rule 23(b)(3).

## BACKGROUND

### A.    Barclays' Settlements of LIBOR-Related Conduct.

Throughout the Class Period, Barclays Bank served as a contributing panel bank for LIBOR, a benchmark interest rate calculated daily and published by the BBA. (SAC ¶ 42.) On

the morning of June 27, 2012, Barclays announced that it had entered into an NPA with the DOJ, as well as settlements with other regulators, resolving those authorities' investigations into Barclays' LIBOR and Euribor submission practices. (*Id.* ¶ 175.) Those settlements disclosed to the market that, at the direction of "Barclays senior management," Barclays' LIBOR submissions from August 2007 through January 2009 sometimes were inconsistent with the BBA LIBOR definition and understated Barclays' perception of its borrowing costs.[3] (*See* CFTCS at 19; SOF ¶¶ 34-48, 52.) Plaintiffs do not allege any LIBOR-related misstatements after January 2009.

### B. Plaintiffs Agree that Barclays' ADS Price Did Not React to the Disclosure of Prior LIBOR-Related Conduct on June 27, 2012.

Barclays' LIBOR-related settlements were announced prior to the opening of U.S. markets on June 27, 2012, and were widely reported in the press. It is undisputed that the disclosures concerning Barclays' prior LIBOR submissions were digested by the market on June 27, 2012. Indeed, Plaintiffs' expert, Dr. Finnerty, explained that the "[p]rice impact of those disclosures . . . would have been reflected in the market by the end of the day June 27." (Finnerty Dep. at 167:25-168:4.) Dr. Finnerty also analyzed price movements in Barclays' ADS following the announcement of the settlements and the disclosure of Barclays' prior LIBOR-related conduct, which found that "the market did *not* react significantly to the news on Wednesday, June 27, 2012." (Finnerty I ¶ 56 (emphasis added)). Indeed, the price "*increased* 1.31% on Wednesday, June 27, 2012." (*Id.*)

---

[3] Barclays also acknowledged that Barclays swaps traders at certain times made requests to LIBOR submitters to alter submissions to benefit the traders' individual positions. (SOF ¶¶ 11-12.) Despite Plaintiffs' gratuitous references to "trader-induced fraud" (Pls.' Mem. at 3), this conduct is not relevant to any of the remaining claims given that the allegations regarding Barclays' internal controls have been dismissed. *See Carpenters*, 750 F.3d at 235-37.

### C.    Barclays' ADS Price Declined Temporarily Following "Anti-Barclays Commentaries" on June 28, 2012.

After the markets closed on June 27, 2012, "various anti-Barclays commentaries were made by lawmakers and investors alike" and Barclays' then CEO, Mr. Diamond, "faced pressure from U.K. lawmakers to resign while others called for criminal investigations."  (Finnerty I ¶ 57.)  Dr. Finnerty examined price movements in Barclays' ADS "following a ratcheting up of the anti-Barclays/Bob Diamond rhetoric" on June 28, 2012, which involved "calls for senior management dismissal, calls for criminal prosecutions, and warnings of increased risk of private litigation."  (*Id.* ¶¶ 59-60.)  According to Dr. Finnerty, the price of Barclays' ADS decreased on June 28, 2012 "in response to what appears to be the market's digestion of the implications of the British government officials' response to the fines and settlement."  (*Id.* ¶ 59.)

After the price of Barclays' ADS fell in response to the "collateral damage" (Finnerty Dep. 131:15-16) stemming from Barclays' settlements with regulators, Plaintiffs rushed to file this action seeking to capitalize on that temporary decline.  But by the time Plaintiffs filed the SAC, approximately six months later, the price of those shares had increased more than 50% from their opening price on the day before the settlements were announced.

### LEGAL STANDARD

Plaintiffs "wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23."  *Halliburton II*, 134 S. Ct. at 2412.  The Court "must receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met" by a preponderance of the evidence. *George* v. *China Auto. Sys., Inc.*, 2013 WL 3357170, at *4 (S.D.N.Y. 2013); *see also Teamsters Local 445 Freight Div. Pension Fund* v. *Bombardier Inc.*, 546 F.3d 196, 202-03 (2d Cir. 2008) (applying preponderance standard "to establish Rule 23's requirements").

Here, in addition to proving under Rule 23(a) that "there are questions of law and fact common to the class," Plaintiffs must satisfy the more demanding standard of Rule 23(b)(3) by proving that "questions of law or fact common to class members predominate over any questions affecting only individual members." *IBEW Local 90 Pension Fund* v. *Deutsche Bank AG*, 2013 WL 5815472, at *17 (S.D.N.Y. Oct. 29, 2013). Despite Plaintiffs' attempts to characterize class certification in securities actions as "routine[]" (Pls.' Mem. at 25), the Supreme Court has made clear that certification "is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of [Rule 23]" are met, an inquiry that "frequently [] overlap[s] with the merits of the plaintiff's underlying claim." *Comcast Corp.* v. *Behrend*, 133 S. Ct. 1426, 1432 (2013).

## ARGUMENT

### I. PLAINTIFFS HAVE FAILED TO PROVE THAT INDIVIDUALIZED ISSUES REGARDING RELIANCE WILL NOT PREDOMINATE.

#### A. The *Basic* Presumption Is Unavailable Because Plaintiffs Failed to Prove that Barclays' ADS Traded in an Efficient Market.

"[T]o invoke the *Basic* presumption, a plaintiff must prove that . . . the stock traded in an efficient market." *Halliburton II*, 134 S. Ct. at 2413. Absent proof that Barclays' ADS traded efficiently throughout the Class Period, "[e]ach plaintiff would have to prove reliance individually, so common issues would not 'predominate' over individual ones, as required by Rule 23(b)(3)." *Id.* at 2416. Because Plaintiffs bear the burden of proof on each of Rule 23's requirements, "[t]o defeat the presumption of reliance, defendants do not . . . have to show an inefficient market. Instead, they must demonstrate that plaintiffs' proffered proof of market efficiency falls short of the mark." *Deutsche Bank AG*, 2013 WL 5815472, at *20. Here, Plaintiffs' proof unquestionably falls short. Dr. Finnerty's initial event study is based upon a fatally flawed regression model and failed to satisfy *Dr. Finnerty's own minimum standard for reliable proof of market efficiency*. Dr. Finnerty's second, purportedly "supplemental" event

study is equally deficient and utterly contradicts the first.  It is based upon a regression model that produced results contrary to those presented in the first model that Dr. Finnerty continues to rely upon, and it hinges on an inherently subjective and inconsistent analysis of analyst "sentiment" to foretell after-the-fact price movements on hand-selected earnings release days.

### 1. Plaintiffs Have Offered No Reliable Evidence of Market Efficiency.

Plaintiffs plod through each of the factors identified in *Cammer* v. *Bloom*, 711 F. Supp. 1264 (1989), and *Krogman* v. *Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001), as supposedly indicative of market efficiency.  (Pls.' Mem. at 19-20 & n.23.)  But the Second Circuit and the parties' experts all agree that the fifth *Cammer* factor—the "demonstration of a cause and effect relationship between unexpected, material disclosures" and an "immediate response in the price of" Barclays' ADS—is not only "the most important" test of efficiency, *see Bombardier*, 546 F.3d at 200, 207, but a "test [that] has to be passed," (Finnerty Dep. 79:19-80:2).  While other factors might "support an inference of efficiency, these factors cannot substitute for evidence of a cause-and-effect relationship between unexpected news and market price."[4]  Nevertheless, as set forth in Defendants' pre-motion letter requesting leave to file a motion to exclude Dr. Finnerty's opinions under FRE 702 and *Daubert*, the two event studies that Dr. Finnerty performed yield irreconcilable results and suffer from numerous methodological errors that render his opinions irrelevant, unreliable and thus inadmissible.[5]  This should end the inquiry. Beyond the inadmissibility of Dr. Finnerty's opinions, the flawed evidence offered by Dr.

---

[4] *In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 182 (S.D.N.Y. 2012) ("Without evidence of the prompt effect of unexpected news on market price, the market cannot be called efficient."); *accord* Gompers I, ¶ 11(b)(ii).

[5] *See* Defendants' Pre-Motion Letter dated June 12, 2015.

Finnerty is "unpersuasive" and falls miles short of proving "by a preponderance of the credible evidence that the market for [Barclays' ADS] was efficient." *Freddie Mac*, 281 F.R.D. at 182.

## 2.   Dr. Finnerty's First Event Study Is Fatally Flawed.

Dr. Finnerty's initial report hinges on a fatally flawed event study that (i) analyzes a small, arbitrarily selected sample of trading days, (ii) employs a model that fails to properly control for relevant variables, and (iii) yields no meaningful evidence of a cause-and-effect relationship between unexpected news and price, as Dr. Finnerty was forced to admit.[6]

*First*, Dr. Finnerty's event study examines only "25 days out of 1,254 trading days in the Class Period, or less than 2% of the days." (Gompers I ¶ 32.)  Courts have recognized that such small sample sizes can render expert work both unreliable and unpersuasive.  *See, e.g.*, *Deutsche Bank AG*, 2013 WL 5815472, at *21 (rejecting expert's efficiency analysis, in part, because it "was based on an inadequate foundation of 12 trading days out of 515").  Indeed, Dr. Finnerty performed a statistical test to evaluate the minimum reliable sample size in a report for another case that he drafted at the same time, and application of that same test in this case reveals that Dr. Finnerty's sample size is woefully inadequate here.  (*See* Gompers I ¶ 32.)  Dr. Finnerty did not "perform any statistical or financial analysis to determine what the appropriate sample size was" in this case because he "didn't have time." (Finnerty Dep. 169:14-17, 172:22-173:4.)

*Second*, Dr. Finnerty's study fails to properly control for relevant variables.  It does "nothing to account for" changes in the volatility of Barclays' ADS price during the Class Period,

---

[6] Plaintiffs cannot meet their burden to *prove* that Barclays' ADS traded efficiently merely by pointing repeatedly to the fact that Barclays' ADS were listed on the NYSE and referencing the general characteristics of the NYSE. (Pls.' Mem. at 18, 20-21.)  Listing on a national exchange is "not dispositive when efficiency is disputed." *Freddie Mac*, 281 F.R.D. at 178; *see also Bell* v. *Ascendant Solutions, Inc.*, 2004 WL 1490009, at *5 (N.D. Tex. July 1, 2004) (same).  Market efficiency can vary with respect to stocks traded on the same exchange, and stocks that trade efficiently in certain times may not trade efficiently in other times.  (Gompers I ¶¶ 37, 58.)

which spans the turbulent financial crisis. (Gompers I ¶¶ 43-45.) It also employs an inappropriate industry index to control for the potential impact of irrelevant industry-wide news on Barclays' ADS price. (*Id.* ¶¶ 48-50.) Instead of using an index composed of Barclays' peers, Dr. Finnerty used the S&P Financials Index, which includes incomparable entities like life insurers and property management companies. (*Id.* ¶ 49.) As a result, Dr. Finnerty's model is likely to produce false positives and inexplicable negatives when calculating whether statistically significant price movements occurred. (*Id.* ¶¶ 45, 50.)

*Third*, beyond these fundamental methodological errors, Dr. Finnerty's event study produced no relevant evidence of efficiency. Of the 25 days he examined, Dr. Finnerty found that just two included "economically significant" news regarding Barclays that should produce a price reaction. (Finnerty I ¶ 51.) His report states that, for one of these two days—May 16, 2008—the price of Barclays' ADS "did not exhibit a statistically significant abnormal return," and on the other day—October 3, 2008—"Barclays ADS did exhibit an abnormal return significant at the 5% level." (*Id.*) Even if this analysis was correct (and it is not), it proves nothing. A sample size of two out of 1,254 days is useless. And finding that Barclays' ADS reacted to supposedly "economically significant" news on one of two days does not prove efficiency, as Dr. Finnerty conceded.[7] All Dr. Finnerty could say about his defective analyses was that "[t]he market reacted less than [he] thought it would." (Finnerty Dep. 182:25-183:11.)

In fact, as Dr. Finnerty later admitted, his opinion regarding market efficiency rested entirely on a "mistake," because the return on October 3 was significant only at the 10% level.

---

[7] Finnerty Dep. 234:9-13 (prices should react as expected "[a] preponderance of the time"); *see George*, 2013 WL 3357170, at *12 ("showing that only seven out of sixteen days resulted in a market reaction is an insufficient foundation upon which to pronounce market efficiency"); *Freddie Mac*, 281 F.R.D. at 182 (showing that a stock "responded to material news 28% of the time [16 out of 57 news days] is insufficient to satisfy . . . *Cammer*'s [fifth] factor").

(*Id.* at 181:7-182:24.)  Dr. Finnerty acknowledged that he would not be able to convince himself nor "convince a trier of fact that [his] conclusions [about market efficiency] would stand up" based on results that are statistically significant only at the 10% level.[8]  Indeed, Dr. Finnerty previously sought to premise a market efficiency conclusion on data that was significant only at the 10% level, and was forcefully rebuffed by Judge Batts.[9]  Yet, Dr. Finnerty admitted that his *only* evidence of a cause-and-effect relationship was on October 3, and that he mistakenly reported that result as significant at a 5% level when it was not.  (Finnerty Dep. at 181:7-182:24.)  In short, Dr. Finnerty's first event study produced *no reliable evidence* whatsoever of efficiency.

Instead, Dr. Finnerty's first report points only to inefficiencies in the Barclays ADS market.  Dr. Finnerty identified just two days with "economically significant news," and he found no statistically significant price reaction on either day.  He also looked at three "fraud-related news events" during the Class Period—on October 31, 2008, April 27, 2011 and June 27, 2012.  (Finnerty I Ex. 8-9.)  On two of those dates (April 27 and June 27) he found no significant price reaction, and on the third (October 31) he did find a significant price reaction—but in the wrong direction.  (*Id.*)  This evidence defeats any argument that the market was efficient.[10]

---

[8] Finnerty Dep. 158:16-159:7; *see also* Gompers I ¶ 29 ("[I]t is most common . . . for a researcher to draw conclusions based on results that are significant at the 5% level.").

[9] *See In re Am. Int'l Grp., Inc. Sec. Litig.* ("*AIG*"), 265 F.R.D. 157, 187 (S.D.N.Y. 2010), *vacated on other grounds*, 689 F.3d 229 (2d Cir. 2012) (rebuking Finnerty for attempting "to draw conclusions at the 10% level"); *see also In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 493 n.11 (S.D.N.Y. 2011) (10% level "is below the conventional statistical measure of [5%] and therefore is not sufficient evidence of a link between the corrective disclosure and the price").

[10] Tellingly, after his first event study was shown to lack any evidence of market efficiency but instead produced evidence of inefficiency, Dr. Finnerty now asks the Court to disregard the premise of his first event study.  In a footnote to Finnerty II, Dr. Finnerty states that October 3, 2008—the entire foundation of his first market efficiency opinion—also was "mistakenly" identified as a Barclays-specific "economically significant" news day.  (Finnerty II ¶ 18 n.21.)  This about-face confirms the complete deficiency of Dr. Finnerty's first report and the entirely subjective, unscientific and unreliable analysis put forward in his second report.

**3.    Dr. Finnerty's Second Event Study Is Equally Deficient and Provides No Reliable Evidence of Market Efficiency.**

Dr. Finnerty's second event study is no better than the first, and it is equally unscientific. As explained by Dr. Gompers, Dr. Finnerty's new model is irreconcilable with the old one, and is itself so fundamentally flawed—in both design and implementation—that it cannot provide reliable evidence that Barclays' ADS traded efficiently throughout the Class Period.  (Gompers II ¶¶ 21-30.)  Although Dr. Finnerty claims that his second study is meant to "supplement" the first, constituting a "combined sample" that is "in essence one report,"[11] his new analysis has fundamentally different implications for efficiency that are wholly incompatible with the old model, yielding unreliable and irreconcilable results.  Among other differences, the new study:

(i) abandons random sampling in favor of hand-selecting days on which Barclays released what Dr. Finnerty deems to be "surprise" financial results;

(ii) replaces a regression model that assumed volatility was constant with a model that breaks the Class Period into three distinct sub-periods, supposedly to account for varying volatility, even while Dr. Finnerty disputes the propriety of doing so and he provides no economic justification for his chosen sub-periods;

(iii) utilizes a new and different industry index that Dr. Finnerty denies is appropriate and bears no resemblance to the index used in the old report, and

(iv) dispenses with the requirement of statistical significance of data in favor of vaguely defined notions of "economic significance" in an attempt to obfuscate the fact that the new report also finds insufficient evidence of statistically significant price reactions to new, Barclays-specific news.  (*See* Gompers II ¶¶ 9, 53-68; Finnerty II ¶¶ 12-13, 23.)

These two models—which are based on conflicting economic assumptions—cannot both simultaneously provide accurate descriptions of Barclays' ADS.  (Gompers II ¶ 10.)  Indeed, the two models agree on whether residual returns are statistically significant on only *18 days* over the course of the *five-year* Class Period, or less than 23% of the time.  (*Id.* ¶¶ 27- 29.)  As Dr. Gompers points out, this leads to "conflicting conclusions regarding the efficiency of Barclays

---

[11] Finnerty II ¶ 3; *see also* Finnerty Dep. 211:24-212:17.

ADS."[12]  (*Id.* ¶ 28.)  That alone is reason enough to deny Plaintiffs' motion here.[13]

Further, the analyses in Finnerty II cannot possibly meet Plaintiffs' affirmative burden of proof because Dr. Finnerty does not even embrace them as accurate.  Dr. Finnerty supposedly erected his second event study solely to accommodate criticisms of his prior (admittedly defective) event study, but he defiantly argues that the changes he adopts were neither necessary nor appropriate.[14]  For example, Dr. Finnerty divides the Class Period into three sub-periods despite testifying that doing so was ill-advised and having conducted no test to determine the propriety or scope of sub-periods.  Instead, he blindly adopts breakpoints that Dr. Gompers previously employed in a different case involving a different stock for a U.S. (not U.K.) company, while simultaneously denying that these breakpoints are relevant for Barclays' ADS.  (Gompers II ¶¶ 37-41.)  Further, although Dr. Finnerty specifically excluded from this first industry index LIBOR-contributing banks that were implicated in the LIBOR "scandal" (Finnerty I ¶ 46), his second index now includes 11 of those banks (out of 18 companies in the index), despite Dr. Finnerty's continued concern that doing so "potentially introduce[s] biases into [his] regression analysis."  (Finnerty Dep. 249:8-249:10.)  By incorporating methodologies with which he expressly disagrees, Dr. Finnerty's second study is its own retort.

---

[12] For example, of the 15 days in Dr. Finnerty's new sample, his new regression model purports to identify statistically significant reactions on five days, while the old model finds *insignificant* reactions on three of those five days; conversely, on one of the days with insignificant reactions under the new model, the old model finds a statistically significant reaction at the 1% level.  (*Compare* Finnerty II Ex. 4, *with* Finnerty I Ex. 10.)

[13] *See, e.g.*, *Freddie Mac*, 281 F.R.D. at 181 (expert's "analysis changed so many times in important ways and was so internally inconsistent that I found it unreliable and unpersuasive"); *Brown* v. *China Integrated Energy Inc.*, 2014 U.S. Dist. LEXIS 117764, *25 (C.D. Cal. Aug. 4, 2014) (rejecting efficiency opinion because the "high level of discrepancy" between two proffered studies revealed the "subjectivity" and unreliability of the expert's approach); *see also Dean* v. *China Agritech*, 2012 WL 1835708, at *7 (C.D. Cal. May 3, 2012).

[14] *See* Finnerty II ¶¶ 8, 14; Finnerty Dep. 275:19-276:3; 286:13-25.

Nevertheless, whether viewed alone or together with his first study, Dr. Finnerty's second study is deeply flawed and provides no reliable evidence of efficiency. Among other things:

(i) *Unscientific Statistical Model.* Although Judge Batts recently rebuked Dr. Finnerty for submitting a market efficiency opinion based on data that was statistically significant at only the 10% level rather than the traditional 5% level, *see AIG*, 265 F.R.D. at 187, Dr. Finnerty here drops any pretense of scientific evidence by contending that the data supporting his conclusions ***need not be statistically significant <u>at all</u>***. (Finnerty Dep. 226:21-229:12; 231:4-232:25.) Even under his otherwise defective second study, Dr. Finnerty reports Barclays' ADS price movements that are statistically significant at the 5% level on just *five out of the fifteen days studied*. (Finnerty II Ex. 5.) Recognizing that the absence of statistical significance to these price movements dooms his market efficiency theory, Dr. Finnerty jettisons the criteria of statistical significance in favor of a vague standard of "economic significance," which has no basis in economics (Gompers II ¶¶ 53-68) or law, *AIG*, 265 F.R.D. at 187.

(ii) *Inadequate Sample Size.* The new study analyzes a total of 15 out of 24 days on which Dr. Finnerty determined there was "surprise" earnings-related news. But a sample of just 15 out of 1,254 trading days is still far too small to reliably draw conclusions about efficiency over the entire Class Period.[15] (Gompers II ¶¶ 80-87.) And identifying statistically significant price reactions on only five out of 1,254 trading days is wholly inadequate to prove efficiency for a Class Period *spanning five years. See, e.g., Deutsche Bank AG*, 2013 WL 5815472, at *21.

---

[15] Even if the samples from both studies are considered in the aggregate, which they should not be (*see Freddie Mac*, 281 F.R.D. at 180 (where expert presents "two different methodologies . . . it is not appropriate simply to add the results of his two event studies")), the combined sample of 40 days is still too small to reliably opine on efficiency over the course of the five-year Class Period, based on Dr. Finnerty's own analysis in a prior case (*see* Gompers II ¶ 86).

      ***(iii)  Flawed, Subjective and Unscientific Analyses.***  Dr. Finnerty fails to objectively

measure the impact of earnings-related news and instead relies on an inherently subjective and

inconsistent analysis of analyst "sentiment" on each of his hand-selected days.  Dr. Finnerty's

subjective approach is non-replicable, unscientific, and circular.[16]  (Gompers II ¶¶ 69-79, 103-

133.)  For example, Dr. Finnerty concluded in his first study that the totality of news on October

3, 2008 was economically significant; two months later, Dr. Finnerty concluded in his second

report *that the same information was not significant*.  (Finnerty II ¶ 18 n.21.)  Dr. Finnerty and

his staff disagreed about the economic significance of the overall news on one or more of the

days in his second sample.  (Finnerty Dep. 321:23-324:3.)  Worse still, Dr. Finnerty testified that

the LIBOR submissions themselves were ***not*** economically significant news (*id.* at 177:2-17;

305:15-22; 458:13-459:10), while the crux of the complaint here is that the submission rates

"were themselves materially false and misleading statements," (SAC ¶ 171).  The record makes

clear that Dr. Finnerty's conclusions are entirely subjective and unreliable.  For these reasons, Dr.

Finnerty's opinions are neither "relevant to the task at hand" nor rest "on a reliable foundation,"

as required by *Daubert*, and in all events suffer from serious methodological flaws that render

the opinions entirely unpersuasive.  *Freddie Mac*, 281 F.R.D. at 182.

      Even apart from the evidentiary and methodological flaws in Dr. Finnerty's reports, his

analyses provide no evidence of efficiency throughout the Class Period.  Despite testifying that

prices should react on at least a preponderance of the news days to find efficiency (Finnerty Dep.

271:8-20), Dr. Finnerty found statistically significant price movements on just *five of his fifteen*

---

[16] The analyst "sentiments" that Dr. Finnerty reviewed were often already informed by that day's stock price movements, creating a circular dynamic of price movements leading to sentiments consistent with an earnings "surprise" and vice-versa.  (Gompers II ¶ 72.)  Dr. Finnerty also admitted that, before embarking upon an effort to predict price movements years after-the-fact, he and his staff knew the actual returns each day, further highlighting his subjective, results-driven approach.  (*See* Finnerty Dep. 360:8-18.)

sample days.  Of those five days, only *one*—February 19, 2008—falls within the August 2007 to January 2009 period in which Barclays allegedly lowered its LIBOR submissions.  (Finnerty II ¶¶ 28-31.)  On the *three* other "significant news" days during this period, Dr. Finnerty reports no statistically significant price reaction.  (*Id.* ¶¶ 26-37.)  Even if the market for Barclays' ADS was at other times or even *generally* efficient, a statistically significant price reaction on *one of four days* over the entire August 2007 through January 2009 timeframe provides no economic basis to show that ADS were trading efficiently and incorporating new, value-relevant information during that critical period, which overlaps with the peak of the financial crisis and includes the period during which *all* of the alleged misstatements were made.[17]

### 4.    Dr. Finnerty Ignores Substantial Evidence of Market Inefficiency.

The failure of Dr. Finnerty's event studies to reveal any persuasive evidence of efficiency is to be expected given the significant impediments to efficient trading, particularly during the unprecedented circumstances of the financial crisis, which Dr. Finnerty identifies, but ignores. For example, Dr. Finnerty dismisses without basis the impact of short sale constraints during the Class Period.  (Gompers I ¶¶ 68-69.)  Observing that "Barclays's average short interest was above the NYSE average" for "months in 2008, 2011, and 2012," Dr. Finnerty also finds statistically significant violations of put-call parity during four months in 2008.  (Finnerty I

---

[17] *See Deutsche Bank AG*, 2013 WL 5815472, at *22 (that a security "may have traded at many other points in time in an efficient market [was] irrelevant" because "the Class Period encompasse[d] an extraordinary financial crisis directly impacting trading conditions").  Indeed, Dr. Finnerty acknowledged at his deposition that he "need[ed] to look at each of the sub-periods" and find that a preponderance of the significant news days *in each period* reflected a cause-and-effect relationship.  (Finnerty Dep. 271:8-20.)  Dr. Finnerty did not do so here.  A statistically significant reaction on only one out of four, or 25%, of news days during the first and second sub-periods is insufficient to prove efficiency during those sub-periods.  *See George*, 2013 WL 3357170 at *12 ("seven out of sixteen days . . . is an insufficient foundation upon which to pronounce market efficiency."); *Freddie Mac*, 281 F.R.D. at 180-81 ("28% of the time is insufficient[.]"); *see also Deutsche Bank AG*, 2013 WL 5815472, at *6 (excluding expert opinion that showed only "that statistically significant price movement occurred 25% of the time").

¶¶ 78-82.)  Such violations are indicators of potential inefficiency because they point to a breakdown of normal arbitrage relations.  (Gompers I ¶ 69.)  Dr. Finnerty shrugs off these results, stating that "three of these four months occur at the peak of the recent financial crisis," but fails to explain why the Court should disregard them on this basis.  (Finnerty I ¶ 82; Finnerty II ¶ 102; Gompers I ¶¶ 68-69.)  Dr. Finnerty's failure to consider fully the implications of his own findings renders his opinion unscientific and unpersuasive.[18]

Equally problematic is Dr. Finnerty's treatment of Barclays' bid-ask spreads, which he found to be at least 60% wider than the average and median spreads for NYSE common stocks and displayed considerable volatility during the period spanning October 2008 to June 2009. (Finnerty I ¶ 70, Ex. 15.)  These findings are notable because "wide bid-ask spreads may prevent arbitrageurs from taking advantage of arbitrage opportunities, which could impair market efficiency, especially during the crisis period."  (Gompers I ¶ 63.)  Dr. Finnerty again disregards his own findings, stating that he can ignore evidence of inefficiency during the financial crisis because the spreads were otherwise "reasonably sized" and "consistent with an efficient market." (Finnerty I ¶ 70; Finnerty II ¶ 103.)  Such "*ipse dixit*" is the hallmark of an unreliable and unpersuasive opinion.  *Gen. Elec. Co.* v. *Joiner*, 522 U.S. 136, 146 (1997).

**B.    Even If Plaintiffs Could Invoke the Presumption of Reliance, that Presumption Is Defeated by Plaintiffs' Own Expert Evidence.**

Even when shown to apply—and, here, it does not—the *Basic* presumption is "rebuttable" and "any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff . . . will be sufficient" to defeat it.  *Halliburton II*, 134 S. Ct. at 2408.  Indeed, the *Basic* reliance presumption is rebutted by any "appropriate evidence,

---

[18] *See Deutsche Bank AG*, 2013 WL 5815472, at *16 (rejecting efficiency opinion that "fail[ed] to take into account any market impact of the periods during which the U.S. and Germany had imposed short sale bans").

including evidence that the asserted misrepresentation (*or its correction*) did not affect the market price of the defendant's stock."  *Id.* at 2414 (emphasis added).

Far from a "daunting task,"[19] the absence of a price impact here is shown by Plaintiffs' *own expert evidence*.  Dr. Finnerty *agreed* that Barclays' LIBOR submissions were not "economically significant" news, and that the LIBOR submissions and Diamond's statement in October 2008 had no discernable impact on price, either at the time those statements were made or at the time of their supposed "correction" on June 27, 2012.[20]  Because the *Basic* presumption has been rebutted by Plaintiffs' own evidence, reliance must be shown through individualized proof, and no class can be certified.  *See Halliburton II*, 134 S. Ct. at 2416.

### 1.    Dr. Finnerty's Analyses Show that the Alleged Misstatements Had No Inflationary Impact on Barclays' ADS Price.

The SAC specifically identifies five dates over the course of the Class Period on which Barclays Bank allegedly made artificially low LIBOR submissions:  (i) November 16, 2007; (ii) November 28, 2007; (iii) November 29, 2007; (iv) November 30, 2007; and (v) March 19, 2008.  (SAC ¶ 172.)  The SAC also alleges that Barclays made low LIBOR submissions in "early" December 2007 and "around" April 16, 2008.  (*Id.*)  Dr. Finnerty conducted regression analyses for each of these dates and found no statistically significant price movements.  (*See* Finnerty I Ex. 10; Finnerty II Ex. 4.)  Indeed, Dr. Finnerty admitted at deposition that he tried but was unable to identify any inflation associated with LIBOR submissions *at any point in time*.[21]  The same is

---

[19] Pls.' Mem. at 14, 16.  Plaintiffs' reliance on *Aranaz* v. *Catalyst Pharmaceutical Partners Inc.*, 302 F.R.D. 657 (S.D. Fla. 2014), is misplaced. There, the court described defendants' burden as "particularly onerous" and a "daunting task" because (unlike here) a "drastic spike" followed the misrepresentation, a "dramatic decline" followed the corrective disclosure, and "all agree[d]" that the misrepresentations and disclosure "caused those price swings."  *Id.* at 673.

[20] Finnerty I Ex. 10; Finnerty II Ex. 4; Finnerty Dep. 167:9-168:4; 458:13-20, 467:6-12.

[21] Finnerty Dep. 458:13-20, 467:6-467:12.  *See In re Moody's Corp.*, 274 F.R.D. at 493 (where defendants demonstrated "there [wa]s no date on which any alleged misrepresentation caused a

true of Diamond's challenged statements on October 31, 2008 (SAC ¶¶ 108-09), a date on which Dr. Finnerty's analyses show a significant *decrease* in price.  (Finnerty I Ex. 10; Finnerty II Ex. 4.)  Accordingly, Plaintiffs' *own evidence* defeats the fraud-on-the-market presumption.[22]

> ### 2.    Dr. Finnerty's Testimony Regarding "Corrective Disclosures" on June 27, 2012 Establishes the Absence of Price Impact.

Recognizing that Dr. Finnerty's analyses show no inflationary impact from the alleged misstatements, Plaintiffs resort to arguing that the alleged misstatements "improperly maintain[ed] the existing stock price."  (Pls.' Mem. at 15-17.)  But as Plaintiffs concede (Pls.' Mem. at 14-15), *Halliburton II* confirmed that the failure of a corrective disclosure to affect the market price also rebuts the presumption of reliance.  134 S. Ct. at 2414.  Where (as here) the alleged corrective disclosure "did not affect the market price of the defendant's stock," the "basis for finding that the fraud ha[s] been transmitted through market price [is] gone," and the presumption of reliance is defeated.  *Id.* at 2414-17.[23]

Dr. Finnerty admitted that the price impact of any disclosures contained in Barclays' June 27 regulatory settlements would have "been reflected in the market by the end of the day June 27."  (Finnerty Dep. 167:20-168:4.)  According to Dr. Finnerty, Barclays' settlements, which "were disclosed to the market the morning of June 27," "laid out in great detail the particulars" of Barclays' conduct, including that "Barclays . . . submitted false LIBOR levels in order to create the impression in the market that their cost of money was lower than it reality [sic] was."

---

statistically significant increase in the price," defendants successfully "severed the link between the misrepresentation and the price by showing that the allegedly false information the market was absorbing was not causing the stock price to artificially inflate").

[22] *See, e.g.*, *In re Moody's Corp.*, 274 F.R.D. at 493; *In re Credit Suisse First Boston Corp. (Lantronix, Inc.) Analyst Sec. Litig.*, 250 F.R.D. 137, 143 n.11, 144-45 (S.D.N.Y. 2008).

[23] *See In re Moody's Corp.*, 274 F.R.D. at 490 ("[A] showing that there was no price decrease when the misrepresentations were disclosed is evidence that the stock price was not artificially inflated by the introduction of the misrepresentation in the market."); *AIG*, 265 F.R.D. at 182.

(*Id.* at 167:2-168:4; *see also id.* at 131:21-132:9 (acknowledging that the "fact as to whether or not prior LIBOR submissions were accurate or inaccurate . . . was incorporated in the market on [June] 27th").)  Nevertheless, Dr. Finnerty's event studies demonstrate that Barclays' ADS price showed no statistically significant movement on that date.  (Finnerty I ¶ 56; Finnerty II, Ex. 4.)[24] Instead, the ADS price *increased* on June 27.  This rebuts the *Basic* presumption.  Plaintiffs' own expert opinions are "salient evidence" that the "alleged misrepresentation did not actually affect the stock's market price, and consequently, that the *Basic* presumption does not apply."[25]

Plaintiffs cannot salvage their failed motion by pointing to *post*-Class Period price declines on June 28, 2012.[26]  The claims in this case allege simply that Defendants misrepresented Barclays' borrowing costs between 2007 and 2009.  (SAC ¶¶ 108-09, 171-73.) Dr. Finnerty agreed that any such misstatement was corrected and incorporated into Barclays'

---

[24]  Dr. Finnerty also appears to identify April 27, 2011, the date on which Barclays issued an interim management statement that disclosed that regulatory authorities were "conducting investigations relating to certain past submissions made by Barclays to the [BBA]" (SAC ¶ 153), as a partial corrective disclosure.  (*See* Finnerty II Ex. 3C.)  Although the SAC makes no such claim, Dr. Finnerty's analyses in any event revealed no price movement on that date at the accepted 5% level.  *See AIG*, 265 F.R.D. at 187 (finding *Basic* presumption rebutted where price decline following alleged corrective disclosure was significant only at the 10% level).

[25]  *Halliburton II*, 134 S. Ct. at 2415-16.  Plaintiffs incorrectly rely (Pls.' Mem. at 16-17) on certain pre-*Halliburton II* decisions refusing to consider evidence that the challenged statement had no price impact in certifying a class.  *See, e.g.*, *Schleicher* v. *Wendt*, 618 F.3d 679, 685 (7th Cir. 2010).  Plaintiffs' post-*Halliburton II* cases are irrelevant because they all involve undisputed price declines when the "truth" was disclosed.  *See, e.g.*, *Aranaz*, 302 F.R.D. at 673 ("dramatic decline" followed disclosure); *McIntire* v. *China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 435 (S.D.N.Y.  2014) ("CCME's stock price plummeted.").  Other cases do not address price impact at all.  *See, e.g., Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund* v. *Regions Fin. Corp.*, 762 F.3d 1248, 1256, 1259 (11th Cir. 2014) (market efficiency); *FindWhat Investor Grp.* v. *FindWhat.com*, 658 F.3d 1282, 1313-14 (11th Cir. 2011) (summary judgment appeal); *Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund* v. *Regions Fin. Corp.*, 2014 U.S. Dist. LEXIS 175126, at *2-4 (N.D. Ala. Dec. 18, 2014) (class notice motion).

[26]  As Plaintiffs concede, if "Barclays ADSs traded in an efficient market," stock price reactions to economically significant news should be "immediate."  (Pls.' Mem. at 19, 22; *see also* Finnerty Dep. 62:6-11 (agreeing that, "in an efficient market, prices adjust quickly and fully (*within minutes or hours*) to new information" (emphasis added))).

ADS price on June 27.  (Finnerty Dep. 131:21-132:9.)  Further, Dr. Finnerty volunteered that the June 28 decline was "in response to . . . the market's digestion of the implications of the *British government officials' response to the fines and settlement*" (Finnerty I ¶ 59 (emphasis added)), and "additional new information" regarding the "sharp series of reactions to the disclosures on the 27th that came into the market after it closed" (Finnerty Dep. 76:6-15).[27]

There is no dispute that the June 28 price decline was not caused by the revelation that LIBOR-related statements were false; rather, Plaintiffs contend the decline related to future collateral consequences of the LIBOR settlements themselves.  (Finnerty Dep. 131:5-132:9 (price decline was in "reaction to what the effect may be on the business, could be a lawsuits [sic]").)  A stock drop is actionable only when it is "in reaction to information released into the market rather than in reaction to the fraudulent statements themselves."  *In re State Street Bank & Trust Co. Fixed Income Funds Inv. Litig.*, 774 F. Supp. 2d 584, 589-90 (S.D.N.Y. 2011).  The new news in the market on June 28 was not a "corrective disclosure" of any alleged misstatement in this case.  *See Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161, 175 n.4 (2d Cir. 2005) (disclosure must "reveal to the market the falsity of the prior recommendations"); *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010) (a "negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure"); *Gusinsky*, 944 F. Supp. 2d at 292 & n.95.  Thus, it cannot be the basis for certifying a class.  *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 39 (2d Cir. 2009) ("[W]hen a claim cannot succeed as a matter of law, the Court should not certify a class on that issue.").

---

[27] *See also* Finnerty Dep. 130:19-22 (June 28 "was the day on which the market was initially able to react to the *commentary* from people who read the settlement documents, reacted to the *news* coming into the market" (emphasis added)); Finnerty I ¶ 59 (June 28 price decline was "[b]ased on the announcement of the regulatory fines and the negative reactions to Barclays's admissions in its settlements with regulators (i.e., resulting in calls for senior management dismissal, calls for criminal prosecutions, and warnings of increased risks of private litigation)").

Grasping at straws, Plaintiffs advance a new theory of liability well beyond the narrow issues accepted by the Second Circuit in its remand to this Court, based upon some failure to disclose that "Barclays's upper management had acted fraudulently with regards to Barclays's LIBOR submissions to the BBA panel." (Finnerty II ¶ 108.) This newly minted claim is of no help to Plaintiffs. *First*, this supposed misstatement (or omission) also was bluntly "corrected" in the June 27 settlements, which disclosed in detail that "Barclays Senior Management Directed that LIBOR Submissions Be Lowered." (CFTCS at 19; *see* SOF ¶¶ 34-47; FSAS ¶¶ 13-14, 102.) There is no dispute that the information in the June 27 settlements was impounded in the price by market close. (Finnerty Dep. 131:21-132:9, 167:9-168:4; Gompers II ¶¶ 153-57.) *Second*, the Second Circuit affirmed dismissal of all claims regarding statements about Barclays' corporate citizenship, internal controls, and legal compliance, *see Carpenters*, 750 F.3d at 235-37, and no alleged misstatements concerning the conduct of "upper management" remain at issue in this case. *Third*, this new theory appears to rest upon the notion that the fallout from the LIBOR settlement reflected some "materialization" of a concealed risk related to Barclays' LIBOR-related conduct. Yet, the Second Circuit flatly rejected that claim, holding that Plaintiffs' "risk materialization theory is simply untenable." *Id.* at 233 n.7. That holding is the law of the case, *see Kerman* v. *City of New York*, 374 F.3d 93, 109 (2d Cir. 2004), and dooms the proposed class.

## C.    The *Affiliated Ute* Presumption Has No Application Here.

Plaintiffs cannot invoke the unpled *Affiliated Ute* presumption of reliance on omissions because Plaintiffs' remaining claims rest on alleged affirmative misstatements: Barclays' LIBOR submissions and Diamond's conference call statements. (*See, e.g.*, SAC ¶¶ 108-09, 171-73.) Where, as here, "positive statements are central to the alleged fraud . . . the *Affiliated Ute* presumption does not apply." *Goodman* v. *Genworth Fin. Wealth Mgmt., Inc.*, 300 F.R.D. 90, 104 (E.D.N.Y. 2014). Plaintiffs cannot spin out "omission" claims merely by arguing that, in

making the alleged misstatements, Defendants "failed to disclose" that the statements were false. *See, e.g.*, *In re Lehman Bros. Sec. & ERISA Litig.*, 2013 WL 5730020, at *3 (S.D.N.Y. Oct. 22, 2013) ("Every misrepresentation could be characterized as an omission if it were defined in terms of the absence of the information that would correct the misrepresentation.").

## II.    PLAINTIFFS FAIL TO SHOW THAT INDIVIDUALIZED DAMAGES ISSUES WILL NOT PREDOMINATE.

Plaintiffs also fail to prove that common issues predominate, as required by Rule 23(b)(3), because they identify no viable class-wide damages model that tracks their remaining theories of liability.  Under *Comcast*, Plaintiffs are "entitled only to damages resulting" from the alleged fraud, so any "model purporting to serve as evidence of damages in th[e] class action must measure only those damages," or else "it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)."  133 S. Ct. at 1433.  Here, the generic "methodology" that Dr. Finnerty proposes—for the first time in a single paragraph of his second report (Finnerty II ¶ 106)—is untethered to the facts and legal theories of this case. Plaintiffs' inability to even propose some mechanism for calculating legally recoverable damages for the class members here further confirms that Plaintiffs have not met their burden to show a predominance of class issues, as Rule 23(b)(3) requires.

### A.    Plaintiffs' Generic Damages Arguments Do Not Prove that Individualized Issues Will Not Predominate.

"*Comcast* signals a significant shift in the scrutiny required for class certification," whereby district courts must "rigorously examine[] proposed damages methodologies in putative class action cases for disconnects between damages and liability."  *In re BP p.l.c. Sec. Litig.*, 2013 WL 6388408, at *17 (S.D. Tex. Dec. 6, 2013).  Plaintiffs now must "show that they can prove, through common evidence, that all class members were . . . injured by the alleged [misconduct]," *Sykes* v. *Mel S. Harris & Assocs.*, 780 F.3d 70, 82 (2d Cir. 2015), and

demonstrate a "linkage between [the] theory of liability and [the] theory of damages," *Fort Worth Emps.' Ret. Fund* v. *J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 141 (S.D.N.Y. 2014).

Seeking to avoid the scrutiny that *Comcast* requires, Plaintiffs offer no class-wide model of damages applicable to the remaining claims.[28]  Instead, after offering no damage theory at all in his first report, Dr. Finnerty vaguely outlines only a hypothetical model.  (Finnerty II ¶ 106.) Dr. Finnerty acknowledged that he merely "describ[ed] the general . . . damages calculation methodology that I apply in 10b-5 cases," and has "not described th[e] specific element" of how he would "calculate the inflation associated with particular instances of false LIBOR."  (Finnerty Dep. 467:6-12.)  Dr. Finnerty hypothesizes that one could determine "the economic loss per share" by calculating the abnormal returns on disclosure dates "using *an appropriate regression analysis methodology*, so as to exclude the impact of market-wide and industry-wide factors that are unrelated to the fraud."  (Finnerty II ¶ 106(a) (emphasis added).)  He also suggests that "a loss causation analysis" could then be performed whereby the "effects of any company-specific factors that are unrelated to the alleged fraud are subtracted from the abnormal return."  (*Id.* ¶ 106(b).)  But Dr. Finnerty fails to describe—as he must—what regression method is "appropriate" or *how* one might disaggregate factors "unrelated to the alleged fraud" on the facts here.  *See Vaccarino* v. *Midland Nat'l Life Ins. Co.*, 2013 WL 3200500, at *15 (C.D. Cal. June 17, 2013) (rejecting argument that Plaintiffs "need not present a damages theory tailored to this particular case, offering instead the damages theories . . . from various other cases").

Given the length of the Class Period—five years spanning the worst financial crisis in

---

[28] Although *Comcast* "did not foreclose the possibility of class certification under Rule 23(b)(3) in cases involving individualized damages calculations," the need for those calculations still "must [be] consider[ed] in deciding whether issues susceptible to generalized proof 'outweigh' individual issues."  *Roach*, 778 F.3d at 408.  Common issues cannot predominate where, as here, no viable class-wide model exists, and key elements of Plaintiffs' claims—loss causation and damages—have to be determined individually and on each of the 1,254 Class Period days.

nearly a century—and the complexity of Plaintiffs' theories of liability, Plaintiffs cannot possibly

meet their burden to "affirmatively demonstrate [] compliance with Rule 23," *Comcast*, 133 S.

Ct. at 1432, by refusing to provide particulars on how their damages methodology will identify

each class member's losses without resort to individualized inquiries.[29]  Without more

information, the Court has no way of determining if Plaintiffs' hypothetical approach to proving

damages is consistent with their theory of liability, as *Comcast* requires.  *See In re BP*, 2013 WL

6388408, at *17; *Turnbow* v. *Life Partners, Inc.*, 2013 WL 3479884, at *17 (N.D. Tex. July 9,

2013) (lack of detail left court unable to assess adequacy of "proposed damages calculus").

### B.    Plaintiffs' Complex Theory of Liability Cannot Be Translated Into a Reliable Class-Wide Model of Damages.

"[A]t the class certification stage (as at trial), any model supporting a plaintiff's damages

case must be consistent with its liability case," and it must "measure only those damages

attributable to that theory."  *Comcast*, 133 S. Ct. at 1433. Thus, the "first step in a damages study

is the translation of the *legal theory of the harmful event* into an analysis of the economic impact

*of that event*."  *Id.* at 1435.  Plaintiffs fail to explain how they will accomplish this critical task.

As Dr. Gompers demonstrates,[30] determining the economic impact (if any) of the alleged

misstatements would be complex, if not impossible.  Plaintiffs have not shown (i) how purported

price reactions in June 2012 provide an appropriate starting point for calculating damages on the

claims still at issue; (ii) how they will isolate the incremental impact of LIBOR-related

statements on Barclays' ADS in light of other information relating to Barclays' borrowing costs;

---

[29] *See In re BP*, 2013 WL 6388408, at *17 (rejecting model that did not explain how "an event study [would be used] to calculate class members' damages, and how that event study will incorporate—and, if necessary, respond to—the various theories of liability"); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 254 (D.C. Cir. 2013) (movant may not rely on "a questionable model whose unsubstantiated claims cannot be refuted through *a priori* analysis").

[30] *See* Gompers I ¶¶ 79-130; Gompers II ¶¶ 142-78.

or (iii) how they will account for variations in inflationary impact over time.

*First*, Plaintiffs have no damages theory at all that is confined to the claims remaining in this case. Plaintiffs admit that they cannot show any inflation associated with any LIBOR submission, or with Diamond's October 2008 statements (on which date the price went *down*, not up). There likewise is no dispute that any "falsity" in these "statements" whereby Barclays supposedly misrepresented its historical borrowing costs was corrected on June 27, and incorporated into Barclays' ADS price by the close of the U.S. markets on June 27. (*See supra* Section I.B.1-2.) Yet, because Dr. Finnerty finds no decline—statistically significant or otherwise—in Barclays' ADS price on June 27 (Finnerty I ¶ 56; Finnerty II Ex. 4), *Plaintiffs offer no damage theory at all tied to these theories (the only theories in this case).*

*Second*, even if Plaintiffs had identified some relevant price inflation as a starting point (and they have not), Plaintiffs have offered no methodology to isolate the incremental impact of some actionable statement on ADS price on any particular date during the Class Period. Given Dr. Finnerty's testimony that LIBOR submissions were not themselves economically significant news (Finnerty Dep. 177:2-17; 305:11-307:4), any model that purported to isolate the "price impact" of LIBOR would be perplexing. In any event, the "impact" on the value of Barclays' ADS "would depend on other available information that informed investors about Barclays' borrowing costs," including Barclays' published financial statements. (Gompers I ¶¶ 94, 96-98.)

Thus, to track Plaintiffs' theory of liability, a damages model would have to isolate the incremental impact of daily LIBOR submissions in light of the total mix of other information concerning Barclays' financial condition. (*Id.* ¶¶ 98-101.) Because myriad sources provided contemporaneous—and sometimes conflicting—assessments of Barclays' financial health, Plaintiffs must do more than assert that they will create a damages model at some point in the

future in order to prove that they can actually compute damages on a class-wide basis.[31] (*Id.* ¶ 101.) Accordingly, Plaintiffs have failed to meet their burden under Rule 23(b)(3). *See Turnbow*, 2013 WL 3479884, at *17 (denying class where "[n]umerous factors that affect the amount of damages, if any, to any given class member [we]re not accounted for in [expert's] formula").

*Third*, Plaintiffs fail to show how they will account for inevitable variations in inflationary impact over time. Dr. Finnerty's second report baldly asserts that his model "assumes that the amount of the inflation per ADS is a constant dollar amount within each of the relevant time intervals during the Class Period." (Finnerty II ¶ 106(d).) Notably, he fails to explain what those "relevant time intervals" are, and for good reason. Dr. Finnerty conceded in his deposition that, to the extent low LIBOR submissions resulted in any price inflation at all, a subsequent *accurate* submission would *remove* that inflation. (Finnerty Dep. at 470:2-21; 472:21-474:12.) Accordingly, under Dr. Finnerty's approach, "any time there's a misstatement, I have to make an adjustment. Any time there's a disclosure, I have to make an adjustment." (*Id.* at 473:3-7.) Put differently, the "relevant time intervals" in Dr. Finnerty's parlance means that each separate instance of an "inaccurate" LIBOR submission would have to be modeled separately, and damages calculated separately, in respect of each such interval, resulting in potentially hundreds of mini-trials. This is entirely unworkable and unmanageable, as it threatens to overwhelm the trial with individualized calculations in violation of Rule 23(b)(3).

## CONCLUSION

For these reasons, Defendants respectfully request that Plaintiffs' Motion be denied.

---

[31] *In re BP*, 2013 WL 6388408, at *17 (plaintiffs "cannot avoid [*Comcast*'s] hard look by refusing to provide the specifics of their proposed methodology"). Nor can Plaintiffs satisfy their *Comcast* burden without showing how they will differentiate between losses associated with LIBOR submissions and losses associated with Diamond's October 2008 statements, *id.*, a task which Dr. Finnerty admitted he had not bothered to undertake. (Finnerty Dep. 469:2-14.)

Dated: June 12, 2015
      New York, New York

           Respectfully submitted,

           SULLIVAN & CROMWELL LLP

           /s/ Jeffrey T. Scott
           David H. Braff (braffd@sullcrom.com)
           Jeffrey T. Scott (scottj@sullcrom.com)
           Brian T. Frawley (frawleyb@sullcrom.com)
           Matthew J. Porpora (porporam@sullcrom.com)
           Stephen H. O. Clarke (clarkest@sullcrom.com)
           125 Broad Street
           New York, NY  10004
           (212) 558-4000

           BOIES, SCHILLER & FLEXNER LLP
           Jonathan D. Schiller       Michael Brille
           William Todd Thomas    5301 Wisconsin Ave. NW
           Amos E. Friedland       Washington, D.C. 20015
           Karen Paik              (202) 237-2727
           575 Lexington Avenue
           New York, NY  10022
           (212) 446-2300

           *Attorneys for Defendants Barclays PLC, Barclays Bank PLC, Barclays Capital Inc., Marcus A.P. Agius, and John S. Varley*

           DECHERT LLP
           Andrew J. Levander
           Jeffrey A. Brown
           Amanda Rios
           1095 Avenue of the Americas
           New York, NY  10036
           (212) 698-3500

           *Attorneys for Defendant Robert E. Diamond, Jr.*