**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- X

CARPENTERS PENSION TRUST FUND OF : 
ST. LOUIS, ST. CLAIR SHORES POLICE & : 
FIRE RETIREMENT SYSTEM, POMPANO :       Case No. 1:12-cv-5329-SAS
BEACH POLICE & FIREFIGHTERS' : 
RETIREMENT SYSTEM, :          ECF CASE
                                    : 
           Plaintiffs, :   **ORAL ARGUMENT REQUESTED**
        v. : 
                                      : 
BARCLAYS PLC, et al., : 
                                      : 
          Defendants. : 

---------------------------------------------------------- X

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO EXCLUDE THE EXPERT OPINIONS OF JOHN D. FINNERTY**

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
(212) 558-4000

BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, New York  10022
(212) 446-2300

5301 Wisconsin Ave. NW
Washington, D.C.  20015
(202) 237-2727

*Attorneys for Defendants Barclays PLC, Barclays Bank PLC,*
*Barclays Capital Inc., Marcus A.P. Agius, and John S. Varley*

DECHERT LLP
1095 Avenue of the Americas
New York, New York  10036
(212) 698-3500

June 24, 2015               *Attorneys for Defendant Robert E. Diamond, Jr.*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ......................................................................................................... 3

I.   FINNERTY'S OPINIONS ON EFFICIENCY ARE UNRELIABLE BECAUSE
     THEY REST ON IRRECONCILABLE ASSUMPTIONS AND RESULTS. ................... 4

II.  FINNERTY's OPINIONS ARE UNSCIENTIFIC AND UNRELIABLE
     BECAUSE HE RELIES ON STATISTICALLY INSIGNIFICANT DATA.................... 6

III. FINNERTY'S SUBJECTIVE INTERPRETATION OF "ECONOMICALLY
     SIGNIFICANT" NEWS DAYS IS ARBITRARY AND NOT REPLICABLE................ 7

     A.   Finnerty's Methods Are Entirely Subjective. ......................................... 8

     B.   Finnerty's Methods Are Not Testable or Replicable. ............................. 9

IV.  FINNERTY'S OPINIONS ARE NOT RELEVANT BECAUSE THEY DO NOT
     ADDRESS THE LIABILITY THEORY OF THE CASE. ............................................ 10

V.   FINNERTY II IS UNRELIABLE BECAUSE FINNERTY DISAGREES WITH
     THE INPUTS AND ASSUMPTIONS EMPLOYED IN THAT REPORT. .................... 11

VI.  FINNERTY'S OPINIONS ON EFFICIENCY REST ON INADEQUATE DATA. ........ 13

CONCLUSION...................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant:small-caps">Cases</span>

*24/7 Records, Inc*. v. *Sony Music Entm't, Inc*.,
514 F. Supp. 2d 571 (S.D.N.Y. 2007)......................................................................9

*Amorgianos* v. *Amtrak*,
303 F.3d 256 (2d Cir. 2002)......................................................................4

*Bell* v. *Ascendant Solutions, Inc.*,
2004 WL 1490009 (N.D. Tex. July 1, 2004)......................................................................9

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston*,
853 F. Supp. 2d 82 (D. Mass. 2012)......................................................................8

*Bricklayers & Trowel Trades Int'l Pension Fund* v. *Credit Suisse Sec. (USA) LLC*,
752 F.3d 82 (1st Cir. 2014)......................................................................9, 10

*Brown* v. *China Integrated Energy Inc.*,
2014 U.S. Dist. LEXIS 117764 (C.D. Cal. Aug. 4, 2014)......................................................................5, 8

*Carpenters Pension Trust Fund of St. Louis* v. *Barclays PLC*,
56 F. Supp. 3d 549, 552 (S.D.N.Y. 2014)......................................................................11

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993)...................................................... *passim*

*Davis* v. *Carroll*,
937 F. Supp. 2d 390 (S.D.N.Y. 2013)......................................................................3

*Gen. Elec. Co.* v. *Joiner*,
522 U.S. 136 (1997)......................................................................15

*George* v. *China Auto. Sys., Inc.*,
2013 WL 3357170 (S.D.N.Y. July 3, 2013)......................................................................9, 15

*IBEW Local 90 Pension Fund* v. *Deutsche Bank AG*,
2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013)......................................................................8, 14, 15

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
265 F.R.D. 157 (S.D.N.Y. 2010), *vacated on other grounds*,
689 F.3d 229 (2d Cir. 2012)......................................................................7

*In re Blood Reagents Antitrust Litig.*,
783 F.3d 183 (3d Cir. 2015)......................................................................4

*In re Diamond Foods, Inc., Sec. Litig.*,
    295 F.R.D. 240 (N.D. Cal. 2013) ............................................................13

*In re Executive Telecard, Ltd. Sec. Litig.*,
    979 F. Supp. 1021 (S.D.N.Y. 1997) ........................................................12

*In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*,
    281 F.R.D. 174 (S.D.N.Y. 2012) ....................................................6, 14, 15

*In re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig.*,
    593 F. Supp. 2d 549 (S.D.N.Y. 2008) ......................................................10

*In re Northfield Labs., Inc. Sec. Litig.*,
    267 F.R.D. 536 (N.D. Ill. 2010) ....................................................9, 12, 14

*In re Novatel Wireless Sec. Litig.*,
    2013 WL 494361 (S.D. Cal. Feb. 7, 2013) ................................................11

*In re Paoli R.R. Yard PCB Litig.*,
    35 F.3d 717 (3d Cir. 1994) .........................................................................9

*In re Pfizer Inc. Sec. Litig.*,
    2014 WL 2136053 (S.D.N.Y. May 21, 2014) ...........................................11

*In re Polymedica Corp. Sec. Litig.*,
    453 F. Supp. 2d 260 (D. Mass. 2006) .......................................................14

*In re Rezulin Prods. Liab. Litig.*,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004) ........................................................9

*In re U.S. Foodservice Inc. Pricing Litig.*,
    729 F.3d 108 (2d Cir. 2013) ........................................................................4

*Kumho Tire Co.* v. *Carmichael*,
    526 U.S. 137 (1999) ........................................................................... *passim*

*Mitchell* v. *Gencorp Inc.*,
    165 F.3d 778 (10th Cir. 1999) .....................................................................4

*SEC* v. *Tourre*,
    950 F. Supp. 2d 666 (S.D.N.Y. 2013) ........................................................9

*Teamsters Local 445 Freight Div. Pension Fund* v. *Bombardier Inc.*,
    546 F.3d 196 (2d Cir. 2008) ........................................................................4

*Wal-Mart Stores, Inc.* v. *Dukes*,
    131 S. Ct. 2541 (2011) ................................................................................4

*Zenith Electronics Corp.* v. *WH-TV Broadcasting Corp.*,
    395 F.3d 416 (7th Cir. 2005) ...............................................................................................10

**OTHER AUTHORITIES**

Fed. R. Evid. 702 ...............................................................................................1, 3, 9

Fed. R. Evid. 401 ...............................................................................................4

## TABLE OF ABBREVIATIONS AND DEFINED TERMS

| | |
|---|---|
| **ADS:** | American Depositary Shares |
| **Barclays:** | Barclays PLC, Barclays Bank PLC, and Barclays Capital Inc. |
| **Class Period:** | The approximately five-year period between July 10, 2007 and June 27, 2012. |
| **Defendants:** | Barclays PLC, Barclays Bank PLC, Barclays Capital Inc., Marcus A.P. Agius, Robert E. Diamond, Jr., and John S. Varley |
| **Finnerty I:** | Declaration of John D. Finnerty, Ph.D., in Support of Lead Plaintiffs' Motion for Class Certification, dated February 9, 2015 [Dkt. No. 140]. |
| **Finnerty II:** | Supplemental Declaration of John D. Finnerty, Ph.D., in Support of Lead Plaintiffs' Motion for Class Certification, dated April 17, 2015 [Dkt. No. 141]. |
| **Finnerty Dep.:** | Depositions of John D. Finnerty, dated February 25, 2015 and May 19, 2015 [Dkt Nos. 153-1 and 153-2]. |
| **Finnerty (*In re Goldman*) Rpt:** | Declaration of John D. Finnerty, *In re Goldman Sachs Group, Inc. Sec. Litig.*, No. 1:10-cv-03461-PAC (S.D.N.Y.), dated January 30, 2015 (annexed as Exhibit C to the Porpora Declaration). |
| **FRE:** | Federal Rules of Evidence |
| **Gompers I:** | Declaration of Paul A. Gompers, Ph.D., dated March 3, 2015 [Dkt. No. 137-1]. |
| **Gompers II:** | Supplemental Declaration of Paul A. Gompers, Ph.D., dated May 29, 2015 [Dkt. No. 153-3] |
| **Hr'g Tr.:** | Transcript of Pre-Motion Conference, Carpenters Pension Trust Fund v. Barclays PLC, No. 1:12-cv-5329-SAS (S.D.N.Y.), dated April 30, 2015 (annexed as Exhibit A to the Porpora Declaration). |
| **LIBOR:** | London Interbank Offered Rate |
| **MacKinlay (1997):** | A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. Econ. Lit. Vol. XXXV (1997) (annexed as Exhibit B to the Porpora Declaration). |

**Porpora Decl.**      Declaration of Matthew J. Porpora, dated June 24, 2015.

**SAC:**      The Second Amended Complaint filed in the above-captioned action.

## PRELIMINARY STATEMENT

The shifting market efficiency and damages opinions proffered by Plaintiffs' expert,

Dr. John D. Finnerty, are neither relevant nor reliable, as required by FRE 702 and *Daubert* v.

*Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  This Court should, therefore, exclude

Finnerty's opinions — the only evidence offered by Plaintiffs in support of class certification.

Finnerty opines that the market for Barclays' ADS was efficient during the Class Period

based on two irreconcilable and equally flawed event studies, which purport to show some causal

relationship between new, Barclays-specific news and movements in the price of Barclays' ADS.

In his first event study, Finnerty relied on a "random sample" of 25 days during the five-year

Class Period, and he purported to conclude that the ADS market was efficient based upon a

*single* statistically significant price reaction on one of two "significant news" days from among

that sample.  (Finnerty I ¶ 51.)  After his conclusion as to statistical significance was shown to be

a "mistake,"[1] Finnerty prepared a second unauthorized and equally defective event study, which

is entirely irreconcilable with his previous methods and conclusions.  Yet, Finnerty contends that

his two event studies remain valid and that each support his market efficiency opinion

(Finnerty II ¶ 3), despite the two studies' conflicting assumptions, methodology, and results, and

even though Finnerty disputes the assumptions he used in his second study.  These unscientific

opinions are inadmissible here.

*First*, despite Finnerty's claim that his two studies "supplement" each other and are "in

essence one report" (Finnerty Dep. 211:24-212:17), the two analyses are based on mutually

---

[1] At his deposition, Finnerty admitted that he "mistake[nly]" reported the single price reaction upon which his first event study hinged at the 5% level of statistical significance when his model actually showed a reaction only at the 10% level, which Finnerty conceded is below the threshold for drawing scientific conclusions.  *Compare* Finnerty I ¶ 51 *with id.* Ex. 10 at 5 (October 3, 2008 entry); *see also* Finnerty Dep. 158:16-159:7; 181:8-182:20.

exclusive economic assumptions that yield unreliable and irreconcilable results that cannot co-exist.  Indeed, the conclusions regarding the statistical significance of price movements in his two regression models *conflict*, with the results of each fatally undermining the other.  The two models collectively purport to identify 80 unique days on which residual ADS price returns were statistically significant, but the two models *disagree as to the existence of a significant price return on 62 of those 80 days*.  (Finnerty II, Ex. 4; Finnerty I, Ex. 10.)  Even in respect of the sample of 15 "earnings surprise" days that form the basis of the efficiency opinion in Finnerty II, the two models agree as to the existence of a significant price reaction on just 2 of 15 days.  (*Id.*)

*Second*, Finnerty's opinions are inadmissible because he fails to "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire Co.* v. *Carmichael*, 526 U.S. 137, 152 (1999).  Finnerty dispensed with any pretense of applying scientific principles to his event study in Finnerty II, wrongly asserting that market efficiency can be shown by price reactions, even where, as here, those reactions *do not rise to the level of statistical significance*.  (Gompers II ¶¶ 53-68.)  In contrast to his expert work in this case, Finnerty acknowledged that, in his academic work, he would base conclusions only on data that was statistically significant.  (Finnerty Dep. 353:3-12.)  Under settled law, to be admissible, Finnerty's work must adhere to the standards of his profession.  Clearly, the opinions in Finnerty II fail to do so.

*Third*, the new event study in Finnerty II is unreliable because it is based on subjective, inconsistent, and untestable analyses of market "sentiment" regarding "expected" price reactions to supposed "earnings surprises."  (Finnerty II ¶¶ 18-25.)  Finnerty examines certain "earnings surprises," and then proceeds to conduct a haphazard review of contemporaneous analyst reports, whose "sentiments" are often already informed by that day's stock movements, to present an entirely subjective "prediction" of the expected stock price reaction on that day, three to eight

years after the fact.  Such expert opinions that rest merely on "subjective belief or unsupported speculation" should be excluded.  *Daubert*, 509 U.S. at 590.

*Fourth*, Finnerty's opinions are not admissible because they are not "relevant to the task at hand."  *Kumho*, 526 U.S. at 141.  Despite the fact that the claims in this case relate to an assertion that LIBOR submissions were themselves material and misstated (SAC ¶¶ 108-09, 171-73), Finnerty testified that Barclays' LIBOR submissions themselves were not "economically significant" information (Finnerty Dep. 177:2-17; 458:13-459:10), and they are not the basis for any market efficiency or damages theory he has proposed.

*Fifth*, Finnerty rests his market efficiency opinion upon the event study in Finnerty II while simultaneously disagreeing with the economic premise of the changes implemented in Finnerty II.  (*Id.* 275:19-276:3; 286:13-25.)  Plaintiffs cannot prove that opinions their own expert disagrees with are relevant and reliable.

*Finally*, Finnerty's efficiency opinion in all events is based upon an inadequate and unrepresentative sample.   Finnerty's random sample size in Finnerty I is insufficient even under Finnerty's own standards.  The event study in Finnerty II sampled only 15 "earnings surprise" days in three distinct sub-periods over the 1,254-day Class Period — only four during the two periods encompassing the economic crisis and alleged misconduct.  Finnerty acknowledged that he "need[ed] to look at each of the sub-periods" and find that a preponderance of the days tested reflect a cause-and-effect relationship.  (Finnerty Dep. 271:8-20.)  Yet Finnerty II fails to meet this test across the Class Period as a whole and in each distinct sub-period identified by Finnerty.

## ARGUMENT

"Under Rule 702 and *Daubert*, district courts are assigned a critical gatekeeping role at the boundary between real science and junk science."  *Davis* v. *Carroll*, 937 F. Supp. 2d 390, 411-12 (S.D.N.Y. 2013).  To be admissible, expert evidence must be both relevant and reliable.

*Daubert*, 509 U.S. at 589.  Under Rule 401, expert evidence is relevant only if it might "make the existence of any fact that is of consequence to the determination of the action more probable or less probable."  *Id.* at 587 (quoting FRE 401).  In determining the reliability of an expert's testimony, the Court may consider several factors:  (1) "[w]hether a 'theory or technique . . . can be (and has been) tested"; (2) whether the technique or theory "has been subjected to peer review and publication"; (3) "[w]hether, in respect to a particular technique, there is a high 'known or potential rate of error' and whether there are 'standards controlling the technique's operation'"; and (4) whether the technique or theory "enjoys 'general acceptance' within a 'relevant scientific community.'"  *Kumho Tire*, 526 U.S. at 149-50 (citing *Daubert*, 509 U.S. at 592-94).[2]

The party proffering an expert must prove by a preponderance that its expert's opinion is sufficiently reliable "at every step" of its analysis.  *Amorgianos* v. *Amtrak*, 303 F.3d 256, 267 (2d Cir. 2002).  "This is true whether the step completely changes a reliable methodology or merely misapplies that methodology."  *Mitchell* v. *Gencorp Inc.*, 165 F.3d 778, 782 (10th Cir. 1999).

## I.   FINNERTY'S OPINIONS ON EFFICIENCY ARE UNRELIABLE BECAUSE THEY REST ON IRRECONCILABLE ASSUMPTIONS AND RESULTS.

Finnerty claims that his two models constitute a "combined sample" that is "in essence one report" that should be considered collectively.  (Finnerty Dep. 211:24-212:17.)  Yet, the two reports start with conflicting assumptions about the behavior for the market for Barclays' ADS. (Gompers II ¶¶ 21-30.)  When Finnerty performed an "alternative" regression model in Finnerty

---

[2] Although "[t]he Supreme Court has not definitively ruled on the extent to which a district court must undertake a *Daubert* analysis at the class certification stage," *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 129 (2d Cir. 2013), the Second Circuit and others—including the Supreme Court—have suggested that it does.  *See id.* at 129-30; *Teamsters Local 445 Freight Div. Pension Fund* v. *Bombardier Inc.*, 546 F.3d 196, 208 n.15 (2d Cir. 2008) (class certification expert report "may be rejected . . . if it is methodologically unsound or unreliable"); *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187-88 (3d Cir. 2015) (collecting cases); *cf. Wal-Mart Stores, Inc.* v. *Dukes*, 131 S. Ct. 2541, 2553-54 (2011) ("[w]e doubt" district court's statement that *Daubert* did not apply at class certification).

II in response to Defendants' criticisms of his original model, he arbitrarily adopted alternative inputs without testing for their appropriateness, and he stated that these inputs were less appropriate than those used in Finnerty I.[3]

Indeed, Finnerty's two event studies are hopelessly irreconcilable, with each supposedly valid model fatally undermining the other. (Gompers II ¶¶ 21-30.) For example:

- The two models collectively identify 80 days on which Barclays' ADS exhibited a statistically significant return. But the two models concur that a given date is statistically significant ***less than 23% of the time*** (on only 18 days). Put differently, the models ***disagree*** as to the existence of significant returns on 62 out of 80 days.[4]

- For the 15 "earnings surprise" days that form the basis of Finnerty II, the new model finds statistically significant reactions on only five days, but Finnerty I finds *insignificant* reactions at the 5% level on *three of those five days*.[5]

- With respect to the three individual sub-periods into which Finnerty divides the Class Period in Finnerty II, the contradictions in his models are even more stark. Although Finnerty agrees that he must find the market in each sub-period to be efficient, as Dr. Gompers explains "one would have to conclude that the market is inefficient" in the first two sub-periods under Finnerty's models: If one assumes that Finnerty I accurately identifies days with important news, Finnerty II fails to show a statistically significant price reaction for 92% of those days in the first and second sub-periods; conversely, if one assumes that Finnerty II accurately identifies important news days, Finnerty I fails to show a statistically significant price reaction on 91% of those days in the first and second sub-periods. (Gompers II ¶¶ 28-29.)

In short, Finnerty's two models cannot possibly coexist because they provide opposing descriptions of how Barclays' ADS price moved, with each model fatally undermining the other. (Gompers II ¶¶ 10, 21-30.) Alone or together, the models cannot support any market efficiency opinion here. *See, e.g.*, *Brown* v. *China Integrated Energy Inc.*, 2014 U.S. Dist. LEXIS 117764,

---

[3] Finnerty apparently created his second event study solely to accommodate Dr. Gompers' criticisms of his prior (defective) event study, but he continues to argue that the changes he adopts were neither necessary nor appropriate. (Finnerty II ¶ 13; Finnerty Dep. 248:4-249:10; 286:13-25); *see* Part V, *supra*.

[4] *See* Finnerty II Ex. 4; Finnerty I Ex. 10; Gompers II ¶ 10.

[5] Finnerty II Ex. 5, Panel B; Gompers II Ex. 1.

*25 (C.D. Cal. Aug. 4, 2014) (excluding an opinion because the "high level of discrepancy"

between two event studies revealed the unreliability of the expert's approach).[6]

## II.      FINNERTY'S OPINIONS ARE UNSCIENTIFIC AND UNRELIABLE BECAUSE HE RELIES ON STATISTICALLY INSIGNIFICANT DATA.

Finnerty testified that, in order to conclude a market is efficient, the market should move

as expected in response to material news more than 50% of the time.  (Finnerty Dep. 271:8-20.)

Yet, his event study in Finnerty I found ***not one*** statistically significant price reaction on his

"economically significant" news days, and Finnerty II found statistically significant price

reactions on just ***five out of his 15*** "earnings surprise days."  (Gompers II ¶¶ 30-33.)  It is beyond

dispute that "[i]n an efficient market, stock prices should show *statistically significant* abnormal

returns on days in which unexpected, material information is released into the market."  *Freddie*

*Mac*, 281 F.R.D. at 178 (emphasis added).  Finnerty's own data defeats his efficiency theory.

Recognizing this, Finnerty jettisons entirely the standard of statistical significance,

adopting instead a new standard that he calls "economic significance," which purportedly

permits him to draw conclusions regarding efficiency based on *insignificant* returns, as long as

the *direction* of the return is consistent with the direction of his "prediction."[7]  This is wrong, and

has no basis in economics.  (Gompers II ¶¶ 53-68.)  An economist cannot reliably conclude that a

return is distinguishable from zero without a "proper statistical test [that] explicitly accounts for

the possibility that a given residual return is imprecisely measured."  (*Id.* ¶ 62.)

---

[6] Hr'g Tr. 16:14-15 (THE COURT:  "[I]f [Dr. Finnerty] stands by both and they come up with inconsistent results, that's going to be a problem for me."); *see In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 181 (S.D.N.Y. 2012) (expert's "analysis changed so many times in important ways and was so internally inconsistent that I found it unreliable and unpersuasive.").

[7] *See* Finnerty Dep. 225:5-13 ("the real issue, as in Basic versus Levinson, is materiality or economic significance . . . statistical significance, while helpful, is not the determining factor").

Finnerty's opinions fall far short of the "level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. Finnerty admitted that, "[i]f [he] were performing a – an academic study which [he] would hope to get published in a top journal, then the only results [he] would emphasize would be those that were statistically significant, preferably at the 1 percent level." (Finnerty Dep. 352:24-353:12.) Likewise, Finnerty acknowledged in Finnerty I that an event study is a "standard statistical technique that financial economists use to *test whether a security's price reaction to a news announcement (or some other event) is statistically significant*," and that, on days with economically significant Barclays-related news, one *should* observe abnormal price returns that are "*statistically significant* in an efficient market." (Finnerty I ¶¶ 34, 50 (emphasis added).)

Finnerty thus admits that (i) financial economists rely only on statistically significant data, (ii) the objective of an event study is to test for statistically significant price reactions, and (iii) significant news days should be associated with statistically significant price reactions in an efficient market. His attempt to jettison the threshold of statistical significance altogether renders his opinions unreliable. Indeed, Judge Batts rejected a market efficiency opinion from Finnerty that purported to be based on data that was statistically significant, but only at the 10% level rather than the traditional 5% level.[8] Finnerty's attempt to go much further afield and jettison the threshold of statistical significance altogether must be rejected.

## III.   FINNERTY'S SUBJECTIVE INTERPRETATION OF "ECONOMICALLY SIGNIFICANT" NEWS DAYS IS ARBITRARY AND NOT REPLICABLE.

Because subjective determinations can render event studies unreliable, courts require experts to "take steps to minimize . . . subjectivity" by defining what constitutes a relevant news

---

[8] *In re Am. Int'l Grp., Inc. Sec. Litig.*, 265 F.R.D. 157, 187 (S.D.N.Y. 2010), *vacated on other grounds*, 689 F.3d 229 (2d Cir. 2012) (rejecting Finnerty's "conclusions at the 10% level").

event *ex ante* with criteria that are as objective as possible.  *Brown*, 2014 U.S. Dist. LEXIS

117764, at *22.  In Finnerty II, however, Finnerty eschewed any objective criteria in favor of

non-replicable, non-testable "subjective judgments about which news impacted" Barclays' ADS

price that render his analysis completely unreliable.  *Bricklayers & Trowel Trades Int'l Pension

Fund* v. *Credit Suisse First Boston*, 853 F. Supp. 2d 181, 190 (D. Mass. 2012).

### A.    Finnerty's Methods Are Entirely Subjective.

Academic literature on event study methodology instructs that "[t]o facilitate the

examination of the impact of the [event] on the value of the firm's equity, it is essential to posit

the relation between the information release and the change in value of the equity."  (MacKinlay

(1997) at 16.)  In his study of "earnings surprises" in Finnerty II, however, Finnerty did no such

thing.  Finnerty examined certain "earnings surprises," and then proceeded to conduct a

haphazard review of roughly contemporaneous analyst reports to "predict" the expected stock

price reaction on that day, three to eight years after the fact.  (Finnerty II ¶¶ 19-25.)  Yet, the

analyst "sentiments" often already were informed by that day's stock movements (and/or the five

hours of trading in Barclays ordinary shares in London prior to the market open in the U.S.), and

in many instances simply reported the day's events. (Gompers II ¶¶ 69-72.)  Thus, this exercise

is circular, because the analyst commentary reflects the very market reactions that Finnerty

purports to predict.[9]

Further confirming the unreliability of his methods, Finnerty acknowledged that he and

his staff knew each actual price movement before embarking upon a subjective effort to

"predict" that historical fact.  (Finnerty Dep. 360:8-18.)  In other words, Finnerty offers nothing

---

[9] *See* Gompers II ¶¶ 72-79; *cf. IBEW Local 90 Pension Fund* v. *Deutsche Bank AG*, 2013 WL
5815472, at *16 (S.D.N.Y. Oct. 29, 2013) (excluding expert whose "analysis [was]
tautological—one cannot rely on the wisdom of the traders to conclude that the price was
efficient when the efficiency of the market is what [the expert] has been hired to determine").

more than a subjective, after-the-fact view that the news appears consistent with the observed (in most cases, statistically insignificant) price reaction. This is deficient.[10] Indicative of his results-driven approach, through this novel exercise, on 6 of his 15 "earnings surprise" days, Finnerty predicts a stock price reaction *inconsistent with the direction of the earnings surprise*.[11]

As Finnerty admitted, he did not apply any "parameters" for determining news significance, but simply offers his subjective assessments.[12] Rule 702 "guards against the admission of [such] subjective or speculative opinions." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004). "[A] subjective analysis without any methodological constraints does not satisfy the requirements of *Daubert*." *Bricklayers & Trowel Trades Int'l Pension Fund* v. *Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 95 (1st Cir. 2014). Finnerty's methods are inadmissible for, among other reasons, they lack any "standards controlling the technique's operation." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 n.8 (3d Cir. 1994).

### B.    Finnerty's Methods Are Not Testable or Replicable.

Finnerty's opinions also must be excluded because his subjective methodology cannot be replicated or tested. *24/7 Records, Inc*. v. *Sony Music Entm't, Inc*., 514 F. Supp. 2d 571, 575

---

[10] *George* v. *China Auto. Sys., Inc.*, 2013 WL 3357170, at *12 n.13 (S.D.N.Y. July 3, 2013) (methodology of "using the t-statistics as an initial method of identifying significant days and then from that reviewing whether there was news" was "backwards" and therefore "flaw[ed]").

[11] *See, e.g.*, Finnerty II ¶¶ 38-41, 89-93; Gompers II Ex. 1; *see Bell* v. *Ascendant Solutions, Inc.*, 2004 WL 1490009, at *2-3 (N.D. Tex. July 1, 2004) (excluding expert based on his study of "dates that appear[ed] to be consciously chosen in order artificially to support his hypothesis of efficiency"); *In re Northfield Labs., Inc. Sec. Litig.*, 267 F.R.D. 536, 548 (N.D. Ill. 2010) (excluding expert who "made decisions about [the event] study that tend to skew it toward a conclusion that the market was efficient").

[12] Finnerty Dep. 174:18-175:11; *id.* 315:2-6 ("I make a judgment based on the [] overall sentiment and the overall body of information"); *see* Gompers I ¶ 34 ("It is not clear what Dr. Finnerty uses as a threshold for economic significance, because Dr. Finnerty has not disclosed it."); Gompers II ¶¶ 69-79, 103-33; *see also SEC* v. *Tourre,* 950 F. Supp. 2d 666, 678 (S.D.N.Y. 2013) (excluding expert whose determinations of "economically material" information was based on "economic logic," which is a "form of inadmissible *ipse dixit*").

(S.D.N.Y. 2007) (rejecting expert methodology when "[i]t cannot be tested, it has no known rate of error, and it is not subject to any particular standards or controls").  To be admissible, "[s]omeone else using the same data and methods must be able to replicate the result."  *Zenith Elecs. Corp.* v. *WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005).  Finnerty's methods amount to nothing more than "expert intuition" that do not qualify as expert evidence.  *Id*; *see also In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 593 F. Supp. 2d 549, 562 (S.D.N.Y. 2008) (Scheindlin, J.) (expert's "hunch" excluded where it "lack[ed] scientific rigor").  Among other things:

- Finnerty himself looked at the same data, and reached diametrically opposite conclusions as to the economic significance of October 3, 2008 in Finnerty I and Finnerty II, *in each case offering the contradictory conclusion that supported his result*.  (Finnerty I ¶ 51; Finnerty II ¶ 18 n. 21.)  *See MTBE*, 593 F. Supp. 2d at 560 (rejecting expert where "it appears [the expert] is reaching his conclusion first . . . and then providing whatever reasons are necessary to support it").

- Finnerty and his own staff looked at the exact same earnings information and analyst reports, and reached different conclusions as to the "economic significance" of the collective data on several of the 15 sample days.  (Finnerty Dep. 322:10-324:3.)

- Finnerty admitted that a different financial economist in the same position could reach different conclusions based on the same information.  (*Id.* 321:9-12.)

In *Bricklayers*, 752 F.3d at 88, the First Circuit affirmed the exclusion of an event study where the "selection criteria were so vague that two economists would be apt to pick vastly different . . . dates given the same instructions."  Where, as here, the expert "seemingly made a judgment call . . . without any methodological underpinning," the expert opinion is inadmissible.  *Id.* at 95.

## IV.   FINNERTY'S OPINIONS ARE NOT RELEVANT BECAUSE THEY DO NOT ADDRESS THE LIABILITY THEORY OF THE CASE.

Finnerty's opinions are not "relevant to the task at hand," *Kumho*, 526 U.S. at 141, because they are premised largely if not exclusively upon a liability theory that is not in this case.

"As a result of prior rulings, only two sets of alleged misstatements remain in this case: Barclays's [LIBOR] submissions from August 2007 through January 2009, and Diamond's remarks during a conference call . . .  on October 31, 2008." *Carpenters Pension Trust Fund of St. Louis* v. *Barclays PLC*, 56 F. Supp. 3d 549, 552 (S.D.N.Y. 2014).  Yet, Finnerty bluntly acknowledged that Barclays' LIBOR submissions themselves were not "economically significant" information (*see* Finnerty Dep. 177:2-17; 305:15-22; 458:13-459:10), and they are not the basis for any class-wide theory of damages he has proposed.  Indeed, Finnerty found **no** ADS price movement in response to **any** Barclays LIBOR submission.  (*Id.* at 305:15-307:15; 458:17-20.)  Instead, his opinions are based on the theory that Barclays failed to disclose management's "involvement in the LIBOR" conduct (*Id.* at 465:23-468:25)—a theory not in this case.  Finnerty offers no opinion that Barclays' ADS efficiently incorporated LIBOR-related news (*see* Gompers I ¶¶ 37-41), and he offers no damages theory tied to the two categories of misstatements at issue in this case, (*see* Gompers II ¶¶ 148-78).

Finnerty's opinions should be rejected because they "do not accurately reflect Plaintiffs' causes of action." *In re Novatel Wireless Sec. Litig.*, 2013 WL 494361, at *4 (S.D. Cal. Feb. 7, 2013) (excluding expert's analysis as "no longer relevant or reliable" in light of the expert's incorporation of dismissed allegations).  Thus, in *In re Pfizer Inc. Sec. Litig.*, 2014 WL 2136053, at *1 (S.D.N.Y. May 21, 2014), Judge Swain excluded an expert's analysis because, like Finnerty, the analysis did not "account in any way for the impact of . . . statements" excluded by the court, "render[ing] [the expert's] opinions unhelpful to the jury in making calculations of damages proximately caused by Defendants' alleged misrepresentations and omissions."

## V.   FINNERTY II IS INADMISSIBLE BECAUSE FINNERTY DISAGREES WITH THE INPUTS AND ASSUMPTIONS HE ADOPTED IN THAT REPORT.

In Gompers I, Dr. Gompers observed fundamental errors in the construction of Finnerty's

original event study that rendered it unreliable, including that Finnerty erroneously assumed that volatility in the market for Barclays' ADS was constant over the entire five-year Class Period (despite the extreme market dislocations of the financial crisis period),[13] and that his model adopted an industry index that lacked any power to control for the effect of irrelevant industry-wide news on Barclays' ADS price.[14]   Each of these defects is sufficient ground to exclude the Finnerty I regression model as unreliable.   *See Northfield Labs.*, 267 F.R.D. at 548 (excluding expert who inadequately addressed "volatility"); *In re Executive Telecard, Ltd. Sec. Litig.*, 979 F. Supp. 1021, 1027 (S.D.N.Y. 1997) (excluding expert analysis that used improper index).

In his second expert report, Finnerty begrudgingly employed an "alternative" regression model solely to respond in part to Defendants' criticisms of his original model.  (Finnerty Dep. 248:4-249:10; 286:13-25.)  In response to criticism that he failed to properly control for volatility, Finnerty arbitrarily divided the Class Period into three sub-periods: (a) July 10, 2007 to September 12, 2008, (b) September 15, 2008 to February 24, 2009, and (c) February 25, 2009 to June 28, 2012.  (Gompers II ¶ 25.)  Finnerty chose these sub-periods without performing any analysis whatsoever as to the appropriateness of each period; instead, Finnerty blindly adopted two structural breakpoints proposed by Dr. Gompers' report in a *different* case involving a *U.S. company's* stock and a different class period.[15]  Yet, when asked if the class here should be divided into sub-periods as he did in Finnerty II or looked at holistically as he did in Finnerty I, Finnerty said that he preferred the approach in Finnerty I.  (Finnerty Dep. 123:8-10; 286:13-25.)

---

[13] Gompers I ¶¶ 43-47 & Ex. 1 (observing that due to volatility being overstated "there are **no** statistically significant residuals (at the 10% level or higher) between January 20, 2012 and June 27, 2012, a period of approximately 5 months," whereas "one would expect at least 10% of days to be significant at the 10% threshold during a given period"); *see also* Finnerty I Ex. 7.

[14] Gompers I ¶¶ 48-50.  As Finnerty acknowledged, "[i]f someone picks the wrong index, then the abnormal returns will be calculated incorrectly."  (Finnerty Dep. 108:24-109:2.)

[15] Finnerty II ¶ 14; Finnerty Dep. 286:23-24; Gompers II ¶¶ 39-41.

Similarly, in response to criticism of his original industry index, Finnerty adopted a completely different industry index that included, out of 18 firms, 11 banks implicated in LIBOR issues, despite his own view that including such firms could introduce biases in the regression analysis.[16]  Plaintiffs cannot possibly meet their burden to show that the methodology underlying Finnerty II is relevant and reliable when Finnerty disagrees with it.

## VI.   FINNERTY'S OPINIONS ON EFFICIENCY REST ON INADEQUATE DATA.

The samples of days Finnerty examined in his event studies are far too small to reliably extrapolate any of his purported findings across the entire five-year Class Period.  *See, e.g.*, *In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 249 (N.D. Cal. 2013) ("probative value of event studies" depends on "whether the study is based on a sufficiently large number of observations").  In his first study, Finnerty examined just 25 out of 1,254 trading days in the Class Period without conducting any analysis to determine if this small sample was sufficient.  According to an analysis Finnerty previously employed, that 25-day sample size results in findings with respect to the Class Period at a confidence level of *less than 70%*, far below the scientifically acceptable level of 95%.  (Gompers I ¶ 32.)[17]  Finnerty used an even smaller sample in his second study.  Finnerty analyzed just 15 "earnings surprise" days, which is ***only 1.2%*** of total trading days during the Class Period.[18]  This is an "inadequate foundation" for an

---

[16] Finnerty I ¶ 46; Finnerty Dep. 248:4-10; 249:3-10; *see also* Gompers II ¶¶ 42, 45.

[17] *See* Finnerty *(In re Goldman)* Rpt. ¶ 49 n.40 (using formula to determine that 63 days out of 844 was a sufficient sample to reach findings at a 90% confidence level and 10% rate of error); *see also* Finnerty Dep. 169:14-17, 172:22-173:4 (testifying that he did not "perform any statistical or financial analysis" of sample size in this case because he "didn't have time").

[18] Even if the samples from both studies are considered in the aggregate, which they should not be (*see Freddie Mac*, 281 F.R.D. at 180 (where expert presents "two different methodologies . . . it is not appropriate simply to add the results of his two event studies")), the combined sample of 40 days is still too small to reliably opine on efficiency using the same analysis Finnerty applied in prior case (*see* Gompers II ¶ 86).

opinion regarding efficiency on each day of the five-year Class Period.[19]

Indeed, Finnerty I provides no evidence of market efficiency, but instead points only to the inefficiency of the Barclays ADS market.  Finnerty testified that an economist could not conclude that a market was efficient without supporting data that is statistically significant at the 5% or greater level (*i.e.*, a 95% or higher confidence level) (Finnerty Dep. 158:16-159:7), and that the market should react as the economist would expect more than 50% of the time (*id.* at 271:8-20).  Yet, on **not one** of the days with "economically significant" news examined in Finnerty I did the market react in a statistically significant manner.  (Gompers II ¶ 30.)  Finnerty II found statistically significant price movements on just five of his fifteen "earnings surprise" days, one of which reflects a price movement in the direction opposite of the "earnings surprise." (Gompers II, Ex. 1.)

Moreover, Finnerty acknowledged that "[o]ne needs to look at each of the sub-periods" within the Class Period separately to find the market efficient during those periods,[20] which, by Finnerty's own standards, means that a preponderance of the days tested should reflect a cause-and-effect relationship.  Yet, of the **four** "earnings surprise" dates in Finnerty II that fall within Finnerty's first two sub-periods between July 2007 and February 2009 — **the period during which all of the alleged misstatements were made** — Finnerty finds just **one** day with a significant return.  ( Finnerty II Ex. 5.)  Plainly, Finnerty's analyses showing a price reaction to

---

[19] *Cf. Deutsche Bank AG*, 2013 WL 5815472, at *21 ("analysis of market efficiency was based on an inadequate foundation of 12 trading days out of 515 [**2.3%** of such days]—during a time in which a 'sheer enormity' of information regarding DB was released into the market."); *In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 269-70 (D. Mass. 2006) ("analysis [came] nowhere close" where expert "self selected" five event days out of 160 trading days).

[20] Finnerty Dep. 271:8-20.  Courts have held that efficiency must be shown throughout the *entire* class period, particularly where systemic market dislocations occur during relevant intervals. *Deutsche Bank AG*, 2013 WL 5815472, at *20-21; *In re Northfield Labs.*, 267 F.R.D. at 549.

new news only 25% of the time cannot support a conclusion of efficiency.[21]  His opinion is inadmissible because there is "simply too great an analytical gap between the data and the opinion proffered."  *Gen. Elec. Co.* v. *Joiner*, 522 U.S. 136, 146 (1997).

Finally, Finnerty's own analyses show significant impediments to efficiency during the height of the financial crisis, including a ban on short selling (and higher borrowing costs impeding short selling even where not banned), as well as objective evidence of a breakdown in market efficiency over this critical period, such as put-call parity violations, widening spreads, and pricing anomalies.  (Gompers I ¶¶ 57-78.)  Finnerty does not dispute that this evidence signals potential inefficiencies, he simply dismisses it because it coincided with the financial crisis.[22]  This is backwards.  An expert must address the conflicting evidence, and Finnerty has no explanation for the apparent inefficiencies in the market for Barclays' ADS during the height of the financial crisis.  *See Deutsche Bank AG*, 2013 WL 5815472, at *14 (expert "fail[ed] to tackle plainly important considerations," including the fact that "the financial crisis was ongoing" and that "there were short sale bans in both the U.S. and in Germany").

## CONCLUSION

For these reasons, Defendants respectfully request that Finnerty's opinions be excluded in accordance with FRE 702 and *Daubert*.

---

[21] *See George*, 2013 WL 3357170, at *12 ("showing that only seven out of sixteen days resulted in a market reaction is . . . insufficient"); *Freddie Mac*, 281 F.R.D. at 180-8 1 ("showing that the market reacted to news 28% of the time is insufficient.").

[22] Finnerty II ¶ 102 ("I have seen no evidence indicating that the market for Barclays ADS was dislocated ***outside of violations of put-call parity for a very limited time over the Class Period*** (at most four months out of 60)." (emphasis added)).  In fact, out of six purported news days in Finnerty's event studies occurring between the first day of the Class Period, July 10, 2007, and January 31, 2009, Finnerty's results show that there was a *lack* of a statistically significant reaction on five of those six days (or 83% of the time): two news days with *zero* statistically significant reactions from the random sample study, and four news days with *one* statistically significant reaction from the "earnings surprise" study. Finnerty I Exs. 10, 13; Finnerty II Ex. 5.

Dated: June 24, 2015
       New York, New York


Respectfully submitted,

BOIES, SCHILLER & FLEXNER LLP          SULLIVAN & CROMWELL LLP

/s/ Jonathan D. Schiller                /s/ Jeffrey T. Scott
Jonathan D. Schiller (jschiller@bsfllp.com)   David H. Braff (braffd@sullcrom.com)
Amos E. Friedland (afriedland@bsfllp.com)    Jeffrey T. Scott (scottj@sullcrom.com)
575 Lexington Avenue                    Brian T. Frawley (frawleyb@sullcrom.com)
New York, NY 10022                      Matthew J. Porpora (porporam@sullcrom.com)
(212) 446-2300                          Stephen H. O. Clarke (clarkest@sullcrom.com)
                                        125 Broad Street
Michael Brille (mbrille@bsfllp.com)     New York, NY  10004
Thomas Keenan (tkeenan@bsfllp.com)      (212) 558-4000
5301 Wisconsin Ave. NW
(202) 237-2727

William Todd Thomas (tthomas@bsfllp.com)
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
(954) 356-0011

Karen Paik (kpaik@bsfllp.com)
401 Wilshire Blvd., Suite 850
Santa Monica, CA 90401
(310) 752-2400

*Attorneys for Defendants Barclays PLC, Barclays Bank PLC, Barclays Capital Inc., Marcus A.P. Agius, and John S. Varley*


DECHERT LLP
Andrew J. Levander
Jeffrey A. Brown
Amanda Rios
1095 Avenue of the Americas
New York, NY  10036
(212) 698-3500

*Attorneys for Defendant Robert E. Diamond, Jr*