UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

CARPENTERS PENSION TRUST FUND OF :    Civil Action No. 1:12-cv-05329-SAS
ST. LOUIS, et al., Individually and on Behalf :
of All Others Similarly Situated,    :    CLASS ACTION
                                         :
                  Plaintiffs, :    REPLY MEMORANDUM OF LAW IN
                                         :    SUPPORT OF PLAINTIFFS' MOTION FOR
      vs.                                       :    CLASS CERTIFICATION, APPOINTMENT
                                         :    OF CLASS REPRESENTATIVES AND
BARCLAYS PLC, et al.,                    :    APPOINTMENT OF CLASS COUNSEL
                                         :
                  Defendants. : 
                                         :

———————————————————— x

## TABLE OF CONTENTS

Page

I.  INTRODUCTION ...........................................................................................1

II. PLAINTIFFS CAN RELY ON THE *BASIC* PRESUMPTION ..........................................2

    A. Defendants Concede that Dr. Finnerty Has Established Most of the Commonly Accepted Indicators of Market Efficiency ...........................................3

    B. The Finnerty II Event Study Conclusively Establishes Market Efficiency ............3

        1. Dr. Gompers' Criticisms of the Finnerty II Event Study Are Unfounded, Baseless and Contradictory ....................................................5

        2. The Minor Differences Between the Finnerty I and II Event Studies Do Not Abrogate the Conclusions of the Finnerty II Event Study .....................................................................................7

        3. *Krogman* Factor Two Is Met and Defendants' Supposed Indicia of Market Inefficiency Are Not Compelling .....................................................8

    C. Defendants Have Failed to Meet Their Burden of Proving the Lack of Any Price Impact Necessary to Rebut the Presumption of Reliance.............................9

III. DEFENDANTS CANNOT REBUT THE *AFFILIATED UTE* PRESUMPTION ...........12

IV. DEFENDANTS' *COMCAST* ARGUMENTS ARE MISPLACED .................................13

    A. Class-Wide Proof of Damages Is Not Required to Show Predominance ..............14

    B. Although Not Required, Plaintiffs Have Submitted Sufficient Evidence to Show Common Damages Issues Will Predominate Under Rule 23(b)(3)............15

V.  CONCLUSION.................................................................................................15

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Affiliated Ute Citizens v. United States*,
    406 U.S. 128 (1972) ............................................................................2, 12, 13, 14

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) .................................................................................. *passim*

*Billhofer v. Flamel Techs, S.A.*,
    281 F.R.D. 150 (S.D.N.Y. 2012) ..............................................................................8

*Brown v. China Integrated Energy Inc.*,
    2014 U.S. Dist. LEXIS 117764
    (C.D. Cal. Aug. 4, 2014) ............................................................................................8

*Cammer v. Bloom*,
    711 F. Supp. 1264 (D.N.J. 1989) ................................................................1, 3, 5, 8

*Comcast Corp. v. Behrend*,
    133 S. Ct. 1426 (2013) ......................................................................................14, 15

*Dodona I, LLC v. Goldman, Sachs & Co.*,
    296 F.R.D. 261 (S.D.N.Y. 2014) .....................................................................13, 14

*Fogarazzo v. Lehman Bros.*,
    232 F.R.D. 176 (S.D.N.Y. 2005) .....................................................................12, 13

*Fogarazzo v. Lehman Bros.*,
    263 F.R.D. 90 (S.D.N.Y. 2009) ..............................................................................12

*George v. China Auto Sys., Inc.*,
    2013 WL 3357170
    (S.D.NY. July 3, 2013) ..............................................................................................6

*Goodman v. Genworth Fin. Wealth Mgmt., Inc.*,
    300 F.R.D. 90 (E.D.N.Y. 2014) ..............................................................................12

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    134 S. Ct. 2398 (2014) ............................................................................... *passim*

*IBEW Local 90 Pension Fund v. Deutsche Bank AG*,
    2013 WL 5815472
    (S.D.N.Y. Oct. 29, 2013) .................................................................................4, 5, 6

Page

*In re Alstom SA Sec. Litig.*,
253 F.R.D. 266 (S.D.N.Y. 2008) ..................................................................8

*In re Am. Int'l Group, Inc. Sec. Litig.*,
265 F.R.D. 157 (S.D.N.Y. 2010) ..................................................................5

*In re Amaranth Natural Gas Commodities Litig.*,
269 F.R.D. 366 (S.D.N.Y. 2010) ..................................................................8

*In re BP PLC Sec. Litig.*,
2013 WL 6388408
(S.D. Tex. Dec. 6, 2013) .............................................................................14

*In re BP PLC Sec. Litig.*,
2014 U.S. Dist. LEXIS 69900
(S.D. Tex. May 20, 2014) ............................................................................15

*In re Deepwater Horizon*,
739 F.3d 790 (5th Cir. 2014) ................................................................14, 15

*In re Dynex Capital Sec. Litig.*,
2011 WL 781215
(S.D.N.Y. Mar. 7, 2011) .........................................................................12, 13

*In re Fed. Home Loan Mortg. Corp. Secs*,
281 F.R.D. 174 (S.D.N.Y. 2012) ..............................................................6, 8

*In re Groupon, Inc. Sec. Litig.*,
2014 WL 5245387
(N.D. Ill. Sept. 23, 2014) ............................................................................14

*In re Groupon Inc. Sec. Litig.*,
2015 WL 1043321
(N.D. Ill. Mar. 5, 2015) ......................................................................... *passim*

*In re Moody's Corp. Sec. Litig.*,
274 F.R.D. 480 (S.D.N.Y. 2011) ..............................................................12

*In re Omnicom Grp., Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010)......................................................................11

*In re Sadia, S.A. Sec. Litig.*,
269 F.R.D. 298 (S.D.N.Y. 2010) ................................................................9

- iii -

Page

*In re Smith Barney Transfer Agent Litig.*,
  290 F.R.D. 42 (S.D.N.Y. 2013) ........................................................................12, 13

*In re State Street Bank & Trust Co. Fixed Income Funds Inv. Litig.*,
  774 F. Supp. 2d 584 (S.D.N.Y. 2011)..............................................................11, 12

*In re Vivendi Universal, S.A. Sec. Litig.*,
  765 F. Supp. 2d 512 (S.D.N.Y. 2011)......................................................................10

*Jones v. Pfizer, Inc.*,
  C.A. No. 10-cv-03864 (S.D.N.Y. Mar. 29, 2012) ....................................................9

*Krogman v. Sterritt*,
  202 F.R.D. 467 (N.D. Tex. 2001) .....................................................................1, 3, 8

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005)....................................................................................11

*Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*,
  2014 WL 6661918
  (N.D. Ala. Nov. 19, 2014) ..................................................................................9, 11

*Lumen v. Anderson*,
  280 F.R.D. 451 (W.D. Mo. 2012).............................................................................1

*McIntire v. China MediaExpress Holdings, Inc.*,
  38 F. Supp. 3d 415 (S.D.N.Y. 2014).............................................................3, 5, 10

*Roach v. T.L. Cannon Corp.*,
  778 F.3d 401 (2d Cir. 2015)....................................................................................14

*Sicav v. Jun Wang*,
  2015 WL 268855
  (S.D.N.Y. Jan. 21, 2015).........................................................................................11

*Smilovits v. First Solar, Inc.*,
  295 F.R.D. 423 (D. Ariz. 2013) ................................................................................6

*Sykes v. Mel S. Harris & Assocs. LLC*,
  780 F.3d 70 (2d Cir. 2015)......................................................................................14

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
  546 F.3d 196 (2d Cir. 2008)......................................................................................4

**Page**

*Turnbow v. Life Partners, Inc.*,
    2013 WL 3479884
    (N.D. Tex. July 9, 2013) ........................................................................................14

*Vaccarino v. Midland Nat'l Life Ins. Co.*,
    2013 WL 3200500
    (C.D. Cal. June 17, 2013) ....................................................................................14

**STATUTES, RULES AND REGULATIONS**

Federal Rules of Civil Procedure
    Rule 23 .................................................................................................................2, 11
    Rule 23(b)(3) .................................................................................................13, 14, 15

## I.    INTRODUCTION

Defendants[1] do not oppose the appointment of Lead Plaintiffs as Class Representatives, or the appointment of Lead Counsel as Class Counsel.  Nor do Defendants contest superiority.

Instead, Defendants ask the Court to make an incredible finding: that the market for Barclays' ADSs – which trade on the NYSE and are equity securities for one of the most closely watched, actively-traded financial institutions in the world – was not efficient during the Class Period.  Defendants challenge market efficiency in spite of Dr. Finnerty's thorough and rigorous conclusions that Barclays' ADSs traded in an efficient market during the Class Period and that the other *Cammer* and *Krogman* factors are met.

Defendants raise a host of baseless and contradictory arguments opposing the Motion, frequently mischaracterizing Dr. Finnerty's reports and testimony.  Chief among them is that the Finnerty I and II event studies are irreconcilable.  Defendants ignore, however, that the Finnerty I and II event studies agree over 95% of the time; that conducting two event studies is routinely accepted by the academic literature and the courts; and that event studies employing different methodologies will necessarily have slightly different results.  Regardless, Dr. Finnerty primarily rests his *Cammer* Factor Five conclusion on the Finnerty II event study.

Defendants and their expert, Dr. Gompers, do not support their criticisms with an event study or opinion on market efficiency,[2] but instead quibble with Dr. Finnerty's approach – an approach that adopted many of the methods that Dr. Gompers advocated in the Gompers I report and has used

---

[1]  Capitalized terms not otherwise defined have the same meanings ascribed to them in Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Class Certification ("Pltf. Mem.") (Dkt. No. 135) and in the "Table of Abbreviations and Defined Terms" from Defendants' Memorandum of Law In Opposition to Plaintiffs' Motion for Class Certification ("Def. Opp.").  *See* Dkt. No. 152. All citations are omitted and all emphasis is added unless otherwise noted.

[2]  Dr. Gompers has frequently been rebuked by courts when opposing the market efficiency conclusions of other experts.  *See, e.g., In re Groupon Inc. Sec. Litig.*, 2015 WL 1043321, at *11 (N.D. Ill. Mar. 5, 2015) (criticizing Dr. Gompers' opinions); *Lumen v. Anderson*, 280 F.R.D. 451, 461 (W.D. Mo. 2012) (declining to adopt Dr. Gompers' criticisms).

in his previous expert work.  Although Defendants raise a laundry list of challenges, they do not – because they cannot – attack Dr. Finnerty's ultimate conclusion: the Finnerty II event study exhibited statistically significant price reactions on numerous days, evidencing an efficient market.

Plaintiffs are also entitled to a presumption of reliance under *Affiliated Ute*, and Defendants do not meaningfully contest that Plaintiffs' claims are omissions.  Lastly, Defendants raise loss causation (guised as price impact) and damages arguments that are inappropriate for resolution on a Rule 23 motion.  Because Plaintiffs have met their burden of establishing reliance pursuant to both *Basic* and *Affiliated Ute*, and Defendants' arguments lack merit, the Motion should be granted.[3]

## II.   PLAINTIFFS CAN RELY ON THE *BASIC* PRESUMPTION

The Supreme Court in *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014) ("*Halliburton II*") explained that market efficiency has a unique legal meaning in the FOTM context, reaffirmed the holding in *Basic*, and stated that its ruling was based on "***the fairly modest premise that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'***"  *Id.* at 2410 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 247 n.24 (1988)).  "'That the . . . price [of a stock] may be inaccurate does not detract from the fact that false statements affect it, and cause loss,' which is 'all that *Basic* requires.'"  *Id.*

Here, to test efficiency, Dr. Finnerty conducted an event study in the Finnerty II report that included fifteen event days.  *See* Pltf. Mem. at 22-23.[4]  These event days were selected using a methodology championed by Dr. Gompers in the Gompers I report and in his expert testimony in

---

[3]  Defendants mischaracterize the claims in this case as "simply [alleging] that Defendants misrepresented Barclays' borrowing costs between 2007 and 2009."  Def. Opp. at 18.  This is untrue. As explained in Plaintiffs' opening brief, Plaintiffs' claims include, among other things, that false LIBOR submissions were made and that Barclays' senior management participated in a scheme to artificially manipulate LIBOR.  *See* Pltf. Mem. at 3-4.

[4]  Dr. Gompers agrees that event studies assume market efficiency.  Gompers Dep. at 195:5-18. "Gompers Dep." refers to the depositions of Dr. Gompers, dated March 25, 2015 and June 18, 2015. Cited pages from Dr. Gompers' June 15 deposition transcript are annexed as Exhibit A to the Declaration of David A. Rosenfeld in Further Support of Plaintiffs' Motion for Class Certification, dated June 26, 2015 ("Rosenfeld Decl.").

previous cases. *See* Gompers I at ¶¶35-36; Finnerty II at ¶¶18-23; Gompers Dep. at 79:2-80:25; 123:16-124:20. Five event days exhibited abnormal returns statistically significant at the 5% confidence level,[5] with two days also being significant at the 1% confidence level, and on each event day Barclays' ADS price moved in the direction predicted by Dr. Finnerty. Finnerty II at ¶23. As such, Plaintiffs have met their burden to show market efficiency.

### A.   Defendants Concede that Dr. Finnerty Has Established Most of the Commonly Accepted Indicators of Market Efficiency

Dr. Gompers agrees with (or does not dispute) Dr. Finnerty's conclusions that:

- the NYSE (where Barclays' ADSs traded during the Class Period (Finnerty I at ¶13)) is a well-developed exchange where most companies' stocks trade efficiently most of the time (Gompers Dep. at 28:2-12);
- *Cammer* Factor One: Barclays' ADSs traded with heavy volume throughout the Class Period (Gompers Dep. at 60:18-61:3; 204:22-205:6);
- *Cammer* Factor Two: Barclays was followed by numerous analysts during the Class Period (Gompers Dep. at 67:14-19; 204:22-205:6);
- *Cammer* Factor Three: between 55% and 97% of Barclays' ADSs were held during the Class Period by institutional investors, and there were 51 active market makers for Barclays' ADSs with very high trading volumes (Gompers Dep. at 68:24-69:15; 204:22-205:6);
- *Cammer* Factor Four: Barclays was eligible to file a Form S-3 throughout the Class Period (Gompers Dep. at 69:23-70:5; 204:22-205:6);
- *Krogman* Factor One: Barclays' ADSs market capitalization was approximately 20 times as large as the $75 million minimum for NYSE listing (Gompers Dep. at 71:12-25); and
- *Krogman* Factor Three: the public float percentage of Barclays' ADSs was approximately 100% during the Class Period (Gompers Dep. at 72:2-24; 205:7-17).

*See McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 431 (S.D.N.Y. 2014) ("[A]fter evaluating the *Cammer* factors and the *Krogman* factors, the Court is persuaded that Plaintiffs have presented sufficient evidence to show that CCME traded in an efficient market."); *Groupon*, 2015 WL 1043321, at *3 (noting that Dr. Gompers agrees that "experts employ a *Cammer* factor analysis to assess market efficiency for purposes of securities litigation").

### B.   The Finnerty II Event Study Conclusively Establishes Market Efficiency

The event study in the Finnerty II report serves as the primary basis for Dr. Finnerty's market

---

[5]   In other words, there is less than a 5% likelihood that the price drops occurred by mere chance.

efficiency conclusion.[6]  The Finnerty II event study utilized the following methodology: (i) using "pre-selected objective criteria . . . before searching for dates" (*Groupon*, 2015 WL 1043321, at *5)[7] – Dr. Finnerty determined prior to selecting any dates that he would select ***every*** earnings release date during the Class Period where the results surprised the market (Finnerty II at ¶19; Finnerty Dep. at 290:22-291:15); (ii) comparing "consensus pre-announcement estimates to the reported earnings" to select earnings surprise dates (*Groupon*, 2015 WL 1043321, at *6) – Dr. Finnerty used analyst estimates in order to "quantify a measure of earnings surprise relative to market expectations" (Finnerty II at ¶¶20-21; Finnerty Dep. at 308:18-309:14); and (iii) predicting whether the impact of the earnings surprise will have a positive or negative impact, observing the actual impact, and testing its statistical significance (*IBEW Local 90 Pension Fund v. Deutsche Bank AG*, 2013 WL 5815472, at *21 (S.D.N.Y. Oct. 29, 2013))[8] – Dr. Finnerty adopted an objective approach to determine earnings surprise predictions by reviewing "the mix of information released into the market for Barclays ADS to assess . . . news items and . . . [evaluate] the overall direction of sentiment based on the collective body of news about Barclays released that day." Finnerty II at ¶¶20-21; Finnerty Dep. at 368:24-371:4; 396:17-23.[9]

---

[6]  The Second Circuit holds that "an event study that correlates the disclosures of unanticipated, material information about a security with corresponding fluctuations in price has been considered prima facie evidence of the existence" of market efficiency. *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 207 (2d Cir. 2008).

[7]  "[E]arnings-surprise dates are commonly used by experts conducting event studies." *Groupon*, 2015 WL 1043321, at *5.

[8]  The *Deutsche Bank* court excluded plaintiffs' expert primarily due to serious concerns with plaintiffs' expert's lack of relevant qualifications, *i.e.*, that he did not have a graduate degree, teaching experience, or any published materials. 2013 WL 5815472, at *2, *13-*15.  Dr. Finnerty stands in stark contrast – as set forth in the Finnerty I report, Dr. Finnerty has a Ph.D., is a tenured Professor of Finance at Fordham University's Graduate School of Business Administration, and has published 15 books and over 100 articles and papers, among his many other qualifications and relevant experience.  *See* Finnerty I at ¶¶3-7. Defendants do not contest Dr. Finnerty's qualifications.

[9]  The *Deutsche Bank* court also criticized plaintiffs' expert because he failed in his event study to make objective predictions of the earnings impact.  *See* 2013 WL 5815472, at *21.  Here, Dr. Finnerty adopted an objective methodology for making his predictions (Finnerty II at ¶¶20-21), and

Because the Finnerty II event study finds statistically significant price reactions on five event days, and all fifteen event days exhibited the expected directional movements,[10]  Plaintiffs have proffered sufficient evidence to satisfy *Cammer* Factor Five.  *See McIntire*, 38 F. Supp. 3d at 433 (finding efficiency with statistically significant price reactions on 11 out of 26 event days).

### 1.    Dr. Gompers' Criticisms of the Finnerty II Event Study Are Unfounded, Baseless and Contradictory

Defendants and Dr. Gompers attack the Finnerty II event study with a host of minor criticisms[11] that are most notable for what they do not contest – that the Finnerty II event study shows that public material information about Barclays affected its ADS prices, "which is 'all that *Basic* requires.'"  *Halliburton II*, 134 S. Ct. at 2410.  None of their critiques hold water:

- Defendants claim that Dr. Finnerty subjectively selected event days, but ignore that Dr. Finnerty adopted the very selection process outlined in the Gompers I report (Gompers I at ¶¶35-36) and used by Dr. Gompers in his previous expert work.  Gompers Dep. at 79:2-80:25; 124:8-20.[12]
- While Defendants criticize the Finnerty II event study regression model for adopting the breakpoint sub-periods used by Dr. Gompers in the Goldman Sachs matter, Dr. Gompers

---

Dr. Gompers testified he has previously conducted event studies constructed nearly identical to the one in the Finnerty II report.  *See* Gompers Dep. at 215:17-216:23.

[10]  Dr. Gompers agrees that "the size of the surprise should affect the size of the stock price movement" (Gompers Dep. at 226:15-21) and that a minimal earnings surprise would not cause a statistically significant stock price reaction.  *See id.* at 220:23-222:5; 223:23-224:17; 231:16-232:3; 234:5-12; 392:5-25.  Dr. Gompers therefore concedes that economic significance is a relevant consideration for an earnings surprise event study.

[11]  In *In re Am. Int'l Group, Inc. Sec. Litig.* ("*AIG*"), 265 F.R.D. 157, 187 (S.D.N.Y. 2010), Dr. Finnerty's event study was found to be reliable and the class was certified, but the court did not agree with one of Dr. Finnerty's conclusions because he based it on a result that was only statistically significant at the 10% confidence level. *Id.* at 183-87.  Here, the Finnerty II event study finds price reactions significant at the 5% confidence level or better (Finnerty II at ¶23), and, therefore, *AIG* has no bearing on Dr. Finnerty's opinions in this case.

[12]  *See Groupon*, 2015 WL 1043321, at *6 ("[I]n *Deutsche Bank*, the court excluded plaintiff's expert partly because the expert chose all of the defendant's earnings disclosure dates during the class period as event days, *regardless of whether the earnings results were unexpected*").  Here, Dr. Finnerty did the very analysis requested by Dr. Gompers in *Deutsche Bank*, and "include[d] only days for which there was a consensus earnings estimate (or a Bloomberg survey of analyst estimates)[.]"  Finnerty II at ¶20.  Unsurprisingly, Dr. Gompers conceded that a Bloomberg survey is an objective measure of analyst consensus.  Gompers Dep. at 229:21-230:2.

admits he selected those dates because they were the best ones to use (*id.* at 324:6-19), that the January 31, 2009 breakpoint that Gompers suggested in the Gompers I report is not the best day to use and is only relevant because of its relationship to Plaintiffs' allegations (*id.* at 327:24-329:4), and that he would not be surprised if Chow and Levene tests showed that the days adopted by Dr. Finnerty were acceptable. *Id.* at 335:10-336:18.[13]

• Defendants complain that the industry index used in the Finnerty II event study is inappropriate, but an index comprised of Barclays' self-selected peers is similar to those Dr. Gompers has previously used. *See id.* at 352:2-6. Moreover, Dr. Gompers agreed that selecting an industry index requires an expert's subjective judgment. *Id.* at 352:24-354:18.

• Defendants attack the sample size of event days used in the Finnerty II event study as being too low,[14] but ignore that Dr. Finnerty objectively selected ***every*** earnings surprise day in the Class Period, and therefore it would have been impossible to expand the sample size without violating his objective criteria. Finnerty Dep. at 289:20-291:15.[15]

• Defendants raise concerns with Dr. Finnerty's discussion of economic versus statistical significance, but ignore that Dr. Finnerty never testified that statistical significance is not a relevant consideration (*Id.* at 225:16-20), and that Dr. Gompers agrees economic significance is a relevant consideration in assessing earnings surprise event studies. Gompers Dep. at 226:15-21 (acknowledging that the economic impact of the price movement will correlate with the level of the surprise). In any event, Dr. Finnerty found statistically significant price reactions on five event days.[16]

---

[13] Defendants misstate Dr. Finnerty's testimony in arguing that he failed to find efficiency for each of the sub-periods in the Finnerty II event study. *See* Def. Opp. at 13-14. Dr. Finnerty clearly testified that "[t]he opinion as to market efficiency applies to the class period as a whole, and the use of the structural breakpoints is to simply assist in estimating the market model." Finnerty Dep. at 337:7-22; *see also id.* at 341:21-342:19. Because Defendants conflate using three sub-periods for the ***regression model*** with conducting three separate event studies for each sub-period, Defendants' argument that each sub-period requires an independent showing of market efficiency is unavailing.

[14] Defendants also attack the sample size used in the Finnerty I event study. *See* Def. Opp. at 7. Dr. Finnerty, however, testified that a sample size of 25 days was appropriate and that he could have expanded the sample size had it been necessary. Finnerty Dep. at 169:18-170:7; 173:5-12.

[15] Of course, had Dr. Finnerty done this, Defendants would have lobbied that very accusation. Courts, however, routinely hold that selecting all earnings surprise days across a given period is an appropriate event study methodology, even if the resulting sample size is low. *See Groupon*, 2015 WL 1043321, at *4 (finding market efficiency even though "only two dates met [the expert's] objective criteria"); *Smilovits v. First Solar, Inc.*, 295 F.R.D. 423, 435-36 (D. Ariz. 2013) (adopting event study which used as news days all 16 earnings release dates in the almost four year class period). Defendants' cases are not relevant because they all involved event studies with different news selection criteria. *See George v. China Auto Sys., Inc.*, 2013 WL 3357170, at *11 (S.D.N.Y. July 3, 2013) (event days were days with analyst rating changes or earnings guidance releases, not earnings surprises); *Deutsche Bank*, 2013 WL 5815472, at *2-*3 (event days were not earnings surprises); *In re Fed. Home Loan Mortg. Corp. Secs* ("*Freddie Mac*"), 281 F.R.D. 174, 179 (S.D.N.Y. 2012) (news days were not earnings surprises).

[16] In claiming that Dr. Finnerty characterized the LIBOR submissions as not economically significant news, Defendants again misstate his testimony. *See* Def. Opp. at 13. Dr. Finnerty clearly

Accordingly, Plaintiffs have established market efficiency.

      **2.**       **The Minor Differences Between the Finnerty I and II Event Studies Do Not Abrogate the Conclusions of the Finnerty II Event Study**

The Finnerty I event study was incomplete because it contained a mistake with respect to the statistical significance level for one event day. Finnerty Dep. at 181:14-182:14. Had Dr. Finnerty been aware of this mistake, he would have spent the time to expand the sample size in the Finnerty I event study.[17] *Id.* at 215:11-216:14. Because Dr. Finnerty did not recognize his mistake until his deposition (after submitting the Finnerty I report), he ran additional tests.[18]

Event studies can be conducted in many different ways. *See, e.g.*, A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. ECON. LIT. 13, 16-19 (Mar. 1997) (describing various appropriate event study approaches).[19] Unsurprisingly, because the event studies in Finnerty I and Finnerty II employ different methods (selection of event days, construction of regression model, and composition of industry index), their results are not 100% in sync. Even so, Dr. Gompers acknowledges that both the Finnerty I and II event studies agree over 95% of the time with respect to statistically significant price movements (Gompers Dep. at 364:19-24; 365:15-21), that conducting two event studies and concluding from the combined findings that there is market efficiency (known

---

testified that the LIBOR submissions omitted material information, meaning that the market had no reason to believe that the submissions were false. Finnerty Dep. at 306:17-307:15.

[17] While Defendants make much of Dr. Finnerty's testimony that he "didn't have time" for the Finnerty I event study (*see* Letter Requesting Pre-Motion Conference, dated Apr. 21, 2015, at 2 (Dkt. No. 142)), that remark was in reference to the size of the event day sample for the Finnerty I event study – ***not*** for lacking time to complete the analyses in the Finnerty I event study. *See* Finnerty Dep. at 172:22-173:4. To be clear, Dr. Finnerty never testified that there was any deficiency with the sample size for the Finnerty I event study; it was just his explanation as to why he applied an approach that differed from what he used in the Goldman Sachs matter. *Id.* Because the Finnerty II event study used different criteria for selecting event days and adopted all of the available event days, Defendants' criticism is moot.

[18] Defendants again mischaracterize Dr. Finnerty's testimony and postulate that "he defiantly argues that the changes he adopts [between the two reports] were neither necessary nor appropriate." *See* Def. Opp. at 11. In reality, Dr. Finnerty agrees that certain of Dr. Gompers' criticisms were "reasonable," which is why he used them. Finnerty Dep. at 272:19-22; 275:9-18; 285:22-286:4.

[19] Attached as Exhibit B to the Rosenfeld Decl.

as a "robustness check") is well accepted in academic literature (*id.* at 200:8-201:5), and that Dr. Gompers himself has utilized two differing event studies in his previous work. *Id.* at 341:20-343:14; 381:23-382:17.[20]  Regardless, Dr. Finnerty is principally relying upon the Finnerty II event study for his *Cammer* Factor Five conclusion.  *See* Finnerty Dep. at 223:18-224:21.  Thus, the minor differences between the Finnerty I and Finnerty II event studies are not relevant.[21]

### 3. *Krogman* Factor Two Is Met and Defendants' Supposed Indicia of Market Inefficiency Are Not Compelling

Defendants incorrectly argue that Dr. Finnerty ignores evidence of market inefficiency.  *See* Def. Opp. at 14-15.  For example, Defendants' claim that Dr. Finnerty's bid-ask spread analysis for *Krogman* Factor Two indicates market inefficiency is belied by Dr. Finnerty's conclusion in the Finnerty II report that the "average bid-ask spread is nonetheless nominal throughout the entire Class Period."  Finnerty II at ¶103.[22]  Likewise, with respect to the short sale ban, Dr. Finnerty found that

---

[20] *See also In re Amaranth Natural Gas Commodities Litig.*, 269 F.R.D. 366, 383-84 (S.D.N.Y. 2010) (Scheindlin, J.) (certifying class in reliance on expert who proposed two event studies to evaluate the impact of certain trading on futures prices); *Groupon*, 2015 WL 1043321, at *10-*11 (noting that expert opinions have been accepted when based upon two event studies).  Dr. Finnerty's reports are not analogous to the expert report in *Brown v. China Integrated Energy Inc.*, 2014 U.S. Dist. LEXIS 117764 (C.D. Cal. Aug. 4, 2014), where, unlike here, plaintiff's expert did not define a "protocol for identifying what qualifies as an event" and "never indicates what criteria he used to identify event days. *Id.* at *21-*22.  Nor can Dr. Finnerty be compared to the expert in *Freddie Mac*, who made critical errors that he never corrected and whose findings were unsupported by his tests. *See* 281 F.R.D. at 180, 182.

[21] Defendants argue incorrectly that the Finnerty I event study does not produce "reliable evidence" of efficiency.  *See* Def. Opp. at 9 & n.10.  On the contrary, the Finnerty I event study provides compelling evidence of market efficiency because none of the non-news days had statistically significant price reactions (*see* Finnerty I at Ex. 13), which is consistent with an efficient market. *See Billhofer v. Flamel Techs, S.A.*, 281 F.R.D. 150, 162 (S.D.N.Y. 2012) ("Flamel's stock price did not change by a statistically meaningful amount that would be expected on an overall basis on non-event dates during the Class Period."); *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008) (finding market efficiency where "Alstom was over 6 times more likely to have a statistically significant stock return on a day with news than on a day with no news.").  That Dr. Finnerty concluded in the Finnerty II report that October 3, 2008, one of the two news days from the Finnerty I event study, should have been originally classified as a non-news day is consistent with Dr. Finnerty's finding that this date lacked a 5% level statistically significant price reaction.

[22] Dr. Gompers fails to address *Krogman* Factor Two or bid-ask spreads in the Gompers II report.

any "dislocation created by the short sale ban[] would have had a short-lived effect" (*Id.* at ¶104) and Dr. Gompers agreed that market efficiency can exist even during a short sale ban.  Gompers Dep. at 126:11-18; 206:14-207:18.[23]  For the same reasons, Defendants' argument concerning Dr. Finnerty's put-call parity analysis also fails.  *See* Finnerty II at ¶¶103-04; Finnerty Dep. at 451:22-452:14; 453:15-24.  Thus, there is no compelling evidence of market inefficiency.

## C.    Defendants Have Failed to Meet Their Burden of Proving the Lack of Any Price Impact Necessary to Rebut the Presumption of Reliance

*Halliburton II* requires Defendants to prove that the "asserted misrepresentation (or its correction) ***did not*** affect the market price of [Barclays' ADSs]" in order to rebut the *Basic* presumption of reliance.  134 S. Ct. at 2414.  Defendants must do this using ***direct evidence*** of a ***lack*** of any price impact.  *See* Pltf. Mem. at 14-15.

Here, Defendants and Dr. Gompers cannot prove a total lack of price impact.  Failing to offer any affirmative or direct evidence of lack of price impact, as is their burden, Defendants instead misstate Dr. Finnerty's reports and testimony in an effort to cobble together a price impact challenge.[24]  *See* Def. Opp. at 15-20.  This argument is misplaced.  Crucially, unless and until Defendants meet ***their*** burden of establishing price impact – which they have not – Plaintiffs have no burden to show price impact.  *Halliburton II*, 134 S. Ct. at 2417; *see also Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 2014 WL 6661918, at *8 (N.D. Ala.

---

[23]   In fact, numerous courts, including this Court, have certified classes that span the recent financial crisis.  *See, e.g.*, *In re Sadia, S.A. Sec. Litig.*, 269 F.R.D. 298 (S.D.N.Y. 2010) (Scheindlin, J.) (certifying a class with a class period from April 30, 2008 to September 26, 2008); *Jones v. Pfizer, Inc.*, C.A. No. 10-cv-03864 (S.D.N.Y. Mar. 29, 2012) (ORDER) (certifying class spanning from January 19, 2006 to January 23, 2009, despite defendant's arguments that the financial crisis impacted the efficiency of the market during the class period).  *See* Exhibits C (at *1) and D (at *25-*26) to the Rosenfeld Decl.

[24]   Defendants cite Dr. Gompers only once in contesting price impact.  *See* Def. Opp. at 20.  Instead, Defendants rely on, and mischaracterize yet again, Dr. Finnerty's testimony.  *See, e.g.*, Def. Opp. at 16 & n.21.  Significantly, Dr. Finnerty never testified that "he tried but was unable to identify any inflation associated with LIBOR submissions[,]" and for good reason – proving lack of price impact is Defendants' burden, not Dr. Finnerty's, and Dr. Finnerty had no reason to assess inflation because he was not tasked with evaluating loss causation in his reports.

Nov. 19, 2014) (for purposes of price impact, "nothing in *Halliburton II* requires the plaintiffs to produce an event study in opposition to defendants' event study on a class certification motion"). Moreover, while Defendants challenge price impact, they do not submit an event study, nor do either of Dr. Gompers' reports directly address price impact.[25]

Defendants make two arguments. First, Defendants claim that because Dr. Finnerty found no statistically significant price movements on a few of the known dates where false LIBOR submissions were made (although the Complaint mentions hundreds of other instances which will be uncovered in discovery (*see, e.g.*, Complaint ¶51)), there is no price impact.[26] This argument fails because Defendants ignore that a "material misstatement can impact a stock's value either by improperly causing the value to increase ***or by improperly maintaining the existing stock price.***" *McIntire*, 38 F. Supp. 3d at 434; *see also In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 561 (S.D.N.Y. 2011) ("[M]isstatement may cause inflation simply by maintaining existing market expectations[.]"); Pltf. Mem. at 16. Here, Dr. Finnerty testified that Barclays' LIBOR submissions were material omissions that maintained inflation in Barclays' ADSs. *See* Finnerty Dep. at 128:9-18; 193:22-194:2; 487:14-488:3.[27] Accordingly, Defendants have simply explained

---

[25] Dr. Gompers admits he has no opinion on price impact or loss causation. Gompers Dep. at 263:3-4; 263:14-15. In addition, Dr. Gompers' failure to submit an event study for price impact runs directly counter to the understanding of Cornerstone Research, his research firm, who acknowledges that, after *Halliburton II*, event studies are "key tools for defendants seeking to establish prior to class certification that an alleged misrepresentation did *not* impact price." *See* Exhibit E to the Rosenfeld Decl., at *1 (emphasis in original); *id.* at *2 (event studies should also be used to assess price impact for omissions); *see also* Gompers Dep. at 53:5-54:17.

[26] Defendants misstate Dr. Finnerty's findings by asserting that he found no statistically significant price movement on October 31, 2008, when Diamond made the conference call remarks. *See* Def. Opp. at 16-17. As shown in both the Finnerty I and Finnerty II reports, the price movement in Barclays' ADSs on October 31, 2008 – when Barclays announced a $7 billion capital raise – was statistically significant at the 1% confidence level. *See* Finnerty I at Ex. 10; Finnerty II at Ex. 4.

[27] Defendants fail to cite the entirety of Dr. Finnerty's testimony on this point. *See* Finnerty Dep. at 458:21-459:10 ("What I also testified about this morning is that there was never any announcement by Barclays that it was submitting false LIBOR rates, in fact, quite the contrary. Mr. Diamond announced on an earnings conference call that, in fact, Barclays was reporting its LIBOR submissions accurately. There was no way that an outside investor would know, even if he or she

Plaintiffs' price maintenance theory of inflation (*see* Pltf. Mem. at 15 & n.18), not proved a lack of price impact.

Second, Defendants contend that Dr. Finnerty's testimony concerning the corrective disclosure on June 27 and 28, 2012, is direct evidence of lack of price impact. This is not a price impact argument. Instead, Defendants make a loss causation argument that is inappropriate for resolution on a Rule 23 motion. *See Regions*, 2014 WL 6661918, at *8-*10 (rejecting price impact arguments as improper attempts to argue loss causation prior to the merits stage).

Moreover, Defendants ignore that the price decline on June 28 was statistically significant at the 1% confidence level (Finnerty I at ¶59), and Dr. Finnerty explained that a corrective disclosure which takes place over two days is consistent with market efficiency. *See* Finnerty I at ¶63; Finnerty II at ¶108; Finnerty Dep. at 54:12-56:2; 56:23-57:20; 70:2-71:7; 73:11-74:8; 76:6-15; 478:2-20; *see also Sicav v. Jun Wang*, 2015 WL 268855, at *2 (S.D.N.Y. Jan. 21, 2015) ("In a typical securities fraud class action, plaintiffs allege that the market reacted negatively on a given day *or several-day period* to a corrective disclosure, causing a decline in stock value that simultaneously harmed all shareholder class members in the same way."); Gompers Dep. at 254:8-17 (agreeing that event studies often use an event window of two days, the day of the announcement and the day after); *id.* at 257:9-15 (agreeing that under both the Finnerty I and II event studies the price decline on June 28 was statistically significant at the 1% level).[28]

---

had the LIBOR submissions, would know that they were false . . . ."); *see also* Pltf. Mem. at 22 n.24.

[28] Defendants' argument about the June 28 price decline is a thinly-veiled attempt to inappropriately raise loss causation at the Rule 23 stage. *See* Def. Opp. at 19. In fact, each case relied upon by Defendants (including the first motion to dismiss opinion in this case) analyzed loss causation – *and not one mentions price impact*. *See In re State Street Bank & Trust Co. Fixed Income Funds Inv. Litig.*, 774 F. Supp. 2d 584, 589-90 (S.D.N.Y. 2011); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005); *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 510-12 (2d Cir. 2010). Further, the holding in *State Street* is inapplicable because that case concerned mutual funds, whose value, unlike an individual security, only fluctuates based on its underlying holdings, not announcements specific to the mutual fund. 774 F. Supp. 2d at 591.

At best, Defendants offer conflicting evidence[29] concerning the June 27 and 28 corrective disclosure – far short of their *Halliburton II* burden and insufficient to show a lack of price impact.

## III.   DEFENDANTS CANNOT REBUT THE *AFFILIATED UTE* PRESUMPTION

As set forth in Plaintiffs' opening brief, *Affiliated Ute* applies to Plaintiffs' omissions claims – which the Second Circuit already deemed to be material – providing an independent basis for a presumption of reliance. *See* Pltf. Mem. at 23-24.  Once the *Affiliated Ute* presumption applies, "'the burden shifts to the defendant to establish . . . that the plaintiff did not rely on the omission in making the investment decision.'" *Fogarazzo v. Lehman Bros.*, 263 F.R.D. 90, 100 (S.D.N.Y. 2009) (Scheindlin, J.) ("*Fogarazzo II*").

Defendants make no attempt to rebut the *Affiliated Ute* presumption.  Instead, Defendants claim that Plaintiffs have not pled omissions – but fail to explain how the LIBOR submissions or defendant Diamond's October 31, 2008 statements are not omissions.  *See* Def. Mem. at 20-21. Rather than carefully considering the nuances between misrepresentations and omissions,[30] Defendants baldly assert that all of Plaintiffs' claims are misrepresentations and ignore that omissions claims lie where "the heart of the alleged deception is rooted . . . in the fact that ***specific information*** . . . was withheld, and that information would have been important to a reasonable investor."[31] *In re Dynex Capital Sec. Litig.*, 2011 WL 781215, at *7 (S.D.N.Y. Mar. 7, 2011); *see also Fogarazzo v. Lehman Bros.*, 232 F.R.D. 176, 186 (S.D.N.Y. 2005) (Scheindlin, J.)

---

[29] Defendants improperly rely on *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480 (S.D.N.Y. 2011). In *Moody's*, unlike here, defendant's expert offered an event study to challenge price impact.  *Id.* at 492.  Relying on this report, the court held that "there is no period within the proposed class period . . . where a corrective disclosure caused a statistically significant decline in price."  *Id.* at 493. Because Dr. Gompers has not conducted an event study here, there is no similar basis for finding a lack of price impact for the June 27 and 28 disclosure.

[30] *See In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 47 (S.D.N.Y. 2013) (noting that "articulating [*Affiliated Ute*] is easier than applying it").

[31] The lone, non-Southern District case cited by Defendants does not hold differently.  *See Goodman v. Genworth Fin. Wealth Mgmt., Inc.*, 300 F.R.D. 90, 106 (E.D.N.Y. 2014) (distinguishing the facts in *Goodman* from those in *Fogarazzo II*, where, like here, the *Affiliated Ute* presumption applied because "the alleged failure to disclose 'made the [statements] themselves misleading.'").

("*Fogarazzo I*") (applying *Affiliated Ute* where "defendants omitted their own *quid pro quo* arrangements in addition to deliberately misrepresenting their opinions").  Even in cases involving misrepresentations, the applicability of *Affiliated Ute* "is not undermined simply because a defendant makes misstatements at the same time it omits material information."  *Fogarazzo I*, 232 F.R.D. at 185-87 (certifying class and finding that both the *Basic* and *Affiliated Ute* presumptions apply); *Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 270 (S.D.N.Y. 2014) ("the existence in Dodona's complaint of certain affirmative misrepresentations does not at this stage in the litigation preclude Dodona from relying on the *Affiliated Ute* presumption").

Here, the LIBOR submissions and Diamond's October 31, 2008 remarks are classic omission statements.  *See* Complaint ¶¶108-09, 171-73.  Each LIBOR submission was "truthful, as far as they go.  But what makes them misleading is what they do not say" (*Smith Barney*, 290 F.R.D. at 48) – that in an effort to enhance the market's perception of Barclays' financial health, Defendants purposefully submitted false LIBOR rates but never informed investors of this fact.  *See* Complaint ¶¶52-76.[32]  Similarly, Diamond's conference call remarks were also omissions because the "heart" of their falsity was that "specific information was withheld" – namely, that Diamond had issued a directive to his subordinates to artificially lower LIBOR submissions.  *See Dynex*, 2011 WL 781215, at *7 ("the alleged omissions played an independent, or at least interdependent, role in the alleged fraud").  Because Plaintiffs have primarily pled omissions claims and Defendants cannot establish that Plaintiffs did not rely on these omissions, reliance is also presumed under *Affiliated Ute*.

## IV.    DEFENDANTS' *COMCAST* ARGUMENTS ARE MISPLACED

Failing to heed the Court's admonition to avoid raising loss causation or damages issues at the class certification stage (*see* Pltf. Mem. at 15 n.17), Defendants raise premature, merits-based loss causation arguments under the guise of a Rule 23(b)(3) damages-based predominance argument.

---

[32]  Dr. Finnerty understands the LIBOR claims to be omissions.  Finnerty Dep. at 459:11-20.

### A.    Class-Wide Proof of Damages Is Not Required to Show Predominance

Because Plaintiffs have successfully invoked the *Basic* and *Affiliated Ute* presumptions, they have satisfied their burden of proving predominance.   Defendants nonetheless assert that the Supreme Court's **antitrust** opinion in *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) (which was decided before *Halliburton II*) requires Plaintiffs to submit a damages model at the class certification stage.   The Second Circuit recently rejected such a broad reading of *Comcast*: "*Comcast*'s holding was narrower.   *Comcast* held that a model for determining class-wide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class's asserted theory of injury; ***but the Court did not hold that proponents of class certification must rely upon a classwide damages model to demonstrate predominance.***"   *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015).   The Second Circuit noted that the parties in *Comcast* did not even contest whether there was a requirement that damages be measured on a classwide basis (*id.* at 402), and that although damage questions "should be considered at the certification stage when weighing predominance issues," there is no "requirement of a class-wide damages model."   *Id.* at 407-08.

Defendants' argument misses the broader point that, unlike the facts of *Comcast* and other non-securities class actions such as antitrust cases, securities class actions are ***not*** cases in which "[q]uestions of individual damage calculations will inevitably overwhelm issues common to the class," especially "in light of the class-wide methodology for calculation of damages."   *Dodona I*, 296 F.R.D. at 270-71; *see also In re Groupon, Inc. Sec. Litig.*, 2014 WL 5245387, at *2 (N.D. Ill. Sept. 23, 2014) (rejecting defendants' *Comcast* arguments and explaining that "*Comcast* was an antitrust class action brought by subscribers against the cable company and is inapposite in a securities fraud class action such as this").[33]   Accordingly, *Comcast* does not require Plaintiffs to

---

[33]  Defendants' cases are inapposite – *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70 (2d Cir. 2015); *Vaccarino v. Midland Nat'l Life Ins. Co.*, 2013 WL 3200500 (C.D. Cal. June 17, 2013); and *Turnbow v. Life Partners, Inc.*, 2013 WL 3479884 (N.D. Tex. July 9, 2013) are all consumer cases. Further, *In re BP PLC Sec. Litig.*, 2013 WL 6388408 (S.D. Tex. Dec. 6, 2013) is an out-of-Circuit opinion that is inconsistent with the Fifth Circuit's subsequent decision in *In re Deepwater Horizon*,

make the loss causation or damages showings that Defendants inappropriately seek.[34]

> **B.    Although Not Required, Plaintiffs Have Submitted Sufficient Evidence to Show Common Damages Issues Will Predominate Under Rule 23(b)(3)**

Plaintiffs have independently satisfied *Comcast* despite having no burden to make such a showing.  Dr. Finnerty has submitted a methodology, to be used in conjunction with his regression analysis and the Finnerty II event study, that can calculate damages on a Class-wide basis.  *See* Finnerty II at ¶¶106-08.[35]  Dr. Finnerty's methodology is one commonly accepted by courts in securities cases and can be used at a later stage to estimate damages.[36]  While Defendants would like Dr. Finnerty to take the next step and perform in-depth loss causation and damages analyses, they are not required at this stage.

## V.    CONCLUSION

For the reasons set forth herein and in Plaintiffs' Motion and related briefing (Dkt. Nos. 135-41), the proposed Class should be certified.

---

739 F.3d 790 (5th Cir. 2014), that there is no requirement of a reliable common methodology for measuring damages under Rule 23(b)(3), as well as the subsequent *BP* decision.  *In re BP PLC Sec. Litig.*, 2014 U.S. Dist. LEXIS 69900, at *66, *107-*08 (S.D. Tex. May 20, 2014).

[34]  Dr. Gompers did not create a damages model in this case.  Gompers Dep. at 129:14-23.

[35]  Defendants misrepresent Dr. Finnerty's analysis.  *See* Def. Opp. at 24-25.  First, Dr. Finnerty explained that the corrective disclosure at the end of the Class Period took place between June 27 and 28, *not* just on June 27.  Finnerty I at ¶63; Finnerty Dep. 478:2-10.  Second, Dr. Finnerty explained that Defendants' "incremental impact" argument stems from their misunderstanding of the LIBOR submissions claims – because they are omissions, there is no "incremental impact" from these statements.  Finnerty Dep. 458:13-459:20; 462:4-16; 484:16-485:11.  Finally, with respect to "inflationary impact," despite Defendants' attempts to confuse Dr. Finnerty, he testified that after false LIBOR submissions were made, subsequent accurate LIBOR submissions would *not* remove the inflation until the falsity of the prior submissions was ***actually disclosed*** to investors.  *Id.* at 476:11-21; 487:14-488:3.  Dr. Gompers agrees that no actual disclosure took place until at least June 27.  Gompers Dep. at 302:12-18.

[36]  Pursuant to the Scheduling Order entered on November 10, 2014 (*see* Dkt. No. 105), Plaintiffs' merits expert reports on damages and loss causation are due by October 7, 2015.

DATED: June 26, 2015                 ROBBINS GELLER RUDMAN
                                       & DOWD LLP
                                     SAMUEL H. RUDMAN
                                     DAVID A. ROSENFELD
                                     CHRISTOPHER M. BARRETT
                                     MICHAEL G. CAPECI


                                     _____
                                            */s/ David A. Rosenfeld*
                                          DAVID A. ROSENFELD

                                     58 South Service Road, Suite 200
                                     Melville, NY  11747
                                     Telephone:  631/367-7100
                                     631/367-1173 (fax)
                                     srudman@rgrdlaw.com
                                     drosenfeld@rgrdlaw.com
                                     cbarrett@rgrdlaw.com
                                     mcapeci@rgrdlaw.com

                                     *Lead Counsel for Plaintiffs*

                                     SAXENA WHITE, P.A.
                                     MAYA SAXENA
                                     JOSEPH E. WHITE III
                                     LESTER R. HOOKER
                                     Boca Center, 5200 Town Center Circle
                                     Suite 601
                                     Boca Raton, FL  33431
                                     Telephone:  561/394-3399
                                     561/394-3382 (fax)
                                     msaxena@saxenawhite.com
                                     jwhite@saxenawhite.com
                                     lhooker@saxenawhite.com

                                     *Additional Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I, David A. Rosenfeld, hereby certify that on June 26, 2015, I caused a true and correct copy

of the attached:

REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS
REPRESENTATIVES AND APPOINTMENT OF CLASS COUNSEL

to be served: (i) electronically on all counsel registered for electronic service for this case; and (ii) by

first-class mail to any additional counsel.



*/s/ David A. Rosenfeld*
DAVID A. ROSENFELD