UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————— x

CARPENTERS PENSION TRUST FUND OF     :     Civil Action No. 1:12-cv-05329-SAS
ST. LOUIS, et al., Individually and on Behalf     :
of All Others Similarly Situated,     :     <u>CLASS ACTION</u>
                                      :
                         Plaintiff,   :     PLAINTIFFS' MEMORANDUM OF LAW
                                      :     IN OPPOSITION TO DEFENDANTS'
             vs.                      :     MOTION TO EXCLUDE THE EXPERT
                                      :     OPINIONS OF JOHN D. FINNERTY
BARCLAYS PLC, et al.,                 :
                                      :
                         Defendants.  :
                                      :
——————————————————— x

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................................1

II.    LEGAL STANDARD............................................................................................2

III.   ARGUMENT .........................................................................................................3

    A.     Defendants Do Not Contest Dr. Finnerty's Qualifications.......................3

    B.     Dr. Finnerty's Testimony Is Relevant.....................................................4

    C.     Dr. Finnerty's Testimony Is Reliable.....................................................4

        1.     The Finnerty II Event Study Evidences Efficiency ....................5

        2.     Dr. Finnerty's Opinion Relies on Statistically Significant Data.................7

        3.     The Finnerty I and II Event Studies Are Highly Consistent and Support a Finding of Efficiency.................................8

        4.     Dr. Finnerty's Methods Are Objective .......................................9

        5.     Dr. Finnerty's Methods Are Testable and Replicable ..............12

        6.     Dr. Finnerty Adopted the Methodology for the Finnerty II Event Study Because It Is a Reasonable Approach.............................13

        7.     Dr. Finnerty's Opinions Are Based on Adequate Data............................14

IV.    CONCLUSION....................................................................................................15

# TABLE OF AUTHORITIES

**Page**

## CASES

*24/7 Records, Inc. v. Sony Music Entertainment, Inc.*,
  514 F. Supp. 2d 571 (S.D.N.Y. 2007)..............................................................12, 13

*Amorgianos v. Amtrak*,
  303 F.3d 256 (2d Cir. 2002).................................................................................3

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)....................................................................................1, 2, 4

*Beastie Boys v. Monster Energy Co.*,
  983 F. Supp. 2d 354 (S.D.N.Y. 2014)....................................................................3

*Billhofer v. Flamel Techs., S.A.*,
  281 F.R.D. 150 (S.D.N.Y. 2012) ..........................................................................12

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*,
  752 F.3d 82 (1st Cir. 2014).........................................................................11, 12, 13

*Bricklayers & Trowel Trades International Pension Fund v. Credit Suisse First Boston*,
  853 F. Supp. 2d 181 (D. Mass. 2012) ..............................................................10, 11

*Brown v. China Integrated Energy, Inc.*,
  2015 U.S. Dist. LEXIS 19177
  (C.D. Cal. Feb. 17, 2015)..............................................................................9, 11

*Carpenters Health & Welfare Fund v. Coca-Cola Co.*,
  2008 WL 4737173
  (N.D. Ga. Mar. 14, 2008)..................................................................................12

*City of Ann Arbor Emps. Ret. System v. Sonoco Products Co.*,
  827 F. Supp. 2d 559 (D.S.C. 2011)........................................................................4

*City of Livonia Employees' Retirement System v. Wyeth*,
  284 F.R.D. 173 (S.D.N.Y. 2012) .........................................................................10

*Daubert v. Merrell Dow Pharms.*,
  509 U.S. 579 (1993)...........................................................................................3

*Dean v. China Agritech*,
  2012 WL 1835708
  (C.D. Cal. May 3, 2012) .....................................................................................6

**Page**

*Fener v. Operating Engineers Const. Indus. and Misc. Pension Fund (LOCAL 66)*,
579 F.3d 401 (5th Cir. 2009) ...................................................................................11

*Figueroa v. Boston Sci. Corp.*,
254 F. Supp. 2d 361 (S.D.N.Y. 2003)..........................................................................4

*George v. China Automotive Systems, Inc.*,
2013 WL 3357170
(S.D.N.Y. July 3, 2013) ............................................................................................15

*IBEW Local 90 Pension Fund v. Deutsche Bank AG*,
2013 WL 5815472
(S.D.N.Y. Oct. 29, 2013) ......................................................................................6, 15

*In re AIG, Inc. Securities Litigation*,
265 F.R.D. 157 (S.D.N.Y. 2010) ...........................................................................8, 15

*In re Countrywide Fin. Corp. Sec. Litig.*,
273 F.R.D. 586 (C.D. Cal. 2009) ..............................................................................12

*In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec.*,
281 F.R.D. 174 (S.D.N.Y. 2012) ...............................................................................15

*In re Groupon, Inc. Sec. Litig.*,
2015 WL 1043321
(N.D. Ill. Mar. 5, 2015)......................................................................................5, 6, 15

*In re HealthSouth Corp. Sec. Litig.*,
257 F.R.D. 260 (N.D. Ala. 2009)...............................................................................15

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
32 F. Supp. 3d 453 (S.D.N.Y. 2014)........................................................................3, 5

*In re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig.*,
593 F. Supp. 2d 549 (S.D.N.Y. 2008)........................................................................13

*In re Northfield Laboratories, Inc. Securities Litigation*,
267 F.R.D. 536 (N.D. Ill. 2010)................................................................................14

*In re Novatel Wireless Sec. Litig.*,
2013 WL 494361
(S.D. Cal. Feb. 7, 2913) .............................................................................................4

**Page**

*In re Paoli R.R. Yard PCB Litig.*,
  35 F.3d 717 (3d Cir. 1994) ..................................................................5, 11

*In re Pfizer Sec. Litig.*,
  2014 WL 2136053
  (S.D.N.Y. May 21, 2014) ............................................................................4

*In re PolyMedica Corp. Securities Litigation*,
  453 F. Supp. 2d 260 (D. Mass. 2006) ......................................................15

*In re Rezulin Products Liab. Litig.*,
  309 F. Supp. 2d 531 (S.D.N.Y. 2004) ......................................................11

*In re STEC Inc.*,
  2012 U.S. Dist. LEXIS 186180
  (C.D. Cal. Mar. 7, 2012) .............................................................................4

*In re Xerox Corp. Sec. Litig.*,
  746 F. Supp. 2d 402 (D. Conn. 2010) ......................................................12

*Kumho Tire, Co. v. Carmichael*,
  526 U.S. 137 (1999) ..................................................................................12

*Malletier v. Dooney & Bourke, Inc.*,
  525 F. Supp. 2d 558 (S.D.N.Y. 2007) ........................................................3

*McIntire v. China MediaExpress Holdings, Inc.*,
  38 F. Supp. 3d 415 (S.D.N.Y. 2014) ..........................................2, 5, 7, 12

*RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*,
  2000 WL 310352
  (S.D.N.Y. Mar. 24, 2000) ..........................................................................12

*Schleicher v. Wendt*,
  2009 WL 761157
  (S.D. Ind. 2009) ........................................................................................15

*Silverman v. Motorola, Inc.*,
  798 F. Supp. 2d 954 (N.D. Ill. 2011) ..........................................................4

*Smilovits v. First Solar, Inc.*,
  295 F.R.D. 423 (D. Ariz. 2013) ................................................................15

**Page**

*Wilkof v. Caraco Pharm. Labs., Ltd.*,
   280 F.R.D. 332 (E.D. Mich. 2012) ......................................................................................15

**STATUTES, RULES AND REGULATIONS**

Federal Rules of Civil Procedure
   Rules 23(b)(3) .............................................................................................................1, 2

Federal Rules of Evidence
   Rule 702 ..................................................................................................................2, 3, 4

Plaintiffs[1] respectfully submit this memorandum of law in opposition to Defendants' Motion to Exclude the Expert Opinions of John D. Finnerty.

## I.    INTRODUCTION

In support of their motion to certify this action as a class action, Plaintiffs rely on the opinion of Dr. Finnerty, a veteran economics expert with extensive experience testing for market efficiency, performing loss causation analyses, and calculating damages in securities fraud actions.   In connection with Plaintiffs' burden to show that questions of law or fact common to class members predominate over individual questions (Fed. R. Civ. P. 23(b)(3)), Dr. Finnerty has opined that the market for Barclays ADS was open, developed, and efficient during the Class Period – allowing Plaintiffs to invoke the *Basic* presumption of reliance.  As explained herein and in Plaintiffs' class certification papers, Dr. Finnerty's analysis is comprehensive, rigorous and, most importantly, reliable, and provides overwhelming and compelling evidence of market efficiency.

In examining whether the market was efficient, Dr. Finnerty tested the five *Cammer* factors and the three *Krogman* factors and concluded that the market was efficient throughout the Class Period based on his results from testing ***all eight factors***.   Notably, Defendants either agree with, or do not dispute, Dr. Finnerty's conclusions about six of these eight factors.  *See* Pltf. Rep. at 3.  Nor do Defendants contest that Dr. Finnerty is qualified to offer his opinion, or the general efficiency of stocks that trade on the NYSE.  *See id.*

Despite the many points that Defendants concede, they nonetheless seek to exclude Dr.

---

[1]  Capitalized terms have the meanings ascribed to them in Plaintiffs' Reply Memorandum of Law in Support of Plaintiffs' Motion for Class Certification ("Pltf. Rep."). *See* Dkt. No. 152.  All citations are omitted and all emphasis is added unless otherwise noted.  "Def. Mem." refers to Defendants' Memorandum of Law in Support of Motion to Exclude the Expert Opinions of John D. Finnerty. *See* Dkt. No. 158.  Finnerty I (Dkt. No. 140); Finnerty II (Dkt. No. 141); Gompers I (Dkt. No. 137-1); and Gompers II (Dkt. No. 153-3), and Finnerty Dep. (Dkt. No. 153-1, 2) were previously filed in connection with Plaintiffs' motion for class certification.  Gompers Dep. is attached in excerpted form as Exhibit A to the Declaration of David A. Rosenfeld in Opposition to Defendants' Motion to Exclude the Expert Opinions of John D. Finnerty ("Rosenfeld Decl.").

Finnerty's *entire* opinion; critically, they fail to raise a single legitimate argument in support.

Among the many reasons that Defendants miss the mark are the following:

- Defendants attempt to focus the Court on trivial comparisons between the Finnerty I and II event studies, despite Dr. Finnerty's clear position that he is primarily relying on the Finnerty II event study for his *Cammer* Factor Five conclusion and the fact that the two event studies agree 95% of the time.

- Defendants complain that Dr. Finnerty's opinion is unreliable because he considers statistically insignificant data. But this argument ignores that the Finnerty II event study rests its finding of market efficiency on five days out of 15 being statistically significant at the 5% level; this alone sufficiently evidences a cause and effect relationship.

- Defendants mischaracterize Dr. Finnerty's opinion as entirely subjective, but ignore that the Finnerty II event study adopts the same objective methodology that Dr. Gompers proposed in the Gompers I report and that he has relied on in his previous expert work.

- Defendants wrongfully contend that the Finnerty II event study cannot be replicated despite Dr. Finnerty's careful explanation in the Finnerty II report of how it can be.

- Defendants claim that Dr. Finnerty's opinion about the efficiency of the U.S. market for Barclays' ADS must address the liability theory of the case. But Defendants confuse event studies used to prove market efficiency with event studies used to prove loss causation (and cite cases dealing with the latter).

- Defendants argue that Dr. Finnerty's event study is based on inadequate data despite the fact that Dr. Finnerty meticulously followed an event selection methodology proffered by Dr. Gompers and which has been deemed acceptable by numerous other courts.

    The bottom line is that Defendants have failed to raise sufficient grounds for excluding any

part of Dr. Finnerty's opinion, let alone its entirety. At best, their "objections go to the weight, not

the admissibility, of the testimony." *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d

415, 428 (S.D.N.Y. 2014). Because Plaintiffs have satisfied both Fed. R. Evid. 702 and *Daubert*, the

Court should deny Defendants' motion.[2]

## II.   LEGAL STANDARD

In deciding a *Daubert* motion, "courts are reminded that the Federal Rules of Evidence favor

the admissibility of expert testimony, and their role as gatekeeper is not intended to serve as a

---

[2] Regardless of the *Basic* challenge that Defendants make in their *Daubert* motion and class certification opposition, Fed. R. Civ. P. 23(b)(3) is independently satisfied because Plaintiffs have established that reliance is presumed under *Affiliated Ute*. *See* Pltf. Rep. at 12-13.

replacement for the adversary system." *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 562 (S.D.N.Y. 2007) (quoting *Daubert v Merrell Dow Pharms.*, 509 U.S. 579, 589 (1993). "Indeed, '[w]here the expert's conclusion is drawn from a reliable methodology . . . the correctness of that conclusion is still an issue for the finder of fact.'" *Id.* (citation omitted). Ultimately, "trial courts must consider only the *admissibility* of expert evidence rather than its weight or credibility." *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 32 F. Supp. 3d 453, 461 (S.D.N.Y. 2014) (emphasis in original).[3]

## III.    ARGUMENT

Plaintiffs have demonstrated that: (i) Dr. Finnerty is "qualified as an expert by knowledge, skill, experience, training, or education"; (ii) that Dr. Finnerty's "knowledge will help the trier of fact to understand the evidence or to determine a fact in issue" (*i.e.*, is relevant); and (iii) that his testimony is reliable because it "is based on sufficient facts or data," "is the product of reliable principles and methods," and Dr. Finnerty "has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Thus, Defendants' *Daubert* challenge is without merit.

### A.    Defendants Do Not Contest Dr. Finnerty's Qualifications

Unsurprisingly, Defendants concede that Dr. Finnerty is qualified to offer an opinion on market efficiency. Dr. Finnerty holds a Ph.D., is a tenured Professor of Finance at Fordham University's Graduate School of Business Administration, and has published 15 books and over 100 articles and papers on corporate finance, fixed income, and business and securities valuation. Most relevant here, Dr. Finnerty has extensive experience testing for market efficiency, performing loss

---

[3]  "The judge should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions." *Beastie Boys v. Monster Energy Co.*, 983 F. Supp. 2d 354, 363 (S.D.N.Y. 2014) (citing *Amorgianos v. Amtrak*, 303 F.3d 256, 267 (2d Cir. 2002)). "'This limitation on when evidence should be excluded accords with the liberal admissibility standards of the federal rules and recognizes that our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony.'" *Id.*

causation analyses, and calculating damages in securities fraud actions.  Thus, Dr. Finnerty is unquestionably qualified to provide an opinion on market efficiency.[4]

### B.     Dr. Finnerty's Testimony Is Relevant

An expert opinion is relevant if it "'will assist the trier of fact to understand the evidence or to determine a fact in issue.'"  *Figueroa v. Boston Sci. Corp.*, 254 F. Supp. 2d 361, 366 (S.D.N.Y. 2003) (quoting Fed. R. Evid. 702).  Here, Dr. Finnerty has provided testimony about the efficiency of the market for Barclays ADS, which is directly relevant to Plaintiffs' motion for class certification.  *See Basic Inc. v. Levinson*, 485 U.S. 224, 249-50 (1988).

Defendants contend that Dr. "Finnerty's opinions are not relevant because they do not address the **liability** theory of the case."  Def. Mem. at 10.  This argument fails, however, because Dr. Finnerty is not opining on **liability**, but is instead opining on the ***efficiency of the market***, (*see* Finnerty II at ¶3), and Plaintiffs' theory of liability is not relevant to this task.  Defendants confuse event studies used to prove damages/loss causation (to which the liability theory would be relevant) with event studies used to prove market efficiency; their relevancy arguments are therefore misplaced and the cases they cite inapposite.[5]

### C.     Dr. Finnerty's Testimony Is Reliable

Dr. Finnerty's proposed testimony is based on a reliable foundation.  "In assessing reliability,

---

[4]  Dr. Finnerty's opinions have been routinely accepted by District Courts.  *See, e.g.*, *In re STEC Inc.*, 2012 U.S. Dist. LEXIS 186180, at *36 (C.D. Cal. Mar. 7, 2012); *Silverman v. Motorola, Inc.*, 798 F. Supp. 2d 954, 983-84 (N.D. Ill. 2011); *City of Ann Arbor Emps. Ret. System v. Sonoco Products Co*., 827 F. Supp. 2d 559, 571 (D.S.C. 2011) (denying *Daubert* motion to exclude Dr. Finnerty).

[5]  *See In re Novatel Wireless Sec. Litig*., 2013 WL 494361, at *2 (S.D. Cal. Feb. 7, 2013) (loss causation/damages); *In re Pfizer Sec. Litig*., 2014 WL 2136053, at *1 (S.D.N.Y. May 21, 2014) (damages).  Moreover, Defendants wrongly claim that the failure to disclose management's involvement in the LIBOR misconduct is not a theory in this case.  Defendants conflate the difference between a statement, on the one hand, and an omitted fact that makes a statement misleading, on the other.  For example, Plaintiffs allege that defendant Diamond's statements during the October 31, 2008 conference call (¶108) were misleading because Defendants failed to disclose the involvement of senior management in the false LIBOR submissions (¶¶90, 109).

- 4 -

the trial judge should consider whether: (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has reliably applied the principles and methods to the facts of the case." *Longtop Fin.*, 32 F. Supp. 3d at 460-61.[6] Dr. Finnerty's opinion and underlying analyses readily satisfy these considerations.

In opining on the efficiency of the U.S. market for Barclays ADS, Dr. Finnerty analyzed the five *Cammer* factors and the three *Krogman* factors and found that ***all eight*** demonstrate that the market was efficient throughout the Class Period. *See* Finnerty I at ¶20; Finnerty II at ¶24. Notably, Dr. Gompers agrees with, or does not contest, Dr. Finnerty's conclusions concerning *Cammer* Factors 1 through 4, *Krogman* Factors 1 and 3, and that the NYSE is a well-developed exchange where most companies' stocks trade efficiently most of the time. *See* Pltf. Rep. at 3.

Based on this extensive analysis, Dr. Finnerty has reliably opined that the market for Barclays ADS was efficient during the Class Period. *See McIntire*, 38 F. Supp. 3d at 431 ("[A]fter evaluating the *Cammer* factors and the *Krogman* factors, the Court is persuaded that Plaintiffs have presented sufficient evidence to show that CCME traded in an efficient market."); *In re Groupon, Inc. Sec. Litig.*, 2015 WL 1043321, at *3 (N.D. Ill. Mar. 5, 2015) (noting that Dr. Gompers agrees that "experts employ a *Cammer* factor analysis to assess market efficiency for purposes of securities litigation").

### 1.    The Finnerty II Event Study Evidences Efficiency

The Finnerty II event study shows a cause-and-effect relationship between unexpected earnings surprises and a response in Barclays' ADS price – thus satisfying *Cammer* Factor Five. *See*

---

[6] It should be "emphasize[d] that the [reliability] standard is not that high." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994).  "The evidentiary requirement of reliability is lower than the merits standard of correctness." *Id*. at 744.  In other words, "plaintiffs [do not] have to prove their case twice – they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are *correct*, they only have to demonstrate by a preponderance of evidence that their opinions are reliable." *Id.*  (emphasis in original.)

Pltf. Rep. at 3-5.  The Finnerty II event study utilized the following methodology:

1.  First, as in *Groupon,* "Dr. [Finnerty] *first* selected the news dates based on objective criteria (unexpected earnings-related reports) *before* studying any effect on price."   2015 WL 1043321 at *6.  Prior to selecting any dates, Dr. Finnerty determined that he would select *every* earnings release date during the Class Period where there was a surprise.  *See* Finnerty II at ¶19; Finnerty Dep. at 290:22-291:15.

2.  Next, Dr. Finnerty "compared consensus pre-announcement estimates to the reported earnings" (*Groupon*, 2015 WL 1043321, at *6) to locate earnings surprise dates.  *See* Finnerty II at ¶¶20-21; Finnerty Dep. at 308:18-309:14.  This objective methodology was advocated by Dr. Gompers in the Gompers I report, and in his previous expert work.  *See* Gompers I at ¶¶35-36; Finnerty II at ¶¶18-23; Gompers Dep. at 79:2-80:25; 123:16-124:20; *see also IBEW Local 90 Pension Fund v. Deutsche Bank AG*, 2013 WL 5815472, at *21 (S.D.N.Y. Oct. 29, 2013) ("*IBEW Local 90*").

3.  Finally, Dr. Finnerty adopted a consistent approach to determine earnings surprise predictions by reviewing "the mix of information released into the market for Barclays ADS to assess . . . news items and . . . [evaluate] the overall direction of sentiment based on the collective body of news about Barclays released that day."  Finnerty II at ¶¶20-21.[7]

Because the Finnerty II event study finds statistically significant price reactions at the 5% level or better on five event days,[8] and all fifteen event days exhibited the expected directional movements,[9] Plaintiffs have proffered sufficient evidence to satisfy *Cammer* Factor Five.[10]  *See*

---

[7]  Importantly, "simply because a company announces earnings that [differ] from the consensus earnings forecast does not imply that the announcement will always elicit a statistically significant stock price reaction."  Finnerty II at ¶21.  Dr. Gompers agrees.  *See* Gompers Dep. at 226:15-21.

[8]  In other words, there is less than a 5% likelihood that the price reactions occurred by mere chance.

[9]  As explained in further detail below, Dr. Gompers agrees that "the size of the surprise should affect the size of the stock price movement" (Gompers Dep. at 226:15-21) and that a minimal earnings surprise would not cause a statistically significant stock price reaction (*see id.* at 223:23-224:17; 231:16-232:3; 234:5-12; 392:5-25).  Dr. Gompers therefore concedes that economic significance is a relevant consideration for an earnings surprise event study.  "[O]ther academics and experts recognize . . . that stock price movement is important and a valid way of assessing the existence of a cause-effect relationship, even if the movement is not statistically significant at [the 5%] level."  *Dean v. China Agritech*, 2012 WL 1835708, at *3 (C.D. Cal. May 3, 2012).

[10]  Contrary to what Defendants contend (*see* Def. Mem. at 6), Dr. Finnerty did not testify that a stock must have statistically significant price reactions on most of the event days studied. Rather, he testified that one would need to observe the market moving in the right direction a preponderance of the time to conclude that the market was efficient (*see* Finnerty Dep. 234:9-13), which is exactly what he observed.  *See id*. at 27:19-21 ("Fifteen out of fifteen is a preponderance" and noting that his directional predictions were consistent with his expectations on all fifteen days, thus further evidencing an efficient market).

*McIntire*, 38 F. Supp. 3d at 433 (finding efficiency with statistically significant price reactions on 11 out of 26 event days).[11]

### 2.      Dr. Finnerty's Opinion Relies on Statistically Significant Data

Unable to contest the ultimate conclusion of the Finnerty II event study, Defendants are left to argue that Dr. Finnerty's opinion is unreliable because, in their view, he relies on statistically insignificant data.  *See* Def. Mem. at 6.  These contentions lack merit.

Seizing on the term "economic significance," Defendants mischaracterize Dr. Finnerty's testimony and now claim that he has simply abandoned statistical significance.  He, of course, has done no such thing.[12]  As explained above, the Finnerty II event study rests its *Cammer* Factor Five conclusion on finding statistically significant price reactions on five dates and uses the market reactions as expected on all 15 dates as additional evidence supporting a cause-and-effect relationship.  Finnerty II at ¶¶23-24.  Ignoring this, Defendants have taken Dr. Finnerty's testimony – that economic significance is a ***relevant consideration*** to an earnings surprise event study – and transformed it into what they essentially describe as a disclaimer of statistical significance.  In truth, Dr. Finnerty's testimony on this issue can hardly be controversial: he benignly points out that a finding of market efficiency is ***bolstered*** where economic significance is found, *i.e.*, the stock price moves in the expected direction in response to new information, even if that movement is not sufficiently large to be statistically significant at the 5% confidence level.  *See* Finnerty Dep. at 225:16-227:17.  Simply put, even in an efficient market, stocks will not always show statistically

---

[11]  Bolstering these results is that the Finnerty I event study found no statistically significant price reactions on any of the 24 non-news days.  *See* Finnerty II at ¶18 ("a lack of significant price reaction when there is no economically significant news is an important factor in establishing market efficiency").

[12]  *See* Finnerty Dep. 225:16-20 (Q. "So is it your testimony that you could reach a conclusion of market efficiency without statistical significance?" A. "I didn't say that. No, I didn't say that at all."); *see also id*. at 102:16-18 (A. "the only way I know of measuring -- really truly measuring significance is to measure it statistically.").

significant price reactions on days of unexpected, material news – a fact that even Dr. Gompers concedes. *See* Gompers Dep. 226:15-21 ("the size of the surprise should affect the size of the stock price movement"). Accordingly, and contrary to what Defendants contend, Dr. Finnerty's discussion of economic significance is not an adoption of a "new standard" for event studies.

Additionally, Defendants improperly suggest that Dr. Finnerty is not employing the same level of intellectual rigor in the courtroom as he would in his academic work. *See* Def. Mem. at 7. As Dr. Finnerty testified, the event studies done in academia and the event studies done in connection with securities litigation are quite different because "[t]hese sorts of studies [*i.e.*, event studies focusing only on a single stock, such as the Finnerty II event study] are not done in academic work [where the focus is on portfolios of stocks]." Finnerty Dep. at 350:23-24. Accordingly, because academic event studies and securities fraud event studies have vastly different constructions, Defendants are comparing apples with oranges.[13]

### 3. The Finnerty I and II Event Studies Are Highly Consistent and Support a Finding of Efficiency

Dr. Finnerty principally relies on the Finnerty II event study for his *Cammer* Factor Five conclusion. *See* Finnerty Dep. at 223:18-224:21; 275:19-276:3. For this reason, the Finnerty I event study's relevance is limited. Even so, the Finnerty I event study supports a finding of efficiency because on all 24 non-news days in that study, the stock did not exhibit any statistically significant price reactions at the 5% level, which "is an important factor in establishing market efficiency."[14] Finnerty II at ¶18. Dr. Gompers agrees. *See* Gompers Dep. at 247:22-248:9.

---

[13]  Contrary to Defendants' suggestion, Dr. Finnerty's opinion was not rejected by the court in *In re AIG, Inc. Securities Litigation*, 265 F.R.D. 157 (S.D.N.Y. 2010), only slightly disagreed with. *See id.* at 188. Because the Finnerty II event study places the greatest weight on those days with statistically significant price reactions at the 5% level or better (in reaching its conclusion regarding the cause-and-effect relationship), the concerns raised in *AIG* have no bearing here.

[14]  In Finnerty I, Dr. Finnerty mistakenly identified October 3, 2008 as an economically significant news date, which he subsequently corrected in Finnerty II. *See* Finnerty II at ¶18 n.21.

Nonetheless, Defendants continue to attack the Finnerty I event study in an attempt to muddy the waters. *See* Def. Mem. at 4-6. This effort should be rejected for the following reasons:

- Defendants misleadingly compare only days that are statistically significant at the 5% level to conclude that the studies agree that a given date "is statistically significant less than 23% of the time." Def. Mem. at 5. But looking at all days in the two event studies shows that, far from undermining one another, when all days are considered, the Finnerty I and II event studies ***agree 95% of the time***. *See* Gompers Dep. at 362:23-366:4. (1,192 out of 1,254 days are in agreement).

- Defendants also complain that the two studies do not completely agree as to the statistical significance of the price reactions on the event days used in the Finnerty II event study. *See* Def. Mem. at 5. But this is not surprising given that the Finnerty II event study utilized two break points and a different industry index. These changes necessarily result in different expected daily returns, and, unsurprisingly, slightly different results. *See* Pltf. Rep. at 7.

- Contrary to Defendants' mischaracterization of his testimony, Dr. Finnerty did not agree that efficiency must be established for each sub-period. He clearly testified that "[t]he opinion as to market efficiency applies to the class period as a whole, and the use of the structural breakpoints is to simply assist in estimating the market model." Finnerty Dep. at 337:14-17.

Defendants' complaints about the interplay between the Finnerty I and II event studies do nothing to undermine Dr. Finnerty's findings in the Finnerty II event study, and should be ignored.[15]

### 4.   Dr. Finnerty's Methods Are Objective

Defendants, in arguing that Dr. Finnerty's interpretation of news was improper, misstate standard practice in general and Dr. Finnerty's methodology specifically.[16] While Defendants are

---

[15] Defendants cite (and mischaracterize) *Brown v. China Integrated Energy Inc.* to support their argument that Dr. Finnerty's two models cannot support market efficiency. *See* Def. Mem. at 5-6 (citing 2014 U.S. Dist. LEXIS 117764, at *24 (C.D. Cal. Aug. 4, 2014)). In *Brown*, the court was troubled that plaintiffs' two experts, using "subjective criteria . . . ended up selecting a very different group of event dates." *Id.* at *22. Here, by contrast, Dr. Finnerty used ***objective*** methods for choosing event days. In Finnerty I, Dr. Finnerty randomly selected event days (Finnerty I at ¶50), and in Finnerty II, Dr. Finnerty chose all Class Period days on which there were earnings surprises. Finnerty II at ¶19. Dr. Gompers only challenges the selection of event days in Finnerty I, which Dr. Finnerty rendered moot with his use of every earnings surprise date in Finnerty II.

[16] Defendants also incorrectly rely on *Bricklayers & Trowel Trades International Pension Fund v. Credit Suisse First Boston* ("*Bricklayers I*") for the proposition that Dr. Finnerty is not permitted to "make subjective judgments about which news impacted the stock price." Def. Mem. at 8 (quoting 853 F. Supp. 2d 181, 190 (D. Mass. 2012)). *Bricklayers I* concerned loss causation at the summary judgment stage and the event study there was being used to prove the impact of the defendants' alleged fraud on the stock price, rather than the efficiency of a market. As Judge Sullivan reasoned

correct that an academic article "instructs that '[t]o facilitate the examination of the impact of the [event] on the value of the firm's equity, it is essential to posit the relation between the information release and the change in value of the equity'" (Def. Mem. at 8 (quoting MacKinlay (1997) at 16)), [t]his is precisely what Dr. Finnerty did. As he explained, "[i]t is important to review new or unexpected information that may alter the value perception of the company's share price." Finnerty II at ¶20. Accordingly, "for each of [the 15 days that had surprise earnings announcements,] [he] reviewed the mix of information released into the market for Barclays ADS to assess the significance of the positive news items and the significance of the negative news items . . . ." *Id.* at ¶¶20-21.[17]

Additionally, Defendants distort Dr. Finnerty's explanation of his methodology to assert that he bases his predictions only on analyst reports. Again, Dr. Finnerty says no such thing. *See* Finnerty II at ¶¶19-25. Rather, Dr. Finnerty "reviewed the ***mix*** of information released into the market for Barclays ADS. . . ." – *i.e.*, all information, not just analyst reports. *Id.* at ¶20. Then, he "evaluated the overall direction of the sentiment based on the collective body of news about Barclays released ***that day***." *Id.* Thus, contrary to Defendants' assertion,[18] Dr. Finnerty did utilize "methodological constraints," (Def. Mem. at 9) (quoting *Bricklayers & Trowel Trades Int'l Pension*

---

in *City of Livonia Employees' Retirement System v. Wyeth*, 284 F.R.D. 173 (S.D.N.Y. 2012), the *Bricklayers I* court's reasoning is wholly irrelevant to class certification. *Id.* at 183 n.2 (concluding that defendants' reliance on *Bricklayers I* was misplaced because it "involve[d] the summary judgment stage as opposed to the class certification stage").

[17] This technique actually corresponds to a method advocated by Dr. Gompers, who in his previous work has explained that: "multiple pieces of news could be released on the same trading day but with different and possibly opposite value implications. A researcher therefore needs to analyze the total mix of information for any day of interest and attribute the stock price reaction to each separate piece of information being released." Gompers Decl., *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, No. 11-cv-4209 (S.D.N.Y.), ECF No. 62 ("Gompers Deutsche Bank Decl.") at ¶49, attached in excerpted form as Exhibit B to the Rosenfeld Decl.

[18] *In re Rezulin Products Liab. Litig.*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004), cited by Defendants (*see* Def. Mem. at 9), stands for the proposition that an expert opinion cannot be "purely subjective" (*id.* at 544), not that an expert may not base an opinion, in part, on a subjective determination, and, therefore, is inapplicable to Dr. Finnerty's analyses.

*Fund v. Credit Suisse Sec. (USA) LLC* ("*Bricklayers II*"), 752 F.3d 82, 95 (1st Cir. 2014)), and his methodology did not "lack any 'standards controlling the technique's operation.'" *Id.* (quoting *Paoli*, 35 F.3d at 742).

In any event, Defendants' complaints about Dr. Finnerty's reliance on analyst reports is belied by their own expert, Dr. Gompers, who has reviewed analyst reports as part of his event study analyses in at least one other case.[19]   Moreover, a similar methodology was recently approved in *Brown v. China Integrated Energy, Inc.*, 2015 U.S. Dist. LEXIS 19177 (C.D. Cal. Feb. 17, 2015). There, defendants moved to exclude plaintiffs' expert, partly because the expert – relying on an analyst report written *ex post* – concluded that the company's earnings announcement was negative despite beating estimates and raising guidance.  *Id.* at *37.   Although agreeing with defendants that the expert's decision "contained a component of subjectivity," the court ultimately denied the motion to exclude, holding that "the subjectivity was minimal and seemingly inevitable."  *Id.* at *38-39.

Although Dr. Finnerty's method did include very limited subjective assessments, Defendants do not cite a single case to support their argument that an event study being used to evidence market efficiency cannot contain ***any*** "subjective assessments."[20]   This is not surprising because there will ***always*** be subjective aspects to an event study.   As the court noted in *McIntire*, "an expert who is conducting an event study necessarily must use his or her discretion to define selection criteria that are conducive to the execution of a meaningful multivariate regression analysis."  38 F. Supp. 3d at

---

[19]   *See Fener v. Operating Engineers Const. Indus. and Misc. Pension Fund (LOCAL 66)*, 579 F.3d 401, 408 (5th Cir. 2009) ("Gompers's event study examined 132 analyst reports and found that the stock price decline was primarily related to the non-fraudulent disclosures instead of the fraudulent one."); *see* Gompers Decl., *Fener v. Belo Corp.*, No. 3:04–CV–1836 (N.D. Tex.), ECF No. 113-2, ¶32, attached in excerpted form as Exhibit C to the Rosenfeld Decl.

[20]   *Bricklayers II* concerned loss causation, where plaintiffs "bear[] the burden of showing that [their] losses were attributable to the revelation of the fraud and not the myriad other factors that affect a company's stock price." *Bricklayers II*, 752 F.3d at 95. "Thus, when conducting an event study, an expert must address confounding information that entered the market on the event date." *Id.*

429; *see also Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 163 (S.D.N.Y. 2012) (determining selection criteria "necessarily requires a researcher to make an independent determination"). "Put differently, 'identifying news, categorizing which news is 'material,' and determining whether news should have a certain (albeit rough) magnitude of positive or negative influence on price are all subjective determinations.'" *McIntire*, 38 F. Supp. 3d at 429 (quoting *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 618 (C.D. Cal. 2009));[21] *see also Carpenters Health & Welfare Fund v. Coca-Cola Co.*, 2008 WL 4737173, at *2 (N.D. Ga. Mar. 14, 2008) ("In any complex statistical analysis, there is the potential for reasonable minds to disagree regarding [variable] choices.").

### 5.   Dr. Finnerty's Methods Are Testable and Replicable

Next, Defendants argue that Dr. Finnerty's opinions must be excluded because his methods are not "testable or replicable." Def. Mem. at 9.[22]  That is untrue; the Finnerty II event study can be tested because Dr. Finnerty clearly explained his analyses and provided all data that he considered.

Defendants do not cite any cases in which an event study (like Dr. Finnerty's or otherwise) was excluded because it could not be tested.[23]  Here, "[r]ather than put Dr. [Finnerty] to the test, [Defendants] ha[ve] simply argued that [his] techniques are unreproducible . . . ." *Bricklayers II*, 752 F.3d at 94.  Like the event study at issue in *Bricklayers II*, the Finnerty II event study can be

---

[21]  *Accord RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, 2000 WL 310352, at *8 (S.D.N.Y. Mar. 24, 2000); *In re Xerox Corp. Sec. Litig.*, 746 F. Supp. 2d 402, 412 (D. Conn. 2010).

[22]  Testability is merely one of four factors suggested by the Supreme Court in *Daubert*.  "[A] trial court *may* consider one or more of [these] . . . when doing so will help determine that testimony's reliability." *Kumho Tire, Co. v. Carmichael*, 526 U.S. 137, 141-42 (1999).  These factors "neither necessarily nor exclusively appl[y] to all experts or in every case." *Id.*

[23]  For example, in *24/7 Records, Inc. v. Sony Music Entertainment, Inc.*, 514 F. Supp. 2d 571 (S.D.N.Y. 2007), that expert (who did not utilize an event study) opined on the value of a record company and, unlike Dr. Finnerty here, did "not provide any source for [his] theory of valuation[;] [did not] testify that this is an established and accepted method of valuing a business[; and] . . . [did] not explain how or why this theory of valuation applies to this case." *Id.* at 575.  Likewise, the *MTBE* action is wholly inapposite to the facts here.  *See In re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig.*, 593 F. Supp. 2d 549, 562 (S.D.N.Y. 2008) (Scheindlin, J.) (expert did "not base his conclusions on any study he conducted or any identifiable methodology").

replicated because Dr. Finnerty "provided all of the necessary guidelines to recreate his event study," and it "would not be a difficult task" to "repeat[] his event study under the same conditions that he did." *Id.*; *see* Finnerty II at ¶¶6-21.

Lastly, Defendants fail to explain why Dr. Finnerty's methodology is not testable:

- First, Defendants suggest that Dr. Finnerty changed his conclusion about the economic significance of October 3, 2008 in the Finnerty I and Finnerty II event studies in order to fit his conclusions. But as Dr. Finnerty acknowledged, the economically significant news on October 3 (which was not statistically significant at the 5% level in either event study) was more about the financial services industry in general and, therefore, was not Barclays-specific news. *See* Finnerty II at 8 n.21.

- *Second*, Defendants again selectively quote Dr. Finnerty to argue that "[he] and his own staff looked at the exact same earnings information and analyst reports, and reached different conclusions as to the 'economic significance' of the collective data on several of the 15 sample days." Def. Mem. at 10 (citing Finnerty Dep. 322:10-324:3). Not so. Dr. Finnerty clarified that there were occasions where the direction of a price reaction "was too close to call because [of] the mix of information[.]" Finnerty Dep. at 324:24-25. His recollection was that on "one or two days . . . it was too close to call and so [he] then stepped in." *Id.* at 323:17-19. He "gathered additional information . . . then made the call" (*id.* at 324:9-12) – meaning that Dr. Finnerty made the ultimate decision, and internal discussions amongst his staff that are not reflected in the final version of the Finnerty II event study are not relevant.

- *Third*, Defendants claim that Dr. Finnerty "admitted that a different financial economist in the same position could reach different conclusions based on the same information." Def. Mem. at 10 (citing Finnerty Dep. at 321:9-12). But Defendants do not explain how this bears on Dr. Finnerty's ultimate conclusion that five days in the Finnerty II event study exhibited statistically significant price reactions at the 5% confidence level. Significantly, Defendants do not contest that Dr. Finnerty's predictions on these earnings surprise dates were inaccurate, subjective, or could be interpreted any way other than he did.

### 6. Dr. Finnerty Adopted the Methodology for the Finnerty II Event Study Because It Is a Reasonable Approach

Contrary to Defendants' characterization, Dr. Finnerty fully agrees with his opinion and the bases for it. In fact, Dr. Finnerty agrees that certain of Dr. Gompers' early criticisms were "reasonable," which is why he accounted for them in the Finnerty II event study. *See* Finnerty Dep. at 272:19-22; 275:9-18; 285:22-286:4.[24] Additionally, Dr. Finnerty did not "arbitrarily divide[] the

---

[24] Because Dr. Finnerty is not relying on his event study from Finnerty I, Defendants' reliance on *In re Northfield Laboratories, Inc. Securities Litigation*, 267 F.R.D. 536, 548 (N.D. Ill. 2010), is misplaced. In *Northfield Laboratories*, the court took issue with the expert's exclusion of 117 event

Class Period into three sub-periods."  Def. Mem. at 12.  Dr. Finnerty explained that these structural breaks were "reasonable" because they "were tied to two critical economic events."  Finnerty Dep. at 281:20-282:3.  Dr. Gompers does not disagree.  *See* Gompers Dep. at 327:24-329:4; 335:10-336:18.

Defendants also complain that Dr. Finnerty preferred his original regression model over the one in Finnerty II.  Def. Mem. at 12.  However, as the testimony cited by Defendants makes clear, while Dr. Finnerty might "prefer the approach that [he] applied, . . . ***it's not the only approach one could apply***."  Finnerty Dep. at 123:8-10.  In fact, Dr. Finnerty twice testifies that the latter approach is "reasonable."  *Id*. at 286:25-287:2, 287:10-11.  Lastly, contrary to Defendants' assertion, Dr. Finnerty does not "disagree" with the inclusion of Barclays' peers in the industry index he utilized in the Finnerty II event study. *See* Finnerty Dep. at 248:4-10.  Defendants cannot say that they disagree with this approach either as it was used at the suggestion of Dr. Gompers. *See* Gompers I at ¶¶49-50.

### 7. Dr. Finnerty's Opinions Are Based on Adequate Data

Defendants wrongly claim that Dr. Finnerty's opinion is not based on sufficient data because the combined sample size between the Finnerty I and II event studies is only 40 days.  *See* Def. Mem. at 13.  This criticism is entirely baseless because the Finnerty II event study – the foundation for Dr. Finnerty's *Cammer* Factor Five conclusion – objectively adopts ***every available date*** on which there was an earnings surprise.  *See* Finnerty II at ¶19.[25]  Accordingly, any concerns about sample size are irrelevant for the earnings surprise event study contained in Finnerty II.[26]

---

dates to account for volatility, "instead of excluding a few dates."  267 F.R.D. 536.  Here, by contrast, Dr. Finnerty's regression only contained dummy variables for four dates in the Finnerty II event study.  *See* Finnerty II, Exs. 3B, 3C.

[25]   In fact, many courts have found that selecting news days in this manner is appropriate, regardless of the ultimate sample size.  *See* Pltf. Rep. at 6 n.15.

[26]   Defendants' other cases are inapposite. For example, the *Freddie Mac* court was opining on a different event study methodology (determining whether there were "substantially more" statistically significant returns on news than on non-news days) and is therefore not analogous.  *In re Fed. Home Loan Mortg. Corp.* (*Freddie Mac*) *Sec.*, 281 F.R.D. 174, 179-80 (S.D.N.Y. 2012).  In *George v.*

Tellingly, Defendants cite to no other objective standard or explain why 15 event days are insufficient.[27] This is unsurprising – there is no bright-line test, and many courts[28] have found event studies that analyzed even fewer events to be acceptable.[29]

## IV.    CONCLUSION

For these reasons, Defendants' motion to exclude Dr. Finnerty's opinion should be denied.

---

*China Automotive Systems, Inc*., 2013 WL 3357170 (S.D.N.Y. July 3, 2013), the expert failed to "look under the hood" to determine why there was a lack of statistical significance on numerous days that he expected would exhibit a stock price reaction. *Id*. at *12 n. 12. Here, Dr. Finnerty carefully examined each of the 15 event days (*see* Finnerty II at ¶¶26-97), and noted that the market reacted as he expected "fifteen out of fifteen" times. Finnerty Dep. at 326:20-21.

[27] In *IBEW Local 90*, the expert utilized earnings disclosure dates rather than earnings *surprise* dates, and therefore is inapposite. *See* 2013 WL 5815472, at *21. Moreover, the *IBEW Local 90* court excluded that expert primarily due to serious concerns about his qualifications (*id.* at *15) – concerns which Defendants have conceded are not relevant to Dr. Finnerty. Likewise, *In re PolyMedica Corp. Securities Litigation*, 453 F. Supp. 2d 260 (D. Mass. 2006), is also not analogous because that expert did not even conduct an event study. *Id.* at 268-69.

[28] *See, e.g*., *In re AIG, Inc. Sec. Litig*., 265 F.R.D. 157, 188 (S.D.N.Y. 2010) (4 of 11 event days were statistically significant); *Groupon*, 2015 WL 1043321, at *4 (holding that 2 event days, although "on the low side" were sufficient); *Smilovits v. First Solar, Inc*., 295 F.R.D. 423 (D. Ariz. 2013) (5 event days); *Wilkof v. Caraco Pharm. Labs., Ltd*., 280 F.R.D. 332, 345 (E.D. Mich. 2012) (5 event days); *Schleicher v. Wendt*, 2009 WL 761157 (S.D. Ind. 2009) (11 event days); *In re HealthSouth Corp. Sec. Litig*., 257 F.R.D. 260, 282  n.22 (N.D. Ala. 2009) (2 event days).

[29] Defendants' remaining arguments disputing efficiency are easily dispensed with. With respect to the short sale ban, Dr. Finnerty found that any "dislocation created by the short sale ban[] would have had a short-lived effect" (Finnerty II at ¶104), and Dr. Gompers agreed that market efficiency can exist even during a short sale ban. *See* Gompers Dep. at 126:11-18; 206:14-207:18. In fact, numerous courts, including this Court, have certified classes spanning the recent financial crisis. *See* Pltf. Rep. at 9 n.23. For the same reasons, Defendants' argument concerning Dr. Finnerty's put-call parity analysis also fails. *See* Finnerty II at ¶¶103-04; Finnerty Dep. at 451:22-452:14; 453:15-24. With regard to the bid-ask spread analysis, Dr. Finnerty concluded that the "average bid-ask spread is nonetheless nominal throughout the entire Class Period." Finnerty II at ¶103.

DATED:  July 9, 2015                    Respectfully submitted,

                                        ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                        SAMUEL H. RUDMAN
                                        DAVID A. ROSENFELD
                                        CHRISTOPHER M. BARRETT
                                        MICHAEL G. CAPECI


                                        _____
                                             */s/ David A. Rosenfeld*
                                             DAVID A. ROSENFELD

                                        58 South Service Road, Suite 200
                                        Melville, NY  11747
                                        Telephone:  631/367-7100
                                        631/367-1173 (fax)
                                        srudman@rgrdlaw.com
                                        drosenfeld@rgrdlaw.com
                                        cbarrett@rgrdlaw.com
                                        mcapeci@rgrdlaw.com

                                        ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                        ROBERT R. HENSSLER JR.
                                        655 West Broadway, Suite 1900
                                        San Diego, CA  92101-8498
                                        Telephone:  619/231-1058
                                        619/231-7423 (fax)
                                        bhenssler@rgrdlaw.com

                                        *Lead Counsel for Plaintiffs*

                                        SAXENA WHITE, P.A.
                                        MAYA SAXENA
                                        JOSEPH E. WHITE III
                                        LESTER R. HOOKER
                                        Boca Center, 5200 Town Center Circle, Suite 601
                                        Boca Raton, FL  33431
                                        Telephone:  561/394-3399
                                        561/394-3382 (fax)
                                        msaxena@saxenawhite.com
                                        jwhite@saxenawhite.com
                                        lhooker@saxenawhite.com

                                        *Additional Counsel for Plaintiffs*

- 16 -

## CERTIFICATE OF SERVICE

I, David A. Rosenfeld, hereby certify that on July 9, 2015, I caused a true and correct copy of

the attached:

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO EXCLUDE THE EXPERT OPINIONS OF JOHN D. FINNERTY

to be served: (i) electronically on all counsel registered for electronic service for this case; and (ii) by

first-class mail to any additional counsel.



*/s/ David A. Rosenfeld*
DAVID A. ROSENFELD