UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

CARPENTERS PENSION TRUST FUND OF
ST. LOUIS, ST. CLAIR SHORES POLICE &
FIRE RETIREMENT SYSTEM, and
POMPANO BEACH POLICE &
FIREFIGHTERS' RETIREMENT SYSTEM,

              **Plaintiffs,**

            **v.**

BARCLAYS PLC, BARCLAYS BANK PLC,
BARCLAYS CAPITAL INC., MARCUS A.P.
AGIUS, JOHN S. VARLEY, and ROBERT E.
DIAMOND, JR.,

            **Defendants.**

------------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/20/15

**OPINION AND ORDER**

**12-cv-5329 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

# I.   INTRODUCTION

Plaintiffs bring claims for violations of section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder against three corporate defendants — Barclays PLC, Barclays Bank PLC, and Barclays Capital Inc. (collectively "Barclays") — and one individual defendant — Robert E. Diamond, Jr.  In addition, they bring claims under section 20(a) of the Exchange Act against individual defendants Diamond, Marcus A.P. Agius, and John S. Varley.

1

As a result of prior rulings, only two sets of alleged misstatements remain in this case: Barclays' London Interbank Offered Rate ("LIBOR") submissions from August 2007 through January 2009, which understated Barclays' true borrowing costs, and Diamond's remarks during a conference call with market analysts on October 31, 2008.[1]  Diamond's statements were that: (1) "we're categorically not paying higher rates in any currency" and (2) "we benefit in times of turmoil, so we post where we're transacting, and it's clearly not at high levels."[2]

Plaintiffs now move to certify a class consisting of all persons who purchased Barclays PLC American Depositary Shares ("ADS") between July 10, 2007 and June 27, 2012, inclusive (the "Class Period"), and who were damaged thereby (the "Class").  They also request that the Court appoint Lead Plaintiffs Carpenters Pension Trust Fund of St. Louis and St. Clair Shores Police & Fire Retirement System as Class Representatives and Robbins Geller Rudman & Dowd LLP ("Robbins Geller") as Class Counsel.

---

[1]     *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227 (2d Cir. 2014), *affirming in part and reversing in part Gusinsky v. Barclays PLC*, 944 F. Supp. 2d 279 (S.D.N.Y. 2013); *Carpenters Pension Tr. Fund of St. Louis, St. Clair Shores Police & Fire Ret. Sys. v. Barclays PLC*, 56 F. Supp. 3d 549 (S.D.N.Y. 2014) ("*Carpenters II*").  For purposes of this Opinion and Order, familiarity with these prior rulings — including the general background and facts alleged in the Second Amended Complaint ("Complaint") — is assumed.

[2]     Complaint ¶ 108.

2

To be certified, a putative class must demonstrate that it satisfies all four of the requirements of Rule 23(a)[3] and one of the categories of Rule 23(b) of the Federal Rules of Civil Procedure.  In this case, plaintiffs seek certification based on Rule 23(b)(3).  For the following reasons, plaintiffs' motion for class certification is GRANTED, and defendants' motion to preclude plaintiffs' expert is DENIED.

## II.   LEGAL STANDARDS

### A.   Rule 23(b)(3)

Under Rule 23(b)(3), certification is appropriate where "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and class litigation "is superior to other available methods for the fair and efficient adjudication of the controversy."

> The matters pertinent to these findings include the class members'
> interests in individually controlling the prosecution or defense of
> separate actions; the extent and nature of any litigation concerning
> the controversy already begun by or against class members; the
> desirability or undesirability of concentrating the litigation of the
> claims in the particular forum; and the likely difficulties in

---

[3]   Rule 23(a) requires that the class be so numerous that joinder of all members is impracticable, there are questions of law or fact common to the class, the claims or defenses of the representative parties are typical of the claims or defenses of the class, and the representative parties will fairly and adequately protect the interests of the class.  There is no dispute that plaintiffs have satisfied these requirements, and after careful review of the record I hereby find that each has been satisfied.

managing a class action.[4]

The predominance inquiry focuses on whether "a proposed class is 'sufficiently cohesive to warrant adjudication by representation.'"[5]  It is akin to, but ultimately "a more demanding criterion than," the "commonality inquiry under Rule 23(a)."[6]  Class-wide issues predominate "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."[7]  The Second Circuit has emphasized that "Rule 23(b)(3) requires that common questions predominate, not that the action include only common questions."[8]  In carrying out this inquiry, the court may "consider the '. . . improbability that large numbers of

---

[4]     Fed. R. Civ. P. 23(b)(3)(A)-(D).

[5]     *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 133 S. Ct. 1184, 1196 (2013) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)).

[6]     *In re Nassau County Strip Search Cases*, 461 F.3d 219, 225 (2d Cir. 2006) (citing *Amchem*, 521 U.S. at 623-24).

[7]     *Catholic Healthcare W. v. U.S. Foodservice Inc. (In re U.S. Foodservice Inc. Pricing Litig.)*, 729 F.3d 108, 118 (2d Cir. 2013) (internal citations omitted).

[8]     *Brown v. Kelly*, 609 F.3d 467, 484 (2d Cir. 2010).

class members would possess the initiative to litigate individually.'"[9]

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action."[10]   To sustain a claim for securities fraud under section 10(b), "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."[11]

Defendants opposing class certification often challenge plaintiffs' claim of reliance.[12]   By the same token, it is well settled that if proof of individual reliance were required, it would be impossible to meet the predominance

---

[9]      *D'Alauro v. GC Servs. L.P.*, 168 F.R.D. 451, 458 (E.D.N.Y. 1996) (quoting *Haynes v. Logan Furniture Mart, Inc.*, 503 F.2d 1161, 1165 (7th Cir. 1974)).

[10]     *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011) ("*Halliburton I*").

[11]      *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

[12]     Reliance is typically the only ground on which to challenge predominance because section 10(b) claims will almost always arise from a common nucleus of facts surrounding the fraudulent misrepresentation of material facts and the causal relationship between the correction of that misrepresentation and the price of the security.

requirement.[13]  The predominance requirement is typically met in securities fraud

class actions by plaintiffs' invocation of one of two presumptions developed by the

Supreme Court that obviate the need to prove reliance on an individual basis.[14]

These are the "*Basic* presumption" of reliance in fraudulent misstatement cases,

and the "*Affiliated Ute* presumption" of reliance in fraudulent omission cases.

Issues and facts surrounding damages have rarely been an obstacle to

establishing predominance in section 10(b) cases.[15]  In *Comcast Corp. v.

Behrend*,[16] the Supreme Court held, in the context of an antitrust claim, that class

certification is appropriate only when class-wide damages may be measured based

---

[13]     *See Halliburton I*, 131 S. Ct. at 2185 ("Requiring proof of individualized reliance from each member of the proposed plaintiff class effectively would prevent such plaintiffs from proceeding with a class action, since individual issues would overwhelm the common ones.") (internal quotation marks and alterations omitted).

[14]     *See Basic Inc. v. Levinson*, 485 U.S. 224, 241 (1988) (establishing rebuttable presumption of reliance in fraudulent misstatement cases); *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 154 (1972) (establishing presumption of reliance in fraudulent omission cases).

[15]     *See, e.g.*, *In re Fogarazzo v. Lehman Bros., Inc.*, 263 F.R.D. 90, 109 (S.D.N.Y. 2009) ("'[T]he fact that damages must be calculated on an individual basis is no impediment to class certification.'") (quoting *Klay v. Humana*, 382 F.3d 1241, 1260-61 (11th Cir. 2004)) (citing *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 429 (4th Cir. 2003)) ("The possibility that individualized inquiry into Plaintiffs' damages claims will be required does not defeat the class action because common issues nevertheless predominate.")).

[16]     133 S. Ct. 1426 (2013).

6

on the theory of injury asserted by the plaintiffs.  The Second Circuit has rejected a

broad reading of *Comcast*:

> *Comcast* [ ] did not hold that a class cannot be certified under Rule 23(b)(3) simply because damages cannot be measured on a classwide basis.  *Comcast's* holding was narrower.  *Comcast* held that a model for determining classwide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class's asserted theory of injury; but the Court did not hold that proponents of class certification must rely upon a classwide damages model to demonstrate predominance. . . . .
>
> To be sure, *Comcast* reiterated that damages questions should be considered at the certification stage when weighing predominance issues, but this requirement is entirely consistent with our prior holding that "the fact that damages may have to be ascertained on an individual basis is . . . a factor that we must consider in deciding whether issues susceptible to generalized proof 'outweigh' individual issues."  *McLaughlin* [*v. American Tobacco Co.*], 522 F.3d [215,] 231 [2d Cir. 2008].  The Supreme Court did not foreclose the possibility of class certification under Rule 23(b)(3) in cases involving individualized damages calculations.[17]

---

[17]     *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407-08 (2d Cir. 2015) (internal citations omitted) (citing *In re Deepwater Horizon*, 739 F.3d 790, 817 (5th Cir. 2014) (construing the "principal holding of *Comcast* [as being] that a 'model purporting to serve as evidence of damages . . . must measure only those damages attributable to th[e] theory' of liability on which the class action is premised" (ellipsis and second alteration in original) (quoting *Comcast*, 133 S. Ct. at 1433)); *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 799 (7th Cir. 2013) (construing *Comcast* as holding only "that a damages suit cannot be certified to proceed as a class action unless the damages sought are the result of the class-wide *injury* that the suit alleges" (emphasis in original)); *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (interpreting *Comcast* to hold that class-action plaintiffs "must be able to show that their damages stemmed from the defendant's actions that created the legal liability"); *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d at 123 n.8 (stating that "[p]laintiffs' proposed measure for damages is

Thus, "[p]redominance is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."[18]  And "the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification."[19]

### B.   Admissibility of Expert Testimony

The proponent of expert evidence bears the initial burden of establishing admissibility by a "preponderance of the evidence."[20]  For expert testimony to be admissible under Federal Rule of Evidence ("FRE") 702, the witness must be "qualified as an expert by knowledge, skill, experience, training, or education[.]"[21]  The court must then "compare the area in which the witness has superior knowledge, education, experience or skill with the subject matter of the

_____

thus directly linked with their underlying theory of classwide liability . . . and is therefore in accord with the Supreme Court's recent decision in *Comcast*")).

[18]     *Id.* at 405 (internal quotation marks omitted).

[19]     *Id.* (internal quotation marks omitted).

[20]     *United States v. Williams,* 506 F.3d 151, 160 (2d Cir. 2007).

[21]     Fed. R. Evid. 702.

proffered testimony."[22]

To be admissible, the proposed expert testimony must be based "on a reliable foundation."[23]  In assessing reliability, the trial judge should consider whether:

> (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has reliably applied the principles and methods to the facts of the case.[24]

Although the Supreme Court has instructed district courts to focus "on [the] principles and methodology" employed by the expert and "not on the conclusions that they generate,"[25] "nothing in either *Daubert v. Merrell Dow Pharmaceuticals* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."[26]  Indeed, "[a] court may conclude that there is simply too great an analytical gap between the

---

[22]     *United States v. Tin Yat Chin,* 371 F.3d 31, 40 (2d Cir. 2004).

[23]     *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). *Accord Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-49 (1999).

[24]     Fed. R. Evid. 702.

[25]     *Daubert*, 509 U.S. at 595.

[26]     *Kumho Tire,* 526 U.S. at 157 (internal quotation marks and citations omitted).

data and the opinion proffered."[27]

District courts are charged with acting as "'gatekeeper[s] to exclude invalid and unreliable expert testimony,'"[28] and are given "broad discretion" to make such determinations.[29]  However, trial courts must consider only the *admissibility* of expert evidence rather than its weight or credibility.  "As the Supreme Court has explained, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'"[30]  Thus, the Second Circuit favors an inclusive approach to the admission of expert testimony, noting that *Daubert* contemplates "liberal admissibility standards"[31] and "reinforces the idea that there should be a presumption of admissibility of evidence."[32]

---

[27]     *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

[28]     *Baldwin v. EMI Feist Catalog, Inc.*, 989 F. Supp. 2d 344, 349 (S.D.N.Y. 2013) (quoting *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 449 (2d Cir. 1999)).

[29]     *Davis v. Carroll*, 937 F. Supp. 2d 390, 413 (S.D.N.Y. 2013).  *Accord Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002).

[30]     *Amorgianos*, 303 F.3d 256 at 267 (quoting *Daubert*, 509 U.S. at 596).

[31]     *Id.*

[32]     *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995).

Finally, it is often the case that some, but not all, of an expert's opinions will meet the criteria of FRE 702.  Indeed, it is routine for a party to retain a single expert to opine on a variety of issues that, while related, can be analyzed independently under the *Daubert* standard.  In such cases, the court, as gatekeeper, has discretion to decide which opinions are reliable and which are not, from which it follows that a court may exclude portions of an expert report while admitting other portions.[33]

## III.   APPLICABLE LAW

### A.   The Presumption of Reliance for Omissions

The Supreme Court has held that a presumption of reliance may apply in section 10(b) cases in which plaintiffs have alleged that defendants failed to disclose information.  In *Affiliated Ute Citizens of the State of Utah v. United States*, the Court held that where a plaintiffs' fraud claims are based on omissions, reliance may be satisfied so long as the plaintiff shows that defendants had an obligation to disclose the information and the information withheld is material.[34] This presumption may be rebutted by evidence that even if the material facts had

---

[33]     *See Laumann v. National Hockey League*, --- F. Supp. 3d ----, No. 12 Civ. 1817, 2015 WL 3542322, at *22 (S.D.N.Y. May 29, 2015) (holding in consumer antitrust case that expert's consumer demand model was not admissible but that his supply side analysis satisfied FRE 702).

[34]     *See* 406 U.S. at 154.

11

been disclosed, plaintiffs' decision to enter into the transaction would have been the same.[35]

**B.    The Presumption of Reliance for Misstatements**

  **1.    The *Basic* Presumption**

   The Supreme Court has also held that a presumption of reliance may apply in section 10(b) cases in which plaintiffs have alleged that defendants made fraudulent misstatements.  In *Basic v. Levinson*, the Supreme Court recognized that plaintiffs are typically entitled to a rebuttable presumption based on the "fraud-on-the-market" theory.[36]  Under this theory, "'the market price of shares traded on well-developed markets reflect all publicly available information, and, hence, any material misrepresentations.'"[37]  To invoke the *Basic* presumption, a plaintiff must prove that: (1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was

---

  [35] *See, e.g.*, *In re Initial Pub. Offering Sec. Litig.*, 260 F.R.D. 81, 93 (S.D.N.Y. 2009).

  [36] *See* 485 U.S. at 241.

  [37] *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2413 (2014) ("*Halliburton II*") (quoting *Basic*, 485 U.S. at 246).

revealed.[38]

## 2.   The *Basic* Presumption at Class Certification

The *Basic* presumption does not relieve plaintiffs of the burden of proving predominance under Rule 23(b)(3).[39]  Plaintiffs can establish predominance at the class certification stage by satisfying the prerequisites of the *Basic* presumption.[40]  The first three prerequisites — publicity, materiality, and market efficiency — are directed at "price impact" — "whether the alleged misrepresentation affected the market price in the first place."[41]  "In the absence of price impact, *Basic's* fraud-on-the-market theory and presumption of reliance collapse."[42]  Significantly, however, the Supreme Court made clear in *Halliburton II* that plaintiffs are not required to prove price impact directly to invoke the *Basic* presumption.  Rather, market efficiency and the other prerequisites for invoking

---

[38]    *See id.* (citing *Basic*, 485 U.S. at 248, n.27).

[39]    *See id.* at 2412.

[40]    *See id.*  However, in *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, the Supreme Court held that materiality does not need to be proven before a class can be certified, but is instead left to be addressed at the merits stage. *See* 133 S. Ct. at 1195-96.

[41]    *Halliburton II*, 134 S. Ct. at 2414 (internal quotation marks omitted).

[42]    *Id.* (quotation marks, alterations, and citations omitted).

13

the presumption serve as a proxy for price impact.[43]  Furthermore, in *Halliburton I* the Supreme Court held that a securities fraud plaintiff need not establish loss causation — *i.e.*, that plaintiffs' damages were caused by the fraud and nothing else — in order to certify a class.[44]  In so holding, the Supreme Court explained that loss causation was not an element of reliance.[45]

        *Halliburton II* held that defendants may submit price impact evidence prior to class certification for the purpose of rebutting the *Basic* presumption.  This is because "an indirect proxy should not preclude direct evidence when such evidence is available."[46]  Thus, "any showing that severs the link between the alleged misrepresentation and the price received (or paid) by the plaintiff will be sufficient to rebut the presumption of reliance because the basis for finding that the

---

[43]     *See id.* at 2414-15.

[44]     In order to establish loss causation, a plaintiff must prove that the decline in the stock was "because of the correction to a prior misleading statement and that the subsequent loss could not otherwise be explained by some additional factors revealed then to the market." *Halliburton I*, 131 S. Ct. at 2185 (internal quotation marks omitted) (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005)).  However, "[t]he fact that a subsequent loss may have been caused by factors other than the revelation of a misrepresentation has nothing to do with whether an investor relied on the misrepresentation in the first place, either directly or presumptively through the fraud-on-the-market theory.  Loss causation has no logical connection to the facts necessary to establish the efficient market predicate to the fraud-on-the-market theory." *Id.* at 2186.

[45]     *See id.*

[46]     *Halliburton II*, 134 S. Ct. at 2415.

14

fraud had been transmitted through market price would be gone."[47]

### 3. Degree of Efficiency After *Halliburton II*

There are three general forms of the efficient capital markets

hypothesis:

> First is the weak form, which asserts simply that the current share price in an efficient market reflects all information about past share prices.  If the weak form of the hypothesis accurately describes a market, it is impossible to predict future prices using only past prices.  Second, the semi-strong form, which asserts that a share price in an efficient market reflects all public information concerning the security (including but not limited to past share prices). Third, the strong form, which asserts that all relevant information, public and private, is reflected in the price of securities in an efficient market. The strong form has been widely discredited.[48]

Although *Basic* did not explicitly endorse any of these forms of an efficient

market, many courts had presumed that plaintiffs must establish the semi-strong

form.[49]

---

[47]    *Id.* at 2415-16 (internal quotation marks and alterations omitted).

[48]    *In re Initial Pub. Offering Sec. Litig.*, 260 F.R.D. at 98 n.148 (citing Daniel R. Fischel, *Efficient Capital Markets, The Crash, and the Fraud on the Market Theory*, 74 Cornell L. Rev. 907, 910-11 (1989)).

[49]    *See, e.g., id.* ("The semi-strong form is the form that generally concerns courts, and is the form to which I refer in this Opinion.") (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 100 n.4 (2d Cir. 2007) ("The efficient capital market hypothesis, as adopted by the Supreme Court, posits that 'the market price of shares traded on well-developed markets reflects all publicly available information.'") (quoting *Basic*, 485 U.S. at 246)).

In *Halliburton II*, however, the Supreme Court clarified that in recognizing the presumption of reliance, the *Basic* court did not adopt any particular theory of market efficiency.[50]  Instead, the *Basic* presumption is based "on the fairly modest premise that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'"[51]  "[I]n making the presumption rebuttable, *Basic* recognized that market efficiency is a matter of degree and accordingly made it a matter of proof."[52]  Debates about the "precise *degree* to which stock prices accurately reflect public information are [ ] largely beside the point."[53]  Furthermore, "[t]hat the price of a stock may be inaccurate does not detract from the fact that false statements affect it, and cause loss, which is all that *Basic* requires."[54]  The fact that

---

[50]    *See Halliburton II*, 134 S. Ct. at 2410.  Halliburton had argued that the Supreme Court should overrule *Basic* in part because "overwhelming empirical evidence now suggests that capital markets are not fundamentally efficient" because "public information is often not incorporated immediately (much less rationally) into market prices." *Id.* at 2409 (internal quotation marks omitted). While Halliburton did not argue that capital markets are always inefficient, "in its view, *Basic*'s fundamental error was to ignore the fact that efficiency is not a binary, yes or no question." *Id.* (internal quotation marks omitted).

[51]    *Id.* at 2410 (quoting *Basic*, 485 U.S. at 247, n.24).

[52]    *Id.*

[53]    *Id.* (emphasis in original).

[54]    *Id.* (internal quotation marks and alterations omitted).

*Basic* does not require that stocks reflect *all* public information within any specific time-frame or to any specific degree, necessarily affects the required proof of the relationship between stock movement and unexpected news.

### 4.      **Proving Market Efficiency**[55]

In an efficient market there are "[l]arge numbers of rational and intelligent investors," and "[i]mportant current information" that is "almost freely available to all participants . . . ."[56]  Because it is difficult to test for these requirements directly, courts use a variety of factors to evaluate whether a market for securities is efficient.

In *Cammer v. Bloom*, the court enumerated five factors that are frequently used to determine whether a market is efficient.[57]  These factors are (1) the average weekly trading volume; (2) the number of analysts who follow the stock; (3) the existence of market makers and arbitrageurs; (4) the ability of the

---

[55]      In this section, I incorporate without citation large portions of my opinion in *In re Initial Public Offering Securities Litigation*, 260 F.R.D. 81.

[56]      Paolo Cioppa, *The Efficient Capital Market Hypothesis Revisited: Implications of the Economic Model for the United States Regulator*, 5 Global Jurist Advances 1, 5-6 (2005).  The first component does not require that all investors be rational and intelligent, merely that there be enough rational, intelligent investors to outweigh any irrational actions.  *See id.* at 5.

[57]      *See* 711 F. Supp. 1264, 1283-87 (D.N.J. 1989).

company to file Securities Exchange Commission ("SEC") Form S-3;[58] and (5)
evidence of share price response to unexpected news.  The court in *Krogman v.
Sterritt* added three factors.  *First*, the court noted that investors tend to be more
interested in companies with higher market capitalizations, thus leading to more
efficiency.[59]  *Second*, the court determined that a small bid-ask spread indicated
that trading in the stock was inexpensive, suggesting efficiency.[60]  *Third*, the court
looked to the percentage of shares that were available to the public.  Because
insiders are more likely to have private information, if substantial portions of
shares are held by insiders, the price is less likely to reflect only the total of all
public information.[61]

### a.    Average Weekly Trading Volume

High volume suggests efficiency "because it implies significant
investor interest in the company.  Such interest, in turn, implies a likelihood that

---

[58]    *See generally* Cioppa, 5 Global Jurist Advances at 28 ("The SEC's
three tiered system recognized that markets for different securities in the United
States are efficient to different degrees.  Essentially, moving from the S1 filers to
the S3 filers, the more widely traded and followed the issuing company and the
longer it has traded, the more efficient the market for it and the less information it
must disclose in its registration statements.").

[59]    *See* 202 F.R.D. 467, 478 (N.D. Tex. 2001).

[60]    *See id.*

[61]    *See id.*

many investors are executing trades on the basis of newly available or disseminated corporate information."[62] *Cammer* supposes that turnover of two percent or more of outstanding shares would justify a strong presumption of efficiency, while turnover of one percent would justify a substantial presumption.[63]

### b.     Number of Securities Analysts

*Cammer* recognizes that a stock covered by a "significant number of analysts" is more likely to be efficient because such coverage implies that investment professionals are following the company and making buy/sell recommendations to investors.[64]

### c.     Existence of Market Makers and Arbitrageurs

*Cammer* explains that "[t]he existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level."[65] *Krogman* responded that the mere number of market makers, without more, is essentially meaningless;

---

[62]     *Cammer*, 711 F.Supp. at 1286.

[63]     *See id.* (citing Bromberg & Lowenfels, 4 Securities Fraud and Commodities Fraud § 8.6 (Aug. 1988)).

[64]     *Id.*

[65]     *Id.* at 1286-87.

19

"what is important is 'the volume of shares that they committed to trade, the volume of shares they actually traded, and the prices at which they did so.'"[66] One study has found that the number of market makers is not correlated with the efficiency of the market.[67] Nevertheless, this factor can provide reasonable guidance in determining whether the *Basic* presumption applies.

### d.    Eligibility to File Form S-3

The SEC permits a company to file Form S-3 when, in the SEC's judgment, the market for shares in the company is reasonably efficient at processing information.[68] *Cammer* emphasized the SEC's statement that the Form S-3 is "'*predicated on the Commission's belief that the market operates efficiently for these companies* [that file Form S-3s]*, i.e., that the disclosure in Exchange Act reports and other communications by the registrant, such as press releases, has*

---

[66]    *Krogman*, 202 F.R.D. at 476 (quoting *O'Neil v. Appel*, 165 F.R.D. 479, 501-02 (W.D. Mich. 1996)).

[67]    *See* Dr. Allen Michel et al., 24 Am. Bankr. Inst. J. 58, 60 (2005) (citing Brad Barber et al., *The Fraud–on–the–Market Theory and the Indicators of Common Stocks' Efficiency*, 19 J. Corp. L. 285, 286 (1994)).

[68]    *See Cammer*, 711 F. Supp. at 1284 (observing that the SEC permits seasoned issuers to incorporate by reference because "'[t]o the extent that the market accordingly acts efficiently, and this information is adequately reflected in the price of a registrant's outstanding securities, there seems little need to reiterate this information in a prospectus in the context of a distribution'") (quoting SEC Securities Act Release No. 6235, 45 Fed. Reg. 63,693 (1980)).

*already been disseminated and accounted for by the market place.'*"[69]  Deferring to

the SEC's expertise in this area, I agree that this factor provides a strong indication

of efficiency.

        e.     ***Cammer* 5**

      *Cammer* 5 — empirical evidence of price changes in response to

unexpected information — is often highly probative of efficiency.[70]  However,

there is no consensus as to how quickly share prices must change to justify a

finding of efficiency.

      *Cammer* 5 is often proven with an event study.  An event study is "a

statistical regression analysis that examines the effect of an event . . . on a

dependent variable, such as a company's stock price."[71]  An event study has four

parts: defining the event (*e.g.*,  an earnings announcement), establishing the

announcement window (*i.e.*, the period over which stock price changes are

---

      [69]    *Id.* (quoting SEC Securities Act Release No. 6331, 46 Fed. Reg. 41,902 (1981) (emphasis in original).

      [70]    *See id.* at 1287 (stating that "it would be helpful to a plaintiff seeking to allege an efficient market to allege empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price" and noting that this factor is "the essence of an efficient market and the foundation for the fraud on the market theory").

      [71]    Michael J. Kaufman & John M. Wunderlich, *Regressing: The Troubling Dispositive Role of Event Studies in Securities Fraud Litigation*, 15 Stan. J. L. Bus. & Fin. 183, 190 (2009) (internal quotation marks omitted).

calculated), measuring the expected return of the stock, and computing the abnormal return (which is the actual return minus the expected return).

Performing the third step, "requires the expert to isolate the effect of the event from other market, industry, or company-specific factors simultaneously affecting the company's stock price."[72] "A large abnormal stock price movement occurring at the same time the market receives news about an event suggests that the event caused the abnormal price movement."[73]

In sum:

[A]n event study is similar to a medical experiment in which there is a control group and a treatment group. The control group provides the benchmark against which the treatment group is compared to determine if the event being studied had any effect. In a securities setting, the control group is established by modeling the normal relationship of a stock's price movements to movements of a market and/or industry index. The difference between the stock price movement we actually observe and the movement we expected to observe (i.e. the difference between the treatment and the control group) that occurs upon the release of a particular piece of information is called the excess price movement of the stock at the time of the event. This excess price movement is tested for statistical significance to see whether the result is unusual or unlikely to be explained by the normal random variations of the stock price.[74]

---

[72]    *Id.* at 192.

[73]    *Id.* at 193 (internal quotation marks omitted).

[74]    *Id.* at 193-94 (internal quotation marks omitted). *Accord In re Federal Home Mortg. Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 178 (S.D.N.Y. 2012) (explaining, in a case that pre-dates *Halliburton II*, that in an

In most scientific work, the level needed to obtain a statistically significant result is set at a five percent level of significance, which means that there is no more than a five percent chance that the observed relationship is purely random.

### f.    Other Factors

The markets for companies with higher market capitalizations and shares with a smaller bid-ask spread are more likely to be efficient.[75]  The percentage of shares available to the public generally bears a direct relationship to efficiency.[76]  A put-call parity relationship between the share price and the prices of the put and call options written on the share indicates that the market for the stock and the options written on the stock are efficient.[77]  In an efficient market, stock returns follow what is known as a "random walk," meaning that investors

---

event study "[t]he actual price of the security during the event is compared against the expected price, which is calculated based on the security's historical relationship to a market index.  This historical relationship is measured over a 'control period.'  The difference between the stock's actual price and the expected price is defined as an 'abnormal return.'  A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. Econ. Lit. 13, 14-16 (1997).  In an efficient market, stock prices should show statistically significant abnormal returns on days in which unexpected, material information is released into the market.").

[75]    *See Krogman*, 202 F.R.D. at 478.

[76]    *See id.*

[77]    Arbitrageurs correct put-call disparities by engaging in short-sales. When short-selling bans restrict an arbitrageur's ability to exploit put-call disparities, these constraints may cause the stock to be overpriced.  Thus, put-call parity violations and short-selling constraints may result in inefficiency.

cannot use past stock price movements to predict the next day's stock price

movement.[78]

In addition, some courts have held that if "'a security is listed on the

NYSE . . . or a similar national market, the market for that security is [often]

presumed to be efficient.'"[79]  While other courts have been reluctant to conclude

that a stock was traded efficiently solely because it was traded on the NYSE or

NASDAQ, most courts agree that such listing is a good indicator of efficiency.[80]

---

[78]     *See generally* Eugene F. Fama and Kenneth R. French, *Permanent and Temporary Components of Stock Prices*, 96 Journal of Political Economy 2 (1988).

[79]     *Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 119 (S.D.N.Y. 2008) (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, No. 05 Civ. 1898, 2006 WL 2161887, at *5 (S.D.N.Y. Aug. 1, 2006)).  *Accord Stevelman v. Alias Research*, No. 91 Civ. 682, 2000 WL 888385, at *4 (D. Conn. June 22, 2000) ("For stocks . . . that trade on a listed exchange such as NASDAQ, [the] reliance element of a 10b-5 cause of action is presumed.").

[80]     *See In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 634 (3d Cir. 2011) ("[T]he listing of a security on a major exchange such as the NYSE or the NASDAQ weighs in favor of a finding of market efficiency."); *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 183 (S.D.N.Y. 2008) ("[N]o argument can be made that the [NYSE] is not an efficient market."); *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 296 n.133 (S.D.N.Y. 2008) ("[T]he federal courts are unanimous in their agreement that a listing on the NASDAQ or a similar national market is a good indicator of efficiency"); *RMED Int'l v. Sloan's Supermarkets*, 185 F. Supp. 2d 389, 404-05 (S.D.N.Y. 2002) ("Indeed, research has failed to reveal any case where a stock traded on the AMEX was found not to have been traded in an open and efficient market. . . .  Rather, to the contrary, numerous courts have held that stocks trading on the AMEX are almost always entitled to the presumption.") (citations omitted); *In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 250 (N.D. Cal. 2013) ("[D]efendant [has not] identified any authority,

In unusual circumstances, courts have found that stocks traded on major exchanges are not traded on an efficient market. Defendants rely on *IBEW Local 90 Pension Fund v. Deutsche Bank AG* and *In re Federal Home Mortgage Corporation (Freddie Mac) Securities Litigation*.[81] However, in neither of these cases were the stocks at issue common stock or ADS. In *Deutsche Bank*, the stock at issue was a global registered share, which unlike common stock or ADS, trade globally on various markets, and only a small percentage of those shares traded on the NYSE.[82] And in *Freddie Mac*, the securities were "a limited series of preferred shares, which are traded in patterns significantly different from the trading patterns

---

binding or otherwise, that has held that common shares traded on the NASDAQ are not traded in an efficient market."); *Lumen v. Anderson*, 280 F.R.D. 451, 459 (W.D. Mo. 2012) (noting that *Basic* itself recognized the NYSE was an efficient market"); *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 498 (S.D. Fla. 2003) ("NASDAQ . . . is more likely than not to be considered an efficiently traded market"); *Levine v. SkyMall, Inc.*, No. 99 Civ. 166, 2002 WL 31056919, at *5 (D. Ariz. May 24, 2002) ("Although not dispositive, the fact that SkyMall stock is traded on the NASDAQ stock market's National Market System also contributes to finding that the market is efficient."); *Appel*, 165 F.R.D. at 504 (stating that "[t]he market system upon which a particular stock trades provides some insight as to the likelihood that the market for that stock is efficient").

[81]    *See generally IBEW Local 90 Pension Fund v. Deutsche Bank AG*, No. 11 Civ. 4209, 2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013) (holding that market efficiency had not been established in a case in which the security at issue traded on the NYSE); *Freddie Mac*, 281 F.R.D. 174 (same).

[82]    *See* 2013 WL 5815472, at *3-4 (noting that only two percent of the global registered shares traded on the NYSE).

typical of common shares."[83]

## IV.    THE OPINION OF PLAINTIFFS' EXPERT

Plaintiffs' expert, Dr. John D. Finnerty, opines that the market for

Barclays ADS was open, developed, and efficient during the Class Period based on

two reports which contain two event studies, although plaintiffs now rely only on

the second event study.[84]  Despite *Halliburton II*, Dr. Finnerty employed the semi-

strong definition of market efficiency when conducting his analysis.[85]  In reaching

his conclusion, Dr. Finnerty analyzed numerous factors courts have considered

when assessing whether the market for a security is efficient.  One of those factors

was an event study.  In performing this event study, Dr. Finnerty selected every

earnings release date during the Class Period which contained surprise information.

---

[83]    *In re Computer Sci. Corp. Sec. Litig.*, 288 F.R.D. 112, 120 (E.D. Va. 2012).  In addition, the *Freddie Mac* court explicitly required proof of efficiency at the semi-strong level.  *See* 281 F.R.D. at 177 ("The fraud on the market theory is based on the semi-strong form of market efficiency.").

[84]    *See generally* 2/9/15 Declaration of John D. Finnerty, Ph.D., in Support of Lead Plaintiffs' Motion for Class Certification ("Finnerty I") and 4/17/15 Declaration of John D. Finnerty, Ph.D. in Support of Lead Plaintiffs' Motion for Class Certification ("Finnerty II").  Plaintiffs stated on the record of the hearing on class certification that they were not relying on the first event study. *See* 7/15/15 Hearing Transcript ("Tr. I"), at 16:1-17; 7/16/15 Hearing Transcript ("Tr. II"), at 229:16-17 ("As plaintiffs, we're not relying on [the event study in] Finnerty I.").

[85]    *See* Tr. I at 29:9-12 ("I employ the semi-strong form definition, which is customary in 10b-5 cases.").

He then determined earnings surprise predictions by reviewing the mix of

information released into the market for Barclays ADS using a method that

corresponds to a method advocated by defendants' expert, Dr. Paul Gompers.[86]

His event study found statistically significant price reactions at the five percent

level or better on five of the fifteen event days, and all fifteen event days exhibited

the expected directional movements.

## V.    DISCUSSION

The primary focus of defendants' objection to class certification is

that plaintiffs cannot satisfy predominance under Rule 23(b).  According to

defendants, plaintiffs cannot satisfy class-wide reliance based on either *Basic* or

*Affiliated Ute* and that under *Comcast* individual damages issues will predominate.

Defendants' arguments directed to the *Basic* presumption and *Comcast* are

supported by a motion pursuant to FRE 702 and *Daubert*.

I begin with a discussion of *Cammer* 5, because defendants'

arguments as to the application of the *Basic* presumption rest on the notions that

this factor is the *sine quo non* of market efficiency and that the factor can only be

satisfied with an event study.  I then consider defendants' challenge under *Daubert*.

---

[86]    Dr. Gompers submitted declarations in response to both Finnerty I and
Finnerty II.  *See* 3/3/15 Declaration of Paul A. Gompers, PH.D. ("Gompers I");
5/29/15 Supplemental Declaration of Paul A. Gompers, PH.D. ("Gompers II").

Next, I analyze the factors relevant to a determination of market efficiency.

Finally, I address the *Affiliated Ute* presumption, defendants' claim that *Comcast*

compels denial of class certification, and the appointment of both Class

Representatives and Class Counsel.

### A. *Cammer* 5 Is Not Dispositive of Market Efficiency

Defendants chide plaintiffs for "plod[ding] through each of the factors

identified in *Cammer* [and *Krogman*], as supposedly indicative of market

efficiency."[87]   For defendants, this exercise is pointless under *Teamsters Local 445*

*Fright Division Pension Fund v. Bombardier* which, in defendants' view, makes

*Cammer 5* "not only the 'most important test' of efficiency, but a test that has to be

passed" to establish efficiency for the predominance requirement.[88]   Defendants

contend that plaintiffs cannot satisfy *Cammer* 5 because Dr. Finnerty's event

studies "yield irreconcilable results and suffer from numerous methodological

errors that render his opinions irrelevant, unreliable and thus inadmissable" under

FRE 702 and *Daubert*.[89]   This, defendants argue, "should end the inquiry."[90]

---

[87]   Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification ("Def. Mem."), at 6.

[88]   *Id.* (internal quotation marks, citations, and alterations omitted) (quoting *Bombardier*, 546 F.3d at 207).

[89]   *Id.*

[90]   *Id.*

Defendants arguments are unpersuasive.  The Second Circuit has not adopted a specific test for market efficiency and explicitly declined to do so in *Bombardier*.[91]  While the Second Circuit endorsed the use of the *Cammer* factors in *Bombardier*, it has not required their use or held that any one of them is dispositive.  A substantially similar approach has been taken by the Courts of Appeals for the First, Third, Fourth, Fifth, and Eleventh Circuits.[92]  The vast majority of courts have used the *Cammer* factors as "an analytical tool rather than as a checklist."[93]  Indeed, not even the *Cammer* court considered the fifth factor necessary, stating only that "it *would be helpful* to a plaintiff seeking to allege an

---

[91]     *See Bombardier*, 546 F.3d at 205, n.11 ("This Court has not adopted a test for the market efficiency of stocks or bonds, and we do not do so here.").

[92]     *See In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 18 (1st Cir. 2005) ("While we agree . . . that the [*Cammer*] factors considered by the district court were relevant to the issue of market efficiency, these factors are not exhaustive."); *In re DVI*, 639 F.3d at 634 n.16 ("We have noted the *Cammer* factors may be instructive depending on the circumstances."); *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 368 (4th Cir. 2004) (citing *Cammer* for the proposition that, "to determine whether a security trades on an efficient market, a court should consider factors such as, among others, whether the security is actively traded, the volume of trades, and the extent to which it is followed by market professionals"); *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005) ("[T]his list [of eight factors, including the five *Cammer* factors,] does not represent an exhaustive list, and in some cases one of the above factors may be unnecessary."); *Local 703 v. Regions Fin. Corp.*, 762 F.3d 1248, 1257 (11th Cir. 2014) (same).

[93]     *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 159 (S.D.N.Y. 2012) (citing *Unger*, 401 F.3d at 325).  *Accord Bombardier*, 546 F.3d at 210 ("We conclude [ ] that the district court properly used the *Cammer* factors as an 'analytical tool[.]'") (quoting *Unger*, 401 F.3d at 325).

29

efficient market . . . ."[94]

In most cases, evidence that a stock trades at high volumes on a large national market, such as the NYSE or NASDAQ, and is followed by a large number of analysts will be sufficient to satisfy the *Basic* presumption on class certification.[95]  While defendants have managed to find one case that states that

---

[94]   *Cammer*, 711 F. Supp. at 1287 (emphasis added).

[95]   *See, e.g.*, *Regions Fin. Corp.*, 762 F.3d at 1255 ("[T]he market for a stock is generally efficient when millions of shares change hands daily and [when there is] a critical mass of investors and/or analysts who study the available information and influence the stock price through trades and recommendations.") (internal quotation marks omitted); *Fogarazzo v. Lehman Bros., Inc.*, 232 F.R.D. 176, 185 n.75 (S.D.N.Y. 2005) ("Defendants do not dispute that RSL was traded on an efficient market.  Moreover, RSL shares were traded on the NASDAQ National Market . . . were traded at high volumes during the class period . . . [and were] extensively followed by analysts and received extensive media attention.") (internal quotation marks omitted, alterations in original); *In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. 65, 107 (S.D.N.Y. 2004) (holding that "the record in this case contains several strong indications that the market in which the focus stocks traded was efficient.  Three facts stand out as particularly probative: first, all the focus stocks were traded on the NASDAQ National Market; second, the focus stocks were traded actively at high volumes throughout the class period; and third, the focus stocks were the subjects of numerous analyst reports and extensive media coverage. Under any conceivable test for market efficiency, these three facts are sufficient to meet plaintiffs' Rule 23 burden."). *See also Smilovits v. First Solar, Inc.*, 295 F.R.D. 423, 431 (D. Ariz. 2013) ("In keeping with *Basic* and the other cases cited in the first paragraph of this section, the Court concludes that the trading of First Solar stock on NASDAQ—a major, well-developed stock exchange—weighs in favor of finding market efficiency.  Defendants have not identified any authority, binding or otherwise, that has held that common shares traded on the NASDAQ are not traded in an efficient market.  Moreover, Defendants' expert, Dr. Gompers, agrees that '[m]ost of the time, . . . stocks traded on large national exchanges are likely to be efficient.'") (internal quotation marks

*Cammer* 5 is dispositive — the *Freddie Mac* case involving preferred shares — the

court's reasoning for adopting such a rule is tethered to its factual context.[96]

Different contexts require courts to place greater importance on some factors than

on others.  No other court has adopted a per se rule that any one factor is

dispositive.  At the same time, courts have found market efficiency in the absence

of an event study or where the event study was not definitive.[97]

---

and citations omitted); *In re Computer Sci. Corp. Sec. Litig.*, 288 F.R.D. at 120 ("It is not surprising that no other federal courts have concluded that common shares traded on the NYSE are not traded in an efficient market."); *In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 278-79 (D. Mass. 2006) (stating "that listing on such an exchange undisputably improves the market structure for trading in a particular stock" and "that one would be hard-pressed to deny the relevance of this fact in an efficiency analysis").

[96]    *See Freddie Mac*, 281 F.R.D. at 183 ("Although the less important *Cammer* and *Krogman* factors support an inference of efficiency, these factors cannot substitute for evidence of a cause-and-effect relationship between unexpected news and market price.  This is the critical factor—the *sine qua non* of efficiency.  It speaks to the 'essence' of the efficient market hypothesis, and it is the foundation of the fraud on the market theory.  [*Bombardier*], 546 F.3d at 207. The other *Cammer* and *Krogman* factors do not directly address the question of efficiency.  Without evidence of the prompt effect of unexpected news on market price, the market cannot be called efficient.").

[97]    *See Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 448 (S.D.N.Y. 2013) (holding that although plaintiff's expert "was unable to complete a formal event study" due to lack of data, the expert had demonstrated efficiency by "select[ing] five days on which news was released that she thought might be material, and qualitatively analyz[ing] the change in the price of Winstar bonds relative to the price change of the Lehman U.S. Bond Composite Index (a market-wide bond index composed of investment grade government, agency, corporate and mortgage-backed bonds)" and finding that on two of those days the price changed in response to news); *Aranaz v. Catalyst Pharm. Partners Inc.*, 302

31

Requiring a plaintiff to submit proof of market reactions — and to do so with an event study — ignores Supreme Court precedent as well as practical considerations.  Event studies test for a degree of efficiency that may not be required.  *Halliburton II* makes clear that no specific degree of efficiency is mandated to invoke the *Basic* presumption.[98]  Yet, event studies are designed to

F.R.D. 657, 669 (S.D. Fla. 2014) (finding market efficient for common stock even though expert had not performed an event study and implicitly finding that empirical evidence of the stock price change on the corrective disclosure date satisfied *Cammer* 5); *Computer Sci. Corp. Sec. Litig.*, 288 F.R.D. at 120 (rejecting the argument that plaintiffs had failed to establish market efficiency because they had not submitted an event study); *Smilovits*, 295 F.R.D. at 437 (holding that where *Cammer* 1, 2, and 4 weighed in plaintiffs' favor, *Cammer* 3 was partially unsatisfied, and *Cammer* 5 did not favor either the plaintiffs or the defendants, plaintiffs' evidence was sufficient to establish market efficiency by a preponderance of the evidence).

[98]     *See Halliburton II*, 134 S. Ct. at 2410.  Despite this, defendants wrongly contend that the semi-strong form of market efficiency is required under *Basic.  See* Tr. II at 253:24-25 ("I can tell you that *Basic* accepted the semistrong form of the efficient market hypothesis.").  In fact, the *Basic* presumption is based "on the fairly modest premise that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'" *Halliburton II*, 134 S. Ct. at 2410 (quoting *Basic*, 485 U.S. at 247, n.24).  Defendants further argue that the semi-strong form is what matters because the experts in this case have analyzed efficiency under the presumption that the standard is the semi-strong form.  However, an expert's misconceptions about what the law requires does not bind this Court.  Defendants also stress that Dr. Finnerty testified that an event study is necessary to demonstrate market efficiency.  *See* Def. Mem. at 6.  However, Dr. Finnerty clarified during the class certification hearing that an event study was not necessary to establish market efficiency if other factors have been met.  *See* Tr. I at 83:10-19.  He then discussed a study that demonstrated that *Cammer* 1 and 2 "were statistically significant in distinguishing efficient markets from inefficient markets."  *Id.* at 83:21-84:14.  And he explained

32

test the hypothesis "that publicly available information is impounded immediately into stock prices such that an investor cannot earn abnormal profits by trading on the information after its release."[99]   The failure of an event study to show immediate impoundment does not necessarily indicate whether the market is efficient for purposes of the *Basic* presumption.

      In academic research, event studies are almost exclusively conducted with large samples of securities from a number of different firms.[100]   When the event study is used in a litigation to examine a single firm, the chances of finding

that he relied on *Cammer* 5 because it was a direct test and the "most consistent with the semi-strong form of market efficiency." *Id.* at 84:18-20.  Dr. Gompers — who also applies the semi-strong form of market efficiency — disagrees, arguing that from a "financial economics perspective," one could not find market efficiency without *Cammer* 5.  *Id.* at 163:24-164:15.  He also believes the inverse, that all one needs is *Cammer* 5 in order to find market efficiency.  *See id.* at 164:16-165:15.

[99]    Sanjai Bhagat & Roberta Romano, *Event Studies and the Law: Part I: Technique and Corporate Litigation*, 4 Am. L. & Econ. Rev. 141, 142 (2002).

[100]    *See* Alon Brav and J.B. Heaton, *Event Studies in Securities Litigation: Low Power, Confounding Effects, and Bias* at 3 ("Importing a methodology that economists developed for use with multiple firms into a single firm context creates three substantial difficulties: low statistical power, confounding effects, and bias.").  Dr. Finnerty discussed the difference between event studies as conducted in the academic literature and those used in section 10(b) cases.  *See* Tr. I at 30:14-32:13; 39:20-41:18; 114:15-115:14.  In so doing, he noted that "the academic literature is really talking about the portfolio [*i.e.*, multi-firm approach], and it's the litigation or legal literature that is really the only place I've seen extended discussions of this single-company approach."  *Id.* at 32:10-13.  The notion that event studies are the paramount tool for testing market efficiency comes from these multi-firm event studies.  However, courts have generally not distinguished between the power of multi-firm and single firm event studies.

statistically significant results decrease dramatically.[101]  "[T]he event study

technique improves as the number of firms in the sample increase, as the number

of days in the announcement window decrease, and as the alternative of a larger

abnormal return is considered against the null hypothesis of zero abnormal

return."[102]  As to the latter point, neither the Supreme Court nor the Second Circuit

has indicated whether the abnormal return must meet a particular threshold level,

yet the success of an event study will depend on the size of the return it attempts to

measure.  The following example from the literature highlights the problems

---

[101]       *See* Bhagat & Romano, 4 Am. L. & Econ. Rev. at 149 ("An important question is can an event study be conducted with just one firm, that is, is a sample size of one acceptable? This question is especially relevant in court cases or regulatory injunctions involving only one firm. Conceptually, a sample of one is a rather small sample but this by itself does not invalidate the event study methodology. However, the statistical power with a sample of one is likely to be quite low.  First, the variability of (abnormal) returns of a portfolio with just one stock in it is significantly higher than a portfolio with even a few, say five, stocks in it. Any standard finance or investment textbook will have a graph depicting the sharp drop in variance of portfolio returns as the number of stocks in the portfolio increases from one, to five, to ten; after about fifty stocks in the portfolio the decrease in variance is quite small. Second, it is plausible that the announcement period return of an announcing firm will be affected by other information unrelated to the event under study. If a sample of one is considered, it is quite difficult to determine the separate effects on firm value of the announcement and of the unrelated information item(s). If the sample has several firms, then the effect on firm value of such unrelated information is likely to cancel out.  As the sample size increases the effect on firm value of such unrelated information (goes to zero) becomes less and less significant.").

[102]       *Id.* at 148.

inherent in placing too much emphasis on event studies to measure market efficiency:

> [i]n a sample size of twenty-five companies, the probabilities of detecting an abnormal return (or an effect on the stock price) of 0.5%, 1% and 2% is 24%, 71% and 100% respectively. But if the sample size is increased to 100 companies, the probabilities of detecting an abnormal return of 0.5%, 1%, and 2% is 71%, 94%, and 100% respectively. Thus, there is significant difference in detecting an abnormal return, or effect on the stock price, depending on the size of the event study.[103]

A further problem is that in any particular case it may not be possible to conduct an event study that looks at the relationship between the stock price and unexpected news. For example, there may only be a few — or perhaps no — unexpected events in a given class period that can be tested.[104] This could be because of the short length of the class period, a long period of uninteresting news, or because the company has withheld the unexpected information.[105] As just discussed, the corollary of this is that event studies become increasingly unreliable

---

[103]     Kaufman & Wunderlich, 15 Stan. J. L. Bus. & Fin. at 232-33.

[104]     *See Regions Fin. Corp.*, 762 F.3d at 1257 ("In any given case there may be no unexpected disclosures during the period at all, because the company is withholding that information.").

[105]     It is true that different event study methodologies may be used in the absence of unexpected news. In *Freddie Mac* the methodology was simply to look at news days versus non-news days and to determine whether there were substantially more statistically significant returns on news days than non-news days. *See* 281 F.R.D. at 179-80.

when the period they covers increases.[106]

   Likewise, the net result of *Halliburton I* and *Halliburton II* is that at class certification, a plaintiff is not required to prove either price impact — stock price movement based on the fraud — or loss causation — that the misrepresentation caused a subsequent economic loss.  Thus, it would be inconsistent with this precedent to require a plaintiff to submit proof analyzing stock price movement on days in which the alleged misrepresentations or corrective disclosure are made.

   For all these reasons, I conclude that in the ordinary case of a high volume stock followed by a large number of analysts and traded on a national exchange, whether a plaintiff can satisfy *Cammer* 5 is not dispositive.  Nor is an event study always necessary.  Not even the *Cammer* court said that an *event study* was required to satisfy the fifth factor,[107] and defendants have not cited to any controlling authority that holds that an event study is the only means to satisfy

---

[106] *See* Bhagat & Romano, 4 Am. L. & Econ. Rev. at 148.

[107] *See* 711 F. Supp. at 1287 ("Finally, it would be helpful to a plaintiff seeking to allege an efficient market to allege *empirical facts* showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price.  This, after all, is the essence of an efficient market and the foundation for the fraud on the market theory.").

*Cammer* 5.[108]   In the usual case of common or other highly traded and analyzed stock, there is no reason to burden the court with review of an event study and the opposing expert's attack of it.   The exception, and this was also made clear in *Halliburton II*, is when defendants present evidence of lack of price impact or that the market was inefficient.   In those cases, an event study or other rebuttal evidence is required and class certification becomes a battle of competing expert studies.   Defendants here chose not to submit their own event study.

## B.   Defendants' *Daubert* Motion Is Denied[109]

Defendants' *Daubert* challenge focuses almost exclusively on Dr. Finnerty's event studies.   These attacks provide an insufficient basis to exclude Dr. Finnerty's testimony.

### 1.   Dr. Finnerty's Testimony Is Relevant

---

[108]   In *George v. China Automotive Sys., Inc.*, No. 11 Civ. 7533, 2013 WL 3357170, at *10 (S.D.N.Y. July 3, 2013), the court stated that "courts have noted, event studies are the most reliable way of demonstrating market efficiency." However, the cases cited do not stand for that proposition. *See In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511-12 (2d Cir. 2010) (discussing event studies in the context of loss causation); *Wagner*, 251 F.R.D. at 120 n.7 (quoting *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 245 F.R.D. 147, 161 (S.D.N.Y. 2007) for the proposition that "'numerous courts have held that an event study *is a reliable method* for determining market efficiency and the market's responsiveness to certain events or information.'") (emphasis added).

[109]   Defendants do not contest Dr. Finnerty's qualifications, and I find that he is well qualified to offer opinions on market efficiency.

Ignoring *Halliburton II*, defendants contend that Dr. "Finnerty's opinions are not relevant because they do not address the liability theory of the case" in that Dr. "Finnerty found *no* ADS price movement in response to *any* Barclays LIBOR submission."[110]  However, the Supreme Court has made clear that plaintiffs are not required to prove price impact on class certification, and Dr. Finnerty has not been offered as an expert for this purpose.

Furthermore, a "material misstatement can impact a stock's value either by improperly causing the value to increase or by improperly maintaining the existing stock price."[111]  Dr. Finnerty testified that Barclays' LIBOR

---

[110]     Memorandum of Law in Support of Defendants' Motion to Exclude the Expert Opinions of John D. Finnerty ("Def. Daubert") at 10, 11 (emphasis in original).

[111]     *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 434 (S.D.N.Y. 2014).  *Accord Regions Fin. Corp.*, 762 F.3d at 1256 ("Regions's disclosures were designed to prevent a more precipitous decline in the stock's price, not bring about any change to it. When a company releases expected information, truthful or otherwise, the efficient market hypothesis underlying *Basic* predicts that the disclosure will cause no significant change in the price."); *Alaska Elec. Pension Fund v. Pharmacia Corp.*, 554 F.3d 342, 349 (3d Cir. 2009) (observing that misrepresentations that confirm prior market expectations are unlikely to move stock prices); *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 561 (S.D.N.Y. 2011) ("[C]ourts have suggested that a misstatement may cause inflation simply by *maintaining* existing market expectations, even if it does not actually cause the inflation in the stock price to increase on the day the statement is made.") (emphasis in original).

submissions were material omissions that maintained inflation in Barclays ADS.[112]

Price maintenance fits the theory of plaintiffs' case, which is that "Barclays submitted rates 'nearer to the expected rates of other Contributor Panel banks' to 'deceive the market about the rate at which Barclays truly believed it could borrow funds'" to counter perceptions about its well-documented liquidity problems.[113] Where, as here, "a misrepresentation or omission merely confirms market expectations, there will be no reactionary price impact."[114]

### 2.    Dr. Finnerty's Testimony Is Reliable

"In assessing reliability, the trial judge should consider whether: '(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has reliably applied the principles and methods to the facts of the case.'"[115]  Dr. Finnerty's analyses readily satisfy these considerations.

---

[112]    *See* 2/25/15 Transcript of Deposition of Dr. John D. Finnerty at 128:9-18; 193:22-194:2; 487:14-488:3.

[113]    *Carpenters II*, 56 F. Supp. 3d at 555 (quoting Complaint ¶¶ 171, 173) (internal quotation marks omitted).

[114]    Martis Alex & Michael W. Stocker, *Role of the Event Study in Loss Causation Analysis, Corporate Counsel*, (Aug. 20, 2009), www.newyorklawjournal.com/PubArticleNY.jsp?id=1202433177190.

[115]    *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 32 F. Supp. 3d 453, 460-61 (S.D.N.Y. 2014) (quoting Fed. R. Evid. 702).

As a threshold matter, defendants' attack on Dr. Finnerty's opinion focuses almost exclusively on the event studies he performed in connection with *Cammer* 5.  This challenge is too narrow.  It is widely accepted that analysis of the *Cammer* and *Krogman* factors is a reliable and accepted methodology for establishing market efficiency.[116]  Because there is no serious disagreement concerning Dr. Finnerty's methodology with respect to the majority of these factors — and because I conclude that *Cammer* 5 is not required in this case — there is no basis to reject Dr. Finnerty's opinion that the market is efficient.  This conclusion is supported by his testimony concerning *Cammer* 1 through 4, the additional analyses he performed, such as random walk tests and consideration of the *Krogman* factors, and the general efficiency of the NYSE.

Furthermore, while an event study is not the only way to gather empirical evidence in support of *Cammer* 5, Dr. Finnerty conducted such a study, which is a generally accepted methodology for establishing market efficiency. Finally, while one may question the probative value of the results of the Finnerty II event study, Dr. Finnerty employed standard event study methodology.  He first selected news dates based on objective criteria.  Next, he "compared consensus

---

[116]    *See, e.g.*, *In re Groupon Inc. Sec. Litig.*, Master File No. 12 C 2450, 2015 WL 1043321, at *3 (N.D. Ill. Mar. 5, 2015) (noting that Dr. Gompers, defendants' expert here, agrees that "experts employ a *Cammer* factor analysis to assess market efficiency for purposes of securities litigation").

pre-announcement estimates to the reported earnings" to locate earnings surprise

dates.[117]  He then reviewed the mix of information released into the market for

Barclays ADS to assess news items and evaluate the overall direction of sentiment

based on the collective body of news about Barclays released on the day of the

event.[118]

### a.      Dr. Finnerty's Opinion Relies on Sufficient Data

Defendants argue that Dr. Finnerty's sample size is "far too small to

reliably extrapolate any of his purported findings across the entire five-year Class

Period" and cite to a case that stands for the proposition that the "probative value

of event studies" depends on "whether the study is based on a sufficiently large

number of observations."[119]  As I have already noted, limitations on the number of

testable events are an accident of whether there are a sufficient number of suitable

events to be studied.  When a court accepts the use of event studies to show market

efficiency, there must be awareness of both the limitations of what the tests can

show and what they are required to show.  Finnerty II chooses every available date

on which there was an earnings surprise.  Courts have endorsed this approach even

---

[117]      Finnerty II at ¶¶ 20-21.

[118]      *See id.*

[119]      Def. Daubert at 13 (citing *In re Diamond Foods, Inc., Sec. Litig.*, 295
F.R.D. at 249) (quotation marks omitted).

when the sample is limited.[120]  While these cases are not controlling, neither are the

cases cited by defendants.[121]  The better approach is not to place arbitrary limits on

the number of sample days tested.

Defendants argue that a finding of five statistically significant days

out of fifteen is insufficient.  Defendants are able to reduce this success rate even

further by noting that "of the *four* 'earnings surprise' dates in Finnerty II that fall

within Finnerty's first two sub-periods between July 2007 and February 2009 —

the period during which all of the alleged misstatements were made — Finnerty

finds just *one* day with a [statistically] significant return."[122]  And defendants

---

[120]    *See Smilovits*, 295 F.R.D. at 435-36 (adopting event study which used as news days all sixteen earnings release dates in the almost four year class period); *Wilkof v. Caraco Pharm. Labs., Ltd.*, 280 F.R.D. 332, 345 (E.D. Mich. 2012) (five event days); *Schleicher v. Wendt*, 2009 WL 761157 (S.D. Ind. 2009) (eleven event days); *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 282 n.22 (N.D. Ala. 2009) (two event days).

[121]    Defendants' cases are also distinguishable.  *See George*, 2013 WL 3357170, at *11 (event days were days with analyst rating changes or earnings guidance releases, not earnings surprises); *Deutsche Bank*, 2013 WL 5815472, at *2-3 (study defective because stock traded on multiple exchanges and expert only looked at one exchange and failed to consider the German market in which the vast majority of the stock traded); *Freddie Mac*, 281 F.R.D. at 179 (determining whether there were substantially more statistically significant returns on news days than on non-news days for comparatively low-volume preferred stock).

[122]    Def. Daubert at 14.  Dr. Finnerty testified that although the *one* earnings release in the second sub-period in the study did not show a statistically significant price reaction for the entire day, the result would have been different if he had tested the morning and the afternoon separately.  This is because the stock had "plummeted" in the morning and then rose in the afternoon.  Tr. I at 129:2-6.

contend that Dr. Finnerty's analysis of the price movement on days in which he did not find statistically significant results represents an abandonment of statistical significance in favor of a subjective and unreliable economic significance standard.[123]

However, the failure of Finnerty II to identify a certain percentage of statistically significant days[124] does not demonstrate that the methodology employed was improper[125] or that the results are irrelevant.  For example, as defendants' expert agrees, for any unexpected news day there might not be a

---

In addition, there was a statistically significant price reaction on June 28, 2012, the day after the disclosure of the fraud.  *See infra* Part V.C.

[123]   *See* Def. Daubert at 9-15.

[124]   Defendants believe this figure should be fifty percent based on pre-*Halliburton II*, non-controlling law.  *See id.* at 15 (citing *George*, 2013 WL 3357170, at *12 (showing that "only seven out of sixteen days resulted in a market reaction is . . . insufficient"); *Freddie Mac*, 281 F.R.D. at 180-81 ("[S]howing that the market reacted to news 28% of the time is insufficient.").  However, as explained by another court, "[t]o require a stock to change on at least 50 percent of potentially material news days ignores that, in many circumstances, the absence of a price change on a potentially material news day is not inconsistent with an efficient market." *McIntire*, 38 F. Supp. 3d at 430.  *Accord Winstar Commc'ns Sec. Litig.*, 290 F.R.D. at 448 (finding that two out of five days in an informal analysis of price reactions to news events was sufficient).

[125]   *See, e.g.*, Bhagat & Romano, 4 Am. L. & Econ. Rev. at 149 (observing that single-firm event studies may lack power and fail to separate the effects of the event under study from confounding effects).

statistically significant result if the magnitude of the surprise is not that great[126] or

if confounding news limits the impact of the surprise.[127]   Moreover, Dr. Finnerty

has not abandoned the role of statistical significance in favor of economic

significance.   At the class certification hearing, Dr. Finnerty stated:

> [A] number of articles and econometric books will point out that
> one should not apply a strict mechanical test in deciding on
> whether something is meaningful or economically significant.
> Statistical significance is very useful and very helpful.   So
> if there's a market response that is significant at the 1 percent
> level or the 5 percent level, in all likelihood that's pretty
> significant.   So I'm not going to say that's not significant, but it's
> not determinative.   So there could be situations where you have
> information that doesn't rise to the level of statistical significance

---

[126]     *See* 6/18/15 Transcript of Deposition of Dr. Paul Gompers ("Gompers Dep."), at 226:15-21 (stating that "the size of the surprise should affect the size of the stock price movement").

[127]     *See* Tr. I at 154:9-155:1 (Dr. Finnerty provided an example of when confounding information on an earnings surprise news day may lead to a price reaction that is not statistically significant: "Suppose that Barclays reports a negative earnings surprise but on the same day indicates that it plans to increase the dividend. It's well-established in the literature that negative earnings surprises are bad news and dividend increases are good news. That would be particularly important for Barclays because during the class period, there was a lot of concern about Barclays' capital ratio, its regulatory capital ratios and the significance of the dividend — if Barclays could pay a dividend, that would mean its capital ratios were acceptable to the regulators. So when Barclays announced information regarding its dividend actions that was always, always highlighted by the analysts. So, in my example, negative earnings news, positive dividend news, and one could actually outweigh — little unclear, unless you look at how the analysts react, which one would outweigh the other. But what we normally expect is they would pretty much offset, and I would expect that the reaction would not be statistically significant.").

> at the 5 percent level, but the event is significant enough that a reasonable investor would say that would affect his or her investment decision.
>
> . . . .
>
>      So the accusation, if you will, that I've abandoned statistical significance is not true. But I'm using statistical significance, I believe, properly and putting it in its place.  If one were simply using statistical significance as the sole determinative of economic significance, you wouldn't need Professor Gompers or me; you'd just hire a statistician, and the statistician would just run a bunch of models and make a bunch of mechanical judgments, identify those dates where there's significance at the 5 percent level or better, and you'd be done.[128]

Dr. Finnerty explains that "I'm testing for a cause-and-effect relationship.  I'm not basing my test entirely on statistical significance. . . . [W]hether there's a significant reaction statistically could be helpful in making that determination, but it's not the be all and the end all."[129]  Furthermore, plaintiffs cite to a case in which a court found a substantially similar method to be sufficiently reliable to withstand a *Daubert* challenge.[130]  While defendants fault Dr. Finnerty for not employing the

---

    [128]  *Id.* at 48:15-49:21.

    [129]  *Id.* at 120:8-16.  *Accord* Michael J. Kaufman, *The PLSRA's Damages Formula and Experts*, 26 Securities Litig. Damages § 25:B (Thomson/West 2008) ("An event study combines principles of finance (e.g. what factors influence a company's stock price or the extent to which a company's stock price incorporates all publicly available information) with principles of statistics (e.g., collecting and analyzing data and identifying, isolating, and quantifying numerous variables that may account for the resulting pattern of data).").

    [130]  *See Dean v. China Agritech*, No. CV 11-01331, 2012 WL 1835708, at *3 (C.D. Cal. May 3, 2012) ("Agritech also attacks the way in which Dr. Werner conducted his event study.  Specifically, Agritech takes issue with Dr. Werner's

same level of intellectual rigor in the courtroom as he would in his academic work, this argument fails to take into consideration that single firm event studies are rarely done in an academic environment.

### b.   Dr. Finnerty's Methods Are Sufficiently Objective

Defendants contend that Dr. Finnerty's methods are "entirely subjective" in that he examined "'earnings surprises,' and then proceeded to conduct a haphazard review of roughly contemporaneous analyst reports to 'predict' the expected stock price reaction on that day, three to eight years after the fact."[131]  Furthermore, "the analyst 'sentiments' often already were informed by that day's stock movements . . . and in many instances simply reported the day's events."[132]  "[T]his exercise is circular, because the analyst commentary reflect the very market reactions that Finnerty purports to predict."[133]  Moreover, defendants

---

use of subjective criteria in selecting events to study, as well as his use of stock price movement at a statistically insignificant level.  Dr. Feinstein, however, confirms that the method used by Dr. Werner to do his event study is the method set forth in the literature.  Additionally, other academics and experts recognize that the selection of events is a subjective task and that stock price movement is important and a valid way of assessing the existence of a cause-effect relationship, even if the movement is not statistically significant at that level.  Even Defendants' expert, Dr. Roper, uses this method in his academic work.") (citations omitted).

[131]    Def. Daubert at 8.

[132]    *Id.* (citing Gompers II ¶¶ 69-72).

[133]    *Id.* (citing Gompers II ¶¶ 72-79).

argue, Dr. Finnerty and his staff "knew each actual price movement before embarking upon a subjective effort to 'predict' that historical fact."[134]

    While Dr. Finnerty's analysis is necessarily subjective, that does not mean his opinion is speculative or without any methodological constraints.  As a practical matter, researchers conducting event studies will often have to rely on subjective assessments.[135]  While this methodology may detract from the *weight* one might place on the results, it does not affect admissibility.  I conclude that this study is "sufficiently reliable, objective, and consistent with scientific principles" to withstand a *Daubert* attack.[136]

---

[134]    *Id.*  Defendants also argue that "'a subjective analysis without any methodological constraints does not satisfy the requirements of *Daubert.*'" *Id.* at 9 (quoting *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 95 (1st Cir. 2014)).

[135]    *See, e.g.*, *McIntire*, 38 F. Supp. 3d at 429 ("The Court notes that an expert who is conducting an event study necessarily must use his or her discretion to define selection criteria that are conducive to the execution of a meaningful multivariate regression analysis. *Billhofer,* 281 F.R.D. at 163 (determining selection criteria "necessarily requires a researcher to make an independent determination"). Put differently, "identifying news, categorizing which news is 'material,' and determining whether news should have a certain (albeit rough) magnitude of positive or negative influence on price are all subjective determinations." *In re Countrywide Fin. Corp. Sec. Litig.,* 273 F.R.D. 586, 618 (C.D. Cal. 2009). Taking into account the necessity of expert discretion that accompanies the classification of trading days in an event study analysis and the law's aversion to rigid standards of expert opinion admissibility, *see Daubert,* 509 U.S. at 588-89").

[136]    *Id.  Accord Fener v. Operating Engineers Const. Indus. and Misc. Pension Fund (LOCAL 66)*, 579 F.3d 401, 408 (5th Cir. 2009) ("[Defendant]

Finnerty II identified statistically significant price reactions at the five percent level or better on five event days.  In addition, Dr. Finnerty analyzed the results and concluded that on each of the fifteen days studied, the price moved in the direction he would have expected.  While Finnerty II is not *conclusive* proof of anything, it is a product of reliable principles and methods which have been reliably applied to the facts of this case.  I have considered the remainder of defendants' arguments and find them to be without merit.  By and large, defendants' objections go to the weight, not the sufficiency of the evidence, and are therefore not a basis to exclude Dr. Finnerty's report.[137]

## C.  The Market for Barclays ADS Was Efficient During the Class Period

---

presented Gompers's testimony and an event study that he had conducted. Gompers argued that the press release contained not one piece of information but three separate items of news:  DMN's circulation decrease resulted from (1) fraudulent overstatements; (2) changes in DMN's methodology; and (3) industry-wide decline in newspaper circulation.  Gompers's event study examined 132 analyst reports and found that the stock price decline was primarily related to the non-fraudulent disclosures instead of the fraudulent one.").

[137]  For example, defendants argue that Dr. Finnerty's second event study should be excluded because he does not believe that he had to run the event study — *i.e.*, that he was content with his first event study but only conducted the second one to address Dr. Gompers's concerns.  But the expert's motivation is irrelevant to an evaluation of whether his methodology satisfies the requirements of *Daubert*. In any event, Dr. Finnerty has adequately explained the scientific basis for adopting the changes suggested by Dr. Gompers.  *See* Tr. I at 58:20-61:16; 62:6-10; 62:13-64:20; 105:4-106:14; 108:2-110:15; 111:6-113:7.

The four elements of the *Basic* presumption are that (1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed.  The only disputed element for purposes of this motion is whether Barclays ADS traded in an efficient market.  Based on the following considerations, I conclude that plaintiffs have proven by a preponderance of the evidence that the market for Barclays ADS was efficient.

### 1.    Barclays ADS Traded on the NYSE

It is undisputed that Barclays ADS traded on the NYSE during the Class Period.  As Dr. Finnerty explains:

> The NYSE is the world's largest and most liquid stock exchange. Its infrastructure and participants allow it to provide a reliable, liquid, and efficient market place.  Its stringent listing standards ensure that issuers are large enough to facilitate a liquid market, and its regulations ensure that material company information is disclosed promptly to investors.  In general, to be listed on the NYSE, the market value of a publicly-held equity must exceed $75 million.[138]

Dr. Gompers notes that efficiency can vary with respect to stocks traded on the same exchange, stocks that trade efficiently at certain times may not trade efficiently at other times, and there was increased trading volatility during the

---

[138]    Finnerty I ¶ 67.

financial crises, which spanned a significant portion of the Class Period.[139]  While

the significance of trading on the NYSE or other large markets can be undermined

by direct evidence of inefficiency, defendants have not presented such evidence.

The issues raised by Dr. Gompers mainly relate to the degree of

efficiency, but "[d]ebates about the precise *degree* to which stock prices accurately

reflect public information are [ ] largely beside the point."[140]  The increased

volatility of the markets during the financial crisis raises concerns, but it is not

outcome determinative, and I and other courts have certified classes of purchasers

of stocks during the financial crisis.[141]  Accordingly, the fact that Barclays ADS

traded on the NYSE weighs in favor of finding market efficiency.

### 2.  *Cammer* 1:  Barclays ADS Traded at a Large Average Weekly Volume[142]

The average weekly trading volume for Barclays ADS shares over the

---

[139]    *See* Gompers I ¶¶ 37, 58.

[140]    *Halliburton II*, 134 S. Ct. at 2410.

[141]    *See generally In re Sadia, S.A. Sec. Litig.*, 269 F.R.D. 298 (S.D.N.Y. 2010) (certifying a class with a class period from April 30, 2008 to September 26, 2008); *Local 703, I.B. of T. Grocery and Food Emps. Welfare Fund v. Regions Fin. Corp.*, No. Civ. 10-J-2847, 2014 WL 6661918 (N.D. Ala. Nov. 19, 2014); *Smilovitz*, 295 F.R.D. 423 (certifying a class with a class period from April 30, 2008 to February 28, 2012).

[142]    Defendants do not challenge plaintiffs' showing with respect to *Cammer* 1 through 4 or *Krogman* 1 through 3.  *See* Tr. I at 35:3-7.

Class Period was roughly fifteen million, which is equal to 18.83 percent of the

outstanding ADS during this timeframe.[143]  This far exceeds the two percent

threshold "justify[ing] a strong presumption that the market for the security is an

efficient one . . . ."[144]  Thus, *Cammer* 1 weighs in favor of market efficiency.

### 3.   *Cammer* 2:  A Significant Number of Analysts Followed and Reported on Barclays ADS

During the Class Period, at least eighty securities firms contributed

analyst reports that covered Barclays.[145]  The presence of a substantial number of

analysts indicates that Barclays ADS was closely reviewed by investment

professionals, who made recommendations to client investors based on publicly

available information.[146]  Barclays also issued regular press releases, made regular

securities filings with the SEC, and held regular analyst conference calls.  In

addition, "Barclays received regular press coverage throughout the Class Period,

and information concerning Barclays was widely disseminated throughout the

Class Period through Bloomberg and other news services."[147]  Thus, *Cammer* 2

---

[143]     *See* Finnerty I ¶ 22.

[144]     *Cammer*, 711 F. Supp. at 1286.

[145]     *See* Finnerty I ¶ 25.

[146]     *See Cammer*, 711 F. Supp. at 1286.

[147]     Finnerty I ¶ 26.

weighs in favor of finding market efficiency.

      **4.**    **Cammer 3:  Existence of Market Makers, Institutional Investors, and Arbitrageurs**

As disclosed in Schedule 13-F filings, Barclays ADS representing between 55 and 97 percent of Barclays ADS outstanding were held by institutional investors during the Class period.  "According to Bloomberg, there were 51 active market makers for Barclays ADS between July 2007 and June 2012 with trading volumes in excess of one million shares."[148]  Courts in this Circuit have found that anywhere between six and twenty market makers is sufficient to support a finding of market efficiency.[149]

As described previously, the economic rationale for efficient markets is that under normal circumstances, profit seeking arbitrageurs will act to remove inefficiencies from the market.  However, various market constraints may cause "limits to arbitrage" which may in turn undermine efficiency.  *Cammer* 3 is an indirect test of the extent to which limits to arbitrage exist.  Accordingly, *Cammer* 3 weighs in favor of finding market efficiency.

---

[148]    *Id.* ¶ 29.

[149]    *See McIntire*, 38 F. Supp. 3d at 432 (finding that twenty market makers supported market efficiency); *Winstar Commc'ns Sec. Litig.*, 290 F.R.D. at 447 (finding that six large banks acting as market makers was sufficient evidence of market efficiency).

5.      *Cammer* 4: Barclays Eligibility to File SEC Form S-3

Dr. Finnerty notes that, "Barclays was eligible to file on Form S-3

throughout the Class Period because the Barclays ADS were listed on the NYSE

during the entire Class Period."[150]  Accordingly, *Cammer* 4 weighs in favor of

finding market efficiency.

6.      *Cammer* 5: The Relationship Between News Events and
        Security Price Changes

Dr. Finnerty's statistically significant findings of price movement on

five of the fifteen event days, together with his analysis of the other ten event days,

provides some evidence of market efficiency.  Moreover, the change in price

following the disclosure of the fraud in June 2012 is further empirical evidence of

a cause-and-effect relationship between unexpected corporate events and an

immediate response in the stock price.  Accordingly, *Cammer* 5 weighs in favor of

finding market efficiency.

7.      *Krogman* 1: Market Capitalization

During the Class Period, the quarterly market capitalization of

Barclays ADS ranged from $0.5 to $3.2 billion, and was "on average [ ]

approximately 20 times as large as the $75 million minimum [market value of

---

[150]     *Id.* ¶ 32.

publicly held equity] for NYSE listing."[151]   As Dr. Finnerty explains, "[t]he large market capitalization of Barclays ADS in relation to the average market capitalization of NYSE stocks is consistent with the market for Barclays ADS being efficient during the Class Period."  Accordingly, *Krogman* 1 weighs in favor of finding market efficiency.

### 8. *Krogman* 2: Barclays ADS Bid-Ask Spread

Dr. Finnerty opined that the bid-ask spreads for Barclays ADS were consistent with an efficient market.[152]  However, Dr. Gompers noted that the bid-ask spreads were wider during the financial crisis and found that Dr. Finnerty had no basis to conclude that this financial crisis period result was consistent with market efficiency.[153]  Dr. Finnerty agreed that the average bid-ask spread for Barclays ADS widened during the financial crisis, but concluded that overall the "the average bid-ask spread is nonetheless nominal throughout the entire Class Period."[154]  Accordingly, I find that *Krogman* 2 is neutral — weighing neither for nor against a finding of market efficiency.

---

[151]    *Id.* ¶¶ 66, 69 ("The median market capitalization for all stocks traded on the NYSE ranged from $714.3 million to $1.715 billion, during the Class Period.").

[152]    *See id.* ¶ 70.

[153]    Gompers I ¶ 63.

[154]    Finnerty II ¶ 103.

9.    *Krogman* 3: Barclays ADS Public Float

Dr. Finnerty calculated the public float to be approximately one hundred percent, meaning that Barclays ADS was almost exclusively held by outside investors during the Class Period.[155]  Dr. Finnerty concludes that "[t]he large size of the public float for Barclays ADS suggests a liquid market for the ADS, which is consistent with the hypothesis that the market for Barclays ADS was efficient during the Class Period."[156]  Accordingly, *Krogman* 3 weighs in favor of finding market efficiency.

10.    **Random Walk Tests**

In addition to the *Cammer* and *Krogman* factors, Dr. Finnerty examined put-call parity and conducted random walk tests.[157]  Of these, the random walk tests are more persuasive.  I further note that Dr. Gompers has stated that "Dr. Finnerty's 'random walk tests' are only sufficient to establish weak-form efficiency, not semi-strong form efficiency, which I understand is the relevant standard of efficiency in this litigation."[158]

As Dr. Finnerty explains, "[s]tock prices in an efficient market move

---

[155]    *See* Finnerty I ¶ 71.

[156]    *Id.* ¶ 72.

[157]    *See id.* ¶¶ 73-100.

[158]    Gompers I ¶ 55.

from moment to moment much like bubbles in a glass of soft-drink; that is, when stock returns follow a random walk, stock price movements are independent from moment to moment."[159]  When stocks follow this random walk, investors cannot use past stock price movements to predict the next day's price movement.  Based on a series of tests he ran, Dr. Finnerty concluded that there was no significant serial correlation, and that Barclays ADS returns followed a random walk during the Class Period.[160]  Dr. Finnerty also repeated certain tests to exclude the height of the financial crisis when there was high volatility and short selling was banned for many stocks, and the results were not substantially different and did not support serial correlation.  Dr. Gompers, by contrast, chose not to analyze the impact of the short selling ban on Barclays ADS during the Class Period.[161]  Accordingly, Dr. Finnerty's random walk tests provide some support for the conclusion that the market for Barclays ADS was efficient during the Class Period.

### 11.   Evidence of Inefficiency

Defendants note that there were several indicators of inefficiency during the Class Period:

Finnerty's  own  analyses  show  significant  impediments  to

---

[159]    Finnerty I ¶ 87.

[160]    See id. ¶¶ 100, 102.

[161]    See Tr. I at 198:1-199:5.

efficiency during the height of the financial crisis, including a ban on short selling (and higher borrowing costs impeding short selling even where not banned), as well as objective evidence of a breakdown in market efficiency over this critical period, such as put-call parity violations, widening spreads, and pricing anomalies. (Gompers I ¶¶ 57-78.)  Finnerty does not dispute that this evidence signals potential inefficiencies, he simply dismisses it because it coincided with the financial crisis.   This is backwards.  An expert must address the conflicting evidence, and Finnerty has no explanation for the apparent inefficiencies in the market for Barclays' ADS during the height of the financial crisis.[162]

There is no doubt the issues raised by Dr. Gompers are relevant to an assessment of efficiency, but Dr. Finnerty has responded to these criticisms,[163] and Dr. Gompers has not "offer[ed] an affirmative opinion that the market was inefficient" during the Class Period.[164]  Defendants also rely on *Deutsche Bank* — in which the court denied class certification for a number of reasons including that the expert "fail[ed] to tackle plainly important considerations," including the fact that "the financial crisis was ongoing" and that "there were short sale bans in both the U.S. and in Germany."[165]  However, *Deutsche Bank* involved globally registered shares not ADS, and therefore the relevance of the foreign market was of

---

[162]    Def. Daubert at 15.

[163]    *See, e.g.*, Finnerty II ¶¶ 98-105.

[164]    Tr. I at 186:15-187:5.

[165]    2013 WL 5815472, at *14.

57

far greater significance than it is here.[166]

        While the global financial crisis created market volatility and limited arbitrage opportunities which thereby decreased efficiency, defendants are holding plaintiffs to far too high a standard of proof.[167]  Plaintiffs' evidence is sufficient to prove market efficiency by a preponderance of the evidence, notwithstanding defendants' evidence that the market *may have been* inefficient.[168]  Based on my

---

[166]    In any event, unlike the proposed expert in *Deutsche Bank*, Dr. Finnerty addressed the relationship between Barclays ADS and shares traded on the London Stock Exchange.  *See, e.g.*, Finnerty II ¶¶ 98-102, 104 (concluding that "the daily returns for the Barclays ordinary shares and the daily returns for the Barclays ADS during the approximately four-month U.K. short sale ban period (September 18, 2008 through January 16, 2009) were highly correlated.").

[167]    *See Halliburton II*, 134 S. Ct. at 2410 (explaining that the *Basic* presumption is based "on the fairly modest premise that market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.  *Basic's* presumption of reliance thus does not rest on a 'binary' view of market efficiency.  Indeed, in making the presumption rebuttable, *Basic* recognized that market efficiency is a matter of degree and accordingly made it a matter of proof") (internal quotation marks and citations omitted).

[168]    For example, Dr. Gompers suggests a short sale ban is indicative of inefficiency, but he admits that it is possible for a stock to be efficient during a short sale ban and that he did not analyze the impact of the short selling ban on Barclays ADS during the Class Period.  *See* Tr. I at 198:1-199:5.  *Cf. In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. at 250 ("To summarize, defendant does not provide a study or other evidence concluding that the market for Diamond stock was not efficient during the class period.  Defendant's expert, while purportedly identifying fundamental flaws in plaintiff's event study, has not provided sufficient rebuttal of the study's conclusion regarding efficiency. Nor has defendant identified any authority, binding or otherwise, that has held that common shares traded on the NASDAQ are not traded in an efficient market. For purposes

analysis of all these factors, I find that the plaintiffs are entitled to the *Basic* presumption.  Although *Cammer* 5 supports efficiency, I would have found efficiency on this record even without it.

### C.    Defendants Have Failed to Rebut the Presumption of Reliance by Showing Lack of Price Impact

*Halliburton II* held that a defendant can rebut the *Basic* presumption at the class certification stage by, *inter alia*, proving that the "asserted misrepresentation (or its correction) did not affect the market price" of the security.[169]  While defendants challenge price impact, they ignore the Supreme Court's invitation to offer their own evidence to prove lack of price impact.  Dr. Gompers did not perform an event study and he does not otherwise directly address price impact.

Instead, defendants contend that Dr. Finnerty's event studies and testimony establish lack of price impact.[170]  As explained in *Halliburton II*, "market efficiency and the other prerequisites for invoking the presumption constitute an indirect way of showing price impact," and a plaintiff is not required

---

of this order, plaintiff has sufficiently demonstrated market efficiency and is therefore entitled to the Basic presumption of reliance.").

[169]    *Halliburton II*, 134 S. Ct. at 2414.

[170]    *See* Def. Mem. at 15-20.

to show price impact directly.[171]  At the same time, a properly conducted event study offered into evidence by either the defendant or the plaintiff that definitively demonstrated lack of price impact would "'sever[] the link between the alleged misrepresentation and . . . the price received (or paid) by the plaintiff . . . [which would] be sufficient to rebut the presumption of reliance' because 'the basis for finding that the fraud had been transmitted through the market price would be gone.'"[172]

Defendants argue that Dr. Finnerty's failure to show price impact on six dates identified in the Complaint in which Barclays made artificially low LIBOR submissions is sufficient evidence to show lack of price impact.[173]  This argument fails for two reasons.  *First*, the failure of an event study to disprove the null hypothesis with respect to an event does not prove that the event had no impact on the stock price.[174]  In Dr. Finnerty's study, the null hypothesis was that

---

[171]     *Halliburton II*, 134 S. Ct. at 2415.

[172]     *Id.* at 2415-16 (quoting *Basic*, 485 U.S. at 248); *see id.* at 2416 ("[A]n indirect proxy should not preclude direct evidence when such evidence is available.").

[173]     *See* Def. Mem. at 16 (citing Complaint ¶ 172).

[174]     Defendants exhibit some confusion about how event studies work, and, perhaps, the example given in *Halliburton II*.  In *Halliburton II*, the Court provided an example to show why defendants should not be precluded from demonstrating lack of price impact at the certification stage.  In that example, plaintiffs' evidence was sufficient to show an efficient market while *defendants'*

the market was inefficient and he sought to reject it at various confidence levels. The failure of an event study to find price movement does not prove lack of price impact with scientific certainty.  Dr. Finnerty's findings do not rule out either Type I or Type II errors.[175]

Second, as already discussed, plaintiffs' theory is that the false LIBOR submissions artificially maintained the stock price, not that they artificially inflated the price of the stock.  For these reasons, a regression analysis seeking to prove market efficiency that fails to show statistically significant price movements on the days identified in the Complaint in which false LIBOR statements were made does not necessarily sever the link between "the price received (or paid) by the plaintiff[s.]"[176]  Accordingly, defendants have failed to offer "salient evidence showing that the alleged misrepresentation did not actually affect the stock's market price and, consequently, that the Basic presumption does not apply."[177]

Defendants also argue that Dr. Finnerty's analyses show that the price of Barclays ADS did not change significantly as a result of the disclosure of the

---

event study showed that there was "no price impact with respect to the specific misrepresentation challenged in the suit."  134 S. Ct. at 2415.

[175]   Type I errors are when a study incorrectly rejects a null hypothesis. Type II errors are when a study incorrectly fails to reject a null hypothesis.

[176]   Halliburton II, 134 S. Ct. at 2415 (quoting Basic, 485 U.S. at 248).

[177]   Id. at 2416.

fraud on June 27, 2012. While Dr. Finnerty contends that he has demonstrated efficiency by showing that the price declined dramatically the following day, defendants argue that plaintiffs "cannot salvage their failed motion by pointing to the *post*-Class Period price declines on June 28, 2012."[178] Defendants argue that there is "no dispute that the June 28 price decline was not caused by the revelation that LIBOR-related statements were false; rather, Plaintiffs contend that the decline related to future collateral consequences of the LIBOR settlements themselves."[179] And defendants assert that "[a] stock drop is actionable only when it is in reaction to information released into the market rather than in reaction to the fraudulent statements themselves."[180]

Defendants' arguments are flawed for several reasons. *First*, assuming that Dr. Finnerty's second event study failed to show an abnormal return, this would not prove that the market was inefficient. *Second*, defendants' contentions about what can or cannot cause a price drop are arguments about loss causation, which under *Halliburton I* is not an element of market efficiency. Plaintiffs are not required to prove loss causation on class certification and this

---

[178]     Def. Mem. at 18 (emphasis in original).

[179]     *Id.* at 19.

[180]     *Id.* (internal quotation marks omitted).

evidence is not being offered for that purpose.[181]

Finally, the fact that the stock price changed dramatically due to collateral consequences shows that the stock quickly assimilates new information. In other words, even if this type of price reaction is not sufficient to establish loss causation, it is sufficient to show market efficiency.[182]  Thus, far from supporting defendants, this price reaction supports market efficiency.

Defendants' insistence that it is impermissible for Dr. Finnerty to rely on empirical evidence from the day following the Class Period has no support.  A two- to three-day window is common in event studies.[183]  Because it is standard for experts to utilize an event window including both the day of the event and the day following an event, this event window was proper.

Although the event window used by plaintiffs' expert was appropriate, the question remains as to whether evidence from outside the Class Period may be admitted to show market efficiency.  While defendants cite to several cases within

---

[181]    *See* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Exclude the Expert Opinions of John D. Finnerty at 4.

[182]    While I have always been skeptical that loss causation can be shown in this case, the Second Circuit has deemed otherwise, and I cannot revisit that issue on a motion for class certification.

[183]    *See, e.g.*, *Fogarazzo*, 232 F.R.D. at 189 n.106; Kaufman & Wunderlich, 15 Stan. J. L. Bus. & Fin. at 192 (noting that experts typically use a two- to three-day window); Gompers Dep. at 254:8-17 (agreeing that event studies often use a two-day window, the date of the announcement and the day after).

this circuit, these cases are either distinguishable or unpersuasive.[184]  Plaintiffs cite

to only one case within this circuit, *In re Bank of America Corp. Securities,*

*Derivative, and Employee Retirement Income Securities Act (ERISA) Litigation.*[185]

The court allowed plaintiffs to introduce evidence of the decline in share values,

finding that "[t]he market's reaction to the alleged corrective disclosures provides

some evidence of the alleged misstatements' materiality."[186]  Although the case

discussed the evidence of declining share values in terms of materiality rather than

price impact or market efficiency, the purpose of introducing the evidence is

---

[184]     Defendants cite to *Bombardier*, in which the Second Circuit did not consider testimony from Teamsters' bond trader that he had "obtain[ed] an actual bid or quote *after* the close of the class period."  546 F.3d at 207 n.13.  Without further evidence, the court found that Teamsters "failed to show that firms engaged in . . . activities identified . . . as defining a market maker."  *Id.* at 207.  While the court found that the market makers evidence outside the class period was inadmissible, it did not extend its holding to how the stock reacted to material information.

[185]     281 F.R.D. 134 (S.D.N.Y. 2012).

[186]     *Id.* at 143 (citing *In re SLM Corp. Sec. Litig.*, No. 08 Civ. 1029, 2012 WL 209095, at *6 (S.D.N.Y. Jan. 24, 2012) ("While not required at the class certification stage, evidence of a stock price movement following corrective disclosures may be a relevant factor in the legal assessment of materiality.").  Price movement following the class period is also relevant when assessing damages.  *See* 15 U.S.C. § 78u-4(e)(1) (providing that "the award of damages to the plaintiff shall not exceed the difference between the purchase or the sale price paid . . . by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market").

similar.[187]

        While there is no Second Circuit case on point, a review of the

relevant case law in this circuit and the arguments set forth by plaintiffs compels

the finding that the class period is first and foremost "delimited in order to identify

the individuals who claim membership in the class"[188] and the activity that can give

rise to liability.[189]  In the case of a securities fraud class action, courts are required

to "cut off the class period" on the date of a statement or event that "cure[s] [] the

market."[190]  In other words, a class period ends when the truth has been

disseminated to the market.  In this case, because the event window was proper,

and the event date fell on the last day of the Class Period, I conclude that the

evidence of price movement from June 28, 2012 is admissible and supports a

_____

    [187]    Defendants also cite to *Freddie Mac*.  The court excluded the day
following the class period as a news date, with the only justification being that it
was not "within the class period."  281 F.R.D. at 179.  Moreover, in this case the
event date is June 27, and the reaction occurred on June 28, whereas in *Freddie
Mac* the expert presumptively chose the day after the class period as the event date.

    [188]    *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 643 n.27 (S.D.N.Y.
2007) (stating that while "pre-class period statements can be relevant" in
determinations of scienter, defendants are only liable for "statements made during
the class period") (internal citations omitted).

    [189]    *See id.* at 643 (*citing In re IBM Sec. Litig.*, 163 F.3d 102, 107 (2d Cir.
1998)).

    [190]    *In re Interpublic Sec. Litig.*, No. 02 Civ. 6527, 2003 WL 22509414, at
*5 (S.D.N.Y. Nov. 6, 2003) (citing *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566,
572 (2d Cir. 1982)).

finding of efficiency.[191]

Because defendants have not presented compelling evidence of lack of price impact, plaintiffs do not have to present evidence of price impact to satisfy Rule 23(b)(3).  Accordingly, I find that plaintiffs are entitled to rely on the *Basic* presumption of reliance for misstatements and have satisfied the requirements of Rule 23(b)(3).

### D.    The *Affiliated Ute* Presumption Does Not Apply

Unlike *Basic*, the circumstances in *Affiliated Ute* "involv[ed] primarily a failure to disclose."[192]  The Supreme Court held that in claims revolving around omissions, "positive proof of reliance is not a prerequisite to recovery."[193]  "'[W]here plaintiffs' claims are based on a combination of omissions and misstatements, courts in this Circuit have acknowledged the applicability of the *Affiliated Ute* presumption.'"[194]  Thus, the existence of "affirmative

---

[191]    Dr. Finnerty explained that because the reaction was "in the market by the opening on the 28th [ ] it [came] roughly 25 hours after the original press release . . . ." Tr. I at 78:6-9.  Furthermore, he found that the price decline on June 28 was statistically significant at the 1% level.  *See, e.g.*, Gompers Dep. at 257:9-15 (agreeing that under both the Finnerty I and Finnerty II event studies, the price decline on June 28 was statistically significant at the 1% level).

[192]    *Affiliated Ute*, 406 U.S. at 153.

[193]    *Id.*

[194]    *Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 269 (S.D.N.Y. 2014) (quoting *Fogarazzo*, 232 F.R.D. at 186).

66

misrepresentations" does not necessarily "preclude [plaintiffs] from relying on the *Affiliated Ute* presumption."[195]  However, in cases where the omissions only "exacerbate[] the misleading nature of the affirmative statements," courts have held that *Affiliated Ute* does not apply.[196]  Even so, the distinction between a misstatement and an omission is often difficult to articulate.[197]

Defendants argue that because plaintiffs' claims are based on affirmative misstatements, and not omissions, the *Affiliated Ute* presumption does not apply.[198]  Plaintiffs argue that their claims involve both misrepresentations and omissions "with respect to Barclays' false LIBOR submissions and Diamond's conference call statements."[199]  Plaintiffs contend that defendants failed to disclose the "fact that the company was engaged in LIBOR manipulation."[200]  This gives

[195]   *Id.* at 270.

[196]   *Starr v. Georgeson S'holder, Inc.*, 412 F.3d 103, 109 n.5 (2d Cir. 2005).  *Accord Goodman v. Genworth Fin. Wealth Mgmt., Inc.*, 300 F.R.D. 90 (E.D.N.Y. 2014).

[197]   *See In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 48 (S.D.N.Y. 2013).

[198]   *See* Def. Mem. at 20-21.  Defendants cite to *Goodman v. Genworth Financial Wealth Management, Inc.*, which explains that even in cases where there are both misstatements and omissions, if the "positive statements are central to the alleged fraud . . . the *Affiliated Ute* presumption does not apply."  300 F.R.D. at 104.

[199]   Pl. Mem. at 23.

[200]   Tr. II at 239:8-11.

67

rise to two arguments.  The first is that these statements constitute omissions

because what makes them false is not what was said, but what was not said:

> Each LIBOR submission was truthful, as far as they go.  But what makes them misleading is what they do not say that in an effort to enhance the market's perception of Barclays' financial health, Defendants purposefully submitted false LIBOR rates but never informed investors of this fact.  Similarly, Diamond's conference call remarks were also omissions because the "heart" of their falsity was that "specific information was withheld" — namely, that Diamond had issued a directive to his subordinates to artificially lower LIBOR submissions.  Because Plaintiffs have primarily pled omissions claims and Defendants cannot establish that Plaintiffs did not rely on these omissions, reliance is also presumed under *Affiliated Ute*.[201]

The second, somewhat related argument, is that Diamond's statements gave rise to

a duty to disclose the manipulation.[202]  For these reasons, plaintiffs argue that they

are entitled to a presumption of reliance under both *Basic* and *Affiliated Ute*.[203]

Plaintiffs' first argument fails.  After careful review, I conclude that

this is not a case where any "alleged failure to disclose 'made the [statements]

---

[201]   Memorandum of Law in Further Support of  Plaintiffs' Motion for Class Certification ("Reply Mem.") at 13 (internal quotation marks and citations omitted).

[202]   *See* Tr. II at 243:1-4.  Diamond's statements on the conference call were that "we're categorically not paying higher rates in any currency" and (2) "we benefit in times of turmoil, so we post where we're transacting, and it's clearly not at high levels."  Complaint ¶ 108.

[203]   *See* Reply Mem. at 13.

themselves misleading.'"[204]  A comparison with *Fogarazzo* helps illustrate the difference between a case in which there are both affirmative statements (that may be entitled to the *Basic* presumption) and omissions (which are entitled to the *Affilated Ute* presumption) and the present case.  In *Fogarazzo* there were false analyst ratings, which were misstatements.  However, there was also an undisclosed relationship between the analysts and the companies they were analyzing.  That relationship was a potential conflict of interest that should have been disclosed but was not.  Thus, *Fogarazzo* involves (1) clear misstatements and (2) the omission of a material fact:  the conflict of interest.  By contrast, in the present case, there is just the false LIBOR reports and Diamond's false statement about the bank's borrowing costs, and no separate undisclosed matter such as a conflict of interest.  The "omissions" in this case are simply the truth — the correct LIBOR rate or that defendants had been falsifying that rate.  At most, defendants' failure to disclose that they were manipulating the LIBOR submissions only "exacerbated the misleading nature of the affirmative statements."[205]

Plaintiffs' second argument also fails.  Defendants rightly argue that a company does not have a duty to disclose that it is committing fraud and that there

---

[204]   *Goodman*, 300 F.R.D. at 105 (citing *Fogarazzo v. Lehman Brothers, Inc.*, 263 F.R.D. 90, 106 (S.D.N.Y. 2009)).

[205]   *Starr*, 412 F.3d at 109 n.5.  *Accord Goodman*, 300 F.R.D. 90.

was no material omission in this case.[206]  While the Second Circuit has yet to

decide whether the *Affiliated Ute* presumption of reliance applies in manipulation

cases and courts in this circuit are split on the issue, I am persuaded by the

rationale that "[i]f [] nondisclosure of a defendant's fraud was an actionable

omission, then every manipulative conduct case would become an omissions

case"[207] and that "[a]pplying the *Affiliated Ute* presumption in such cases, . . .

would risk . . . 'swallow[ing] the reliance requirement almost completely.'"[208]

      In short, the thrust of plaintiffs' allegations are that defendants'

statements were "materially false and misleading"[209] and there are no independent

---

[206]    *See* Tr. II at 295:5-9.

[207]    *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 941 (9th Cir. 2009).

[208]    *Joseph v. Wiles*, 223 F.3d 1155, 1163 (10th Cir. 2000)).  In *In re UBS Auction Rate Securities Litigation*, the court reached the issue and held that when a "'defendant [] engaged in conduct that amounts to 'market manipulation' under Rule 10b-5(a) or (c)," an independent duty to disclose was created.  *In re UBS Auction Rate Sec. Litig.*, No. 08 Civ. 2967, 2010 WL 2541166, at *26 (S.D.N.Y. June 10, 2010) (quoting *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 381 (S.D.N.Y. 2003)).  However, the claims in that case included other material omissions in addition to the failure to disclose manipulation.  Plaintiffs also claimed that defendants "fail[ed] to disclose [the] practice of seeking and obtaining [] waivers, as well as . . . to disclose the temporary nature of the waivers."  *Id.*  That is, "in large part, the claim consist[ed] of omissions[]."  *Id.*  Accordingly, the facts are distinguishable from the case at bar where plaintiffs' omissions claims revolve completely around the defendants' failure to disclose the alleged manipulation and do not include other actionable omissions.

[209]    Complaint ¶¶ 109, 173.

actionable omissions in this case.  Accordingly, the presumption of reliance set forth in *Affiliated Ute* does not apply.

### E.   Individualized Damages Issues Will Not Predominate

*Comcast Corp. v. Behrend* held that a model for determining damages must "measure damages resulting from the class's asserted theory of damages."[210] Relying on *Comcast*, defendants argue that plaintiffs have not shown that individualized damages issues will not predominate.[211]  Plaintiffs' theory of the case is that the false LIBOR submissions and Diamond's statements artificially maintained the stock price, and that this inflation was removed from the ADS price following the corrective disclosure on June 27, as reflected in the price change on June 28, 2012.  Consistent with this, Dr. Finnerty explained that he would use "the damages methodology [that he] customarily appl[ies, which]

> involves [ ] measuring the abnormal return on Barclays ADS on the correct[ive] disclosure date, in this case June 28, and then adjusting for any confounding news.  And I haven't done that yet. I have been asked to perform a loss causation analysis or damages analysis, but I would then parse out the [e]ffects of the confounding news, and then I would apply the constant dollar method to calculate the amount of inflation throughout the Class Period.[212]

---

[210]   *Roach*, 778 F.3d at 407 (interpreting *Comcast* narrowly).

[211]   Def. Mem. at 21-25.

[212]   Tr. I at 76:21-77:7.  *Accord* Finnerty II ¶¶ 106-108.

The constant dollar approach "assumes that the amount of the inflation per ADS is a constant dollar amount within each of the relevant time intervals during the Class Period."[213]  Defendants argue that this proposed method is flawed because plaintiffs have not shown "how purported price reactions in June 2012 provide an appropriate starting point for calculating damages on the claims still at issue"; "how they will isolate the incremental impact of LIBOR-related statements on Barclays' ADS in light of other information relating to Barclays' borrowing costs"; or "how they will account for variations in inflationary impact over time."[214]

Plaintiffs' model survives the minimal scrutiny required under *Comcast* and Rule 23(b)(3) — their theory of liability matches their theory of damages and individualized damages issues will not predominate.  As explained by the Second Circuit, *Comcast* "did not foreclose the possibility of class certification under Rule 23(b)(3) in cases involving individualized damages calculations."[215] While there are significant obstacles to proving damages in this case, plaintiffs' merits expert reports on damages and loss causation are not due until October 7, 2015, and plaintiffs are not required to demonstrate either loss causation or

---

[213]     Finnerty II ¶ 106(d).

[214]     Def. Mem. at 21-25. at 23-24.  *See also* Gompers II ¶¶ 157-178.

[215]     *Roach*, 778 F.3d at 401.

72

damages for purposes of class certification.[216]  In other words, whether plaintiffs will be able to prove loss causation or measure price impact — in this case, the inflationary impact of the false LIBOR disclosures and Diamond's statements — are questions that go to the merits and not whether common issues predominate.[217]

### F.    Appointment of Class Representatives Under Rule 23(a)(4) and Class Counsel Under Rule 23(g)

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."  This requirement is met if a plaintiff does not have interests antagonistic to those of the class, and if its chosen counsel is qualified, experienced, and able to conduct the litigation.[218]  Proposed Class Representatives are already representing the interests of the proposed Class and

---

[216]    Among other things, plaintiffs will have to address the argument that "any inflation directly associated with the market being misled about Barclays' financial condition through allegedly false LIBOR submissions, if it existed at all, would have dissipated as soon as Barclays started making accurate LIBOR submissions."  Gompers II ¶ 149.  They will also have to quantify the inflationary impact of the LIBOR submissions (and Diamond's statements) even though Dr. Finnerty previously "tested whether there was statistically significant reactions on those [LIBOR submission] day, and [ ] couldn't find any."  Tr. I at 153:1-2.

[217]    *See, e.g.*, *Betances v. Fischer*, 304 F.R.D. 416, 430-31 (S.D.N.Y. 2015) (holding that *Comcast* did not bar certification of a damages class even though plaintiffs "failed to provide the mathematical formula they intend[ed] to use to calculate damages on a class-wide basis"); *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 414 (S.D.N.Y. 2015) (stating that "nothing in *Comcast* requires an expert to perform his analyses at the class certification stage") (citing cases).

[218]    *See Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 290-91 (2d Cir. 1992).

have demonstrated their adequacy, assertiveness, and commitment to vigorously prosecute this action. The Pension Trust Fund and St. Clair each purchased thousands of Barclays ADS during the Class Period, and have actively supervised and monitored the progress of this litigation, and will continue to actively participate in its prosecution should they be appointed as Class Representatives. In addition, their interests are not antagonistic to those of the Class. Accordingly, I find that the interests of the absent Class members will be more than adequately protected by Lead Plaintiffs, and I hereby appoint them as Class Representatives.

Lead Plaintiffs have retained the law firm of Robbins Geller to represent them and the proposed Class in this matter. Courts within this Circuit have repeatedly found Robbins Geller to be adequate and well-qualified for the purpose of litigating class action lawsuits.[219] Thus, Robbins Geller is qualified, and, along with Lead Plaintiffs, will vigorously protect the interests of the Class. Accordingly, the adequacy requirement of Rule 23(a)(4) is satisfied, and I hereby appoint Robbins Geller as Class Counsel.

## VI. CONCLUSION

For the foregoing reasons, plaintiffs' motion for class certification is

---

[219] *See, e.g.*, *Billhofer*, 281 F.R.D. at 158; *Ellenburg v. JA Solar Holdings Co. Ltd.*, 262 F.R.D. 262, 268 (S.D.N.Y. 2009); *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 278 (S.D.N.Y. 2008); *Vanamringe v. Royal Grp. Techs., Ltd.*, 237 F.R.D. 55, 58 (S.D.N.Y. 2006).

GRANTED and defendants' motion to preclude plaintiffs' expert is DENIED.  The

Clerk of Court is directed to close these motions [Docket Nos. 135 and 157].

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            August 20, 2015

75

**-Appearances-**

**For Plaintiffs:**

Samuel Howard Rudman, Esq.
David Avi Rosenfeld, Esq.
Christopher Michael Barrett, Esq.
Michael G. Capeci, Esq.
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, NY 11747
(631) 367-7100

Joseph E. White III, Esq.
Maya Sexena, Esq.
Lester R. Hooker, Esq.
Saxena White P.A.
Boca Center, 5200 Town Center Circle, Suite 601
Boca Raton, FL 33431
(561) 394-3399

**For Defendants:**

Jeffrey T. Scott, Esq.
Brian T. Frawley, Esq.
Matthew Joseph Porpora, Esq.
Stephen H. O. Clarke, Esq.
Sullivan & Cromwell LLP
125 Broad St.
New York, NY 10004
(212) 558-4000

Jonathan D. Schiller, Esq.
Amos E. Friedland, Esq.
Boies Schiller & Flexner LLP
575 Lexington Avenue
New York, NY 10022

(212) 446-2300

Michael Brille, Esq.
Thomas Keenan, Esq.
Boies Schiller & Flexner LLP
5301 Wisconsin Avenue NW
Washington, D.C. 20015
(202) 237-2727

William Todd Thomas, Esq.
Boies Schiller & Flexner LLP
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
(954) 356-0011

Karen Paik, Esq.
Boies Schiller & Flexner LLP
401 Wilshire Blvd., Suite 850
Santa Monica, CA 90401
(310) 752-2400

Andrew J. Levander, Esq.
Jeffrey A. Brown, Esq.
Amanda Rios, Esq.
Dechert LLP
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3500